## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **LIBERIA GLOBAL MINING COMPANY**, ) | |
| ) | |
| Liberia Global Mining Company ) | |
| Attn: Rakesh Dikshit, Registered Agent ) | **JUDGE:** |
| First Merchant Bank Building ) | |
| Broad Street ) | |
| Monrovia ) | |
| Liberia,      **AND** ) | |
| ) | **CASE NO:** |
| **GLOBAL STEEL HOLDINGS, LTD.,** ) | |
| ) | |
| Global Steel Holdings Limited ) | |
| Murdock House, 1st floor ) | |
| North Shore Road ) | |
| Ramsey ) | |
| Isle of Man IM8 3DY ) | |
| United Kingdom ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | |
| ) | |
| **GOVERNMENT OF REPUBLIC OF** ) | |
| **LIBERIA** ) | |
| ) | |
| The Minister of Lands, Mines and Energy ) | |
| Ministry of Lands, Mines and Energy ) | |
| Monrovia ) | |
| Liberia ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |
| ) | |
| ) | |

## COMPLAINT

This Complaint is filed by the Liberia Global Mining Company ("Joint Venture" or "LGMC") and Global Steel Holdings, Inc. ("GSHL") (collectively "Plaintiffs") against the Government of the Republic of Liberia ("Government of Liberia" or "Defendant"), for a preliminary injunction in aid of an international arbitration before the International Centre for Settlement of Investment Disputes ("ICSID").

## PARTIES

1.      Plaintiff Global Steel Holdings, Limited ("GSHL") (formerly named Global Infrastructure Holdings Limited ("GIHL"))[1] is a company established and organized under the laws of the Isle of Man, United Kingdom, with its principal place of business in Dubai. GSHL is a global corporation operating and managing iron and steel production, as well as mining, metals and minerals, energy and infrastructure businesses around the world.

2.      Plaintiff Liberia Global Mining Company is a joint venture company formed on October 7, 2004 pursuant to a Mineral Development Agreement ("MDA") concluded between the Government of Liberia, GSHL, and LGMC on October 4, 2004. LGMC is jointly owned by Global Steel Holdings, Inc, (70% owner) and the Government of the Republic of Liberia (30% owner).

---

[1] Global Infrastructure Holdings, Ltd. is the same entity as Global Steel Holdings, Ltd. On March 4, 2005, the company filed a Certificate of Change of Name (attached as Exhibit __) formally changing its name to Global Steel Holdings, Ltd. for marketing and branding reasons. For convenience, throughout this complaint, the term "GSHL" will be used to refer to this entity, even though many of the underlying documents refer to by its previous name, "GIHL."

3.    Defendant Government of the Republic of Liberia is a foreign state as defined in 28 U.S.C § 1603(a) located in Western Africa.  It is party to the Mineral Development agreement that gives rise to Plaintiffs' claims.

## JURISDICTION

4.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1330(a) because this is a "nonjury civil action against a foreign state as defined in section 1603(a) of this title" from which the foreign state does not have immunity because the exceptions to foreign sovereign immunity set forth in 28 U.S.C. §§ 1605(a)(1) and (6) are satisfied.  Jurisdiction is also proper pursuant to 28 U.S.C. § 1331, as this case presents claims arising under the Federal Arbitration Act, 9 U.S.C. §§ 1-14, and the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.*

5.    This Court has personal jurisdiction over the Defendant pursuant to 28 U.S.C. § 1330(b), because the requirements of § 1330(a) are met.  Defendant is exempt from jurisdictional immunity pursuant to 28 U.S.C. §§ 1605(a)(1) and (6).

## VENUE

6.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f)(4), which expressly provides for venue in this Court for an action "brought against a foreign state."

3

## INTRODUCTION

This action seeks a preliminary injunction in aid of an international arbitration before the International Centre for Settlement of Investment Disputes ("ICSID"), located in Washington, D.C. The dispute arises out of a twenty-five year concession contract for exclusive rights to the development and mining of iron ore deposits in portions of Nimba and Grand Bassa counties in the Republic of Liberia. The contract, a Mineral Development Agreement ("MDA"), runs between Defendant Government of Liberia, on the one hand, and Plaintiff Global Steel Holdings Limited ("GSHL"), a United Kingdom-incorporated global mining and steel company, and Liberia Global Mining Company, a joint venture company owned by GSHL (70% owner) and the Government of Liberia (30% owner). The Government of Liberia breached this agreement by taking steps to award the very same mining concession to one of GSHL's competitors who had previously bid unsuccessfully for the concession.

