## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LIBERIA GLOBAL MINING COMPANY,** ) | |
| ) | |
| **AND** ) | **JUDGE:** |
| ) | |
| **GLOBAL STEEL HOLDINGS, LTD.** ) | **CASE NO:** |
| ) | |
| ) | **HEARING REQUESTED** |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | |
| ) | |
| **GOVERNMENT OF REPUBLIC OF** ) | |
| **LIBERIA** ) | |
| ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |
| ) | |

## APPLICATION OF PLAINTIFFS LIBERIA GLOBAL MINING COMPANY AND GLOBAL STEEL HOLDINGS LIMITED FOR PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and Local Rule 65.1,

Plaintiffs Liberia Global Mining Company ("LGMC") and Global Steel Holdings, Ltd.

("GSHL") [1] respectfully request that this Court issue a preliminary injunction in aid of arbitration

---

[1] On March 4, 2005, Global Steel Holdings, Ltd. formally changed its name from Global Infrastructure Holdings, Ltd., to Global Steel Holdings, Ltd. for marketing and branding reasons. *See* Certificate of Change of Name (attached as Exhibit 1 to Declaration of Rakesh Dikshit ("Dikshit Decl.) (attached as Exhibit A). Global Infrastructure Holdings, Ltd. is the name that appears in the documents attached hereto as exhibits. For convenience, both plaintiffs will hereafter collectively be referred to as "GSHL."

before the International Centre for Settlement of Investment Disputes ("ICSID").  On July 1,

2005, Plaintiff GSHL filed a request for arbitration with ICSID, pursuant to GSHL's agreement

with the Government of Liberia to submit any disputes regarding a Mineral Development

Agreement ("MDA") concluded between them to ICSID for adjudication of the merits.  Upon

ICSID's registration of the dispute and constitution of an ICSID Tribunal, GSHL intends to seek

provisional remedies directly from ICSID.  *See* ICSID Arb. R. 39.  However, it could take

approximately six months before an ICSID Tribunal is constituted and prepared to consider and

act on such a request.  Accordingly, GSHL seeks a preliminary injunction from this Court to

preserve the status quo pending ICSID's registration of the dispute, constitution of a Tribunal,

and issuance of its own provisional measures.

Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1-16, this Court has the

authority to issue an injunction in aid of arbitration in disputes of this kind.  Moreover, GSHL

meets the substantive standards entitling it to a preliminary injunction.  Finally, the Government

of Liberia does not enjoy sovereign immunity in this context because both the arbitration

exception under 28 U.S.C. 1605(a)(6) and the waiver exception under 28 U.S.C. 1605(a)(1) of

the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, apply in this case, *see*

*infra* at 20-24.

## INTRODUCTION AND STATEMENT OF FACTS

This action seeks a preliminary injunction in aid of an international arbitration

before the International Centre for Settlement of Investment Disputes ("ICSID").  The dispute

arises out of a twenty-five year contract for exclusive rights to develop and mine iron ore in

portions of Nimba and Grand Bassa counties in the Republic of Liberia.  *See* Dikshit Decl. ¶ 14

and Exhibit 2 thereto.  The contract, a Mineral Development Agreement ("MDA") (attached as

Exhibit 2 to Dikshit Decl.), runs between Defendant Government of Liberia, on the one hand, and Plaintiff Global Steel Holdings Limited ("GSHL"), a United Kingdom-incorporated global mining and steel company, and Liberia Global Mining Company ("LGMC"), a joint venture co-owned by GSHL (as 70% owner) and the Government of Liberia (as 30% owner), on the other.

**Negotiation and conclusion of the Mineral Development Agreement.** Prior to entering into the MDA, Plaintiff GSHL and Defendant Government of Liberia signed a Memorandum of Understanding ("MOU") on November 28, 2003. *See* MOU (attached as Exhibit 3 to Dikshit Decl.). The MOU, among other things, provided for a 160-day period of exclusivity, during which GSHL would conduct pre-feasibility studies of the iron ore deposits and existing infrastructure. *Id.* at 4. The MOU anticipated that, based on such studies, the parties would determine whether to proceed to enter into a detailed agreement under which a joint venture between the Government of Liberia and Plaintiff GSHL would be formed to develop those resources. *Id.* The term of the MOU was extended by agreement for three additional months, and the parties successfully carried out the obligations set forth in that agreement. Plaintiff GSHL engaged international consultants and carried out a scoping (*i.e.*, pre-feasibility) study of the mines and infrastructure, decided to proceed with the project, and accordingly, on August 4, 2004, GSHL notified the Government of Liberia that it wished to move forward with a joint venture agreement as contemplated in the MOU, and attached a corresponding proposal. *See* August 4, 2004 Letter (attached as Exhibit 4 to Dikshit Decl.).

In response, the Government of Liberia's Mineral Technical Committee, the inter-ministerial body responsible for evaluating such proposals, recommended to the Board of

Directors of LIMINCO[2] that it should pursue negotiations for a concession agreement with Plaintiff GSHL after considering several competing proposals. *See* August 30, 2004 Letter (attached as Exhibit 5 to Dikshit Decl.). On August 27, 2004, the LIMINCO Board of Directors adopted that recommendation, and authorized the Committee to negotiate an MDA with GSHL. *Id.* Negotiations "proceeded to a successful conclusion," and on October 4, 2004, the parties reached a final, binding agreement, the terms of which were set forth in the MDA. *See* October 4, 2004 Letter (attached as Exhibit 6 to Dikshit Decl.). The MDA identifies Defendant Government of Liberia and Plaintiff GSHL as "the Parties hereto" and specifies detailed contractual obligations for each of them. *See* Exhibit 2 to Dikshit Decl. at 1. The MDA also obligates Plaintiff GSHL and Defendant Government of Liberia to form LGMC, a joint venture 70% owned by GSHL and 30% owned by the Government of Liberia, to serve as the "Concessionaire." *Id.* at 13. The MDA is therefore also styled as an agreement between Defendant Government of Liberia and Plaintiff LGMC.

