# EXHIBIT 2
# TO DIKSHIT DECL.

# MINERAL DEVELOPMENT
# JOINT VENTURE

# AGREEMENT

# BETWEEN

# THE GOVERNMENT
# OF
# THE REPUBLIC OF LIBERIA

# AND

# LIBERIA GLOBAL MINING COMPANY

## TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** — 2
"Affiliate" — 2
"Agreement" — 2
"Associates" — 2
"Centre" — 2
"Class A Mining License" — 2
"Communication Between Parties" — 2
"CONCESSIONAIRE" — 2
"Concession Area" — 2
"Concession Year" — 2
"Convention" — 2
"Development" — 2
"Dollar" and/or "US$" — 2
"Effective Date" — 2
"Extended Term" — 2
"Feasibility Report" — 2
"Financial Year" — 2
"Foreign Currency" — 2
"GOVERNMENT" — 3
"Headings" — 3
"Included Words" — 3
"Infrastructure" — 3
"International Standards" — 3
"Law" — 3
"Mineral" — 3
"Operations" — 3
"Operator" — 3
"Party" — 3
"Person" — 4
"Prevailing Market Rate of Exchange" — 4
"Production" — 4
"Production Area" — 4
"Reference" — 4
"Severability" — 4
"Taxes and Duties" — 4

**ARTICLE II EFFECTIVE DATE** — 4

**ARTICLE III TERMS OF THE AGREEMENT** — 4
Section 1 Initial Term — 4
Section 2 Extended Term — 5

**ARTICLE IV CONCESSION AREA** — 5
Section 1 Grant of Rights — 5
Section 2 Concession Area — 5

**ARTICLE V WORK PROGRAMS** — 6
Section 1 Commencement — 6
Section 2 Minimum Expenditure — 6
Section 3 Operation Reports, Records and Inspection — 6

**ARTICLE VI CLASS A MINING LICENSE**
**AND PRODUCTION AREA** — 6
Section 1 Class A Mining License — 6
Section 2 Production Areas — 7
Section 3 Term of the Class A Mining License — 7

**ARTICLE VII CONFIDENTIALITY** — 7
Section 1 Confidential Information — 7

Section 2 Public Information——————————— 7

**ARTICLE VIII PRODUCTION WORK PROGRAMS**——— 7

**ARTICLE IX LAND AND FACILITIES**——————— 8
Section 1 Public Land———————————— 8
Section 2 Private Land———————————— 8
Section 3 Facilities—————————————— 8

**ARTICLE X HEALTH CARE, SAFETY AND SECURITY**——— 10
Section 1 Health Care————————————— 10
Section 2 Safety——————————————— 10
Section 3 Security Force———————————— 10

**ARTICLE XI EDUCATION AND SKILLS TRAINING**——— 11
Section 1 Education—————————————— 11
Section 2 Skills Training of Liberians——————— 11

**ARTICLE XII EMPLOYMENT AND SECONDMENT**——— 11
Section 1 Employment————————————— 12
Section 2 Secondment————————————— 12

**ARTICLE XIII USE OF LIBERIAN SERVICES
AND MATERIALS**—————————————— 12

**ARTICLE XIV COMMUNITY RESOURCES**————— 12

**ARTICLE XV ENVIRONMENTAL PROTECTION
AND MANAGEMENT**————————————— 12
Section 1 Environmental Impact Statement—————— 12
Section 2 Damage and Restoration————————— 12
Section 3 Plans——————————————— 12
Section 4 Environmental Audit and Assessment————— 12

**ARTICLE XVI CAPITAL AND CORPORATE STRUCTURE**— 12
Section 1 Incorporation———————————— 12
Section 2 Name of CONCESSIONAIRE——————— 13
Section 3 Initial Issued Capital—————————— 13
Section 4 Basis for Equity Participation——————— 13
Section 5 Capital Obligations——————————— 13

**ARTICLE XVII BOARD, MANAGEMENT
AND ADMINISTRATION**———————————— 13
Section 1 Composition of the Board of ——————— 13
Section 2 Free Movement in Liberia of GIHL Directors——— 13
Section 3 Technical Committee—————————— 13

**ARTICLE XVIII PROVISION OF FUNDS TO CONCESSIONAIRE**— 14
Section 1 Procurement of Additional Funds—————— 14
Section 2 Adequate Capital———————————— 14

**ARTICLE XIX UNDERTAKINGS OF THE CONCESSIONAIRE**—— 14
Section 1 Access to Information—————————— 14
Section 2 Provision of Documents————————— 14
Section 3 Use of Aircraft———————————— 14
Section 4 Use of Airports and Seaports——————— 14
Section 5 Electricity Generation and Transmission———— 15
Section 6 Issuance of Necessary Authorization————— 15
Section 7 Protection against Nationalization and Expropriation——— 15
Section 8 Peaceful Enjoyment——————————— 15
Section 9 Non-Derogation———————————— 15
Section 10 Equitable Treatment—————————— 15

**ARTICLE XX UNDERTAKINGS OF GIHL** — 16

**ARTICLE XXI INDEMNIFICATION** — 16
Section 1 Indemnification for Breach of Agreement — 16
Section 2 CONCESSIONAIRE's Indemnification of GOVERNMENT — 17
Section 2 GOVERNMENT's Indemnification of CONCESSIONAIRE,
    GIHL and its Affiliates — 17

**ARTICLE XXII INCOME TAXATION** — 17
Section 1 Rate and Basis — 17
Section 2 Computation of Net Taxable Income — 17
Section 3 Carry Forward Permitted — 18
Section 4 Computation of Taxable Income in Dollars — 18

**ARTICLE XXIII ROYALTIES** — 18
Section 1 Royalty Rate — 18
Section 2 Royalty Basis — 18
Section 3 Payment — 18

**ARTICLE XXIV SURFACE RENTAL**
    **AND MINING LICENSE FEES** — 18
Section 1 CONCESSION AREA — 18
Section 3 Payment — 18

**ARTICLE XXV OTHER PAYMENTS TO**
    **THE CONCESSIONAIRE** — 18
Section 1 Import Duties and Other Payments — 18
Section 2 Payments in Lieu of Import Duties and Fees — 19
Section 3 Other Payments — 19
Section 4 Mineral Development Fund — 19
Section 5 Other Exemptions from Taxes and Duties — 19
Section 6 Non-Application of Article XXV, Section 5 — 20

**ARTICLE XXVI FINANCIAL REPORTING AND CURRENCY** — 20
Section 1 Accounting — 20
Section 2 Exchange Control — 20
Section 3 Currency of Payment — 20
Section 4 Right to Remit and Receive Payment — 21
Section 5 Audits — 21

**ARTICLE XXVII INCIDENTAL RIGHTS** — 21
Section 1 Use of Resources — 21
Section 2 Imports — 21
Section 3 Taxes on Resale — 22

**ARTICLE XXVIII ASSIGNMENT AND ENCUMBRANCE** — 22
Section 1 Right of Assignment — 22
Section 2 Right to Encumber — 22
Section 3 Notice of Assignment or Encumbrance — 22

**ARTICLE XXIX TERMINATION** — 22
Section 1 Termination by CONCESSIONAIRE — 22
Section 2 Termination by GOVERNMENT — 22
Section 3 Opportunity to Cure — 23
Section 4 Deputes Regarding Events of Default — 23
Section 5 Winding-up Commission — 23

**ARTICLE XXX DISPOSITION OF ASSETS** — 24
Section 1 Immovable Assets — 24
Section 2 Movable Assets — 24
Section 3 Removal of Movable Assets — 24

**ARTICLE XXXI ARBITRATION**———————————————— 24
Section 1 Submission to Arbitration———————————————— 24
Section 2 Nationality for Purposes of Arbitration———————— 25
Section 3 Arbitrators———————————————————————— 25
Section 4 Referee————————————————————————— 25
Section 5 Venue—————————————————————————— 25
Section 6 Award—————————————————————————— 25
Section 7 Waiver of Sovereign Immunity———————————— 26
Section 8 Reservation of Rights———————————————— 26
Section 9 Successors———————————————————————— 26

**ARTICLE XXXII COMMUNICATION BETWEEN
       PARTIES HERETO**———————————————————— 26
Section 1 Written Communication———————————————— 26
Section 2 Delivery———————————————————————— 26
Section 3 Address————————————————————————— 27
Section 4 Change of Address———————————————————— 27

**ARTICLE XXXIII FORCE MAJEURE**—————————————— 27
Section 1 Application——————————————————————— 27
Section 2 Definition———————————————————————— 28
Section 3 No Required Settlement———————————————— 28

**ARTICLE XXXIV GOVERNING LAW**—————————————— 28

**ARTICLE XXXV ENTIRE AGREEMENT-MODIFICATIONS**———— 28
Section 1 Entire Agreement———————————————————— 28
Section 2 Amendment——————————————————————— 28

**ARTICLE XXXVI PERIODIC REVIEW**————————————— 28
Section 1 Modification and Review———————————————— 28
Section 2 Good Faith——————————————————————— 29

**ARTICLE XXXVII NON-WAIVER OF RIGHTS**————————— 29

**ARTICLE XXXVIII SUCCESSION**——————————————— 29

**ARTICLE XXXIX SURVIVAL PROVISION**—————————— 29

REPUBLIC OF LIBERIA)
MONTSERRADO COUNTY)

THIS MINERAL DEVELOPMENT JOINT VENTURE AGREEMENT is made by and between the **GOVERNMENT OF THE REPUBLIC OF LIBERIA**, represented by and through its Minister of Finance and Chairman of the Liberia Mining Corporation (LIMINCO) Board of Directors, Honorable Lucinee F. Kamara, Sr., the Minister of Lands, Mines and Energy and Co-Chairman of the LIMINCO Board of Directors, Honorable Jonathan A. Mason, and the Chairman of the National Investment Commission, Honorable Roosevelt Quiah, (hereinafter collectively referred to as "**GOVERNMENT**"), and **LIBERIA GLOBAL MINING COMPANY**, a corporation duly organized, existing and doing business under the laws of the Republic of Liberia, represented by and through its Manager, Business Development, Mr. Rakesh Dikshit (hereinafter referred to as "**CONCESSIONAIRE**"), hereby,

## WITNESSETH:

**WHEREAS**, GOVERNMENT is owner of all iron ore deposits within the territory of the Republic of Liberia, and all the rights related to the Development of all such iron ore deposits, including but not limited to the iron ore deposits within the former LAMCO Concession Area in the Republic of Liberia (the Iron Ore Deposits); and,

**WHEREAS**, GOVERNMENT is determined to revitalize the Development of the iron ore mining industry of Liberia, and, consequently, GOVERNMENT desires to promote the Development and Production of Iron Ore Deposits within the former LAMCO CONCESSION AREA for the economic and social benefit of Liberia and its people; and,

**WHEREAS**, GOVERNMENT recognizes that substantial infusion of capital is necessary to facilitate the economic and efficient Development and Production of the Iron Ore Deposits; and,

**WHEREAS**, the GOVERNMENT of the Republic of Liberia is the organ of the Republic vested with authority to enter into agreements with international companies who wish to bring investment capital, operational expertise and other technical know-how to Liberia; and,

**WHEREAS**, as it relates to the Development of the iron ore industry in Liberia, the Minister of Finance, the Minister of Lands, Mines and Energy, and the Chairman of the National Investment Commissioner are authorized and empowered by GOVERNMENT to negotiate and conclude Mineral Development Agreements with investors; and,

**WHEREAS**, GOVERNMENT / LIBERIA MINING COMPANY (LIMINCO), on the one hand, and GLOBAL INFRASTRUCTURE HOLDING, LIMITED and PROVIDER LIMITED, on the other hand, have executed a Memorandum of Understanding (MOU) dated 28 November 2003 under the terms and conditions of which, amongst other things, a joint venture agreement was to be executed covering the Development of iron ore deposits in the former LAMCO Concession Area and, as well as the rehabilitation of the Industrial Infrastructure; and,

**WHEREAS**, in accordance with Law, the GOVERNMENT has the power to enter into this Agreement, to grant the CONCESSIONAIRE a Mineral Development Agreement as herein described, and to permit the CONCESSIONAIRE to conduct the Operations contemplated by this Agreement.