On Friday, July 1, 2005, Plaintiffs filed a request for arbitration before ICSID pursuant to the arbitration clause of the MDA (attached as Exhibit 1). There are several procedural steps, however, that must take place before an ICSID Tribunal is constituted. Pursuant to the rules governing ICSID, the Secretary-General of ICSID reviews the request for arbitration and must make a determination whether or not to "register" the dispute prior to the constitution of any Tribunal. The Secretary's review is not subject to any specific time frame, as Rule 6 of ICSID's Institution Rules simply requires that this determination be made "as soon as possible." In practice, these determinations typically take several months. Once the dispute is registered, it can take another several months before the Tribunal is constituted. Given the procedural rules of ICSID, it could be approximately six months before an actual Tribunal is formed and able to entertain motions seeking provisional remedies or to consider the merits of

4

the case. Accordingly, Plaintiffs seek the assistance of this Court, pursuant to its powers under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, to preserve the status quo in aid of arbitration pending the registration and constitution of the ICSID Tribunal.

## GENERAL ALLEGATIONS

### The Contract Between the Parties

7.    On November 28, 2003, a Memorandum of Understanding ("MOU") was signed between GSHL, and the Government of the Republic of Liberia. The MOU, among other things, provided for a 160-day period of exclusivity, during which GSHL would conduct pre-feasibility studies of the iron ore deposits and existing infrastructure associated with the specified mines and mineral deposits. The MOU anticipated that, based on such studies, the parties would determine whether to proceed to enter into a detailed agreement under which a joint venture would be formed between the Government of Liberia and Plaintiff GSHL as concessionaire to develop those resources.

8.    The term of the MOU was extended by agreement for three additional months, and the parties successfully carried out the obligations set forth in that agreement. GSHL engaged international consultants and carried out a scoping (pre-feasibility) study of the mines and infrastructure, and decided to move forward with the project. Accordingly, on August 4, 2004, GSHL notified the Government of Liberia that it wished to move forward with a joint venture agreement as contemplated in the MOU, and attached a corresponding proposal.

9.    The Government of Liberia's inter-ministerial Mineral Technical Committee ("the Committee"), which included, *inter alia,* representatives of the Ministry of

Land, Mines and Energy, the Ministry of Finance, the Ministry of Labor, and the Ministry of , Justice, convened in August 2004 to consider GSHL's proposal. After careful consideration, the Committee recommended to LIMINCO's[2] Board of Directors that it should pursue negotiations for a concession agreement with GSHL. On August 27, 2004, the LIMINCO Board of Directors adopted that recommendation, and authorized the Committee to negotiate a Mineral Development Agreement ("MDA") with GSHL.

10.    Negotiation of the MDA ensued, and on October 4, 2004, the parties reached a final, binding agreement. The terms of that binding agreement were set forth in the MDA, which among other things conferred on Plaintiffs the exclusive rights for the exploration, development, production and marketing of iron ore of the Concession area as defined in the MDA. Pending the formality of signing the document, both parties immediately began performing their mutual obligations pursuant to and in reliance on the MDA.

11.    To carry out its various obligations under the MDA and specifically pursuant to Article V of the MDA, GSHL on LGMC's behalf lined up experts and consultants to undertake advanced exploration and feasibility studies. Pursuant to Articles V and XX of the MDA, GSHL deployed a number of its in-house experts to Monrovia, including mining, geology, railway and port handling managers. Pursuant to Article X, Section 3 of the MDA, GSHL hired some 250 workers in the area of the mine to provide security against looting and scrapping of materials and also to begin clearing the railway lines, port and mining facilities.

---

[2] LIMINCO is an enterprise owned and controlled by the Government of Liberia that is tasked with the management of iron ore mining rights for the concession that is the subject of this dispute.

GSHL has expended well over US $465,000, not counting employee salaries, since October 2004 in carrying out its obligations under the MDA.

12.    The Government of Liberia also acted pursuant to its obligations under the MDA. Specifically, as provided for in Article XVI, Section 1 of the MDA, the Minister of Justice and Attorney General acted to incorporate the Liberia Global Mining Company, the Joint Venture company contemplated in the MOU and required under the MDA. On October 5, 2004, the Government of Liberia through the Minister of Justice and Attorney General executed the LGMC Articles of Incorporation.    On October 7, 2004, they filed the Articles of Incorporation with the Minister of Foreign Affairs.    These acts fulfilled obligations arising solely under the MDA.