**Performance of the MDA.** The parties immediately began performing their mutual obligations pursuant to and in reliance on the MDA although they had not gone through the formalities associated with signing and ratification of the document. *See* Dikshit Decl. ¶¶ 15, 16. To carry out its various obligations under the MDA and specifically pursuant to Article V of the MDA, Plaintiff GSHL on LGMC's behalf lined up experts and consultants to undertake advanced exploration and feasibility studies. *See* Dikshit Decl. ¶ 15. Pursuant to Articles V and XX of the MDA, GSHL sent a number of its in-house experts to Monrovia, including mining, geology, railway and port handling managers. *See id.* Pursuant to Article X, Section 3 of the

---

[2] LIMINCO is a parastatal enterprise owned and controlled by the Government of Liberia that is tasked with the management of iron ore mining rights for the concession that is the subject of this dispute. *See* Dikshit Decl. ¶ 14.

MDA, GSHL hired some 150 workers in the area of the mine to provide security against looting and scrapping of materials and also to begin clearing the railway lines, port and mining facilities. *Id.* Plaintiff GSHL has expended over US $465,000 since October 2004 in carrying out the MDA. *Id.*

The Government of Liberia also began performing its obligations under the MDA. *See* Dikshit Decl. ¶ 16. Specifically, as provided for in Article XVI, Section 1 of the MDA, the Minister of Justice and Attorney General acted to incorporate the LGMC, the Joint Venture company contemplated in the MOU and required under the MDA. *Id.* On October 5, 2004, the Government of Liberia through the Minister of Justice and Attorney General executed the LGMC Articles of Incorporation. *Id.* On October 7, 2004, they filed the Articles of Incorporation with the Minister of Foreign Affairs. *See* Articles of Incorporation (attached as Exhibit 7 to Dikshit Decl.).

In addition, as required under Article IX of the MDA, authorities of the Government of Liberia assisted GSHL representatives in obtaining access to the concession area for on-site visits and work. *See* Dikshit Decl. ¶ 16. As provided under Article XII of the MDA, the Government of Liberia allowed GSHL expatriates to travel to Liberia on the concession. *Id.* The Government of Liberia also authorized GSHL to employ local workers to provide security at the sites, consistent with Article X, Section 3 of the MDA. *Id.*

Moreover, the Government of Liberia repeatedly affirmed, orally and in writing, that the MDA was effective and binding and expressly directed GSHL to proceed with performance under it. On October 14, 2004, the Chairman of the Government of Liberia's National Investment Commission wrote to Plaintiff GSHL, Provider Limited (Plaintiff GSHL's introducing broker), and LGMC, directing them to commence work. *See* October 14, 2004

Letter (attached as Exhibit 8 to Dikshit Decl.). He stated that, while the MDA was still to be formally executed, "[o]n behalf of the Government of the Republic of Liberia and its agencies and instrumentalities, this communication constitutes approval and consent to execution of the Mineral Development Agreement as negotiated with the Technical Committee of Liberia." *Id.* On December 15, 2004, the Chairman sent another letter, noting that the MDA was to be signed before January 14, 2005, and confirming that the letter "constitute[d] the re-affirmation, approval and consent to the execution of the [MDA] as negotiated with the Technical Committee of Liberia" and again providing "permission to GSHL ... to proceed with the performance of the works and obligations envisaged" in the MDA. *See* December 15, 2004 Letter (attached as Exhibit 9 to Dikshit Decl.).

        **Liberia's breach of the MDA.** Despite repeatedly affirming the MDA and directing GSHL to proceed to perform under it, the Government of Liberia has now breached the MDA. *See* Dikshit Decl. ¶ 18. Specifically, the Government of Liberia has deprived GSHL of its rights to the concession and taken steps to award the same concession to one of its principal competitors. *Id.* Shortly after the conclusion of the MDA negotiations between GSHL and the inter-ministerial Mineral Technical Committee, Mr. Bryant, the Chairman of the Government of Liberia's National Transitional Government, began pressing LIMINCO, the Ministry of Lands, Mines and Energy, and the Mineral Technical Committee to initiate a new, alternative process for awarding iron ore mining rights. *See* Exhibits 16 and 17 to Exhibit B. The Chairman's intercession, which met with vigorous protest from the Mineral Technical Committee, came after an intervention by the United States Ambassador to Liberia, apparently in support of a competitor of GSHL that was one of the previously unsuccessful original applicants for the concession. *Id.* Indeed, GSHL previously competed with this third party for the concession,

received higher scores, and won the bid, but the scores were subsequently changed due to the intense political pressure. *Id.*

Absent a Court Order, a Mineral Development Agreement will be concluded in short order between the Government of Liberia and GSHL's competitor. *See* Dikshit Decl. ¶ 19. Immediately thereafter, the Government of Liberia will issue a Class A Mining License to GSHL's competitor. *Id.* Accordingly, within weeks, GSHL's competitor will likely begin occupying the mine area and making full use of the associated public infrastructure. Once Global Steel's competitor takes physical custody and control over the mining area – a unique asset – the damage to Global Steel's business and to its ability to fully and adequately protect its rights under the MDA will be irretrievable. *Id.* ¶ 20.