**NOW, THEREFORE**, for and in consideration of the premises, the mutual promises exchanged between GOVERNMENT and GIHL (hereinafter referred to as "the Parties hereto"), the terms and conditions herein contained, the Parties hereto mutually agree, as follows:

# ARTICLE I
# DEFINITIONS

1.1  "Affiliate" shall mean a person that controls, is controlled by or is under common control with CONCESSIONAIRE. For purposes of this Agreement, control means the possession, directly or indirectly, by one person of more than fifty percent (50%) of the equity of or voting power in another person.

1.2  "Agreement" shall mean this Agreement granting a mining right to the CONCESSIONAIRE and any amendments to it made pursuant to its terms as well as all exhibits and appendices to it.

1.3  "Associates" shall mean the Affiliates, shareholders, financiers and contractors (including suppliers of goods and services) of the CONCESSIONAIRE and GIHL and the directors, officers, agents and employees of the CONCESSIONAIRE and of any of the foregoing.

1.4  "Centre" shall mean the International Centre for Settlement of Investment Disputes established under the auspices of the International Bank for Reconstruction and Development.

1.5  "Class A Mining License" shall have the meaning given in Article VI, Section 1 in this Agreement, and as specified in the New Minerals and Mining Law of the Republic of Liberia.

1.6  "Communication Between Parties" shall mean communications given pursuant to Article XXXII, Section 1.

1.7  "CONCESSIONAIRE" shall mean LIBERIA GLOBAL MINING COMPANY and other person(s) to which, pursuant to Article XXVIII, Section 1, it may assign all or any part of its interest under this Agreement.

1.8  "Concession Area" shall mean the former LAMCO Concession Areas in Nimba and Grand Bassa Counties and all areas covered by the associated infrastructure as defined in ARTICLE IV.

1.9  "Concession Year" shall mean a period of twelve (12) consecutive months according to the Gregorian calendar starting on the Effective Date of this Agreement or on any anniversary of said Effective Date.

1.10  "Convention" shall mean the Convention on the Settlement of Investment Disputes between States and Nationals of Other States opened to signature at Washington, D. C., United States of America, on March 18, 1965.

1.11  "Development" shall mean all preparation for the removal and recovery of minerals, including the construction or installation of a mill or any other improvements to be used for the mining, handling, milling, beneficiation or other processing of Minerals.

1.12  "Dollar" and/or "US$" shall mean the lawful currency of the United States of America.

1.13  "Effective Date" shall mean the date described in Article II.

1.14  "Extended Term" shall have the meaning given in Article III, Section 2.

1.15  "Feasibility Report" shall have the meaning given in Article VI, Section 1a.

1.16  "Financial Year" shall mean January 1 through December 31, or such other period as the parties may agree.

1.17  "Foreign Currency" shall mean Dollars and any other currency except currency that is not legal tender in the Republic.

1.18 "GOVERNMENT" shall mean the Republic of Liberia, its GOVERNMENT, and all political subdivisions, branches, divisions, instrumentalities, authorities and agencies thereof.

1.19 "Headings" shall mean the headings to the clauses, Articles and Sections of this Agreement are inserted for convenience only and shall not affect the construction hereof.

1.20 "Included Words"- This Agreement shall be read with such changes in gender or number as the context shall require.

1.21 "Infrastructure" shall mean the following:

a.    Immovable transportation and communication facilities (including roads, bridges, railroads, airports, land strips and landing pads for aircraft, hangars and other airport facilities, garages, channel, tramways, pipelines and radio, telephone, telegraph, telecommunications, and electronic or other forms of communications facilities);

b.    Immovable port facilities (including docks, harbors, piers, jetties, breakwaters, terminal facilities and warehouses, and loading and unloading facilities);

c.    Immovable power, water and sewerage facilities (including electrical generating plants and transmission lines, dams, water drains, water supply systems and systems for disposing of tailings, plant waste and sewage);

d.    Immovable public welfare facilities (including schools, hospitals and public halls);

e.    Miscellaneous immovable facilities used primarily in connection with the operation of any of the foregoing (including offices, machine shops, foundries, repair shops and warehouses);

f.    Other immovable facilities used primarily in connection with or as an incident to Operations; and

g.    Movable facilities and equipment used as an integral part of the immovable facilities described in paragraphs a through f above.

1.22 "International Standards" shall mean generally accepted world mining industry standards and procedures, due allowance being made for any special circumstances.

1.23 "Law" shall mean any constitution, law, statute, decree, rule, regulation, judicial act or decision, judgment, order, proclamation, directive, executive order or sovereign act of the CONCESSIONAIRE that affects or purports to affect the CONCESSIONAIRE or is generally applicable in the Republic.

1.24 "Mineral" shall mean a naturally occurring, no-living substance having a definite chemical composition and physical characteristics and having economic value, but excluding oil, gas, coal and geothermal resources.

1.25 "Operations" shall mean all activities and transactions conducted by or on behalf of the CONCESSIONAIRE with respect to, under or incidental to this Agreement including Exploration, Development, Production, Marketing and the Financing of any of the foregoing.

1.26 "Operator" shall mean the entity designated by GIHL to undertake Operations.

1.27 "Party" shall mean either GOVERNMENT or CONCESSIONAIRE and, in the plural forms, both the GOVERNMENT and CONCESSIONAIRE and any permitted assignee of GOVERNMENT or CONCESSIONAIRE.

3

1.28   "Person" shall mean any individual, partnership, limited liability company, joint venture, association, corporation, trust, estate, unincorporated or other entity, CONCESSIONAIRE or GOVERNMENT and any branch, division, political subdivision, instrumentality, authority or agency of any GOVERNMENT or state.

1.29   "Prevailing Market Rate of Exchange" shall mean the predominant rate, expressed in Dollars, at which willing sellers and willing buyers, acting at arm's length and in the ordinary course of business, purchase or sell, or agree to purchase or sell, currency of another nation.

1.30   "Production" shall mean the commercial exploitation of minerals found in the Concession Area and all other activities incidental thereto including the design, construction, installation, fabrication, operation, maintenance and repair of infrastructure, facilities and equipment and the mining, excavation, extraction, recovery, handling, beneficiation, processing, milling, stockpiling, transportation, export and sale of Minerals.

1.31   "Production Area" shall mean an area selected as such by CONCESSIONAIRE through its Operator pursuant to Article VI, Section 2.

1.32   "Reference"- Unless otherwise stated, a reference herein to a numbered or lettered Article, Section or Appendix shall refer to the Article, Section or Appendix bearing that number or letter in this Agreement. A reference to "this Agreement," "hereof," "hereunder," "herein," or words of similar meaning, shall mean this Agreement, including the Appendices hereto, together with any amendments thereof. The words "and" and "or" will include the conjunctive and disjunctive, as the context may require or permit. The word "include" (and any variation) is used in an illustrative sense rather than in a limiting sense.

1.33   "Severability"- If any provision of this Agreement is or shall become illegal, invalid or unenforceable, in whole or in part, the remaining provisions shall nevertheless be and remain valid and subsisting and the said remaining provisions shall be construed as if this Agreement had been executed without the illegal, invalid or unenforceable portion.

1.34   "Taxes and Duties" shall mean any and all direct and indirect income, profit, gains, capital gains, corporation, net worth, sales, transaction, payroll, import, export, customs, consul, inspection, value added, consumption, supply, use, turnover, severance, stumpage, cash flow, rental, land rental, surface rental, property, stamp and other taxes, duties, fees, levies, excises, rates, charges, imposts, surcharges, royalties and other GOVERNMENT imposed revenue payments of whatever nature and however called and whether similar or dissimilar to the foregoing.

## ARTICLE II
## EFFECTIVE DATE

This Agreement shall become effective and be binding on the Parties thereto when executed by them, ratified by the National Transitional Legislative Assembly and approved by the Chairman of the National Transitional Government of Liberia.

## ARTICLE III
## TERMS OF THE AGREEMENT

**Section 1 Initial Term**
The initial term of this Agreement shall commence on the Effective Date and, subject to Article III, Section 2 below, end on the twenty-fifth (25th) anniversary of the Effective Date, unless sooner terminated in accordance with the other provisions of this Agreement.

**Section 2 Extended Term**

a.     Notwithstanding the provisions of Article III, Section 1 above, the CONCESSIONAIRE shall have the right to request an extension of the term of this Agreement for two (2) additional terms not exceeding twenty-five (25) years each (the "Extended Term") upon providing the CONCESSIONAIRE with Notice, at least one year prior to the termination of the initial term or any extended term, of its intention to seek such extension and, within ninety (90) days after such Notice after the successful completion of the previous work programs, and by providing GOVERNMENT with a Revised Feasibility Report. The Feasibility Report shall indicate that proven reserves exist which shall set forth the type and quantity of ore that is estimated to exist in the Concession Area, or any part thereof, and described in reasonable detail a proposed plan for efficient and economic Production of such ore (in accordance with International Standards and the provisions of this Agreement). It shall also set out a detailed description of the proposed mining and processing methods, the design, cost and construction schedules for the proposed facilities and equipment, the financing arrangements contemplated, and the CONCESSIONAIRE's best estimate in good faith of the date upon which production of such ore will cease (the "Extended Date"), but not later than twenty-five (25) years after the end of the Initial Term or any prior Extended Term.

b.     The GOVERNMENT shall grant its approval for the Extended Term through the Extended Date if the Revised Feasibility Report reasonably complies with International standards, GOVERNMENT's overall mineral development strategy and the provisions of this Agreement. The GOVERNMENT shall, in the event of any delay in or denial of approval of a Revised Feasibility Report, promptly give to CONCESSIONAIRE full details, in writing, of its reasons for withholding or delaying approval. Without prejudice to the generality of Article III, Section 2, if, in the CONCESSIONAIRE's opinion, any such approval has been wrongfully withheld or unreasonably delayed, it may invoke the provisions of Article XXXI on arbitration.

c.     With respect to any such Extended Term, the fiscal terms and conditions of this Agreement shall be amended in such manner as the Parties hereto may agree as fair and reasonable, taking into account fiscal terms generally applicable at the end of any immediately preceding term to large scale mining entities worldwide in respect of operations of the nature envisaged in the Extended Term (due allowance being made for any special circumstances).

## ARTICLE IV
## CONCESSION AREA

**Section 1 Grant of Rights**
By this Agreement and subject to its terms and conditions, GOVERNMENT hereby grants to the CONCESSIONAIRE the exclusive right and license to conduct Exploration for, Development, Production and Marketing of iron ore and associated Minerals and Products and rehabilitation of the associated infrastructure in the former LAMCO Concession area.

**Section 2 Concession Area Defined**
The Concession Area is as shown on the map attached hereto as Appendix "A", the coordinates of which are specified in Appendix "B". It comprises the following:

a.     The Nimba Range including the Main ore body, Mt Gbahm, and Junction Ridge;

b.     The Western Area deposits including Tokadeh, Yuelliton, Gangra and Beeton;

c.     All other areas controlled by LIMINCO, including but not limited to, The Buchanan Facilities (Iron Ore Harbor and associated facilities) and all the housing units at Buchanan and Yekepa; and

d.     Railroad and associated infrastructure.

5

## ARTICLE V
## WORK PROGRAMS

**Section 1 Commencement**
CONCESSIONAIRE shall commence Exploration/Feasibility studies as soon as is reasonably practicable, but not later than forty five (45) days of the Effective Date. A detailed work program is attached hereto as Appendix C.

**Section 2 Minimum Expenditure**
In respect of Article V, Section 1 above, the CONCESSIONAIRE shall incur minimum expenses, as stipulated in Appendix D.