13.    In addition, as required under Article IX of the MDA, authorities of the Government of Liberia assisted GSHL representatives in obtaining access to the concession area for on-site visits and work, and, as provided under Article XII of the MDA, the Government of Liberia granted permits for GSHL expatriates to travel to and work in Liberia on the concession. The Government of Liberia authorized GSHL to employ local workers to provide security at the sites, consistent with Article X, Section 3 of the MDA.

### Liberia's Breach of Contract

14.    After the Parties' agreement was reached and in response to high-level political pressure, the Government of Liberia purported to re-open the bidding process by soliciting new bids for the same mining concession that was the subject of the existing MDA between the Parties. Specifically, in December 2004, the Ministry of Lands, Mines and Energy published a general Request for Proposals for mining projects in Liberia.

7

15.    Concerned that the Government of Liberia was pursuing a course of action inconsistent with the Parties' agreement, GSHL immediately sought confirmation that the agreement embodied in the MDA was still in place. In response, GSHL received repeated assurances, both orally and in writing, from the Government of Liberia, that this "re-opening" of the process was a mere formality in response to political pressure, but that GSHL would remain the party to the Joint Venture and 70% owner of the concession.

16.    For example, GSHL received confirmation of the binding nature of the parties agreement by letter dated October 14, 2004 from the Chairman of the Republic of Liberia's National Investment Commission, Roosevelt K. Quiah. In this letter, whose subject line reads "Consent and Approval to Mineral Development Agreement between the Government of Liberia and GIHL/LGMC," Chairman Quiah represents, "[o]n behalf of the Government of the Republic of Liberia," that the letter "constitutes approval and consent to the execution of the Mineral Development Agreement," and that it also "constitutes permission to GIHL . . . to proceed with the performance of the works and obligations envisaged . . . pending formal signing of the Mineral Development Agreement."

17.    On December 15, 2004, after the re-opening of the bidding process, the Government of Liberia sent a notarized letter to GSHL and the Liberian Global Mining Company that again "reaffirmed" the approval and consent of the MDA and reiterated the "authorization" and "permission" of GSHL to "proceed with the performance of the works and obligations envisaged ... pending formal signing of the Mineral Development Agreement."

18.    Despite Liberia's clear and repeated assurances that GSHL had concluded an MDA on which it could, should, and did rely, the Government of Liberia subsequently took

8

steps to award the same mining concession that is the subject of GSHL's MDA to one of GSHL's primary competitors.

19.    An inter-ministerial Mineral Technical Committee meeting was convened on March 29, 2005 to consider the proposals of the respective bidders in the re-opened bidding process that had begun the previous fall and which GIHL had been repeatedly assured was merely a formality. At this meeting, GIHL's proposal again received the highest score from the Committee, and its intention to proceed with the MDA was confirmed.

20.    The public announcement of the Committee's assessment was unaccountably delayed—until April 6, 2005, when the Ministry of Lands, Mines and Energy informed Chairman Bryant, the head of Liberia's National Transitional Government, that the U.S.-supported competitor of GIHL, instead of GIHL, was "the company selected [to receive the concession] based on the evaluation criteria as established by the members of the Technical Committee" and that "the Committee awaits your further instruction to commence negotiation" with that competitor for the same concession area already covered by GIHL and LGMC's MDA. That competitor was one of the previously unsuccessful original applicants for the concession, whose bid was supported by the U.S. Ambassador to Liberia.

21.    Multiple members of the Mineral Technical Committee have publicly testified that this abrupt about-face occurred because they were pressured by Chairman Bryant and other senior officials to change the results of their assessment arbitrarily in favor of GIHL's competitor. In the words of one Committee member, the reversal of the scores occurred "because Chairman Bryant and the US Embassy want [the competitor] to be the successful bidder for the award of a Mineral Development Agreement." Another explained that "[t]he

9

Minister [of Lands, Mines and Energy]...advised that the Americans would waive 80% of its Liberian debt if [GIHL's competitor] was given the project."