**GSHL's request for arbitration before ICSID.** The MDA contains an arbitration clause which provides, in part, that the parties agree to resolve the merits of any dispute regarding the formation, validity, and breach of their agreement in an ICSID arbitration.[3] *See* Exhibit 2 to Dikshit Decl. at 24-25. Accordingly, on July 1, 2005 GSHL filed a request for arbitration before ICSID. *See* Request for Arbitration (attached as Exhibit B). That request seeks as the primary form of relief specific performance of the MDA by the Government of Liberia. *See* Exhibit B at 18-19. Immediately upon constitution of the Tribunal, GSHL will

---

[3]    ICSID was established under the Convention on the Settlement of Investment Disputes between States and Nationals of Other States ("Convention"), Mar. 18, 1965, 17 U.S.T. 1270, T.IA.S. No. 6090, which came into effect on October 14, 1966. Pursuant to the Convention, ICSID provides facilities for the conciliation and arbitration of disputes between member countries and investors who qualify as nationals of other member countries. ICSID's headquarters are in Washington, D.C., and the parties in this case have agreed to arbitration before ICSID in Washington, D.C. The Government of Liberia signed the Convention on September 3, 1965 and it became effective on July 16, 1970. The United Kingdom signed the Convention on August 27, 1965 and it became effective on October 14, 1966.

request that ICSID issue provisional measures to prevent the Government of Liberia from taking any acts in contravention of GSHL's rights pursuant to the Parties' agreement under the MDA.

Prior to the constitution of an ICSID Tribunal, however, there are several procedural steps that must take place. Pursuant to the rules governing ICSID, the Secretary-General of ICSID reviews the request for arbitration and must make a determination whether or not to "register" the dispute prior to the constitution of any Tribunal. *See* ICSID Arb. R. 6. The Secretary's review is not subject to any specific time frame as the rule simply requires that this determination be made "as soon as possible." *See* ICSID Arb. R. 1. In practice, these determinations may take several months. *See* Declaration of Stanimir A. Alexandrov ("Alexandrov Decl.") (attached as Exhibit C) ¶ 3. Once the dispute is registered, it can take another several months before the Tribunal is constituted. *See id.* ¶ 4. Given these procedures, it is reasonable to expect that it may take approximately six months before an actual Tribunal is formed and empowered to consider requests for provisional remedies.

Accordingly, GSHL seeks the assistance of this Court, pursuant to its powers under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, to preserve the status quo pending the registration of the arbitration request and constitution of the ICSID Tribunal. Because GSHL will seek provisional remedies directly from ICSID once the Tribunal is constituted, GSHL seeks only a temporary injunction from this Court preserving the status quo for the period during which ICSID deliberates regarding registration of the dispute, constitution of the Tribunal, and the issuance of provisional remedies. Absent such temporary injunctive relief, GSHL's ability to obtain meaningful relief from ICSID will be irrevocably compromised, as physical control over the particular mineral deposits that are the subject of the MDA will be transferred to a

competitor, and associated public infrastructure, including railway lines and dock facilities, will be placed at the disposal of that competitor, with GSHL and others excluded by force.

## ARGUMENT

I.    **THIS COURT HAS AUTHORITY TO ISSUE A PRELIMINARY INJUNCTION IN AID OF AN ICSID ARBITRATION.**

A.    **This Court has authority to issue an injunction in aid of arbitration.**

This Court has the authority to issue a preliminary injunction to preserve the status quo in aid of arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1-16. In *Morgan Stanley D.W. Inc. v. Rothe*, 150 F. Supp. 2d 67 (D.D.C. 2001), for example, the plaintiff obtained preliminary injunctive relief from this Court to prevent a former broker from soliciting clients pursuant to a noncompete agreement pending arbitration under the auspices of the National Association of Security Dealers.  150 F. Supp. 2d 67, 68-69 (D.D.C. 2001).  The Court found that while "an arbitration hearing will be the appropriate forum in which to mediate the details of the dispute, *this court is the appropriate forum to determine whether the defendant's alleged breach of his contract justifies granting the plaintiff a temporary restraining order.*"  *Id.* at 80  (emphasis added).  Accordingly, the Court ordered the "return to the status quo."  *Id.*

It is often the case that, absent a federal court's ability to issue a preliminary injunction to preserve the status quo, the "arbitration process would be a hollow formality where the "arbitral award when rendered could not return the parties substantially to the status quo ante."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1050 (4th Cir. 1985) (internal citation omitted).  Every Circuit Court to have considered this issue, save one, agrees.  *See, e.g., Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1380

(6th Cir. 1995) (finding that "grant of preliminary injunctive relief pending arbitration is particularly appropriate ... where the withholding [of such] relief would render the process of arbitration meaningless or a hollow formality" where the arbitral award when issued could not return the parties "substantially to the status quo ante") (internal citations omitted).[4]

**B.    This Court's authority to issue a preliminary injunction in aid of arbitration applies to international arbitrations, including those against foreign states under ICSID.**

The Court's authority to issue preliminary injunctions in aid of arbitration applies with equal force in the context of international arbitrations. *See, e.g., Sauer-Getriebe KG v. White Hydraulics, Inc.*, 715 F.2d 348, 349 (7th Cir. 1983) (finding injunctive relief proper pending an international arbitration before the International Commerce Commission, which would adjudicate the validity of a contract between a West German limited partnership and an Indian corporation). Indeed, Congress rendered the provisions of the FAA expressly applicable to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, a Convention exclusively applicable to international arbitrations. *See* 9 U.S.C. § 208.