**Section 3 Operation Reports, Records and Inspection**
The CONCESSIONAIRE and the Operator shall maintain at their respective principal offices in Liberia, or at such other offices as CONCESSIONAIRE may approve:

a.      Copies of all maps, geological, mining or other earth science reports and mineral analyses (together with all field data which support such reports or data), production records, marketing and financial reports and other data obtained or compiled by the CONCESSIONAIRE as a result of exploration and/or mining operations and activities. All information, data and material specified in this paragraph shall be in a form suitable for reproduction, use or processing as the case may be. The CONCESSIONAIRE shall have the right to temporarily remove such samples and Liberia for the purpose of study and evaluation;

b.      The Operator through CONCESSIONAIRE shall keep GOVERNMENT fully informed of all operations and activities, wherever conducted, and of its plans in respect thereof. The GOVERNMENT shall have the right to monitor Exploration/Feasibility and Mining Operations and activities from time to time and a reasonable number of GOVERNMENT personnel may, upon prior Notice to the CONCESSIONAIRE, at reasonable time and subject to compliance with the CONCESSIONAIRE's/Operator's security and safety requirements, attend and inspect Exploration/Feasibility and Mining Operations and activities conducted in Liberia; and

c.      Within thirty (30) days after the end of each calendar quarter, the Operator through CONCESSIONAIRE shall provide GOVERNMENT with a report on all Exploration/Feasibility and Mining Operations and activities for that calendar quarter, including financial reports of iron ore recovered and sold. Within ninety (90) days after the end of each financial year, CONCESSIONAIRE shall furnish the GOVERNMENT with a report on all Exploration/Feasibility and Mining Operations and activities for that Financial Year, including financial reports of iron ore recovered and sold.

## ARTICLE VI
## CLASS A MINING LICENSE AND PRODUCTION AREA

**Section 1 Class A Mining License**
Upon receipt of Notice from the CONCESSIONAIRE at the end of the Exploration/Feasibility Period, GOVERNMENT shall grant a Class A Mining License for the proposed Production Area subject to the following terms and conditions:

a.      That the CONCESSIONAIRE shall have successfully completed a proposed Exploration/Feasibility program and submitted to GOVERNMENT a detailed map and descriptive statements on the boundaries and size of the deposits from which production will be carried out pursuant to Article VI, Section 2 below;

b.      The Feasibility Report shall describe, in more detail, a proposed plan for the efficient and economic Production (in accordance with International Standards and the provisions of this Agreement) of the iron ore deposits found, including a more detailed and precise description of the proposed mining and processing methods, the design, costs and construction schedules for the proposed facilities and equipment and the marketing

arrangements contemplated. The GOVERNMENT shall not withhold or unreasonably delay its approval of the Feasibility Report and shall grant its approval if the Feasibility Report, or any amendment made to it by CONCESSIONAIRE, reasonably complies with International Standards and the provisions of this Agreement. The GOVERNMENT shall, in the event of any delay in or denial of approval of the Feasibility Report, promptly give to CONCESSIONAIRE full details, in writing, of its reasons for withholding or delaying approval. If, in CONCESSIONAIRE's opinion, any such approval has been wrongfully withheld or unreasonably delayed, it may invoke the provisions of Article XXXI on arbitration; and

c.  That GOVERNMENT shall have been satisfied that the CONCESSIONAIRE possesses the appropriate technical skills and experience and the financial resources to carry out mining operations in keeping with the requirements of a Class A Mining License.

**Section 2 Production Areas**
Each Production Area shall consist of such part of the Concession Area as, in the light of International Standards, and subject to Article IV, Section 2, is reasonable, taking into account the extent and nature of the ore found and the requirements for the efficient and economic Production of such ore and the conduct of other Operations.

Subject to Article VI, Section 2, the CONCESSIONAIRE through the Operator, in order to select a Production Area, shall submit to GOVERNMENT a detailed map and descriptive statement based on actual surveys which shall set forth the boundaries of the Production Area which shall be identified by metes and bounds, and the boundaries and size of the iron ore deposit or deposits which the CONCESSIONAIRE intends to produce. The maps shall be of such scale and contain such detail, including geographical and topographical information, as may reasonably be necessary to identify accurately the Production Area and the boundaries of the iron ore deposits.

**Section 3 Term of the Class A Mining License**
The Class A Mining License for a Production Area selected by the CONCESSIONAIRE shall remain valid and effective for the unexpired portion of the term of this Agreement and any extensions thereof.

## ARTICLE VII
## CONFIDENTIALITY

**Section 1 Confidential Information**
All information exchanged between the Parties hereto in the context of this Agreement shall be considered and treated as confidential information, subject to Article VII, Section 2 below. The Parties hereto hereby agree not to divulge such information to any other Person without the prior written consent of the other party, which consent shall not be unreasonably withheld and/or delayed. Notwithstanding, the foregoing, shall not be applicable to CONCESSIONAIRE's Bankers, Advisors and all those who, in a special way, connected with Operation hereunder.

**Section 2 Public Information**
The obligation of confidentiality set forth in Article VII, Section 1 above shall not apply either to information exchanged between the Parties hereto which is in the public domain or to information exchanged by the Parties which the CONCESSIONAIRE is required to reveal to any other Person by Law.

## ARTICLE VIII
## PRODUCTION WORK PROGRAMS

Subject to Articles V and VI, the CONCESSIONAIRE through the Operator shall commence and continue construction, acquisition and installation of facilities and equipment, and otherwise to produce iron ore and associated minerals and products, substantially in accordance with the Feasibility Report, unless such Production becomes uneconomical, in which event the provisions of Article XXXIII shall apply.

7

# ARTICLE IX
# LAND AND FACILITIES

### Section 1 Public Land

a.  The CONCESSIONAIRE through the Operator shall have the right to enter upon and utilize all public land within the Concession Area for purposes of and incidental to Operations, without costs except as provided for by ARTICLE XXIV, Sections 1 and 2 below.

b.  To the extent that it does not involve an unreasonable interference with the rights of other persons, GOVERNMENT shall grant the CONCESSIONAIRE and the Operator the right to enter upon, utilize and possess, without cost, any public land not within the Exploration Area or a Production Area and which is reasonably required by the CONCESSIONAIRE for purposes of and incidental to Operations including areas required for plant and equipment, Infrastructure and other facilities and equipment. Possession of such land shall be returned to GOVERNMENT following the termination of this Agreement, if not earlier returned, and such land shall be deemed part of the Concession Area during any such period of the occupancy and used by CONCESSIONAIRE.

### Section 2 Private Land

a.  The CONCESSIONAIRE shall endeavor, by direct agreement with the owner, to enter upon and utilize private land within the Concession Area required for or incidental to Operations.

b.  If the CONCESSIONAIRE and the owner of private land in the Concession Area which the CONCESSIONAIRE reasonably requires for Operations cannot agree, GOVERNMENT shall, at the request of the CONCESSIONAIRE, intervene to assist in the conclusion of such agreement, failing which GOVERNMENT shall, at the request of the CONCESSIONAIRE, acquire such land and all improvements thereon in the public interest. The CONCESSIONAIRE shall reimburse GOVERNMENT for all reasonable costs paid in connection with such exploration, including just compensation paid to the prior owner, provided, however, that the amount paid by GOVERNMENT to the owner shall not exceed the reasonable value of the owner's interest in such land (land and any improvements thereon) determined, without regards to the value of any Mineral which may be contained therein, by means of an appraisal conducted by a qualified Person mutually agreed to by the Parties hereto. Title to the property thus acquired shall vest in GOVERNMENT, and GOVERNMENT shall grant CONCESSIONAIRE the right to enter upon, utilize and possess such land which shall be deemed part of the Concession Area.

c.  If CONCESSIONAIRE reasonably requires private land outside the Concession Area for Operations, the CONCESSIONAIRE will endeavor to enter upon and utilize such land by direct agreement with the owner, and such land shall be deemed part of the Concession Area during any period of the occupancy and use by the CONCESSIONAIRE.

d.  For the purposes of the foregoing:

   1.  Private land shall mean any land (including any creeks, streams, rivers or bodies of waters contained thereon, land their residue) owned by a Person other than GOVERNMENT; and

   2.  Public land shall mean all land other than private land.

### Section 3 Facilities
The assets of GOVERNMENT, irrespective of their conditions which shall be contributed to CONCESSIONAIRE' Operations shall comprise but not be limited to the following:

a.  Existing Facilities of the former LAMCO Joint Venture Company:

8

1.  The Mines and Quarries;

2.  The Railroad, including the main railway, all sidings and loops, sheds, communication installations buildings, maintenance yards and facilities, as well as all remaining rolling stocks and other rail infrastructure equipment;

3.  The Port of Buchanan, including the iron ore quay, but excluding the commercial quay; and

4.  All the housing units in Buchanan and Yekepa.

b.  New Facilities within the Concession Area:

1.  The CONCESSIONAIRE shall have the right to acquire, import, construct, install and operate plant and equipment, Infrastructure, import cement and other facilities and equipment reasonably required for Operations;

2.  The CONCESSIONAIRE shall have the right to use public Infrastructure, whether owned, operated or provided by GOVERNMENT or by any other Person under license or authority of GOVERNMENT, to the extent adequate (taking into account the public use thereof) to meet the CONCESSIONAIRE's needs with respect to Operations. GOVERNMENT shall ensure that all charges for, and other terms and conditions of, the use by the CONCESSIONAIRE of public Infrastructure are fair and reasonable, taking into account the cost of providing such Infrastructure, and are not more onerous than those that are generally applicable to others using similar public Infrastructure in a similar manner;

3.  To the extent reasonable in connection with Operations, the CONCESSIONAIRE shall have the right, subject to prior consultation with GOVERNMENT, to integrate any item of its own Infrastructure with similar items of public Infrastructure;

4.  To the extent that CONCESSIONAIRE does not utilize its Infrastructure to full capacity, GOVERNMENT shall have the right to use said Infrastructure on reasonable Notice to the CONCESSIONAIRE, provided that such use does not impair the efficient and economic conduct of Operations. The GOVERNMENT shall pay reasonable compensation to CONCESSIONAIRE (other than in the case of roads and highways unless the use causes material damage thereto) within a reasonable period after invoice from the CONCESSIONAIRE in connection with such use; and

5.  GOVERNMENT reserves the right, on reasonable Notice to and after consultation with the CONCESSIONAIRE, to construct roads, highways, railroads, telegraph and telephone lines and other lines of communication within the Concession Area. GOVERNMENT shall provide timely Notice for the commencement of such operations. In the event of such construction, GOVERNMENT shall, within a reasonable period after invoice from the CONCESSIONAIRE, compensate the CONCESSIONAIRE for all damages thereby caused the CONCESSIONAIRE and its property and thereby indemnifies and saves harmless the CONCESSIONAIRE from all claims by third parties arising therefrom. Under no circumstances will GOVERNMENT engage in such construction if the effect of so doing would be to disrupt or interrupt the conduct of Operations.

c.  Communications Facilities, Systems and Frequencies:

1.  The CONCESSIONAIRE shall have the right, as licensee or assignee, to operate for its own use and that of any Affiliate, such communications systems as it deems necessary, including radio, telecommunication, satellite networks, cellular systems, microwave devices and other communications devices and systems, and to receive from GOVERNMENT such rights, license, registrations, permits and

other authorizations as may be required by Law in connection with the possession, use, importation or purchase of the foregoing; and

2.    GOVERNMENT hereby agrees that it shall make available, for use by the CONCESSIONAIRE, an adequate number of broadcast and communications frequencies for both domestic and international use, and shall grant unto the CONCESSIONAIRE such rights, license, registrations, permits and other authorizations as may be required in order to comply with any Law regarding the possession, use, importation or purchase of related equipment or of any telecommunications devices or other communications equipment or devices. GOVERNMENT and CONCESSIONAIRE shall consult together from time to time as to the specific frequencies to be assigned consistent with international regulations.

## ARTICLE X
## HEALTH CARE, SAFETY AND SECURITY

**Section 1 Health Care**
CONCESSIONAIRE shall construct, maintain and operate health facilities in the Concession Area, and shall install, maintain, and use modern health devices and equipment and shall practice modern health procedures and precautions.