22.     On April 11, 2005, Chairman Bryant instructed the Minister of Lands, Mines and Energy to proceed with negotiations with GIHL's competitor. When the Liberian courts thereafter issued emergency orders purporting to stay any action by the Republic to reach such an agreement, negotiations proceeded in open defiance of those injunctions. Reports from Liberia indicate that the Republic may conclude an MDA with GIHL's competitor at any moment. Both Liberia and GSHL's competitor have boasted publicly in recent days that the mineral concession belongs to GSHL's competitor. Indeed, GSHL's competitor has recently taken out full page advertisements and been quoted in major Liberian newspapers stating emphatically that the concession was awarded to it.

23.     Absent an Order from this Court directing the Government of Liberia and other parties in active participation with it to refrain from taking any actions to transfer GSHL's rights under the Mineral Development Agreement until the ICSID Tribunal is constituted, sources in Liberia report that a Mineral Development Agreement will be concluded in short order between the Government of Liberia and GSHL's competitor. Immediately thereafter, the Government of Liberia will issue a Class A Mining License to GSHL's competitor. Within weeks, Global Steel's competitor will likely begin occupying the mine area and exercising exclusive control over features of the public infrastructure, including railways and port facilities, that are necessary to make productive use of the mining concession.

24.     Liberia is thus proceeding to award the same iron ore concession governed by the MDA to a GSHL competitor and depriving LGMC and GSHL of their rights under the MDA to that concession. Liberia not only has breached but has outright repudiated the MDA.

25.     The Government of Liberia's current actions in negotiating an MDA with GSHL's competitor have been singled out for criticism in a recent report to the U.N. Security Council, as they manifest a flagrant disregard for the process of law. The Report to the Security Council cites the Liberian government for its "open defiance of a Supreme Court stay order [by approving] a proposal to award [the] concession to [GSHL's competitor]."

26.     There is, in any event, little reason to have confidence in the ability of the Liberian judicial system to have any beneficial impact in this dispute. Apart from this Government's demonstrated willingness to disregard the orders of Liberian Courts, the Liberian Courts are subject to significant interferences from the national Government of Liberia and other forms of improper or corrupt influence. Upon information and belief, the Government of Liberia will take orders from international arbitral tribunals and/or the Courts of the United States far more seriously than they will orders from domestic courts.

**Arbitration**

27.     On Friday, July 1, 2005, Plaintiffs filed a request for arbitration before ICSID pursuant to the arbitration clause in the MDA.

28.     Should that request be registered and a Tribunal constituted, GSHL intends to seek provisional remedies as permitted under ICSID's rules and regulations. Such remedies will include an order directing the Government of Liberia to refrain from any and all

11

actions inconsistent with the validity and enforceability of the MDA, including but not limited to any steps to divest GSHL of its rights under the MDA or to award rights to the concession area to GSHL's competitor.

29.    Absent such interim relief, GSHL will be irreparably harmed, and the Tribunal will be deprived of the ability to give meaningful consideration to GSHL's request for declaratory relief and specific performance of the MDA, which constitute the primary forms of final relief sought in the arbitration.

30.    Due to preliminary procedural steps required under ICSID Rules, however, a period of up to six months may elapse before the ICSID Tribunal itself is prepared to consider GSHL''s request for provisional remedies.

31.    Specifically, the Secretary-General of ICSID must first review the request for arbitration and make a determination whether or not to "register" the dispute.    The Secretary's review is not subject to any specific time frame as the rule simply requires that this determination be made "as soon as possible."    In practice, these determinations typically take several months.    Once the dispute is registered, it can take another several months before arbitrators are appointed and the Tribunal is constituted.

32.    During this period of time, GSHL seeks the assistance of this Court, pursuant to its powers under the Federal Arbitration Act, to issue a temporary injunction to preserve the status quo.    Such assistance is necessary in aid of ICSID's jurisdiction in order to ensure that it has an adequate opportunity to consider registration of the dispute, to constitute a Tribunal, and to consider GSHL's request for provisional remedies.

33.    Absent such relief, the Government of Liberia and GSHL's competitor will take steps to irretrievably deprive ICSID of its ability to enter a meaningful judgment on the merits. Upon information and belief, the Government of Liberia will shortly proceed to conclude an MDA with GSHL's competitor, award it a mineral license, allow it to physically occupy the mines and related infrastructure, and protect that occupation with military force, thus rendering the ICSID Tribunal powerless to order meaningful specific relief of the kind GSHL intends to seek.