The court's authority under the FAA also extends to international arbitrations against foreign sovereigns. Section 15 of the FAA expressly contemplates as much. That

---

[4] *See also Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 812 (3rd Cir. 1989) (finding that "district court has the authority to grant injunctive relief in an arbitrable dispute"); *PMS Distrib. Co. v. Huber & Suhner A.G.*, 863 F.2d 639, 642 (9th Cir. 1988) ("The fact that a dispute is arbitrable ... does not strip [the Court's] authority to grant [relief] pending the outcome of the arbitration so long as the criteria for such [relief] are met"); *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 51 (1st Cir. 1986) (finding that "congressional desire to enforce arbitration agreements would frequently be frustrated if the courts were precluded from issuing preliminary injunctive relief to preserve the status quo pending arbitration and, *ipso facto*, the meaningfulness of the arbitration process"); *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125 (2d Cir. 1984) ("The fact that a dispute is to be arbitrated ... does not absolve the court of its obligation to consider the merits of a requested preliminary injunction."); *but see Merrill Lynch, Pierce, Fenner & Smith v. Hovey*, 726 F.2d 1286 (8th Cir. 1984) (holding that district court abused its discretion in granting injunctive relief).

section provides for the "[i]napplicability of the Act of State doctrine," a doctrine relevant only to the validity of the official actions of a foreign state. *See* 9 U.S.C. § 15; *see also Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964) (explaining the act of state doctrine).

Moreover, in the enabling legislation for ICSID, Congress specifically made clear its intention to apply the provisions and authorities of the federal courts under the FAA to ICSID arbitrations prior to award. In that legislation, Congress provided that the FAA would not apply to the *enforcement* of an arbitral award made under ICSID. *See* 22 U.S.C. § 1650a. By unmistakable negative implication, therefore, the authorities of the FAA *do* apply at other stages of ICSID proceedings such as the pre-registration stage at issue here. If the FAA did not apply to ICSID arbitrations at all, there would be no need to pass a statute specifically exempting its application at the enforcement stage. 2A N. Singer, Sutherland Statutes & Statutory Construction § 47:23 (6th ed. 1992) ("The enumeration of exclusions from the operations of a statute indicates that the statute should apply to all cases not specifically excluded.").

Accordingly, this Court has the authority and, indeed, the obligation, *see Roso-Lino Beverage Distribs., Inc.*, 749 F.2d at 125, to issue a preliminary injunction to preserve the status quo in aid of the ICSID arbitration until such time as the ICSID Tribunal is constituted and can issue its own provisional remedies pending adjudication on the merits. To preserve GSHL's ability to seek meaningful relief before the arbitral tribunal chosen by the parties, this Court should exercise its authority as it did in *Morgan Stanley*, to preserve the status quo pending the constitution of the ICSID Tribunal. Such an order is critical where, as here, the temporary unavailability of provisional remedies from ICSID will render the ICSID arbitration a "meaningless" and "hollow formality" if the arbitrators' powers are not supplemented by the powers of this Court under the FAA. *See, e.g., Performance Unlimited*, 52 F.3d at 1380.

Absent an injunction from this Court ordering the Government of Liberia to cease taking steps directed toward conveying all of GSHL's rights under the MDA to another party, ICSID's ability to grant the specific performance sought by GSHL and ultimately to render a meaningful arbitral award will be irretrievably impaired. This Court's power to issue such an injunction is clear.

## II.    A PRELIMINARY INJUNCTION SHOULD BE ISSUED TO PRESERVE THE ABILITY OF ICSID TO RENDER MEANINGFUL RELIEF TO GSHL.

GSHL is entitled to the injunctive relief it seeks, because it satisfies the substantive standards for awarding preliminary injunctions. To obtain a preliminary injunctions, a plaintiff must demonstrate: (1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the order. *See Washington Metro Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). These factors are not considered in isolation from one another, and no one factor is necessarily dispositive as to whether the preliminary injunction should be granted. *See Morgan Stanley*, 150 F. Supp. 2d at 72. In practice, temporary injunctions are readily granted by the federal courts where necessary to permit an arbitral tribunal a meaningful opportunity to exercise jurisdiction over a dispute. *See, e.g., Performance Unlimited, Inc.*, 52 F.3d at 1380; *Ortho Pharm.*, 882 F.2d at 812; *PMS Distrib.*, 863 F.2d at 642; *Teradyne*, 797 F.2d at 51; *Roso-Lino Beverage Distribs.*, 749 F.2d at 125; *Sauer-Getriebe KG*, 715 F.2d at 349, 350. That is particularly true where, as here, the arbitral tribunal will itself shortly have an opportunity to consider the merits of the dispute more closely and to make its own determination concerning the propriety of continuing preliminary relief.

In *Sauer-Getriebe,*, 715 F.2d at 349, 350, the Seventh Circuit held that injunctive relief was appropriate in a case factually analogous to this one. In *Sauer-Getriebe*, White, an

Indian corporation, contracted to give Sauer, a West German limited partnership, the exclusive right to sell motors in a territory encompassing 47 countries. *Id.* at 349. Both parties had agreed that any dispute arising out of the contract would be settled in arbitration. *Id.* When White repudiated the contract by informing Sauer that it was negotiating with a third party the sale of its assets, including manufacturing rights promised to Sauer, Sauer brought suit in district court, representing that "it intended to exercise its right to arbitrate the contract dispute and sought preliminary ... injunctions barring White from transferring any manufacturing rights 'until such time as the respective rights of the parties under the agreement are determined' by the arbitrator." *Id.* The Seventh Circuit reversed the district court's refusal to grant an injunction and directed it to "enjoin [Defendant] from repudiating the contract and from transferring any of [Plaintiff's] contractual rights to a third party until the arbitration requested [was] completed." *Id.* at 349-50.