In connection with Operations, the CONCESSIONAIRE shall furnish in the Concession Area free medical treatment, care and attention at acceptable standards to all employees and CONCESSIONAIRE officials working in connection with the CONCESSIONAIRE's Operations, and their spouses and dependents, and shall acquire qualified medical staff and maintain dispensaries, clinics or hospitals. Without limiting the generality of the foregoing, whenever the CONCESSIONAIRE employs 100 or more persons at any permanent work site within the Production Area, it shall maintain there a dispensary or hospital headed by a resident medical doctor. The CONCESSIONAIRE shall keep records and notify GOVERNMENT immediately of any death of or serious injury to any person in connection with Operations. For the purposes of this provision a "serious" injury is as is defined in the Labor Practices Law of Liberia.

**Section 2 Safety**
In connection with Operations, the CONCESSIONAIRE shall construct, maintain and operate safety devices and equipment and shall practice such safety procedures and precautions (including regular safety training instruction for its employees) as are in accordance with International Standards. The CONCESSIONAIRE shall notify the GOVERNMENT immediately of any death of or serious injury to any employees of the CONCESSIONAIRE that occurred as a result of Operations. For the purposes of this Article X, Section 2, a serious injury shall mean an injury, confirmed by medical reports, which is likely to cause the injured person to lose six (6) or more working days. The CONCESSIONAIRE shall comply with such reasonable written instructions as may, from time to time, be given by the GOVERNMENT under Law with respect to preventing the spread of contagious, life-threatening diseases and other public health hazards.

**Section 3 Security Force**
The CONCESSIONAIRE shall have the right in keeping with the provisions of the Laws of Liberia, to directly or under contract with other persons, establish and maintain its own security force for the purpose of maintaining Law, order and security, with power both of detention (any detained person to be handed over to the appropriate GOVERNMENT authorities as soon as practicable), and of search of and exclusion from the Production Area and such other areas as may be properly restricted for economic, operational or security reasons, always being subject to Law. This Section 3 shall not affect or alter the GOVERNMENT's obligations under Article XXIX.

## ARTICLE XI
## EDUCATION AND SKILLS TRAINING

### Section 1 Education

a.  On and from the commencement of Production, the CONCESSIONAIRE shall provide, in the Concession Area, free primary and secondary education (in conformity with provisions of the Education Laws of Liberia and generally applicable standards on education in Liberia) for the dependents of the CONCESSIONAIRE's own employees, and GOVERNMENT officials assigned in the Concession Area in connection with Operations.

b.  If the CONCESSIONAIRE through the Operator conducts substantial Production in an area in which facilities are inadequate to conduct such education, it shall pay the costs of such education in existing facilities or, at its option, provide facilities reasonably adequate for such purpose.

### Section 2 Skills & Training of Liberians
The CONCESSIONAIRE shall, amongst other measures, provide on a continuing basis for the training of suitable Liberian citizens, in order to qualify them for skilled, technical, administrative and managerial positions, by means of:

a.  Establishing and operating vocational and advanced training centers in Liberia;

b.  Furnishing on-the-job counterpart training, not only in Liberia, but to the extent reasonably feasible in the offices of CONCESSIONAIRE or its agents outside Liberia, in order that such Liberians may receive training in the overseas aspects of CONCESSIONAIRE's shipping, marketing and accounting functions; and

c.  Providing scholarships for qualified Liberian citizens to pursue advanced studies abroad. Detail plans and programs for such training, including timetables and schedules, shall be formulated (and revised when necessary) in consultation with, and shall be subject to the approval of, GOVERNMENT. Such consultation shall commence as soon as practicable in light of the progress of Operations, and in any event after request by GOVERNMENT.

## ARTICLE XII
## EMPLOYMENT AND SECONDMENT

### Section 1 Employment
CONCESSIONAIRE shall not import unskilled labor into the Republic. CONCESSIONAIRE shall employ (and shall give preference to the employment of) qualified Liberian citizens for skilled, technical, administrative and managerial positions. CONCESSIONAIRE shall, however, have the right at all times to choose its senior management freely. Subject to the foregoing, CONCESSIONAIRE shall be entitled to employ expatriates in accordance with the Labor Practices Law of Liberia for the efficient conduct of Operations in the Republic, and GOVERNMENT shall issue such permits as may be required by Law to allow such expatriates freely to enter into, work and reside in the Republic in connection with Operations, and to depart from the Republic.

### Section 2 Secondment

a.  In order to effect the policy of technology transfer, at all times during Operations, GOVERNMENT shall, in consultation with CONCESSIONAIRE second an agreed number of professionals including geologists, mining engineers, surveyors, etc., to participate in the technical aspects of the Operations.

b.  CONCESSIONAIRE shall provide subsistence allowances to the secondees at a rate to be mutually agreed by the Parties.

c.    The GOVERNMENT shall, in consultation with CONCESSIONAIRE, assign an agreed number of representatives to the external marketing and purchasing units of the CONCESSIONAIRE at the expense of CONCESSIONAIRE.

### ARTICLE XIII
### USE OF LIBERIAN SERVICES AND MATERIALS

The CONCESSIONAIRE shall, when purchasing goods and services required with respect to Operations, give first preference to Liberian goods and services that are comparable in quality, terms, delivery, service, quantity and price to, or better than, goods and services obtainable outside the Republic. Subject to the foregoing, the CONCESSIONAIRE may freely contract with such Persons as it desires. Nothing in this Article XIII shall require the CONCESSIONAIRE to act upon other than commercial considerations.

### ARTICLE XIV
### COMMUNITY RESOURCES

It is the objective of the Parties hereto that Operations hereunder shall be carried out in a manner that is consistent with the continuing economic and social viability, both during the term of this Agreement and thereafter, of centers of population that have formed and which may form as a result of such Operations. Upon request of GOVERNMENT at any time, the CONCESSIONAIRE shall consult with GOVERNMENT to mutually establish plans and programs for the implementation of this objective, and thereafter the CONCESSIONAIRE shall in good faith cooperate with GOVERNMENT in regard to its efforts concerning the realization of such plans and programs. Nothing herein shall require the CONCESSIONAIRE to make any expenditure or incur any costs beyond what it would have made or incurred in the ordinary course of its business.

### ARTICLE XV
### ENVIRONMENTAL PROTECTION AND MANAGEMENT

**Section 1 Environmental Management**
The Parties hereto recognize that Operations may result in pollution, contamination or other environmental damage to land, water and the atmosphere within the Concession Area and elsewhere. Accordingly, CONCESSIONAIRE through the Operator shall conduct its Operations pursuant to the Environmental Protection And Management Law of the Republic. Notwithstanding the foregoing, CONCESSIONAIRE shall not be liable for pre-existing environmental damage within the Concession Area.

**Section 2 Environmental Audit and Assessment**
GOVERNMENT, at the expense of CONCESSIONAIRE, shall conduct a periodic environmental audit and assessment of any or all areas encompassing the Concession Area to ascertain that the activities of the CONCESSIONAIRE are in conformity with acceptable environmental practices and standards. If any defects are caused to the environment consequent to the CONCESSIONAIRE's Operations, the CONCESSIONAIRE shall be required to mitigate and/or restore the environment as much as possible to its original and natural state. In furtherance to same, the CONCESSIONAIRE shall be warned to take preventive measures to avoid damage to the environment.

### ARTICLE XVI
### CAPITAL AND CORPORATE STRUCTURE

**Section 1 Incorporation**
As soon as is practicable, but before the execution of this Agreement, GOVERNMENT and CONCESSIONAIRE shall effect the incorporation in Liberia of the CONCESSIONAIRE.

The CONCESSIONAIRE shall not be wound up prior to termination of this Agreement.

Unless GOVERNMENT and GIHL otherwise agree, the CONCESSIONAIRE shall be wound up as and when mutually agreed by the Parties hereto.

### Section 2 Name of CONCESSIONAIRE
The name of the CONCESSIONAIRE shall be LIBERIA GLOBAL MINING COMPANY (LGMC).

### Section 3 Initial Issued Capital
The capital of the CONCESSIONAIRE shall be denominated in Dollars. The initial issued share capital of the CONCESSIONAIRE shall consist of Class-A Stock and Class-B Stock, respectively. The classification of the shares into Class-A Stock and Class-B Stock shall not accord either class any special rights, preferences or benefits over the other, except as otherwise expressly agreed herein. The capital stock of GOVERNMENT shall consist of thirty (30) Class A Stock with no par value to be issued to GOVERNMENT and of seventy (70) Class B Stock, with no par value to be issued to the GIHL.

### Section 4 Basis for Equity Participation

a.  GOVERNMENT shall contribute to CONCESSIONAIRE's Operations the mineral and mining rights for the iron ore and the associated Infrastructure and Facilities as defined in Article IX hereof in the Concession Area, as well as any related studies appertaining thereto. In consideration of its contribution in kind GOVERNMENT shall receive CONCESSIONAIRE's Class A shares.

b.  GOVERNMENT shall further contribute to CONCESSIONAIRE's Operations the industrial infrastructure, facilities, rights and assets that it owns in Liberia.

c.  GIHL shall contribute initial capital in the amount of twenty-five million United States (US$25,000,000.00) Dollars to be drawn down against Work Program in accordance with ARTICLE V hereof, and shall arrange financing for the CONCESSIONAIRE's Operations, all loan capital investments required to fund the implementation of the mining operation. GIHL shall receive all of CONCESSIONAIRE's Class-B shares in consideration for its capital contribution.

### ARTICLE XVII
### BOARD, MANAGEMENT AND ADMINISTRATION

### Section 1 Composition of the Board of Directors
The Board of Directors of CONCESSIONAIRE (hereinafter "the Board") shall consist of Eleven (11) members, as follows: five (5) Persons (and alternates thereof) nominated by the holders of Class A shares and six (6) Persons (and alternates thereof) nominated by holders of Class B shares.

### Section 2 Free Movement in Liberia of GIHL Directors
The GOVERNMENT shall permit all directors (and alternates) of the GIHL to enter and remain in and depart Liberia for purposes of and incidental to attending meetings of the Board of Directors, without hindrance, molestation and/or intimidation.

The GOVERNMENT shall permit all representatives of or proxy holders for Shareholders of CONCESSIONAIRE to enter and remain in and depart Liberia for purposes of and incidental to attending general meetings, without hindrance, molestation and/or intimidation.

### Section 3 Technical Committee
GOVERNMENT and GIHL shall constitute a Technical Committee to the Board, which shall hold periodic meetings for the purpose of making recommendations to CONCESSIONAIRE through the Board with respect to matters arising in the course of operational, medical, health, safety, educational, environmental and other matters. The committee shall also make recommendations through the Board to the CONCESSIONAIRE with respect to the construction by the CONCESSIONAIRE within Liberia of new facilities, and/or the expansion of the existing facilities, for the purpose of providing CONCESSIONAIRE with transportation, communication,

power, water, sewerage, and similar utilities with a view towards coordinating the needs and plans of the CONCESSIONAIRE with the needs and plans of GOVERNMENT for the construction, maintenance and operation of similar facilities for GOVERNMENTAL and public purposes. The Technical Committee shall submit its recommendations to the Boards.

## ARTICLE XVIII
## PROVISION OF FUNDS TO CONCESSIONAIRE

**Section 1 Procurement of Additional Funds**
For so long as GIHL and GOVERNMENT respectively hold the shares mentioned in Article XVI, Section 3 hereof, and GIHL has the right to appoint a majority of the Board, and to the extent that CONCESSIONAIRE's available funds (including any third party borrowings) are insufficient for its purposes, GIHL shall fund (or procure the funding of) CONCESSIONAIRE in accordance with Article XVI, Section 4c.

**Section 2 Adequate Capital**
In making elections from time to time pursuant to paragraph 1 above, GIHL shall ensure that, at all times, the CONCESSIONAIRE has a prudent capital structure. However, a ratio of loans to the greater of equity capital (stated and surplus) and shareholders funds of 4:1 or less shall not be regarded as imprudent.