## CAUSES OF ACTION

### First Cause of Action: Breach of Contract

34.    The allegations of the preceding paragraphs are incorporated herein as if fully set forth.

35.    The Mineral Development Agreement between the Government of Liberia, GSHL, and LGMC constitutes a valid, binding, and enforceable agreement. Both parties intended to be bound by the terms of the MDA even though neither party went through the formality of signing the MDA.

36.    In reliance on the mutual promises made in the MDA, the Parties immediately took steps pursuant to the obligations set forth in the MDA. GSHL altered its business position and expended considerable sums of money in reliance on Liberia's repeated assurances that the contract was final and valid.

37.    Despite the existence of a clear and binding agreement and the steps both Parties were taking in reliance on and pursuant to the MDA, the Government of Liberia

13

breached its agreement by taking steps to award the very same mining concession that was the subject of its MDA with GSHL to one of GSHL's competitors.

38.    As a direct and proximate result of the Government of Liberia's conduct, the Government of Liberia has caused and will continue to cause irreparable injury to GSHL. The Government of Liberia's breach cannot be properly or fully remedied by money damages but only by an award of specific performance.

### Second Cause of Action

### Temporary Injunction in Aid of Arbitration Under the Federal Arbitration Act

39.    The allegations of the preceding paragraphs are incorporated herein as if fully set forth.

40.    Plaintiffs' contract with the Government of Liberia entitles it to rights in a unique asset, including finite mineral resources and access to government-controlled national infrastructure, including port and railway facilities.  Ongoing efforts by the Government of Liberia to assign GSHL's rights under its MDA to a competitor company will, if consummated, make it impossible for GSHL to obtain meaningful specific relief from the ICSID Tribunal. Plaintiff will therefore suffer irreparable harm absent an injunction to preserve the status quo pending the registration of the ICSID arbitration, constitution of the Tribunal, and consideration of provisional remedies.

41.    Plaintiff has a substantial likelihood of success on the merits before the ICSID Tribunal.  The parties have a binding, enforceable agreement, the terms of which were clearly set forth in the MDA.  Despite the binding agreement and the steps both parties took pursuant to their obligations to that binding agreement, the Government of Liberia has now

14

purported to award the very same mining concession to GIHL's competitor, which constitutes a breach of the MDA.

42.    It is in the public interest to enable the parties, pursuant to their agreement, to have a meaningful arbitration before ICSID.    Absent preservation of the status quo, significant, irretrievable damage will occur prior to ICSID's ability to hear and adjudicate the merits of the dispute and will thus render the ICSID arbitration a hollow exercise.

43.    The balance of the hardships favors the Plaintiffs.

44.    Absent this Court's issuance of a preliminary injunction preserving the status quo, GSHL will have no other recourse for the approximately six months before the constitution of the ICSID Tribunal but to continue to seek assistance from the Liberian courts, whose orders have already been routinely disregarded in this matter and which, it is widely believed, are susceptible to improper influences of various kinds that make an outcome adverse to GSHL a foregone conclusion.    As noted in a June 13, 2005 article in the Liberian press, "It appears that rule of law during the transitional period may never take root as the Chairman Gyude Bryant is now apparently ignoring the Supreme Court orders...."

**WHEREFORE**, Plaintiffs request:

(1) a temporary injunction, until such time as the ICSID Tribunal is constituted and can decide whether to institute provisional measures, directing the Government of Liberia and all other parties who are acting in concert or participation with the Government of Liberia and have actual notice thereof:

(a) to take no steps to take or transfer title, ownership, custody, or control of the mining concession that is the subject of Plaintiffs' MDA,

(b) to take no steps to waste the assets of or associated with the mining concession and mining rights under Plaintiffs' MDA, and

(c) to take no other actions that would alter the status quo with respect to the assets that are the subject of Plaintiffs' MDA in such a manner as to impair, impede, or affect Plaintiffs' ability to secure a full and fair consideration of Plaintiffs' claims before ICSID.

(2) such other provisional and further relief as the Court deems equitable, proper, and just.

Respectfully submitted,

Bradford A. Berenson (D.C. Bar No. 441981)
Brandi Feingold (D.C. Bar No. 482759)
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000 (Phone)
(202) 736-8711 (Fax)

Counsel for Plaintiffs Global Steel Holdings, Ltd.
and Liberia Global Mining Company

Dated: July 5, 2005