In mandating an injunction pending arbitration, the Seventh Circuit found that Sauer had made a showing of irreparable harm because Sauer had "made a substantial investment" in reliance on its contract with White, which provided Sauer with access to resources and property rights that Sauer could not obtain from others. *Id.* at 351. The Court found "that without equitable relief, there would be a substantial injury to its reputation, good will and prestige not compensable in damages." *Id.* The Seventh Circuit also found that "Sauer will be entitled to specific performance if it convinces the arbitrators that the contract entitles it to the trade secret and manufacturing rights claimed," *id.* at 352, and that, as a result, "Sauer's right to arbitration will not be worth much if White transfers those rights before arbitration is settled." *Id.* at 351. These factors, plus the strong federal policy in favor of arbitration, justified the issuance of a preliminary injunction.

A.    **Absent A Preliminary Injunction Preserving the Status Quo, GSHL Will Suffer Irreparable Harm.**

Similar to the plaintiff in *Sauer-Getriebe*, GSHL will suffer irreparable harm absent this Court's issuance of a preliminary injunction. This harm comes in two primary forms: the loss of access to unique property rights and resources that cannot be obtained from others and the loss of an opportunity to protect those rights through meaningful remedies in the arbitral process agreed among the parties to the MDA.

With respect to the first, the Government of Liberia is at this moment taking steps to transfer the very same rights that are the subject of the parties' agreement to a third party. See Dikshit Dec. ¶ 18-19. These rights include long-term property interests in unique and finite mineral resources, as well as access to governmental infrastructure, such as railways and port facilities, necessary to create economic value from those rights. *See* Dikshit Decl. ¶ 19. As in *Sauer-Getriebe*, those rights cannot be obtained from any other source. *Cf. Milton S. Kronheim & Co., Inc. v. District of Columbia*, 877 F. Supp. 21, 29 (D.D.C. 1995), *rev'd on other grounds*, 91 F.3d 193 (D.C. Cir. 1996) ("The uniqueness of land typically makes damages an inadequate remedy."); *United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 701 (7th Cir. 1982) ("It is settled beyond the need for citation ... that a given piece of property is considered to be unique, and its loss is always an irreparable injury."). The current actions of the Government of Liberia threaten to transfer that unique bundle of rights to a principal competitor of GSHL in a manner that will be irrevocable. Once another company takes physical custody and control of the mines and associated infrastructure, it will be, as a practical matter, impossible for GSHL to replace that company as the incumbent operator of the mineral concession. *See* Dikshit Decl. ¶ 20. Also as in *Sauer-Getriebe*, Plaintiffs here have made a substantial investment in reliance on the MDA for the purpose of beginning to exercise the unique rights granted in that contract.

*See* Dikshit Decl. ¶ 15.    Thus, as in *Sauer-Getriebe*, GSHL will suffer irreparable harm absent an injunction preserving the status quo and preventing the transfer of GSHL's rights to its competitor.

Absent an injunction from this Court, GSHL, like *Sauer-Getriebe's* plaintiff, will also suffer irreparable harm to its reputation, good will, and prestige.  GSHL's competitor has made recent public statements positioning itself as the rightful holder of the mining concession and disparaging GSHL's claims to the contrary.  *See* Dikshit Decl. ¶ 19.  A senior executive of the company was quoted in a June 9, 2005 article as stating the following:

> The privatization for these iron-ore mines has been through a transparent and competitive bid process, in which [we were] selected as the preferred bidder.  Any information to the contrary is incorrect and is damaging to the future stability and prosperity of the mines.  We are looking forward to continuing with our discussion and complete the acquisition, which we are confident will bring immense benefits to Liberia, including substantial job creation to the local community.

*See* June 9, 2005 advertisement in *The Inquirer* (attached as Exhibit 10 to Dikshit Decl.)  The competitor's statement that it, as the purported rightful holder of the concession will bring "immense benefits to Liberia, including substantial job creation in the local community" is laying the groundwork for a full public relations attack against GSHL if GSHL persists in defending its rights to the concession.  Indeed, a June 13, 2005 article in The Analyst (attached as Exhibit 11 to Dikshit Decl.) specifically comments on "the public relations campaign being mounted by [GSHL's competitor], even in the wake of a [Liberian] Supreme Court stay orders [sic]," and suggests that this campaign is part of an effort to secure mineral development rights from the National Transitional Government prior to the proper implementation by Liberia of various undertakings in international agreements that are designed to ensure transparent and honest economic and political management of the country and its resources.  *See also* Letter

dated 13 June 2005 from the Chairman of the Security Council Committee established pursuant to Resolution 1521 (2003) Concerning Liberia Addressed to the President of the Security Council (attached as Exhibit 1 to Declaration of Stanimir A. Alexandrov (attached as Exhibit C) at 47 (citing the Liberian government for its "open defiance of a Supreme Court stay order [by approving] a proposal to award [the] concession to [GSHL's competitor].). The damage that will flow to GSHL's reputation, good will, and prestige, both within Liberia and in the highly competitive and specialized field of international mineral development, cannot be fully or adequately compensated in money damages alone.