## ARTICLE XIX
## UNDERTAKINGS OF THE GOVERNMENT

**Section 1 Access to Information**
GOVERNMENT hereby undertakes and affirms that the CONCESSIONAIRE, at basic cost, shall be entitled to use and to have access to all geological or other information relating to the Concession Area that is owned by the GOVERNMENT or may be in or subject to the GOVERNMENT's control. The GOVERNMENT hereby agrees that it shall provide such information upon the CONCESSIONAIRE's request within a reasonable time. For purposes of this Agreement, basic cost shall mean the cost of reproduction and any additional un-recovered cost actually incurred by GOVERNMENT in obtaining such information but not to exceed rates charged other Persons.

**Section 2 Provision of Documents**
Subject to Article XII, Section 1 and except to the extent any such person may be disqualified by Law, GOVERNMENT shall promptly furnish to each employee of CONCESSIONAIRE, GIHL and of its Associates who is not a citizen of the Republic, and to the spouse and minor dependents of each such employee, all documents and visas necessary to enable such person to enter and to leave, or travel within, the territory of the Republic without hindrance, molestation and intimidation.

**Section 3 Use of Aircraft**
GOVERNMENT hereby undertakes and affirms that CONCESSIONAIRE, GIHL and its Associates shall be entitled to use, in accordance with Law, an aircraft, whether owned or rented, for journeys within the Republic and into and out of its territory. Moreover, CONCESSIONAIRE, GIHL and its Associates shall have aircraft landing and parking rights in all airports, airfields and landing strips within the Republic, except for those used exclusively as military bases, and shall pay the lowest applicable fees and tariffs for such use.

**Section 4 Use of Airports and Seaports**
GOVERNMENT shall permit CONCESSIONAIRE, GIHL and its Associates to obtain access to and use all airport and seaport installations in the Republic, except those reserved for military and national security related activities, at the lowest prices paid by any other Person, for all aircraft and ships whose presence in Liberian territorial airspace or waters is required by CONCESSIONAIRE, GIHL and its Associates in connection with Operations. These aircraft and ships shall have the right to enter and to leave the territorial airspace and waters of the Republic, without restriction, in accordance with Law.

### Section 5 Electricity Generation and Transmission

GOVERNMENT undertakes and affirms that CONCESSIONAIRE, GIHL and its Associates shall be entitled, at their own cost but free of any further Taxes or Duties or other payments to any Person and/or GOVERNMENT for or in connection with the exercise of such entitlement, to generate, transmit and use electricity, and use and provide water, in accordance with Law regulating such use, as may be required for Operations. In the event that CONCESSIONAIRE, GIHL and its Associates purchase electric power or water from GOVERNMENT for any purpose associated with Operations, they shall be charged at the lowest rates applicable in the Republic to industrial users. If CONCESSIONAIRE produces more electricity or water than it can utilize, it shall sell the extra production to third party users at fair market price.

### Section 6 Issuance of Necessary Authorization

GOVERNMENT undertakes and affirms that it shall issue all licenses, permits, mining titles, easements, and other authorizations, including but not limited to, the rights and titles referred to in Article IV, Section 1 and Article VI, Section 1 above, which are or may be necessary for CONCESSIONAIRE, GIHL and its Associates to conduct Operations.

### Section 7 Protection against Nationalization or Expropriation

GOVERNMENT undertakes and affirms that it shall not nationalize, condemn or expropriate:

a.  Any infrastructure, Facilities or other property, movable or immovable, of CONCESSIONAIRE, GIHL or its Associates to the extent connected with or affecting Operations;

b.  Iron ore, associated Minerals or derivatives thereof in any form resulting from Operations;

c.  Any equity, shares or ownership interests of whatever nature and kind held in or issued by CONCESSIONAIRE;

d.  Any infrastructure put in place or used by CONCESSIONAIRE in connection with Operations; and

e.  Any capital invested by the CONCESSIONAIRE, GIHL or its Affiliates in the Republic.

### Section 8 Peaceful Enjoyment

GOVERNMENT hereby warrants and defends CONCESSIONAIRE's title to, possession and peaceful enjoyment of all rights granted to it by this Agreement and all of its property in the Republic against expropriation, confiscation, condemnation, wrongful possession, and to the extent possible, destruction, disruption, or interference by any Person.

### Section 9 Non-Derogation

GOVERNMENT hereby undertakes and affirms that at no time shall the rights (and the full and peaceful enjoyment thereof) granted by it under this Agreement be derogated from or otherwise prejudiced by any Law or by the action or inaction of GOVERNMENT, or any official of thereof, or any other Person whose actions or inactions are subject to the control of GOVERNMENT.

### Section 10 Equitable Treatment

In the event that GOVERNMENT grants to any other Person terms or conductions that are more favorable than those provided in this Agreement with respect to Operations, Exploration or Production of the same Mineral(s), or in the event that GOVERNMENT enacts any Law or adopts any practice or policy that permits more favorable treatment of any other Person than that accorded to the CONCESSIONAIRE by this Agreement with respect to Exploration and Production of iron ore being explored for, developed or produced by CONCESSIONAIRE, then GOVERNMENT shall grant the same more favorable treatment to the CONCESSIONAIRE, with effect from the date of its application to such other Person or of its entry into force, as the case may be.

## ARTICLE XX
## UNDERTAKINGS OF GIHL

The undertakings/obligations of GIHL shall include but not be limited to the following:

a.   To undertake, through the Operator, a comprehensive Feasibility Study of the mineral deposits in the Concession Area and submit a report to CONCESSIONAIRE;

b.   To produce, through the Operator, a Production Work Program (on the Development/Production of the iron ore deposits in the Concession Area) as will be required under this Mineral Development Agreement (MDA) and use it together with the Feasibility Report as the basis for ongoing Operations (See Appendix 1);

c.   To carry, through the Operator, out an Environmental Impact Assessment hereinafter referred to as "EIA" in relation to Operations as required by the Environmental Protection And Management Law of Liberia, and in keeping with acceptable International Standards on environmental management and control;

d.   To procure Capital Investment and Financing for CONCESSIONAIRE's Operations and manage all such finances on a daily basis;

e.   To bring international expertise, systems and technical know-how to CONCESSIONAIRE's Operations and the associated operations, Facilities and infrastructure;

f.   To solely appoint, constitute, designate and name Operator to manage Operations for and in behalf of CONCESSIONAIRE;

g.   To utilize a well defined management structure, internationally acceptable standards of accounting and governance, and to provide regular comprehensive reporting to the Parties hereto;

h.   To Market all Production, associate products and derivatives;

i.   To bring, through CONCESSIONAIRE, international expertise in Iron Ore mining and processing to Liberia and to provide Employment, Secondment, and Training as may be required as specified in Article XII;

j.   To establish, through CONCESSIONAIRE, Healthcare and Education facilities as may be required as specified in Articles X and XI;

k.   To consider legal and operational obligations for CONCESSIONAIRE's Operations as required by the Liberian Minerals and Mining Law including environmental issues, employment and training of the domestic labor force, the domestic requirement for Iron Ore and the rehabilitation of the mine and site after exhaustion; and

l.   To establish, through CONCESSIONAIRE, an administrative locus in Liberia that will provide reporting and accounting services to Operations and will collaborate with the Parties to ensure smooth running of those Operations.

## ARTICLE XXI
## INDEMNIFICATION

**Section 1 Indemnification for Breach of Agreement**
Any breach by either party to this Agreement of any obligation provided for in this Agreement, shall entitle the party aggrieved by the breach to be indemnified by the defaulting party in an amount equal to the damage suffered by the aggrieved party.

**Section 2 CONCESSIONAIRE's Indemnification of GOVERNMENT**
CONCESSIONAIRE shall at all times indemnify and hold harmless GOVERNMENT and its officers and agents from any and all claims and liabilities for death or injury to persons or damage to property from any cause whatsoever arising out of Operations or as a result of the CONCESSIONAIRE's failure to comply with any Law to which it is subject.

**Section 3 GOVERNMENT's Indemnification of CONCESSIONAIRE, GIHL and its Affiliates**
GOVERNMENT shall indemnify and hold harmless CONCESSIONAIRE, GIHL and its Affiliates from any and all claims, liabilities, costs, expenses, loses and damages suffered by it (whether arising by operation of Law or contract voluntarily made, or otherwise reasonably assumed by it) as a result of any failure of GOVERNMENT to honor any provision or undertaking expressed in this Agreement.


# ARTICLE XXII
# INCOME TAXATION

**Section 1 Rate and Basis**
CONCESSIONAIRE shall be liable to taxation under provisions of the ACT ADOPTING A NEW MINERALS AND MINING LAW and the Revenue Code of Liberia (Act of 2000) on its net taxable income, which shall include capital gains, as follows;

The rate of tax applicable to the net taxable income of CONCESSIONAIRE shall not be less than thirty percent (30%), which net taxable income shall mean its gross income from Production and other Operations, as well as its gross income from the sale or distribution of any asset to, for the benefit of, any person, to the extent of the excess of the fair market value of such asset over its adjusted basis, and any other income from business activity or investment, including currency gains when realized, less the deductions set forth in Article XXII, Sections 2 and 4.

**Section 2 Computation of Net Taxable Income**
In computing CONCESSIONAIRE's net taxable income, the following shall be allowed as deductions from its gross income:

a.    In the year incurred, all expenditures on Operations, other than the capital cost of items of plant, equipment, machinery and Infrastructure and other than any payment made to an expatriate employee by CONCESSIONAIRE as reimbursement for Taxes and Duties paid by such employee to CONCESSIONAIRE, or otherwise as specifically provided below;

b.    Commencing in the year construction, acquisition or installation is completed, an allowance for depreciation of the items of plant, equipment, machinery and Infrastructure shall be computed in accordance with the Revenue Code of the Republic (Act of 2000);

c.    In the year sold, the difference between the adjusted basis and the selling price of any assets to the extent the latter is less than the former or, if any asset is declared to be scrap or obsolete or if construction, acquisition or installation of any asset is abandoned prior to completion, the adjusted basis of the asset in the year the asset is declared scrap or obsolete by CONCESSIONAIRE or in which construction, acquisition or installation of the asset is abandoned;

d.    In the year incurred, all interest and other financing charges on any Approved Indebtedness of CONCESSIONAIRE incurred in connection with Operations;

e.    In the year paid or incurred, any and all payments of Taxes, except for Income Tax and other fees as provided within the Revenue Code of Liberia (Act of 2000);

f.    In each year, all bad debts in excess of any reserve against bad debts, existing in such year and allowed as a deduction against gross income;

g.    In each year, currency exchange losses and accounting translation losses when realized;

17

h.  All costs incurred prior to the Effective Date of this Agreement and with respect to the Concession Area and paid for by CONCESSIONAIRE, subject to the review of such costs for accuracy by the Minister of Finance and the Minister of Lands, Mines and Energy, which shall be capitalized and amortized over five (5) Concession Years from the Effective Date; and

i.  All charitable contributions made in the Republic for educational, religious or medical purposes or for other social services approved by GOVERNMENT to the extent that, with respect to any tax year, such charitable contributions do not exceed fifteen percent (15%) of CONCESSIONAIRE's taxable income as defined under the Revenue Code of Liberia (Act of 2000).

**Section 3 Carry Forward Permitted**
To the extent that, for any reason, there is a net operating loss, it may be carried forward pursuant to the Revenue Code of Liberia (Act of 2000) for such other period(s) as may be provided by the said law or any amendment thereof.

**Section 4 Computation of Taxable Income in Dollars**
Except as otherwise provided in this Agreement, the net taxable income of CONCESSIONAIRE shall be determined in Dollars in accordance with generally accepted accounting principles. Notwithstanding the foregoing, CONCESSIONAIRE shall commence to pay or cause to be paid Income Tax ten (10) years after the Effective Date of this Agreement.