The second general category of irreparable injury that will eventuate absent a temporary injunction is the inability to obtain meaningful relief from the ICSID arbitration. This form of injury is particularly salient in the context of a request for an injunction in aid of arbitration, especially in light of the strong federal policy in favor of arbitration embodied in the FAA. *See Kanuth v. Prescott, Ball & Turben, Inc.*, CIV. A. No. 88-1416, 1989 WL 90579, at *4 (D.D.C. May 16, 1989) (noting the "strong federal policy encouraging arbitration embodied in the Arbitration Act"); *see also Shahmirzadi v. Smith Barney, Harris Upham & Co.*, 636 F. Supp 49, 56 (D.D.C 1985) (citing to the Federal Arbitration Act and noting that the "federal policy favoring arbitration is very strong"). Indeed, the International Convention on the Settlement of Investment Disputes is itself a ratified treaty of the United States and, as such, is the supreme law of the land, U.S. Const. art. VI, reflecting the most solemn commitment of the policymaking branches of the United States government to give it effect and to protect ICSID's jurisdiction. GSHL primarily seeks specific performance in the proceeding it has initiated before ICSID. *See* Exhibit B at 18-19. This remedy is authorized in ICSID proceedings, *see* Alexandrov Decl. ¶ 5, and, given both the unique characteristics of the property and rights at issue and the practical

impossibility of collecting money damages from a country such as Liberia, should be awarded if the ICSID Tribunal accepts GSHL's claims. This remedy will, however, be wholly unavailable if, as GSHL reasonably anticipates in light of ongoing developments in Liberia, possession of the mineral developments rights is transferred to a third party, together with physical custody and control over the related infrastructure.[5] As in *Sauer-Getriebe*, GSHL's "right to arbitration will not be worth much if [Liberia] transfers those rights before arbitration is settled." *Sauer-Getriebe*, 715 F.2d at 351.

**B.    GSHL Has A Substantial Likelihood Of Success On The Merits In The ICSID Arbitration.**

GSHL has a substantial likelihood of success on the merits before the ICSID Tribunal. In the MDA, the parties agreed that Liberian law would be the applicable substantive law in any dispute under the agreement. *See* Art. XXXIV of Exhibit 2 to Dikshit Decl. at 28. Under Liberian law, the ICSID Tribunal will likely rule that GSHL has a valid and binding MDA with Liberia that gives GSHL the exclusive right for a period of 25 years to develop Liberia's iron ore in the relevant mines. The principal defense to GSHL's claim that the Government of Liberia will likely raise is that the MDA was never executed and ratified. However, under Liberian law, a contract can be enforceable and binding absent a signature. *See* Opinion of George Henries (attached as Exhibit D) at 2-3. As under American law, under Liberian law,

---

[5]    Indeed, preliminary injunctions are even appropriate to preserve the viability of damage remedies. For example, in *Teradyne*, the First Circuit found a preliminary injunction restraining the transfer of assets proper in order to preserve the status quo and protect the damages remedy. *See* 797 F.2d at 52. *Cf. Foltz v. U.S. News & World Report*, 760 F.2d 1300,1309 (D.D.C. 1985) ("The affording of ... remedial relief would not run afoul of the well-settled principle of equity that monetary relief is not to be awarded in a money damages case prior to a determination of both liability and the extent of damages.... Notwithstanding that factor, an equitable remedy designed to freeze the status quo... would be entirely in keeping with the principles that undergird equity jurisprudence.") (internal citations omitted). Similarly, here GSHL seeks an injunction in aid of ICSID to enable the ICSID Tribunal to render a meaningful award before a third party takes physical custody of the land and starts dissipating unique mineral assets.

performance and conduct pursuant to obligations assumed under a contract may prove the existence of a contract. *Id.* at 4. In addition, Liberian law recognizes the common law doctrine of estoppel which provides that a party is estopped from arguing that a contract is invalid when it induced performance and reliance on the contract. *Id.* at 3-4.

The parties have a binding, enforceable agreement, the terms of which are clearly set forth in the MDA. The agreement was the product of intense negotiations and both parties intended to be bound by the agreement. *See* Dikshit Decl. ¶ 15. Once the final terms of the agreement were concluded and reduced to writing in the MDA, the Government of Liberia sent written confirmation on several occasions that the agreement had been concluded and instructed GSHL to begin performance. *See* Exhibits 8 and 9 to Dikshit Decl. Both parties then immediately took steps pursuant to their mutual obligations set forth in the MDA. *See* Dikshit Decl. ¶¶ 15, 16. GSHL spent over $465,000 in reliance on the contract. *See* Dikshit Decl. ¶ 15. The Government of Liberia formed the joint venture that would be jointly owned between the parties and the owner of the concession. Thus, both parties were performing as if the contract was in force, despite the lack of signature. *See* Dikshit Decl. ¶¶ 15, 16.

Despite the binding agreement and the steps both parties took pursuant to their obligations to that binding agreement, the Government of Liberia has now indicated its intention and taken concrete steps to award the very same mining concession to Plaintiff GSHL's competitor. *See* Dikshit Decl. ¶ 17-19. The Government of Liberia's motivations for doing so have been called into question, particularly because GSHL received an accumulated score of more than 200 points higher than this competitor even in the second round of competitive bidding. *See* Dikshit Decl. ¶ 18; *see also* April 7, 2005 article in The Analyst (attached as Exhibit 12 to Dikshit Decl.). These facts are likely sufficient to establish breach of contract

under applicable Liberian law. *See* Exhibit D at 4. Accordingly, GSHL has a substantial likelihood of success on the merits.

### C.    The Issuance of a Preliminary Injunction is in the Public Interest And Will Not Substantially Injure Defendant.

It is in the public interest to enable the parties, pursuant to their agreement, to have a meaningful arbitration before ICSID. Absent preservation of the status quo, significant, irretrievable damage will occur prior to ICSID's ability to hear and adjudicate the merits of the dispute and to order meaningful equitable relief, thus rendering the ICSID arbitration a largely impotent proceeding. This would undermine the strong federal policy in favor of arbitration and the policy embodied in ICSID itself for resolving international investment disputes in an orderly way before ICSID Tribunals. *See Report of the Executive Directors on the Convention*, ICSID Convention, Regulations and Rules, pp. 40-41 (Jan. 2003). In addition, given the extreme importance this mining concession has to the local economic community of Liberia, it is in the public interest to keep the status quo in place until the merits of the dispute can be properly adjudicated and the rightful owner of the concession determined.