## ARTICLE XXIII
## ROYALTIES

**Section 1 Royalty Rate**
CONCESSIONAIRE shall pay to GOVERNMENT in Dollars a royalty of three (3%) percent from the sale of iron ore.

**Section 2 Royalty Basis**
Royalty shall be determined on a gross revenue basis taking into account the actual weight and analysis of the ore sold.

**Section 3 Payment**
Royalty shall be paid ninety (90) days after the day on which the iron ore sold is shipped to the purchaser.

## ARTICLE XXIV
## SURFACE RENTAL

**Section 1 Concession Area**
CONCESSIONAIRE shall pay to GOVERNMENT, during each calendar year, a surface rental equal to a lump sum of One Hundred and Seventy-five Thousand (US$175,000.00) United States Dollars for land subject to Exploration/Feasibility Studies and Production. The payment of the surface rental shall commence five (5) years after the Effective Date of this Agreement.

**Section 2 Payment**
All such surface rentals shall be payable annually to GOVERNMENT in advance on or before January 15 of the year period for which payment is being made.

## ARTICLE XXV
## OTHER PAYMENTS TO GOVERNMENT

**Section 1 Import Duties and Other Payments**
Pursuant to provisions of the Investment Incentive Code of Liberia, CONCESSIONAIRE shall pay no Taxes and Duties with respect to the import, use or purchase of goods, equipment, vehicles, machinery, heavy oil, diesel, lubricants and supplies (including medical, training and

18

educational supplies and housing and office materials, furniture and supplies), and any other items required for and used in Exploration, Development and Production. CONCESSIONAIRE shall, with regard to items not used in Exploration, Development and Production or otherwise exempt pursuant to this Article XXV, Section 1 hereof, pay import duties and sales taxes under Law but, without prejudice to Article XXV, Section 2, at rates no higher than those payable by any other producer of iron ore in the Republic.

### Section 2 Payments in Lieu of Duties and Fees
In lieu of the customs duties and fees and other taxes waived herein, CONCESSIONAIRE shall pay to GOVERNMENT an annual lump sum amount of Two Hundred Thousand (US$200,000.00) United States Dollars to be paid in two installments of One Hundred Thousand (US$100,000.00) United States Dollars each on January 15, and July 15, respectively each year.

In consideration of this payment, CONCESSIONAIRE shall not be subject to the payment of taxes, duties and fees with respect to import, use or purchase of goods, equipment, vehicles, machinery, heavy oil, diesel, lubricants and supplies (including medical training and educational supplies and housing and office materials, furniture and supplies), and any other items required for and used in Exploration, Development, and Production. CONCESSIONAIRE shall, with regard to items not used in Exploration, Development and Production. CONCESSIONAIRE shall, with regard to items not used in Exploration, Development and Production or otherwise exempt pursuant to the Agreement, pay import duties and excise taxes under Law but, without prejudice to ARTICLE XXV, Section 1, at rates no higher than those payable by any other producer of iron ore in the Republic. Such payment shall commence five (5) years after the Effective Date of this Agreement.

### Section 3 Other Payments
In respect of Operations and activities CONCESSIONAIRE shall pay to GOVERNMENT:

a.  50% concessionary rate of Import Levy, pursuant to the Revenue Code of Liberia (Act of 2000) on gasoline;

b.  CONCESSIONAIRE shall pay a quarterly presumptive Turn-Over Tax at a concessionary rate of one quarter of one percent of its Gross Income which Tax shall be credited against its corporate income tax in keeping with the Revenue Code of Liberia (Act of 2000); and

c.  CONCESSIONAIRE shall be exempt from the payment of BIVAC or its successor's fee of 1.5% on imports and exports.

### Section 4 Mineral Development Fund
On the Effective Date of this Agreement pursuant to Article II, CONCESSIONAIRE shall make a one-time payment to GOVERNMENT for the Mineral Development Fund, US$50,000 Fifty Thousand (US$50,000.00) United States Dollars.

### Section 5 Other Exemptions from Taxes and Duties
The Taxes and Duties and other amounts specifically provided in this Agreement to be paid to GOVERNMENT are in lieu of all other Taxes and Duties and other amounts (except for ordinary taxes, fees and revenue charges of general application that are minor in nature and amount that are not imposed upon or derived from Operations, such as, for example, business and auto registration and driver's license fees) which, directly or indirectly, at any time, under any sovereign or other Law or otherwise, would be levied upon or payable to the GOVERNMENT by CONCESSIONAIRE or its Associates with respect to any activity or transaction engaged in by any of them, or any items or materials possessed, owned, transported, imported, exported, processed, mined or otherwise dealt with or in by any of them. The above shall apply, without limitation as to the generality of the foregoing, to any Taxes and Duties that might be paid to CONCESSIONAIRE by any of the foregoing Persons resulting from the subscription of equity or loan capital to or by any of them; the payment or receipt of interest and dividends by any of them; the import, export, acquisition, supply, sale, disposition or other dealing with property and any payment, receipt, income, profit or gain made, received, earned or realized by any of them as a result thereof. The above shall further apply, but not be limited, to any payments made to non-

residents, including payments for goods and services, and payments of interest, dividends and other fixed and determinable income.

### Section 6 Non-Application of Article XXV, Section 5

The provisions of Article XXV, Section 5 shall not apply, however, to the Associates of CONCESSIONAIRE with respect to the following: their Taxes and Duties measured by reference to their net income, profit and gain under Law unless any such Person was resident in the Republic for less than one hundred eight-three (183) days in the tax year;

Subject to the foregoing, their Taxes and Duties measured by reference to their net income, profit and gain under Law, and earned by them in the Republic except that no Taxes and Duties shall be payable with respect to any payments made to any of them by CONCESSIONAIRE as reimbursement for Taxes and Duties; or

The import into (and subsequent re-export from) the Republic of personal and household goods and effects except as to one motor vehicle per family and as to their first move to the Republic to establish residency.

## ARTICLE XXVI
## FINANCIAL REPORTING AND CURRENCY

### Section 1 Accounting

All of CONCESSIONAIRE's accounting under this Agreement shall be in Dollars and all amounts paid or received, and obligations incurred or transactions carried out, in currency that is legal tender in the Republic or in any Foreign Currency other than Dollars shall be converted to Dollars in accordance with and pursuant to generally accepted accounting principles in the United States (except to the extent inconsistent with the terms of this Agreement) based upon the Prevailing Market Rate of Exchange of Dollars and any such currency at the date of the applicable transactions.

### Section 2 Exchange Control

CONCESSIONAIRE shall at all times have the right, without restriction, directly or indirectly, by GOVERNMENT, to obtain, hold, deal with and disburse funds in such manner, currencies and places as it chooses. Without prejudice to the generality of the foregoing, CONCESSIONAIRE shall have the unrestricted and unencumbered right to sell and receive payment for iron ore in any currency, including the currency in which the iron ore is sold, and all proceeds therefrom may be deposited in bank accounts outside of the Republic and held there or remitted therefrom to anywhere in the world, in any currency. Notwithstanding the foregoing, CONCESSIONAIRE shall maintain at least one account with a bank or financial institution in the Republic. CONCESSIONAIRE shall also have the right to acquire from, and sell to, any Person currency that is legal tender in the Republic at the Prevailing Market Rate of Exchange. Additionally, any and all transactions between GOVERNMENT and the CONCESSIONAIRE dealing with or referring to currency that is legal tender in the Republic will be converted to Dollars at the Prevailing Market Rate of Exchange on the Date of such transaction. Currency gains or losses for purposes of Article XXII shall be determined by reference to the prevailing Market Rate of Exchange.

### Section 3 Currency of Payment

Payment of CONCESSIONAIRE's direct obligation to GOVERNMENT for Taxes and Duties payable under Articles XXII, XXIII, XXIV and XXV of this Agreement shall be in Dollars, unless the Parties hereto otherwise agree. Any obligation originally stated in currency that is legal tender in the Republic, or in any currency other than Dollars, will be converted to Dollars at the Prevailing Market Rate of Exchange on the date such obligation is paid, or shall fall due, whichever is earlier. However, CONCESSIONAIRE shall make payments of sums it collects on behalf of GOVERNMENT, including, but not limited to, taxes withheld from the salaries or wages of the employees of CONCESSIONAIRE, and any other sums payable to other Persons from which a portion is required by law to be withheld or retained by CONCESSIONAIRE on behalf of GOVERNMENT, in the currency in which such salaries or wages or such other sums are paid. CONCESSIONAIRE shall have the right to make all other payments whether to GOVERNMENT or to other Persons in currency that is legal tender in the Republic.

**Section 4 Right to Remit and Receive Payments**

GOVERNMENT, CONCESSIONAIRE, GIHL Operator and its Affiliates shall have the right to receive and remit in Dollars all payments of dividends, interest, principal and other payments arising from, as a result of, or related to Operations, and to do so free of Taxes and Duties on such remittances or receipts, and without penalties, any required total or partial surrender, exchange or confiscation so such Dollars, or other direct or indirect restrictions on such remittances or receipts.

**Section 5 Audit**

a.      CONCESSIONAIRE, Operator and its Affiliates shall cause their respective books of account to be audited within three (3) months, or such longer period of time as GOVERNMENT may approve, after the close of each Financial Year by an independent auditor selected by CONCESSIONAIRE, and a copy of the annual financial statement duly certified by said auditor shall be furnished to GOVERNMENT within twenty working (20) days after its receipt by the CONCESSIONAIRE. GOVERNMENT shall have the right freely to discuss with the said auditor the results of the audit and certification, and the CONCESSIONAIRE shall take all reasonable measures to ensure that said auditor shall cooperate fully in such discussions. The foregoing shall not in any way imply acceptance of any such audit or certification by GOVERNMENT or preclude GOVERNMENT from auditing such books of account as provided under Law, provided that GOVERNMENT shall provide the CONCESSIONAIRE with a copy of any such audit within forty five (45) days of receipt. However, once either GOVERNMENT or CONCESSIONAIRE has audited any book of accounts, the financial statement thus audited shall be considered acceptable and the audit results binding and conclusive as to its findings, unless a party hereto shall have indicated to the contrary within three (3) years after its receipt of a copy of the audited financial statement.

b.      If CONCESSIONAIRE has, pursuant to this Agreement, underpaid its liability for Taxes and Duties, GOVERNMENT shall assess interest and penalties in accordance with the Revenue Code of Liberia (Act of 2000). If the CONCESSIONAIRE has overpaid its liability for Taxes and Duties then, at its option, it may elect either to be reimbursed by GOVERNMENT or to apply such overpayment against future Taxes and Duties.

c.      In case a review of records or books outside of the Republic is required, CONCESSIONAIRE will cooperate to provide GOVERNMENT with copies of the information, books and records needed to complete the audit. If GOVERNMENT nonetheless deems it necessary for any part of such audit to be performed outside of the Republic, the cost of associated travel will be borne by the CONCESSIONAIRE.

**ARTICLE XXVII**
**INCIDENTAL RIGHTS**

**Section 1 Use of Resources**

Except as otherwise provided in this Agreement, CONCESSIONAIRE shall have the right to remove, extract and use water, gravel, sand, clay, stone and timber (except for protected species, insofar as they do not interfere with or hinder Operations) provided, however, that CONCESSIONAIRE shall not deprive any Person of a constant and reasonable supply of usable water form a previously utilized traditional source without replacing it, nor shall CONCESSIONAIRE, without GOVERNMENT's consent, interfere with any water rights enjoyed by any user under any agreement with GOVERNMENT made prior to the date of execution of this Agreement. In this connection, GOVERNMENT shall advise the existence of any such agreement with respect to the use of water.

**Section 2 Imports**

CONCESSIONAIRE, GIHL and its Affiliates shall be entitled to import and use in respect of Operations, and subsequently export, any and all machinery, equipment, consumable items, fuels, explosives and any other thing whatsoever reasonably required with respect to Operations and in accordance with the terms of this Agreement, provided, however, that CONCESSIONAIRE shall not re-export fuels and explosives surplus to requirements if such

21

surplus can be sold at competitive international prices within the Republic. CONCESSIONAIRE shall at all time comply with Law regarding the safe use, sale disposal and security of explosives.