Further, the issuance of an injunction will not substantially injure Defendant. Given that the mines that are the subject of the MDA have lain untended and unexploited for decades, *see* Dikshit Decl. ¶ 14, a short further delay of several months to permit the ICSID Tribunal to register the case, convene the arbitrators, and consider a request for provisional measures should in no way cause any cognizable injury to the Government of Liberia. To the extent any time value of anticipated mining revenues during the months of the injunction were to be lost, that modest sum would of course be compensated for by the security required by the injunction itself. By contrast, failure to issue an injunction threatens GSHL with the loss of their substantial existing investment as well as the permanent loss of their ability to productively

employ company assets and build corporate franchise value through the commercial exploitation of these unique mineral rights. In addition, as the Seventh Circuit found in *Sauer-Getriebe*, "[Plaintiff's] right to arbitration will not be worth much if [Defendant] transfers those rights before arbitration is settled," and therefore the balance of hardship factor weighed in plaintiff's favor. *Saeur-Getriebe,* 715 F.2d at 351.

In sum, GSHL is entitled to a preliminary injunction for the short period until ICSID has the opportunity to attend to registration of the request for arbitration, constitution of an arbitral tribunal, and consideration of provisional remedies.

## III.    THIS COURT HAS JURISDICTION OVER THIS MATTER.

Because the Government of Liberia may fail to appear in this action or may otherwise argue that it is immune from suit in this Court, we briefly address the basis of this Court's jurisdiction. First, Congress conferred original jurisdiction on the district courts to hear "any nonjury civil action against a foreign state." 28 U.S.C. § 1330(a). Unites States district courts unquestionably have subject matter jurisdiction over cases brought by foreign plaintiffs against foreign states. *See Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 489-90 (1983) (holding that "[28 U.S.C. § 1330(a)] grants jurisdiction over 'any nonjury civil action against a foreign state ... with respect to which the foreign state is not entitled to immunity.' The Act contains no indication of any limitation based on the citizenship of plaintiff"); *see also* 28 U.S.C. § 1330(a). The Supreme Court in *Verlinden* also held that "a suit against a foreign state under [the Foreign Sovereign Immunities Act] necessarily raises questions of substantive federal law [and therefore] 'arises under' federal law, as that term is used in Art. III"). *Verlinden,* 461 U.S. at 493.

Second, the Government of Liberia does not enjoy sovereign immunity from the jurisdiction of this Court. The FSIA, 28 U.S.C. § 1602 *et seq.*, provides several express exceptions to a foreign state's jurisdictional immunity, two of which apply here. Under both the arbitration exception, 28 U.S.C. § 1605(a)(6), and the waiver exception, 28 U.S.C. § 1605(a)(1), the Government of Liberia does not enjoy jurisdictional immunity from the instant action. Accordingly, this Court has subject matter jurisdiction and personal jurisdiction over the Government of Liberia.[6]

### A.    The Government of Liberia is not immune from suit under the arbitration exception.

Section 1605(a)(6) excepts from jurisdictional immunity actions brought against a foreign state pursuant to an agreement to arbitrate the resolution of differences relating to the parties' legal, contractual relationship. Section 1605(a)(6) provides, in relevant part, that:

> A foreign state shall not be immune from the jurisdiction of courts of the United States ... in any case –
>
> in which the action is brought . . . to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States . . . if ... the arbitration . . . is intended to take place in the United States...

28 U.S.C. § 1605(a)(6). This action falls squarely within this exception. Here, the parties' binding agreement contains an arbitration clause that provides, in relevant part:

---

[6]  The analysis of judicial jurisdiction over a foreign state is purely a statutory inquiry; the Due Process Clause imposes no independent limitations on personal jurisdiction, as a foreign state is not a "person" within the meaning of that Clause. *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95-100 (D.C. Cir. 2002) (foreign states may not "cloak themselves in the protections of the Due Process Clause").

Article XXXI, Arbitration, Section 1, Submission to Arbitration

Any dispute between GOVERNMENT and CONCESSIONAIRE arising out of, in relation to or in connection with this Agreement or its *formation, or the validity, interpretation, performance, termination, enforceability, or breach of this Agreement* (including any dispute concerning whether GOVERNMENT or CONCESSIONAIRE has violated or is in breach of this Agreement), for which resolution by submission to an expert is not specifically provided elsewhere in this Agreement shall be exclusively and finally settled by binding arbitration pursuant to the Convention in accordance with the rules of [ICSID] in effect on the Effective Date except to the extent in conflict with this Article XXXI which shall prevail in that event.

*see* MDA (attached as Exhibit 2 to Dikshit Decl. at 24-25 (emphasis added). Thus, the parties' agreement to submit disputes regarding the "formation," "validity," "enforceability" and "breach" of Art. XXXI, Section 1 of the MDA to arbitration are disputes regarding the parties' "defined legal relationship" and the "contractual" relationship expressly contemplated in Section 1605(a)(6). *See U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 151 (2d Cir. 2001) (upholding district court's exercise of jurisdiction and finding that the "arbitration clause contained in the charter party [agreement]," the validity of which was in dispute, "satisfies the requirements of [the] arbitration exception to the FSIA").