**Section 3 Taxes on Resale**
CONCESSIONAIRE, GIHL and its Affiliates may sell, in the Republic, all imported items that are no longer needed for Operations. However, if such imports were exempted from Taxes and Duties, CONCESSIONAIRE shall fulfill all formalities required in connection with the payment by a purchaser of all Taxes and Duties imposed on such sales by Law.

## ARTICLE XXVIII
## ASSIGNMENT AND ENCUMBRANCE

**Section 1 Right of Assignment**
CONCESSIONAIRE shall have the right to assign or otherwise dispose of all or part of its interest under this Agreement with the prior written consent of GOVERNMENT, which consent shall not be unreasonably held and/or delayed.

**Section 2 Right to Encumber**
CONCESSIONAIRE shall have the right to mortgage, charge or otherwise encumber all or part of its interest under this Agreement for the purpose of raising, from one or more Affiliates or third parties, financing for its obligations under this Agreement, but any power of sale arising under any such mortgage, charge or other encumbrance shall only be exercised with the prior written consent of GOVERNMENT, which consent shall not be unreasonably withheld and/or delayed.

**Section 3 Notice of Assignment or Encumbrance**
CONCESSIONAIRE shall promptly give Notice to GOVERNMENT of any assignment, mortgage, charge or other disposition or encumbrance pursuant to this Article XXVIII.

## ARTICLE XXIX
## TERMINATION

**Section 1 Termination by CONCESSIONAIRE**
Notwithstanding any other provisions of this Agreement, CONCESSIONAIRE shall have the right to terminate this Agreement at any time, either in its entirety or as to any part of the Concession Area, thirty (30) days after giving Notice to GOVERNMENT if such notice to GOVERNMENT is given within five (5) years of the Effective Date, or one hundred eighty (180) days after giving Notice to GOVERNMENT if such is given more than five (5) years after the Effective Date. The CONCESSIONAIRE may also terminate this Agreement pursuant to Article XXXIII.

**Section 2 Termination by GOVERNMENT**
Subject to the provisions of Article XXIX, GOVERNMENT shall have the right to terminate this Agreement if any of the following events (hereinafter called "Events of Default") shall occur and be continuing:

a.      Where CONCESSIONAIRE shall fail to comply with its material obligations under this Agreement and such failure shall have a materially adverse effect on GOVERNMENT;

b.      Where CONCESSIONAIRE shall (i) voluntarily make an assignment of all or substantially all of its assets for the benefit of creditors other than an assignment made to secure indebtedness incurred in the ordinary course of business, (ii) file a petition or application to any tribunal for the appointment of a trustee or receiver for all or any substantial part of CONCESSIONAIRE's assets, (iii) commence any proceedings for its bankruptcy, reorganization, arrangement or insolvency under the laws of any jurisdiction, whether now or hereafter in effect, or if any such petition or application is filed, or any such proceedings are commenced against it, indicate its approval thereof, consent thereto or acquiescence therein, or (iv) if any order is entered appointing any such trustee or receiver, or adjudicating CONCESSIONAIRE bankrupt or insolvent, or approving the

22

petition in any such proceedings, permit such order to remain in effect for more than ninety (90) days;

c.    Where CONCESSIONAIRE shall fail to carry out Exploration/Feasibility Studies and other work programs as stipulated in Article V, for a period of Three (3) consecutive months or cease Production with respect to all Production Areas for a period of twenty four (24) consecutive months unless such failure or cessation is consented to by GOVERNMENT or is caused by Force Majeure;

d.    Where CONCESSIONAIRE shall fail to make payments of Taxes and Fees to GOVERNMENT or comply with the Minimum Expenditure requirement in Article V, Section 2; and

e.    GOVERNMENT shall terminate this Agreement at any time, either in its entirety or as to any part of the Concession Area, thirty (30) days after giving Notice to CONCESSIONAIRE if such notice to CONCESSIONAIRE is given within five (5) years of the Effective Date; or one hundred eighty (180) days after giving Notice to CONCESSIONAIRE if such is given more than five (5) years after the Effective Date. GOVERNMENT may also terminate this Agreement pursuant to Article XXXIII.

**Section 3 Opportunity to Cure**
In the case of an alleged Event of Default described in Article XXIX, Section 2 above, GOVERNMENT, before taking any further action, shall provide Notice to CONCESSIONAIRE of the alleged occurrence of such Event of Default and of GOVERNMENT's views in that regard and shall offer the CONCESSIONAIRE a fair opportunity to consult with GOVERNMENT to resolve the matter. If after a reasonable period of time of consultation, GOVERNMENT is of the reasonable opinion that the matter cannot be resolved by further consultation, GOVERNMENT may then send to CONCESSIONAIRE Notice of GOVERNMENT's intention to terminate this Agreement. If the Event of Default is not cured within sixty (60) days after the said Notice, or within such longer period as may be necessary to allow a reasonable period of time to effect such cure, then this Agreement shall be terminated.

**Section 4 Disputes Regarding Events of Default**
Notwithstanding the provisions of Article XXIX, Sections 2 and 3, if CONCESSIONAIRE disputes whether there has been an Event of Default described in Article XXIX, Section 2 and, within sixty (60) days after receipt by the CONCESSIONAIRE of GOVERNMENT's Notice of its intention to terminate, refer such dispute to arbitration in accordance with Article XXXI, then termination of this Agreement shall not take effect until the finality of, and in accordance with, an arbitration award upholding GOVERNMENT's right to terminate.

**Section 5 Winding-up Commission**

a.    That at the time of Notice of any termination of this Agreement, and pursuant to its terms and conditions, the Parties hereto shall set up a winding-up commission (hereinafter referred to as "the Commission") which shall consist of the Technical Committee and two (2) additional members, one each to be appointed by GOVERNMENT and CONCESSIONAIRE. The chairman of the Commission shall be appointed by GOVERNMENT from among the members of the Commission. Each member of the Commission, including its chairman, shall have only one (1) vote.

b.    That the chairman of the Commission shall issue a Notice and agenda for the first meeting of the Commission, which shall be held no later than three (3) weeks after the establishment of the Commission. Thereafter, the Commission shall hold periodic meetings at least once a calendar month.

c.    That CONCESSIONAIRE shall present to the Commission a detailed report on the status of Operations of CONCESSIONAIRE under this Agreement so that the Commission will be able to make recommendations to GOVERNMENT on steps which GOVERNMENT might take under the circumstances with a view to preserving the viability of the enterprise, employment in the area and the centers of population.

23

d.   That at the request of GOVERNMENT, the Commission shall establish plans for the full or partial cessation of operations including the disposition of assets and their demolition or removal according to Article XXX.

e.   That at the request of either party to this Agreement, any meeting of the Commission shall be held outside the Republic, and the requesting party shall be responsible for the travel cost of the participants.

f.   That CONCESSIONAIRE may elect not to participate on the Commission, in which event its obligations under this Article XXIX shall be limited to providing the information required in Article XXIX, Section 5c above.

## ARTICLE XXX
## DISPOSITION OF ASSETS

### Section 1 Immovable Assets

Upon a regular termination of this Agreement occasioned by the expiration of its term(s), except for termination resulting from a breach of this Agreement by GOVERNMENT, or termination pursuant to Article XXIX, Section 1, all lien free permanent immovable assets of CONCESSIONAIRE in the Concession Area that are not otherwise the property of GOVERNMENT shall become the property of GOVERNMENT without charge. In the event of a breach by either Party hereto, the value of the non-movable assets shall be taken into account in any award of damages under Article XXXI, Section 6.

### Section 2 Movable Assets

At any time after termination of this Agreement and with respect to each movable asset of CONCESSIONAIRE in the Republic, which CONCESSIONAIRE desires to sell (other than to an Affiliate at market price), GOVERNMENT shall have the first option to purchase such asset at the fair market price thereof, such price to be paid in Dollars. If GOVERNMENT does not exercise such option within one hundred twenty (120) days after being informed by the CONCESSIONAIRE that it desires to sell such asset, then the CONCESSIONAIRE may sell such asst to any Person, including GOVERNMENT, for such price as it may be able to obtain therefore, or remove such asset from the Republic without Taxes and Duties or other liability to GOVERNMENT. If, however, GOVERNMENT purchases any such asset, it shall pay the purchase price within sixty (60) days after such price has been agreed upon or determined, unless the Parties hereto otherwise agree.

### Section 3 Removal of movable Assets

GOVERNMENT, by Notice to CONCESSIONAIRE within a reasonable period but not to exceed one (1) year after a regular termination of this Agreement occasioned by the expiry of its term(s), and except for termination resulting from a breach by GOVERNMENT, may require reasonable disposal or removal, in accordance with Law, of any or all assets, including unusable assets, remaining within the Concession Area after total disposition of assets in accordance with this Article XXX, and if CONCESSIONAIRE does not reasonably dispose of or remove such asset or assets within a reasonable period after said Notice, GOVERNMENT may effect such reasonable disposal or removal at the expense of CONCESSIONAIRE, but CONCESSIONAIRE shall be entitled to any income realized from the salvage value of such assets.

## ARTICLE XXXI
## ARBITRATION

### Section 1 Submission to Arbitration

Any dispute between GOVERNMENT and CONCESSIONAIRE arising out of, in relation to or in connection with this Agreement or its formation, or the validity, interpretation, performance, termination, enforceability or breach of this Agreement (including any dispute concerning whether GOVERNMENT or CONCESSIONAIRE has violated or is in breach of this Agreement), for which resolution by submission to an expert is not specifically provided elsewhere in this Agreement shall be exclusively and finally settled by binding arbitration pursuant to the Convention in accordance with the rules of the Centre in effect on the Effective

24

Date except to the extent in conflict with this Article XXXI which shall prevail in that event. The Parties hereto agree that this Agreement and CONCESSIONAIRE's Operations pursuant thereto constitute an "investment" by reason of the expenditure of a considerable amount of money in the Republic and that for purposes of Article 25(1) of the Convention, any dispute subject to this Article XXXI is a legal dispute arising directly out of an investment. Either of the Parties to such dispute may institute arbitration proceedings by giving Notice to the other Party and Notice to the Secretary-General of the Centre, including in each a statement of the issues in dispute.

### Section 2 Nationality for purposes of Arbitration

CONCESSIONAIRE is incorporated in Liberia and notwithstanding the incorporation in the Republic of any of CONCESSIONAIRE's successors or assignees, or of any of its other Affiliates, all such entities shall be treated for purposes of arbitration under this Article XXXI as nationals of the United Kingdom of Great Britain for purposes of the Convention and of this Agreement, except that CONCESSIONAIRE and any other such entity may, alternatively, elect to be treated instead as a national of any other state of which, under the Convention, international law or the law of such State or country, it is a national.

### Section 3 Arbitrators

Any arbitration tribunal constituted pursuant to this Agreement shall consist of one (1) arbitrator to be appointed by GOVERNMENT, one (1) arbitrator to be appointed by CONCESSIONAIRE and one (1) arbitrator, who shall be the president of the tribunal and shall be a citizen neither of the Republic nor of a national of the United States of America (or of any other state of which a party is a national under Article XXXI, Section 2) to be appointed by the Secretary-General of the Centre. Any such arbitrator shall have neither an interest in the matters in dispute, nor in the Parties thereof.

### Section 4 Referee

At the request of a Party hereto, any matter otherwise subject to arbitration under this Agreement shall instead be referred for resolution to a single referee to be appointed by the Secretary-General of the Centre, or of any successor entity as provided for by Article XXXI, Section 9 below, except for any dispute arising out of or related to Articles III, VI and XXIX of this Agreement, which must be referred to arbitrators appointed pursuant to Article XXX, Section 3 above unless the Parties mutually agree that any such dispute is not material, in which event it may be referred to the referee for decision at the option of either Party. The decision of the referee shall be rendered pursuant to Article XXXI, Section 6 of this Agreement (except as regards the requirement for a decision by majority vote) and shall be final and binding unless appealed by any party to arbitrators appointed as provided in this Article XXXI, Section 3, who shall examine the referee's decision only as to manifest error(s) of law, findings of fact that are not supported by any credible evidence, and abuse of authority, misconduct or other unauthorized act by the referee.