This action is expressly for the purpose of allowing the enforcement of Liberia's agreement to arbitrate these matters before ICSID. GSHL seeks a temporary order enjoining Liberia and other parties in actual participation or concert with it, *see* Fed. R. Civ. P. 65, from taking any steps pending the constitution of an ICSID Tribunal that would undermine ICSID's ability to issue its own provisional measures and thereby protect its ability to issue a meaningful arbitral award. As a result, the Government of Liberia does not enjoy jurisdictional immunity from this action, which is in direct aid of enforcement of its agreement to arbitrate these types of disputes.

**B.    The Government of Liberia is also not immune because it waived its sovereign immunity.**

Section 1605(a)(1) also exempts from jurisdictional immunity actions brought against a foreign state when the state has waived its immunity explicitly or by implication. *See* 28 U.S.C. § 1605(a)(1).   The MDA provides the following waiver provision:

> The GOVERNMENT hereby irrevocably, unreservedly and unconditionally waives all claims of sovereign immunity from the Arbitrators' jurisdiction, and from the enforcement of any arbitral award rendered by a tribunal constituted pursuant to this Agreement, including immunity from service of process and immunity from the jurisdiction of any court situated in any state, country, or nation.

*See* Art. XXXI, Section 7 of Exhibit 2 to Dikshit Decl. at 26.   Thus, the Government of Liberia has expressly agreed to waive sovereign immunity with respect to (1) the arbitrators' jurisdiction and (2) enforcement of the arbitral award.   Although neither of these express waivers covers the instant action, they give rise to a clear waiver by implication.

The FSIA in terms provides that a waiver of immunity may be made "by implication." *See* 28 U.S.C. § 1605(a)(1).   In expressly waiving immunity from arbitration in Washington, D.C., the Government of Liberia necessarily waived its immunity from ancillary actions that are customarily required to make such arbitrations fair and effective.   Thus, for example, the Government of Liberia could not invoke sovereign immunity with respect to a court action seeking to set aside an arbitral award on grounds of bribery or fraud simply because its express waiver did not encompass that action.   Having waived immunity from the arbitration itself, Liberia has also implicitly consented to have the federal courts exercise their normal jurisdiction to regulate and protect the arbitral process under the FAA.

This is precisely such an action.   GSHL is seeking provisional measures from this Court to permit full, fair, and effective arbitration before an ICSID Tribunal.   Absent this Court's

issuance of provisional remedies to preserve the status quo, ICSID's ability to grant its own provisional measures and the specific performance requested by GSHL will be irretrievably impaired. Thus, the Government of Liberia's express waiver with respect to ICSID's jurisdiction necessarily leads to an implicit waiver of provisional remedies in aid of that arbitration.

Moreover, the Government of Liberia's specific consent to arbitrate in Washington, D.C. is independently sufficient to give rise to the same implicit waiver. The legislative history of the FSIA identifies as a primary example of implicit waiver contracts in which a foreign sovereign expressly agrees to arbitrate in a specific country. Congress noted that, "[w]ith respect to implicit waiver, the courts have found such waivers in cases where a foreign state has agreed to arbitration in another country." *See* H.R. Rep. No. 94-1487, at 18 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6617; *see also In the Matter of the Arbitration Between: Trans Chem. Ltd. & China Nat'l Mach. Import & Export Corp.*, 978 F. Supp. 266, 291 & n.119 (S.D. Tex. 1997) (finding an implicit waiver of jurisdiction under 28 U.S.C. § 1605(a) where the contract in the case named Houston, Texas as the forum of arbitration); *Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fidelity, Ltd.*, 689 F. Supp. 1340, 1351 (S.D.N.Y. 1988) (finding an implicit waiver of jurisdiction under 28 U.S.C. § 1605(a) because the arbitration agreement named New York as the forum for arbitration. "When the contract names the United States...it is both reasonable and consistent with the legislative history to find an implicit waiver," (*citing Ohntrup v. Firearms Ctr., Inc.*, 516 F. Supp. 1281, 1285 (E.D. Pa. 1981)). The theory of implicit waiver in this situation is that arbitration in a specific forum necessarily implicates potential court actions in support of that arbitration in the chosen forum as well. In Article XXXI, Section 5 of the MDA governing venue, the parties agreed that "[a]rbitration proceedings conducted pursuant to this Agreement shall be held in Washington,

D.C., United States of America, or such other place as the Parties hereto may agree." *See* Exhibit 2 to Dikshit Decl. at 25. This agreement further supports the conclusion that Liberia did not retain the right to arbitrate before ICSID several blocks from this courthouse free from supervision by this Court.[7]

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff's request for a preliminary injunction in the form of the Proposed Order attached hereto.

Respectfully submitted,

Bradford A. Berenson (D.C. Bar No. 441981)
Brandi Feingold (D.C. Bar No. 482759)
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000 (Phone)
(202) 736-8711 (Fax)

Counsel for Plaintiffs Global Steel Holdings, Ltd.
Dated: July 5, 2005                     and Liberia Global Mining Company

---

[7] This case accordingly differs from *Maritime Int'l Nominees Establishment v. the Republic of Guinea*, 693 F.2d 1094, 1100 (D.C. Cir. 1982), in which the D.C. Circuit refused to find implicit waiver solely because the Republic of Guinea was a signatory to ICSID and the "seat of ICSID" is Washington, D.C. In declining to find implicit waiver, the court limited its holding to "this particular ICSID agreement" and emphasized that "this particular ICSID agreement" – unlike the agreement at issue here – did not expressly agree that the ICSID Arbitration would take place in the United States. *Id.* at 1103-04. *Cf. Liberian Eastern Timber Corp. v. Gov't of the Republic of Liberia*, 650 F. Supp. 73, 76 (S.D.N.Y. 1986) (decided four years after *Maritime* and finding that the Government of Liberia, as signatory to ICSID, had implicitly waived its immunity regarding enforcement of arbitral award).