### Section 5 Venue

Arbitration proceedings conducted pursuant to this Agreement shall be held in Washington, D.C., United States of America, or such other place as the Parties hereto may agree and shall be conducted in the English language. The costs of the proceedings shall be assessed and borne in such manner as the arbitration tribunal shall decide. Any procedural issues that cannot be determined under the arbitral rules of the Centre shall be determined pursuant to applicable law as set forth in Article XXXIV below.

### Section 6 Award

The arbitrators shall, by majority vote, render a written award that shall state the reasons for their award within three (3) months after any hearing conducted has been concluded. Any monetary award shall be assessed and payable in Dollars (determined at the prevailing Market Rate of exchange as the award of the award involved an obligation expressed in any currency other than Dollars through a bank designated by the recipient, and in the case of an award to the CONCESSIONAIRE, shall be exempt from any Taxes and Duties imposed upon CONCESSIONAIRE by GOVERNMENT. Each Party shall bear its own costs and attorney fees. Neither Party to the arbitration proceedings shall have any liability for either consequential damages (except for purposes of set off) or exemplary or punitive damages, but interest at a rate not to exceed the London Interbank Offering Rate (LIBOR) existing at the time of such award, plus one (1) percentage point, multiplied by the amount of the award, shall be assessed from the

date of any monetary award until its satisfaction. If LIBOR should cease to be reported, then the rate to be applied shall be another substitute rate agreed to by a majority of the tribunal. If the tribunal's award is adverse to the CONCESSIONAIRE, then the arbitration tribunal may, in its discretion, specify a reasonable period of grace to cure any defect or default on the part of the CONCESSIONAIRE, provided that such period of grace shall not exceed one hundred eighty (180) days for the making of any payment by such award.

### Section 7 Waiver of Sovereign Immunity

The GOVERNMENT hereby irrevocably, unreservedly and unconditionally waives all claims of sovereign immunity from the Arbitrators' jurisdiction, and from the enforcement of any arbitral award rendered by a tribunal constituted pursuant to this Agreement, including immunity from service of process and immunity from the jurisdiction of any court situated in any state, country or nation.

### Section 8 Reservation of Rights

The right to refer a claim or dispute to arbitration hereunder shall not be affected by the fact that a claimant or respondent has received full or partial compensation from another Person for a loss or injury that is the object of the claim or dispute, and any such other Person may participate in such proceedings by right of subrogation.

### Section 9 Successors

The consent to the jurisdiction of the Centre as set forth in this Article XXXI shall equally bind any successor of or successors-in-interest to either Party to this Agreement. Should the Centre be replaced by, or its functions be substantially conferred upon or be transferred to, any new international body of a similar type and competence, the Parties hereto shall have the right to submit any dispute to such body for settlement by arbitration in accordance with the foregoing provisions of this Article XXXI.

## ARTICLE XXXII
## COMMUNICATION BETWEEN PARTIES HERETO

### Section 1 Written Communication

All orders, approvals, declarations and Notices of any kind between the Parties hereto which are required, expressly authorized or provided for under this Agreement (hereinafter each referred to as a "Communication") shall be in writing and delivered by hand, by telefax, by postage registered mail, by any other means of communication agreed upon by the Parties hereto, or pursuant to Article XXXII, Section 4. The Communication shall also be signed by a duly authorized representative of the Party dispatching the Communication.

### Section 2 Delivery

A delivery of a Communication to a Party hereto shall be deemed to have occurred in any of the following circumstances:

a.      When an official of GOVERNMENT, in the case of GOVERNMENT, or a director of CONCESSIONAIRE, in the case of CONCESSIONAIRE, has signed a return receipt of registered mail;

b.      When an official confirmation of the receipt has been electronically issued to the sender by a receiving telefax device at a telefax number authorized hereby indicating receipt of a communication sent via telefax;

c.      When verification of the receipt of the Communication has been obtained in any manner specifically agreed to in writing by the Parties hereto; or

d.      When a Party hereto has directly or indirectly acknowledged the receipt of the Communication in writing.

**Section 3 Address**

a.    All Communication from GOVERNMENT to the CONCESSIONAIRE shall be addressed to:

> The Managing Director
> Liberia Global Mining Company
> First Merchant Bank Building
> Broad Street
> Monrovia
> Liberia.

b.    All Communication from CONCESSIONAIRE to GOVERNMENT shall be addressed to:

> The Minister of Lands, Mines and Energy
> Ministry of Lands, Mines and Energy
> Monrovia
> Liberia

with copies sent to:

> The Minister of Finance
> Ministry of Finance
> Broad Street
> Monrovia
> Liberia;

and

> The Chairman
> National Investment Commission
> Tubman Boulevard
> Monrovia
> Liberia.

**Section 4 Change of Address**
Either Party hereto may, upon prior Notice to the other Party, at any time change the designation of the Person(s) named to receive Communication from the other Party, the address or telefax number of the office in the Republic, or elsewhere authorized to receive such Communication or the address or addresses or telefax number or numbers of the offices to which copies of Communication from one Party to the other are to be delivered.

## ARTICLE XXXIII
## FORCE MAJEURE

**Section 1 Application**
In the event of either Party to this Agreement being rendered unable, in whole or in part, by force majeure to carry out any obligation under this Agreement, other than an obligation to make payments of money that accrued prior to the commencement of force majeure, such Person shall give Notice and the particulars of such force majeure in writing to the other Party as soon as is practicable after the occurrence of the cause relied upon, the obligation of the Party giving such Notice, insofar as it is affected by such force majeure, shall be suspended during the continuance of any such inability. However, any such inability shall, as far as is practicable, be remedied with all reasonable dispatch. All time periods specified in this Agreement for the performance of obligations or the enjoyment of rights that are affected by force majeure, except in connection with an obligation to make payments of money that accrued prior to the commencement of force majeure, but including the term of the Agreement, shall be extended by the period of time the inability caused by such force majeure exists. Sixty (60) days after giving Notice to GOVERNMENT, CONCESSIONAIRE shall have the right to terminate this Agreement without further obligations or cost (except for any obligations and cost that accrued prior to the

commencement of force majeure) if a condition of force majeure has existed for a period of one (1) year or more which renders Production impracticable or unprofitable, or prevents Production, the export or sale of minerals, or CONCESSIONAIRE's exercise of a substantial part of its rights under this Agreement.

### Section 2 Definition

The term "force majeure" as used in this Agreement shall mean acts of God (natural disasters which include but are not limited to epidemics, floods, hurricanes, landslides, earthquakes, wild fires as a result of spontaneous combustion, windstorms and lightning) and man made events such as, accidents, wars, acts of war, invasions, acts of public enemies, hostilities (whether war is declared or not), restrictions on trade or other activities imposed by any sovereign, embargoes, blockades, revolutions, riots, civil commotions, sabotage, strikes, shortage of petroleum products, lubricants, cement and/or other industrial, labor or employer-employee disputes (if not cured for a period of more than two (2) months) fires, explosions, expropriation of facilities or goods, and any similar causes, provided any such cause was not within the reasonable control of the Party claiming suspension and could not have been avoided or overcome by such Party through the exercise of due diligence.

### Section 3 No Required Settlement

Nothing in Article XXXIII, Sections 1 or 2 above shall, in and of itself, be construed to require CONCESSIONAIRE to settle any strikes, lockouts or other labor or industrial disputes except as may be required by law.

## ARTICLE XXXIV
## GOVERNING LAW

This Agreement and the rights, obligations and duties of the Parties hereunder shall be construed and interpreted in accordance with Laws of the Republic and by such rules and principles of generally accepted international law as may be applicable, particularly with regard to an investment by nations of one country in another country. Notwithstanding the foregoing, in the event of a conflict between this Agreement or the rights, obligations and duties of a party under this Agreement, and any other Law, including administrative rules and procedures and matters relating to procedure, and applicable international law, then this Agreement shall govern the rights, obligations and duties of the Parties hereto.

## ARTICLE XXXV
## ENTIRE AGREEMENT-MODIFICATIONS

### Section 1 Entire Agreement

This Agreement, including the Appendices attached hereto, represents the entire agreement between the Parties hereto and supersedes all previous oral and written negotiations and agreements.

### Section 2 Amendments

Any modifications or amendments of any of the terms and conditions of this Agreement shall be by the mutually written agreement of the Parties hereto.

## ARTICLE XXXVI
## PERIODIC REVIEW

### Section 1 Modification and Review

The Parties hereto agree that the Agreement shall be subject to periodic review once every five years after the commencement of Production for the purpose of good faith discussions to effect such modifications to the Agreement as may be necessary or desirable in the light of any substantial changes in circumstances which may have occurred during the previous five years.

**Section 2 Good Faith**

It is hereby understood that this clause subjects the Parties to this Agreement to a simple obligation to consider in good faith any proposed modification(s) of the Agreement, subject to Article XXXV, Section 2. This Agreement shall remain unaltered and in force during any such period of consideration.

## ARTICLE XXXVII
## NON-WAIVER OF RIGHTS

The non-exercise or partial exercise by one or the other of the Parties hereto of any of its rights under the terms and conditions of this Agreement shall not in any case constitute a waiver of that right.

## ARTICLE XXXVIII
## SUCCESSION

The terms and conditions of this Agreement shall inure to the benefit of and be binding in addition to the Parties themselves upon their successors, beneficiaries and assignees, including, without limitation, all future manifestations or forms of public power exercising sovereign authority over all or part of the present territory of the Republic.

## ARTICLE XXXIX
## SURVIVAL PROVISION

Notwithstanding termination of this Agreement by either Party thereto or for any reason, including a termination due to a finding that this Agreement or a portion thereof is void, invalid, or unenforceable, Articles XXX, XXXI, XXXII, XXXIII, XXXIV and XXXIX shall survive such termination and shall remain effective as to any matters which are the subject of this Agreement or which arise out of, in relation to or in connection with this Agreement. Moreover, any such termination shall be without prejudice to the rights, duties and obligations that have accrued prior to termination and, notwithstanding such termination, such provisions of this Agreement as are reasonably necessary for the full enjoyment and enforcement of such rights, duties and obligations shall survive such termination for the period necessary.

# APPENDIX C

## ARTICLE V WORK PROGRAM

**Feasibility.**
Year 1        Initiating Scoping activities for Feasibility Report
              Site preparation at Yekepa and Buchanan and rehabilitation works.
              Carry out Feasibility Report.

**Planning**
Year 2        Detailed engineering including the surveying, designing, drawing and
              obtaining estimates for the mines and beneficiation plant, railroad, port
              and communities.
              Mine and road developments.
              Installation of communication systems.
              Financial structuring and planning
              Mobilisation.
              Site preparation.
              Port works.

**Development**
Year 3        Initiate development of mine for operations.
              Crushing unit and downhill system for beneficiation plant.
              Railroad loops, sleepers and track.
              Ore quay and ore handling system.
              Expand communications systems
              Community rehabilitations.
              Port navigation system.

**Construction**
Year 4        Continue development and construction of mine for operations.
              Construction of grinding systems, beneficiation circuit and
              conveyors/structures for beneficiation plant.
              Port ore handling and loading systems.

**Trial Runs & Production**
Year 5        Performance testing and trials of beneficiation plant, railways and port
              systems.
              Initiate full mining production and associated operations.

# APPENDIX D

## ARTICLE V WORK PROGRAM

**MINIMUM EXPENDITURE**

| | |
|---|---|
| **YEAR ONE** | **USD 5.00 M   (Five Million United States Dollars)** |
| **YEAR TWO** | **USD 7.00 M   (Seven Million United States Dollars)** |
| **YEAR THREE** | **USD 13.00 M (Thirteen Million United States Dollars)** |