# EXHIBIT B
# REQUEST FOR ARBITRATION

**BEFORE THE INTERNATIONAL CENTRE
FOR SETTLEMENT OF INVESTMENT DISPUTES**

<u>**REQUEST FOR ARBITRATION**</u>

1.     Liberia Global Mining Company ("LGMC") and Global Steel Holdings Limited

("GSHL") ("Claimants") hereby submit this Request for Arbitration pursuant to:

> (i)     the Mineral Development Joint Venture Agreement of LGMC and GSHL
> (formerly known as Global Infrastructure Holdings Limited, or "GIHL")
> with the Government of the Republic of Liberia (Exhibit 1);
>
> (ii)    the Convention on the Settlement of Investment Disputes between States
> and Nationals of Other States ("ICSID Convention") (575 UNTS 159,
> ICSID Basic Documents, ICSID/15/Rev.1, January 2003); and
>
> (iii)   the Institution Rules and the Arbitration Rules of the International Centre
> for Settlement of Investment Disputes ("ICSID Institution Rules" and
> "ICSID Arbitration Rules") (ICSID Basic Documents, ICSID/15/Rev.1,
> January 2003).

2.     This is a dispute arising out of a twenty-five year concession contract for

exclusive rights to the development and mining of iron ore deposits in portions of Nimba

and Grand Bassa counties in the Republic of Liberia.  The contract runs between the

Republic of Liberia (the "Republic" or "Respondent"), on the one hand, and GSHL, a

United Kingdom-incorporated global mining and steel company, and LGMC, GSHL's

70%-owned Liberian joint venture which under the contract is deemed also to be a United

Kingdom company, on the other hand.

1

3.    The Republic has breached this contract by, *inter alia*, depriving Claimants of their rights to the concession and taking steps to award the same concession to a competitor.  Immediately upon constitution of the Tribunal, Claimants will request provisional measures to halt Respondent's acts in breach of the contract.  Ultimately, Claimants will seek an award declaring that the contract is valid and binding, and ordering Respondent to perform its obligations under the contract, plus damages for delays and disruptions caused by Respondent's breaches.  Should such specific performance be rendered unavailable by intervening events, Claimants would seek, in the alternative, an award of the value of the concession in an amount in excess of US $650 million plus damages in compensation for the Republic's breach and repudiation of the contract.

## I.    PARTIES TO THE ARBITRATION

4.    LGMC, one of the Claimants in this arbitration, is a company established and organized under the laws of Liberia with its principal place of business at the following address:

> Liberia Global Mining Company
> Attn: Rakesh Dikshit, Registered Agent
> First Merchant Bank Building
> Broad Street
> Monrovia
> Liberia

LGMC's duly registered Articles of Incorporation are attached hereto (Exhibit 2).

5.    GSHL, the other Claimant in this arbitration, is a company established and

organized under the laws of the Isle of Man, United Kingdom.  GSHL's registered

address is as follows:

> Global Steel Holdings Limited
> Murdock House, 1st floor
> North Shore Road
> Ramsey
> Isle of Man IM8 3DY
> United Kingdom

An Isle of Man Financial Supervision Commission certificate of incorporation and good

standing for GSHL is attached hereto (Exhibit 3).

6.    GSHL was formerly known as Global Infrastructure Holdings Limited.  The

company recently executed a change of corporate name from GIHL to GSHL, which was

registered with the Financial Supervision Commission of the Isle of Man on March 4,

2005 (Exhibit 4).

7.    For the purposes of this case, all communications to Claimants should be

addressed to Messrs. Daniel M. Price and Stanimir A. Alexandrov of Sidley Austin

Brown & Wood LLP, counsel for Claimants (*see* Exhibits 5, 6), and sent to the following

address:

> Daniel M. Price
> Stanimir A. Alexandrov
> Sidley Austin Brown & Wood LLP
> 1501 K Street, NW
> Washington, DC 20005
> U.S.A.
> Tel: (202) 736-8000
> Fax: (202) 736-8711

3

8.     Respondent is the Republic of Liberia.  For the purposes of this case, Claimants understand the address of the Respondent to be:

> The Minister of Lands, Mines and Energy
> Ministry of Lands, Mines and Energy
> Monrovia
> Liberia

The foregoing is the address specified for notices to the Republic under Article XXXII, Section 3(b) of the parties' Mineral Development Joint Venture Agreement ("MDA").

That provision also specifies that communications should be copied to:

> The Minister of Finance
> Ministry of Finance
> Broad Street
> Monrovia
> Liberia

> and

> The Chairman
> National Investment Commission
> Tubman Boulevard
> Monrovia
> Liberia

## II.     FACTUAL BACKGROUND

### A. Background to Claimants' Investment in Liberia

9.     The Republic relatively recently emerged from decades of domestic civil unrest and armed conflict with the end of the regime of Charles Taylor and the August 18, 2003 conclusion of a Comprehensive Peace Agreement ("CPA") brokered by the United States and ECOWAS, the Economic Community of West African States.  Under the terms of the CPA, the Republic is to be governed for two years by a National Transitional

4

Government of Liberia, with Mr. Gyude Bryant as its Chairman, until the winners of elections in October 2005 take office in January 2006.

10.    One of the most pressing tasks before the newly-peaceful Republic is the revitalization of the Liberian economy. To that end, it was critical to restart the development of Liberia's natural resources—many prior operations for which, including foreign direct investments, had been abandoned—and the rehabilitation of infrastructure such as ports and railways. A key opportunity for such development was the iron ore resources in Nimba and Grand Bassa counties, in an area encompassed by a previous concession granted in the 1950s to the Liberian-American-Swedish Mining Company ("LAMCO"). Although the concession was abandoned in the 1980s and reverted to the Republic, the area is still known as "the LAMCO Concession area." Presently, the Liberian Mining Corporation ("LIMINCO"), a parastatal enterprise owned and controlled by the Republic, is responsible for the management of iron ore mining rights in the LAMCO Concession area for the benefit of the Republic.

11.    Despite Liberia's recent political history, as early as August 2003 the former LAMCO Concession area attracted the interest of potential foreign investors. Consistent with the governing Minerals and Mining Law of Liberia, GIHL submitted to the Republic an application for the rehabilitation and development of the LAMCO Concession area's iron ore deposits.

12.    An inter-ministerial Mineral Technical Committee ("Committee") determined to work with GIHL to explore the prospects for developing the LAMCO Concession area. GIHL (since renamed Global Steel Holdings Limited, as noted above) is a global

5

corporation operating and managing iron- and steelmaking, mining, metals and minerals, energy and infrastructure businesses around the world, in countries ranging from India to Nigeria to the Philippines. The company's businesses presently produce over 14 million metric tons of steel production annually.

13.     On November 28, 2003, the Republic and LIMINCO entered into a Memorandum of Understanding ("MOU") with GIHL and an introducing broker called Provider Limited (Exhibit 7). The MOU provided for a 160-day period of exclusivity, during which GIHL would conduct pre-feasibility studies of the iron ore deposits and existing infrastructure (e.g., railway lines and the Port of Buchanan). The MOU anticipated that, based on such studies, the parties would then determine whether to proceed to enter into a detailed agreement under which a Republic-GIHL joint venture as concessionaire would develop those resources. The term of the MOU was extended by agreement for three additional months, and the parties successfully carried out the obligations set forth in that agreement. GIHL engaged international consultants and carried out a scoping (i.e. pre-feasibility) study of the mines and infrastructure, reviewed the former LAMCO Concession archives in Sweden, and decided to move forward with the project. On August 4, 2004, GIHL and Provider by letter notified LIMINCO that they wished to move forward with a joint venture agreement as anticipated in the MOU and attached a corresponding proposal.

14.     The Republic's inter-ministerial Mineral Technical Committee, which included, inter alia, representatives of the Ministry of Land, Mines and Energy, the Ministry of Finance, the Ministry of Labor, and the Ministry of Justice, convened in August 2004 to consider GIHL's proposal. By that time, four other multinational companies—LNM

6

Holdings, WATCO/Rio Tinto, Shandong International Trading Group, and BHP
Billiton—had also submitted written indications of interest in developing the LAMCO
Concession area. After careful consideration and ten days of deliberations, the
Committee recommended to LIMINCO's Board of Directors that it should pursue
negotiations for a concession agreement with GIHL. On August 30, 2004, the Minister
of Lands, Mines and Energy by letter (Exhibit 8) advised GIHL that, on August 27, 2004,
the LIMINCO Board of Directors had adopted that recommendation and had authorized
the Committee to negotiate a Mineral Development Agreement with GIHL.

### B. The Mineral Development Agreement

15.    On October 4, 2004, the Mineral Technical Committee and GIHL successfully
concluded a Mineral Development Joint Venture Agreement ("the MDA") (Exhibit 1).
The MDA identifies the Government and GIHL as "the Parties hereto" and specifies
detailed contractual obligations for each of them. The MDA obligates GIHL and the
Government to form LGMC as a joint venture, 70% owned by GIHL and 30% owned by
the Republic, to operate the concession. LGMC is the "Concessionaire" mentioned
throughout the contract and in its arbitration clause. The MDA is therefore also framed
as an agreement between the Government and LGMC.

16.    The MDA has an initial term of twenty-five years, renewable on request of
LGMC with the agreement of the Government for two additional terms of twenty-five
years each. Of principal importance here, the MDA confers exclusive rights for the
exploration, development, production, and marketing of iron ore from the former
LAMCO Concession area. The MDA also provides that disputes "arising out of, in
relation to or in connection with this Agreement or its formation, or the validity,

7

interpretation, performance, termination, enforceability or breach of this Agreement"

shall be resolved through arbitration before ICSID.

17.     For reasons of the intervening events described in Section II.C below, the parties

have not yet carried out the administrative formalities of signature and ratification of the

MDA. However, the MDA nevertheless may be (and Claimants maintain it is) effective

and binding on the parties under Liberian law. Attached hereto is an Opinion of the Hon.

George Henries, Esq., a former Solicitor General and Attorney General of Liberia and a

former Associate Justice of the Supreme Court of Liberia, and now the senior partner of

the Henries Law Firm in Monrovia, Liberia (Exhibit 9). As the Opinion explains with

reference to supporting authorities, under Liberian law a contract can be binding and

enforceable notwithstanding the absence of signatures and other administrative acts such

as ratification. This can occur where the parties have performed obligations under the

contract as if it were in force, or where one party has induced another to perform and is

thereby estopped from denying the contract's validity:

> Under Liberian law, lack of signature and ratification does
> not automatically or invariably preclude the conclusion that
> a contract is valid, binding and enforceable. To the
> contrary, the doctrines of part performance and estoppel
> can lead to the conclusion, under Liberian law, that an
> unsigned and unratified contract is in fact binding and
> enforceable...

For example, the Opinion explains that "[w]here a party in reliance on a contract, and

particularly in reliance on the representation and inducement of those with actual and

apparent authority, performs his part, the counter-party must be equitably estopped from

contesting the validity of that contract whether on grounds of lack of signature or

otherwise." Thus, the MDA may be in effect, including with respect to the arbitration

agreement contained therein, even without signature and ratification. This is also

consistent with Article 25(1) of the ICSID Convention, which requires written consent to the arbitration of disputes but does not specify that the writing must be signed. In this respect, in turn, Article 25(1) is consistent with contemporary international arbitration practice. As Redfern and Hunter explain, "[i]n the modern laws of arbitration this requirement [of a signed agreement] has largely disappeared. All that is required is some *written* evidence of an agreement to arbitrate."[1]

18.     Here, the Government has repeatedly confirmed in writing its agreement to the MDA and has directed GIHL to proceed with performance under it. On October 14, 2004, the Chairman of the Republic's National Investment Commission wrote to GIHL and LGMC, directing them to commence work. He stated that, while the MDA was still to be formally executed, "[o]n behalf of the Government of the Republic of Liberia and its agencies and instrumentalities, this communication constitutes approval and consent to execution of the Mineral Development Agreement as negotiated with the Technical Committee of Liberia" and "[t]his approval and authorization also constitutes permission to GIHL or its nominee as Operator to proceed with the performance of the works and obligations envisaged in the draft agreement pending formal signing of the Mineral Development Agreement" (Exhibit 10).

19.     On December 15, 2004, the National Investment Commission Chairman sent another letter to GIHL, Provider and LGMC, noting that the MDA was to be signed before January 14, 2005, but nevertheless stating that this letter "constitutes the re-affirmation, approval and consent to the execution of the [MDA] as negotiated with the

---

[1] Alan Redfern & Martin Hunter (with Nigel Blackaby & Constantine Partasides), LAW AND PRACTICE OF INT'L COMMERCIAL ARBITRATION 136 (4th ed. 2004) (emphasis in original).

Technical Committee of Liberia" and again provides "permission to GIHL...to proceed with the performance of the works and obligations envisaged" in the MDA (Exhibit 11).

20.    Consistent with these communications, the parties to the MDA have proceeded to act on the basis that the MDA is in effect. In the first instance, Respondent has performed obligations imposed on it by the MDA. As provided in Article XVI, Section 1 of the MDA, the Minister of Justice and Attorney General took action to incorporate LGMC by executing the LGMC Articles of Incorporation on October 5, 2004 and by filing them with the Minister of Foreign Affairs on October 7, 2004. As required under Article IX of the MDA, authorities of the Republic assisted GIHL representatives in obtaining access to the concession area for on-site visits and work, and, as provided under Article XII, the Republic granted permits for GIHL expatriates to travel to Liberia for the project. The Republic authorized GIHL to employ local workers to provide security, pursuant to Article X, Section 3 of the MDA.

21.    GIHL also performed its obligations under the MDA. As anticipated in Article V, Section 1 of the MDA, GIHL on LGMC's behalf lined up experts and consultants to undertake advanced exploration and feasibility studies. To carry out its various obligations under Articles V and XX of the MDA, GIHL deployed a number of its in-house experts to Monrovia, including mining, geology, railway, and port handling managers. Pursuant to Article X, Section 3 of the MDA, GIHL contractors hired some 150 workers in the area of the mine to provide security and to begin clearing the railway lines, port, and mining facilities. All in all, GIHL has expended well over US $465,000 since October 2004 in carrying out the MDA.

22.    As the Opinion concludes, in light of these facts and Liberian law on partial performance and estoppel, "there are compelling arguments under applicable standards of Liberian law that the MDA, though unsigned and unratified, is valid, binding and enforceable."

### C. Respondent's Breach of the MDA

23.    Despite repeatedly affirming the MDA and directing Claimants to proceed to perform under it, Respondent has breached that contract. Shortly after the conclusion of the MDA negotiations between GIHL and the inter-ministerial Mineral Technical Committee, Mr. Bryant, the Chairman of the Republic's National Transitional Government, began pressing LIMINCO, the Ministry of Lands, Mines and Energy, and the Mineral Technical Committee to initiate a new, alternative process for awarding iron ore mining rights. The Chairman's intercession, which met with vigorous protest from the Mineral Technical Committee, came after an intervention by the United States Ambassador to Liberia, apparently in support of a competitor of GIHL that was one of the unsuccessful original applicants for the former LAMCO Concession area in August 2004.

24.    In response to that pressure, in December 2004 the Ministry of Lands, Mines and Energy published a general Request for Proposals ("RFP") for mining projects in Liberia. Concerned that the Republic was potentially pursuing a course of action in violation of the MDA's grant of rights to it, GIHL sought clarification from the Ministry of its position with respect to the former LAMCO Concession area covered by the MDA. Minister Mason responded by letter on December 22, 2004, reassuring GIHL that "[t]he recent Request for Proposals…is mainly for public awareness as mining contracts are not

11

awarded by tender.  GIHL is required to submit its original proposal together with a

progress report for compliance purposes only and will be awarded the Mineral

Development Agreement (MDA) based upon its compliance with the new Minerals and

Mining Law approved April 2000 being the legal process" (Exhibit 12).

25.      In reliance on the Minister's letter, GIHL followed the Minister's advice and

submitted documentation under the RFP on December 30, 2004.  Recognizing the

political pressure being exerted on the Ministry, GIHL went further: while taking pains to

make clear that its letter "should not be construed to constitute a departure from the

binding nature of the Mineral Development Agreement concluded in October 2004,"

GIHL offered to amend certain terms of the MDA (*e.g.* royalties paid to the Government)

in the Republic's favor (Exhibit 13).  Reports from confidential sources, later made

public in the Liberian press, indicated that GIHL's terms for the former LAMCO

Concession area were still the most favorable, and that the inter-ministerial Mineral

Technical Committee had ranked GIHL's terms highest in a meeting on March 29, 2005

(Exhibit 14).

26.      The public announcement of the Committee's assessment was unaccountably

delayed—until April 6, 2005, when the Ministry of Lands, Mines and Energy informed

Chairman Bryant that the U.S.-supported competitor of GIHL, instead of GIHL, was "the

company selected [to receive the concession] based on the evaluation criteria as

established by the members of the Technical Committee" and that "the Committee awaits

your further instruction to commence negotiation" with that competitor for the same

concession area already covered by GIHL and LGMC's MDA (Exhibit 15).

27.    This announcement followed yet another intervention by the United States Ambassador to Liberia criticizing the concession review process under which GIHL had previously prevailed, as well as pronouncements by Chairman Bryant that the Mineral Technical Committee's assessment would be subjected to additional scrutiny by his office.  In addition, multiple members of the Mineral Technical Committee have provided sworn testimony to the effect that they were asked to change the results of their assessment in favor of GIHL's competitor (Exhibits 16, 17, 18).  In the words of one Committee member, this occurred "because Chairman Bryant and the US Embassy want [the competitor] to be the successful bidder for the award of a Mineral Development Agreement" (Exhibit 16), and another explained that "[t]he Minister [of Lands, Mines and Energy]...advised that the Americans would waive 80% of its Liberian debt if [GIHL's competitor] was given the project" (Exhibit 17).

28.    On April 11, 2005, Chairman Bryant instructed the Minister of Lands, Mines and Energy to proceed with negotiations with GIHL's competitor.  When the Liberian courts thereafter issued emergency orders purporting to stay any action by the Republic to reach such an agreement, negotiations proceeded in open defiance of those injunctions. Reports from Liberia indicate that the Republic may conclude an MDA with GIHL's competitor at any moment.

29.    The Republic is thus proceeding to award the same iron ore concession governed by the MDA to a GIHL competitor and depriving LGMC and GIHL of their rights under the MDA to that concession.  The Republic not only has breached but has outright repudiated the MDA.

## III.   JURISDICTION

30.    Jurisdiction over this dispute is established by the ICSID Convention and Article

XXXI of the MDA.  Article 25(1) of the Convention states:

> The jurisdiction of the Centre shall extend to any legal
> dispute arising directly out of an investment, between a
> Contracting State…and a national of another Contracting
> State, which the parties to the dispute consent in writing to
> submit to the Centre.

31.    Respondent, the Republic of Liberia, is a Contracting State to the ICSID

Convention, effective July 16, 1970.  The acts and omissions of the agencies and

individuals described above, such as the various Ministries, the National Investment

Commission, the Mineral Technical Committee, LIMINCO, and Chairman Bryant, were

all taken on behalf of, and are all attributable to, Respondent.

32.    Claimants are both "nationals of another Contracting State"—namely, the United

Kingdom of Great Britain and Northern Ireland, which is a Contracting State to the

ICSID Convention, effective January 18, 1967.

33.    Although LGMC is incorporated in Liberia, by agreement of the parties

memorialized in Article XXXI, Section 2 of the MDA, LGMC "shall be treated for

purposes of arbitration under this Article XXXI as nationals of the United Kingdom of

Great Britain for purposes of the [ICSID Convention]."  LGMC is thus a

> juridical person which had the nationality of the
> Contracting State party to the dispute on that date and
> which, because of foreign control, the parties have agreed
> should be treated as a national of another Contracting State
> for the purposes of this Convention

under Article 25(2)(b) of the Convention.

14

34.    GSHL is incorporated in the Isle of Man, a territory for whose international

relations the United Kingdom is responsible, within the meaning of Article 70 of the

Convention.  By notice to the Centre dated November 17, 1983, the United Kingdom

extended the application of the Convention to the Isle of Man as of November 1, 1983.[2]

GSHL is thus a "juridical person which had the nationality of a Contracting State other

than the State party to the dispute on the date on which the parties consented to submit

such dispute to conciliation or arbitration," under Article 25(2)(b) of the Convention.

35.    Claimants have an investment within the meaning of Article 25(1) of the

Convention.  Although Article 25 does not itself supply a definition of "investment," a

concession contract for the exploitation of natural resources is understood to constitute an

investment under any reasonable definition, as regularly acknowledged in ICSID

decisions.  Moreover, Article XXXI, Section 1 of the MDA expressly states that "[t]he

Parties hereto agree that this Agreement and CONCESSIONAIRE's Operations pursuant

thereto constitute an 'investment' by reason of the expenditure of a considerable amount

of money in the Republic."

36.    It should be noted that the circumstances here are clearly different from those in

*Mihaly Int'l Corp. v. Democratic Socialist Republic of Sri Lanka*, where an ICSID

tribunal declined jurisdiction because the parties had executed preliminary agreements

but never concluded a final investment agreement giving rise to an investment.[3]  Here, by

---

[2] *See* Part B: Exclusions of Territories by Contracting States, *Contracting States and Measures Taken by them for the Purposes of the Convention*, available online at http://www.worldbank.org/icsid/pubs/icsid-8/icsid-8-b.htm.

[3] *See Mihaly Int'l Corp. v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/00/2, Award of March 15, 2002, 17 ICSID REVIEW—FOR. INV. L. J. 143 (2002) at paras. 48, 50-51.

contrast, the parties *have* concluded the investment agreement (the MDA) contemplated in their preliminary agreement (the MOU). The circumstances here also differ from *Mihaly* and those in *Zhinvali Dev. Ltd. v. Republic of Georgia*, with respect to Claimants' expenditures. In *Zhinvali*, claimants incurred development costs while engaged in negotiations for "a definitive set of agreements to finance and implement the [project]" that "never came to fruition."[4] Here, the negotiations between Claimants and Respondent did come to fruition in the MDA, and Claimants incurred expenses not during the negotiations for, but in performance of, the contract after it was finalized. The parties' actions described in paragraphs 20 and 21 above constitute performance of their respective obligations under the MDA. They are not merely preparatory, pre-investment activities carried out in anticipation of the MDA. Such preparatory actions—site surveys, pre-feasibility studies, review of archives, etc.—were carried out by GIHL and the Republic under the MOU of November 28, 2003. But it is under the specific terms and obligations of the MDA that the parties proceeded as described above, giving rise to an "investment" for purposes of Article 25(1), both in the form of the MDA itself (as provided in Article XXXI, Section 1 thereof) and in the form of Claimants' expenditures pursuant to the MDA.

37.    Furthermore, as required under Article 25(1) of the ICSID Convention, there exists a legal dispute relating to and arising out of the Claimants' investment in the MDA and operations thereunder. Were there any doubt on that point, Article XXXI, Section 1 of the MDA further provides expressly that "for purposes of Article 25(1) of the

---

[4] *See Zhinvali Development Ltd. v. Republic of Georgia*, ICSID Case No. ARB/00/1, Award of January 24, 2003, at paras. 2, 160, 254; *see also Mihaly* at paras. 48, 51 (declining to treat as "investment" development phase activities of power project that never left negotiating table).

16

Convention, any dispute subject to this Article XXXI is a legal dispute arising directly out of an investment."

38.    The parties to the dispute have consented in writing in the MDA to submit this dispute to arbitration before the Centre.  Article XXXI, Section 1 of the MDA provides that

> [a]ny dispute between GOVERNMENT and CONCESSIONAIRE arising out of, in relation to or in connection with this Agreement or its formation, or the validity, interpretation, performance, termination, enforceability or breach of this Agreement (including any dispute concerning whether GOVERNMENT or CONCESSIONAIRE has violated or is in breach of this Agreement)...shall be exclusively and finally settled by binding arbitration pursuant to the [ICSID] Convention...

As set out in Section II above, there exists here a dispute arising out of, in relation to and in connection with the (lack of) "performance" and the "breach of this Agreement" by Respondent.  If Respondent contests the binding and effective status of the MDA, then there would also exist a dispute under the MDA as to "its formation, or the validity...of this Agreement."  Respondent and Claimants are parties to the MDA and have thus consented in writing to the arbitration of this dispute before the Centre.

39.    Accordingly, all requirements are met for the Centre's jurisdiction over this dispute.

40.    In addition, all procedural requirements of the Centre and of the MDA have been met.  Claimants have provided in this Request the information and materials specified in ICSID Institution Rules 2 and 3.  Pursuant to ICSID Institution Rule 2(1)(f), the Claimants affirm that they have taken all internal actions necessary to authorize this Request.  Attached as Exhibits 5 and 6 are a board resolution of GSHL and a resolution

17

adopted by the majority of the board of directors of LGMC.  Claimants have also

complied with the notice requirements of Article XXXI, Section 1 of the MDA by,

simultaneously with this filing, dispatching to Respondent via registered mail copies of

this Request at the addresses specified in Article XXXII of the MDA.

## IV.    CLAIMS

41.    Respondent has breached its obligations under the MDA.  Moreover, by

proceeding to award the concession to another party, Respondent has repudiated its core

contractual commitment to confer on Claimants the exclusive right and license to

explore, develop, produce, and market iron ore in the former LAMCO Concession area.

## V.    RELIEF REQUESTED

42.    Immediately upon the constitution of the Tribunal, Claimants will seek

provisional measures, in the form of an order directing Respondent to refrain from any

and all actions inconsistent with the validity and enforceability of the MDA, including

but not limited to any steps by Respondent to divest Claimants of their rights under the

MDA or to award rights to the LAMCO Concession area to GIHL's competitor.  Absent

such interim relief, Claimants will be irreparably harmed, and the Tribunal will be

deprived of the ability to give meaningful consideration to Claimants' request for

declaratory relief and specific performance of the MDA.  Although the urgency of the

situation initially prompted resort to emergency litigation in Liberia, there is no realistic

prospect for relief there.

43.    As to final relief, Claimants will seek a declaratory judgment that the MDA is

valid and binding on Respondent.

44.     Claimants will also ask the Tribunal to enforce their rights and obligations under the MDA and to compel Respondent's performance under the contract. In connection with such an award, Claimants will also seek damages associated with Respondent's delay and disruption of the parties' performance under the MDA.

45.     In the alternative, if actions by Respondent in the interim should render specific performance impossible, Claimants would seek compensation in excess of US $650 million for the value of the concession and any damages caused by Respondent's contractual default, including compound interest from the date of such default.

46.     Finally, as provided in Article XXXI, Section 6 of the MDA, Claimants will be entitled to receive interest on any monetary award at the rate of LIBOR plus 1% from the date of the award until the date of payment.

## VI.    REGISTRATION

47.     Claimants respectfully note that Article 36(3) of the ICSID Convention requires the Secretary-General to register a request for arbitration unless he finds "on the basis of the information contained in the request, that the dispute is manifestly outside the jurisdiction of the Centre." As the Executive Directors of the World Bank noted in their 1965 report on the ICSID Convention, the power to refuse registration "is so narrowly defined as not to encroach on the prerogative of…Tribunals to determine their own competence."[5]

48.     Thus, the scope of the Centre's pre-registration review is exceedingly narrow. Aron Broches, former Secretary-General of ICSID and the principal drafter of the ICSID

---

[5] *Report of the Executive Directors on the Convention on the Settlement of Investment Disputes between States and Nationals of Other States,* March 18, 1965, at para. 38.

Convention, has stated that "in case of the slightest doubt [the Secretary-General] should...register the request and leave the decision as to jurisdiction to the arbitral tribunal."[6]  As explained in Note C to ICSID Institution Rule 6, a dispute can be deemed manifestly outside the jurisdiction of the Centre only if it is "beyond reasonable doubt whatever evidence or argument might be produced subsequently" that jurisdiction is lacking.[7]  Mr. Broches was even more express during the negotiations for the Convention, stating that the power to deny registration "would apply where there was not the slightest doubt that the party was in bad faith or misinformed," such as when the party submitting the request was a "national of a country that was not a party to the Convention."[8]  Mr. Broches emphatically reassured the parties that "it was unfounded...to fear that the Secretary-General would prevent an investor from having access to the Centre merely because the Secretary-General thought that it was not a good case."[9]

49.    Claimants anticipate that Respondent may attempt to resist registration. Claimants submit, with all due respect, that no credible argument could be advanced that the dispute is manifestly outside the jurisdiction of the Centre.  If, for example, Respondent were to contest the validity or formation of the MDA as the basis for its consent to arbitration, Claimants have advanced evidence under Liberian law that that

---

[6] Aron Broches, "A Guide for Users of the ICSID Convention," 8(1) *News from ICSID* 7 (1991); *see also* Antonio Parra, "The Screening Power of the ICSID Secretary-General," 2(2) *News from ICSID* 12 (1985) ("If there is doubt, the Secretary-General must register the request....The narrow definition of the powers of the Secretary-General...to filter applications to institute proceedings is meant to avoid encroachments on the role of tribunals to decide on jurisdiction after a proper hearing.").

[7] Note C to ICSID Institution Rule 6, ICSID/4/Rev.1 (reprinted May 1975) at 34.

[8] ICSID, II(2) HISTORY OF THE CONVENTION: DOCUMENTS CONCERNING THE ORIGIN AND FORMULATION OF THE CONVENTION 772 (1968).

[9] ICSID, II(2) HISTORY OF THE CONVENTION: DOCUMENTS CONCERNING THE ORIGIN AND FORMULATION OF THE CONVENTION 772 (1968).

contract is valid and binding on the parties to it, even without the formality of signature, and that the MDA itself provides for ICSID arbitration of disputes concerning its validity and formation. Any "doubt" that Respondent may seek to raise on this point will be an issue for decision by the Tribunal, in its exercise of *kompetenz-kompetenz*. Claimants' request for arbitration should be registered promptly.

## VII.    CONSTITUTION OF THE TRIBUNAL

50.    The Claimants request that a Tribunal be constituted in accordance with ICSID's Arbitration Rules, including in particular ICSID Arbitration Rule 2, which provides for the constitution of the Tribunal as specified in any agreement of the parties. Article XXXI, Section 3 of the MDA sets forth the parties' agreement on the number of arbitrators and the method of their appointment. Article XXXI, Section 3 provides:

> [a]ny arbitration tribunal constituted pursuant to this Agreement shall consist of one (1) arbitrator to be appointed by GOVERNMENT, one (1) arbitrator to be appointed by CONCESSIONAIRE and one (1) arbitrator, who shall be the president of the tribunal and shall be a citizen neither of the Republic nor of a national of the United States of America (or of any other state of which a party is a national under Article XXXI, Section 2) to be appointed by the Secretary-General of the Centre...

51.    Accordingly, Claimants stand ready to name the arbitrator appointed by LGMC immediately upon the Centre's registration of this Request and look to Respondent to likewise appoint its arbitrator. Claimants respectfully request that the Secretary-General also be prepared upon registration to appoint the Tribunal's President, who shall not be a

21

national of the Republic, the United States of America, or the United Kingdom of Great Britain and Northern Ireland.

Respectfully submitted,

Daniel M. Price
Stanimir A. Alexandrov
Counsel for Claimants

July 1, 2005

## LIST OF EXHIBITS

1. Mineral Development Joint Venture Agreement among the Government of the Republic of Liberia, Liberia Global Mining Company, and Global Infrastructure Holdings Limited.

2. Liberia Global Mining Company Articles of Incorporation, filed October 7, 2004.

3. Isle of Man Financial Services Commission, Certificate of Incorporation, June 21, 2005.

4. Isle of Man Financial Services Commission, Certificate of Change of Name, March 4, 2005.

5. Resolution by the majority of the Directors of Liberia Global Mining Company dated June 16, 2005, resolving to pursue arbitration before ICSID and authorizing Sidley Austin Brown & Wood LLP to take all necessary steps in that regard.

6. Resolution of the Board of Directors of Global Steel Holdings Limited dated June 15, 2005, resolving to pursue arbitration before ICSID and authorizing Sidley Austin Brown & Wood LLP to take all necessary steps in that regard.

7. Memorandum of Understanding among the Government of Liberia, Liberian Mining Corporation, Global Infrastructure Holdings Limited, and Provider Limited.

8. Letter from Ministry of Lands, Mines and Energy to Provider Limited, August 30, 2004, confirming authorization to commence negotiations with GIHL for Mineral Development Agreement.

9. Opinion of the Hon. George E. Henries, Esq., June 29, 2005.

10. Letter from National Investment Commission to GIHL, Global Mining Liberia Limited, and LGMC, October 14, 2004, approving and consenting to execution of Mineral Development Joint Venture Agreement and authorizing GIHL performance of said contract.

11. Letter from National Investment Commission to GIHL, Provider Limited, and LGMC, December 15, 2004, re-affirming, approving and consenting to execution of Mineral Development Joint Venture Agreement and authorizing GIHL performance of said contract.

12. Letter from Ministry of Lands, Mines and Energy to Provider Limited, December 22, 2004, clarifying Ministry Request for Proposals.

13. Letter from GIHL to Ministry of Lands, Mines and Energy, December 30, 2004, in response to Request for Proposals and Ministry letter of December 22, 2004.

14. "Crisis Unfolding in LIMINCO Concession," *The Analyst*, April 7, 2005 reporting March 2005 Mineral Technical Committee scores ranking GIHL above its competitor.

15. Letter from Ministry of Lands, Mines and Energy to Chairman Bryant, April 6, 2005, naming GIHL competitor as selected prospective concessionaire.

16. Affidavit of George S. Mulbah, Sr., Assistant Minister of Labour, May 27, 2005.

17. Affidavit of P. Sumo Darwulo, Inspector General of Labour, June 15, 2005.

18. Affidavit of James S. Kpateh, Representative of the Ministry of Finance, June 21, 2005.

19. Certification by Rakesh Dikshit of GIHL and LGMC that the documents attached as Exhibits are true copies of the original documents.

# EXHIBIT 1

# MINERAL DEVELOPMENT
# JOINT VENTURE

# AGREEMENT

# BETWEEN

# THE GOVERNMENT
# OF
# THE REPUBLIC OF LIBERIA

# AND

# LIBERIA GLOBAL MINING COMPANY

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS—————————————————— 2
"Affiliate"————————————————————————— 2
"Agreement"———————————————————————— 2
"Associates"————————————————————————— 2
"Centre"—————————————————————————— 2
"Class A Mining License"————————————————— 2
"Communication Between Parties"——————————— 2
"CONCESSIONAIRE"——————————————————— 2
"Concession Area"————————————————————— 2
"Concession Year"————————————————————— 2
"Convention"———————————————————————— 2
"Development"——————————————————————— 2
"Dollar" and/or "US$"——————————————————— 2
"Effective Date"—————————————————————— 2
"Extended Term"—————————————————————— 2
"Feasibility Report"———————————————————— 2
"Financial Year"—————————————————————— 2
"Foreign Currency"———————————————————— 2
"GOVERNMENT"————————————————————— 3
"Headings"————————————————————————— 3
"Included Words"—————————————————————— 3
"Infrastructure"—————————————————————— 3
"International Standards"————————————————— 3
"Law"——————————————————————————— 3
"Mineral"—————————————————————————— 3
"Operations"———————————————————————— 3
"Operator"————————————————————————— 3
"Party"——————————————————————————— 3
"Person"—————————————————————————— 4
"Prevailing Market Rate of Exchange"———————— 4
"Production"———————————————————————— 4
"Production Area"————————————————————— 4
"Reference"————————————————————————— 4
"Severability"——————————————————————— 4
"Taxes and Duties"———————————————————— 4

ARTICLE II EFFECTIVE DATE—————————————— 4

ARTICLE III TERMS OF THE AGREEMENT——————— 4
Section 1 Initial Term——————————————————— 4
Section 2 Extended Term————————————————— 5

ARTICLE IV CONCESSION AREA————————————— 5
Section 1 Grant of Rights———————————————— 5
Section 2 Concession Area———————————————— 5

ARTICLE V WORK PROGRAMS————————————— 6
Section 1 Commencement———————————————— 6
Section 2 Minimum Expenditure————————————— 6
Section 3 Operation Reports, Records and Inspection— 6

ARTICLE VI CLASS A MINING LICENSE
          AND PRODUCTION AREA——————————— 6
Section 1 Class A Mining License———————————— 6
Section 2 Production Areas——————————————— 7
Section 3 Term of the Class A Mining License————— 7

ARTICLE VII CONFIDENTIALITY————————————— 7
Section 1 Confidential Information———————————— 7

Section 2 Public Information————————————— 7

ARTICLE VIII PRODUCTION WORK PROGRAMS————— 7

ARTICLE IX LAND AND FACILITIES————————— 8
Section 1 Public Land————————————— 8
Section 2 Private Land————————————— 8
Section 3 Facilities——————————————— 8

ARTICLE X HEALTH CARE, SAFETY AND SECURITY———— 10
Section 1 Health Care————————————— 10
Section 2 Safety——————————————— 10
Section 3 Security Force———————————— 10

ARTICLE XI EDUCATION AND SKILLS TRAINING———— 11
Section 1 Education—————————————— 11
Section 2 Skills Training of Liberians——————— 11

ARTICLE XII EMPLOYMENT AND SECONDMENT———— 11
Section 1 Employment————————————— 12
Section 2 Secondment————————————— 12

ARTICLE XIII USE OF LIBERIAN SERVICES
        AND MATERIALS————————————— 12

ARTICLE XIV COMMUNITY RESOURCES——————— 12

ARTICLE XV ENVIRONMENTAL PROTECTION
        AND MANAGEMENT————————————— 12
Section 1 Environmental Impact Statement—————— 12
Section 2 Damage and Restoration————————— 12
Section 3 Plans——————————————— 12
Section 4 Environmental Audit and Assessment————— 12

ARTICLE XVI CAPITAL AND CORPORATE STRUCTURE——— 12
Section 1 Incorporation———————————— 12
Section 2 Name of CONCESSIONAIRE——————— 13
Section 3 Initial Issued Capital————————— 13
Section 4 Basis for Equity Participation—————— 13
Section 5 Capital Obligations—————————— 13

ARTICLE XVII BOARD, MANAGEMENT
        AND ADMINISTRATION——————————— 13
Section 1 Composition of the Board of ——————— 13
Section 2 Free Movement in Liberia of GIHL Directors———— 13
Section 3 Technical Committee—————————— 13

ARTICLE XVIII PROVISION OF FUNDS TO CONCESSIONAIRE— 14
Section 1 Procurement of Additional Funds—————— 14
Section 2 Adequate Capital——————————— 14

ARTICLE XIX UNDERTAKINGS OF THE CONCESSIONAIRE—— 14
Section 1 Access to Information————————— 14
Section 2 Provision of Documents————————— 14
Section 3 Use of Aircraft———————————— 14
Section 4 Use of Airports and Seaports——————— 14
Section 5 Electricity Generation and Transmission———— 15
Section 6 Issuance of Necessary Authorization————— 15
Section 7 Protection against Nationalization and Expropriation—— 15
Section 8 Peaceful Enjoyment—————————— 15
Section 9 Non-Derogation———————————— 15
Section 10 Equitable Treatment—————————— 15

ii

ARTICLE XX UNDERTAKINGS OF GIHL————————————— 16

ARTICLE XXI INDEMNIFICATION————————————— 16
Section 1 Indemnification for Breach of Agreement———————— 16
Section 2 CONCESSIONAIRE's Indemnification of GOVERNMENT——— 17
Section 2 GOVERNMENT's Indemnification of CONCESSIONAIRE,
    GIHL and its Affiliates————————————————— 17

ARTICLE XXII INCOME TAXATION————————————— 17
Section 1 Rate and Basis——————————————————— 17
Section 2 Computation of Net Taxable Income———————————— 17
Section 3 Carry Forward Permitted—————————————— 18
Section 4 Computation of Taxable Income in Dollars————————— 18

ARTICLE XXIII ROYALTIES————————————————— 18
Section 1 Royalty Rate——————————————————— 18
Section 2 Royalty Basis——————————————————— 18
Section 3 Payment ———————————————————— 18

ARTICLE XXIV SURFACE RENTAL
    AND MINING LICENSE FEES————————————— 18
Section 1 CONCESSION AREA————————————————— 18
Section 3 Payment————————————————————— 18

ARTICLE XXV OTHER PAYMENTS TO
    THE CONCESSIONAIRE———————————————— 18
Section 1 Import Duties and Other Payments——————————— 18
Section 2 Payments in Lieu of Import Duties and Fees———————— 19
Section 3 Other Payments—————————————————— 19
Section 4 Mineral Development Fund—————————————— 19
Section 5 Other Exemptions from Taxes and Duties————————— 19
Section 6 Non-Application of Article XXV, Section 5———————— 20

ARTICLE XXVI FINANCIAL REPORTING AND CURRENCY——— 20
Section 1 Accounting———————————————————— 20
Section 2 Exchange Control—————————————————— 20
Section 3 Currency of Payment———————————————— 20
Section 4 Right to Remit and Receive Payment——————————— 21
Section 5 Audits—————————————————————— 21

ARTICLE XXVII INCIDENTAL RIGHTS——————————— 21
Section 1 Use of Resources—————————————————— 21
Section 2 Imports————————————————————— 21
Section 3 Taxes on Resale—————————————————— 22

ARTICLE XXVIII ASSIGNMENT AND ENCUMBRANCE————— 22
Section 1 Right of Assignment———————————————— 22
Section 2 Right to Encumber————————————————— 22
Section 3 Notice of Assignment or Encumbrance—————————— 22

ARTICLE XXIX TERMINATION——————————————— 22
Section 1 Termination by CONCESSIONAIRE——————————— 22
Section 2 Termination by GOVERNMENT————————————— 22
Section 3 Opportunity to Cure————————————————— 23
Section 4 Deputes Regarding Events of Default——————————— 23
Section 5 Winding-up Commission——————————————— 23

ARTICLE XXX DISPOSITION OF ASSETS———————————— 24
Section 1 Immovable Assets—————————————————— 24
Section 2 Movable Assets——————————————————— 24
Section 3 Removal of Movable Assets—————————————— 24

iii

**ARTICLE XXXI ARBITRATION**————————————————— 24
Section 1 Submission to Arbitration————————————— 24
Section 2 Nationality for Purposes of Arbitration——————— 25
Section 3 Arbitrators————————————————— 25
Section 4 Referee—————————————————— 25
Section 5 Venue——————————————————— 25
Section 6 Award——————————————————— 25
Section 7 Waiver of Sovereign Immunity——————————— 26
Section 8 Reservation of Rights——————————————— 26
Section 9 Successors————————————————— 26

**ARTICLE XXXII COMMUNICATION BETWEEN**
        **PARTIES HERETO**——————————————— 26
Section 1 Written Communication—————————————— 26
Section 2 Delivery—————————————————— 26
Section 3 Address—————————————————— 27
Section 4 Change of Address————————————————— 27

**ARTICLE XXXIII FORCE MAJEURE**——————————— 27
Section 1 Application————————————————— 27
Section 2 Definition————————————————— 28
Section 3 No Required Settlement——————————————— 28

**ARTICLE XXXIV GOVERNING LAW**—————————— 28

**ARTICLE XXXV ENTIRE AGREEMENT-MODIFICATIONS**——— 28
Section 1 Entire Agreement————————————————— 28
Section 2 Amendment————————————————— 28

**ARTICLE XXXVI PERIODIC REVIEW**—————————— 28
Section 1 Modification and Review—————————————— 28
Section 2 Good Faith————————————————— 29

**ARTICLE XXXVII NON-WAIVER OF RIGHTS**——————— 29

**ARTICLE XXXVIII SUCCESSION**——————————— 29

**ARTICLE XXXIX SURVIVAL PROVISION**————————— 29

REPUBLIC OF LIBERIA)
MONTSERRADO COUNTY)

THIS MINERAL DEVELOPMENT JOINT VENTURE AGREEMENT is made by and between the **GOVERNMENT OF THE REPUBLIC OF LIBERIA**, represented by and through its Minister of Finance and Chairman of the Liberia Mining Corporation (LIMINCO) Board of Directors, Honorable Lucinee F. Kamara, Sr., the Minister of Lands, Mines and Energy and Co-Chairman of the LIMINCO Board of Directors, Honorable Jonathan A. Mason, and the Chairman of the National Investment Commission, Honorable Roosevelt Quiah, (hereinafter collectively referred to as "**GOVERNMENT**"), and **LIBERIA GLOBAL MINING COMPANY**, a corporation duly organized, existing and doing business under the laws of the Republic of Liberia, represented by and through its Manager, Business Development, Mr Rakesh Dikshit (hereinafter referred to as "**CONCESSIONAIRE**"), hereby,

## WITNESSETH:

**WHEREAS**, GOVERNMENT is owner of all iron ore deposits within the territory of the Republic of Liberia, and all the rights related to the Development of all such iron ore deposits, including but not limited to the iron ore deposits within the former LAMCO Concession Area in the Republic of Liberia (the Iron Ore Deposits); and,

**WHEREAS**, GOVERNMENT is determined to revitalize the Development of the iron ore mining industry of Liberia, and, consequently, GOVERNMENT desires to promote the Development and Production of Iron Ore Deposits within the former LAMCO CONCESSION AREA for the economic and social benefit of Liberia and its people; and,

**WHEREAS**, GOVERNMENT recognizes that substantial infusion of capital is necessary to facilitate the economic and efficient Development and Production of the Iron Ore Deposits; and,

**WHEREAS**, the GOVERNMENT of the Republic of Liberia is the organ of the Republic vested with authority to enter into agreements with international companies who wish to bring investment capital, operational expertise and other technical know-how to Liberia; and,

**WHEREAS**, as it relates to the Development of the iron ore industry in Liberia, the Minister of Finance, the Minister of Lands, Mines and Energy, and the Chairman of the National Investment Commissioner are authorized and empowered by GOVERNMENT to negotiate and conclude Mineral Development Agreements with investors; and,

**WHEREAS**, GOVERNMENT / LIBERIA MINING COMPANY (LIMINCO), on the one hand, and GLOBAL INFRASTRUCTURE HOLDING, LIMITED and PROVIDER LIMITED, on the other hand, have executed a Memorandum of Understanding (MOU) dated 28 November 2003 under the terms and conditions of which, amongst other things, a joint venture agreement was to be executed covering the Development of iron ore deposits in the former LAMCO Concession Area and, as well as the rehabilitation of the Industrial Infrastructure; and,

**WHEREAS**, in accordance with Law, the GOVERNMENT has the power to enter into this Agreement, to grant the CONCESSIONAIRE a Mineral Development Agreement as herein described, and to permit the CONCESSIONAIRE to conduct the Operations contemplated by this Agreement.

**NOW, THEREFORE**, for and in consideration of the premises, the mutual promises exchanged between GOVERNMENT and GIHL (hereinafter referred to as "the Parties hereto"), the terms and conditions herein contained, the Parties hereto mutually agree, as follows:

1

## ARTICLE I
## DEFINITIONS

1.1  "Affiliate" shall mean a person that controls, is controlled by or is under common control with CONCESSIONAIRE. For purposes of this Agreement, control means the possession, directly or indirectly, by one person of more than fifty percent (50%) of the equity of or voting power in another person.

1.2  "Agreement" shall mean this Agreement granting a mining right to the CONCESSIONAIRE and any amendments to it made pursuant to its terms as well as all exhibits and appendices to it.

1.3  "Associates" shall mean the Affiliates, shareholders, financiers and contractors (including suppliers of goods and services) of the CONCESSIONAIRE and GIHL and the directors, officers, agents and employees of the CONCESSIONAIRE and of any of the foregoing.

1.4  "Centre" shall mean the International Centre for Settlement of Investment Disputes established under the auspices of the International Bank for Reconstruction and Development.

1.5  "Class A Mining License" shall have the meaning given in Article VI, Section 1 in this Agreement, and as specified in the New Minerals and Mining Law of the Republic of Liberia.

1.6  "Communication Between Parties" shall mean communications given pursuant to Article XXXII, Section 1.

1.7  "CONCESSIONAIRE" shall mean LIBERIA GLOBAL MINING COMPANY and other person(s) to which, pursuant to Article XXVIII, Section 1, it may assign all or any part of its interest under this Agreement.

1.8  "Concession Area" shall mean the former LAMCO Concession Areas in Nimba and Grand Bassa Counties and all areas covered by the associated infrastructure as defined in ARTICLE IV.

1.9  "Concession Year" shall mean a period of twelve (12) consecutive months according to the Gregorian calendar starting on the Effective Date of this Agreement or on any anniversary of said Effective Date.

1.10  "Convention" shall mean the Convention on the Settlement of Investment Disputes between States and Nationals of Other States opened to signature at Washington, D. C., United States of America, on March 18, 1965.

1.11  "Development" shall mean all preparation for the removal and recovery of minerals, including the construction or installation of a mill or any other improvements to be used for the mining, handling, milling, beneficiation or other processing of Minerals.

1.12  "Dollar" and/or "US$" shall mean the lawful currency of the United States of America.

1.13  "Effective Date" shall mean the date described in Article II.

1.14  "Extended Term" shall have the meaning given in Article III, Section 2.

1.15  "Feasibility Report" shall have the meaning given in Article VI, Section 1a.

1.16  "Financial Year" shall mean January 1 through December 31, or such other period as the parties may agree.

1.17  "Foreign Currency" shall mean Dollars and any other currency except currency that is not legal tender in the Republic.

2

1.18    "GOVERNMENT" shall mean the Republic of Liberia, its GOVERNMENT, and all political subdivisions, branches, divisions, instrumentalities, authorities and agencies thereof.

1.19    "Headings" shall mean the headings to the clauses, Articles and Sections of this Agreement are inserted for convenience only and shall not affect the construction hereof.

1.20    "Included Words"- This Agreement shall be read with such changes in gender or number as the context shall require.

1.21    "Infrastructure" shall mean the following:

a.    Immovable transportation and communication facilities (including roads, bridges, railroads, airports, land strips and landing pads for aircraft, hangars and other airport facilities, garages, channel, tramways, pipelines and radio, telephone, telegraph, telecommunications, and electronic or other forms of communications facilities);

b.    Immovable port facilities (including docks, harbors, piers, jetties, breakwaters, terminal facilities and warehouses, and loading and unloading facilities);

c.    Immovable power, water and sewerage facilities (including electrical generating plants and transmission lines, dams, water drains, water supply systems and systems for disposing of tailings, plant waste and sewage);

d.    Immovable public welfare facilities (including schools, hospitals and public halls);

e.    Miscellaneous immovable facilities used primarily in connection with the operation of any of the foregoing (including offices, machine shops, foundries, repair shops and warehouses);

f.    Other immovable facilities used primarily in connection with or as an incident to Operations; and

g.    Movable facilities and equipment used as an integral part of the immovable facilities described in paragraphs a through f above.

1.22    "International Standards" shall mean generally accepted world mining industry standards and procedures, due allowance being made for any special circumstances.

1.23    "Law" shall mean any constitution, law, statute, decree, rule, regulation, judicial act or decision, judgment, order, proclamation, directive, executive order or sovereign act of the CONCESSIONAIRE that affects or purports to affect the CONCESSIONAIRE or is generally applicable in the Republic.

1.24    "Mineral" shall mean a naturally occurring, no-living substance having a definite chemical composition and physical characteristics and having economic value, but excluding oil, gas, coal and geothermal resources.

1.25    "Operations" shall mean all activities and transactions conducted by or on behalf of the CONCESSIONAIRE with respect to, under or incidental to this Agreement including Exploration, Development, Production, Marketing and the Financing of any of the foregoing.

1.26    "Operator" shall mean the entity designated by GIHL to undertake Operations.

1.27    "Party" shall mean either GOVERNMENT or CONCESSIONAIRE and, in the plural forms, both the GOVERNMENT and CONCESSIONAIRE and any permitted assignee of GOVERNMENT or CONCESSIONAIRE.

3

1.28    "Person" shall mean any individual, partnership, limited liability company, joint venture, association, corporation, trust, estate, unincorporated or other entity, CONCESSIONAIRE or GOVERNMENT and any branch, division, political subdivision, instrumentality, authority or agency of any GOVERNMENT or state.

1.29    "Prevailing Market Rate of Exchange" shall mean the predominant rate, expressed in Dollars, at which willing sellers and willing buyers, acting at arm's length and in the ordinary course of business, purchase or sell, or agree to purchase or sell, currency of another nation.

1.30    "Production" shall mean the commercial exploitation of minerals found in the Concession Area and all other activities incidental thereto including the design, construction, installation, fabrication, operation, maintenance and repair of infrastructure, facilities and equipment and the mining, excavation, extraction, recovery, handling, beneficiation, processing, milling, stockpiling, transportation, export and sale of Minerals.

1.31    "Production Area" shall mean an area selected as such by CONCESSIONAIRE through its Operator pursuant to Article VI, Section 2.

1.32    "Reference"- Unless otherwise stated, a reference herein to a numbered or lettered Article, Section or Appendix shall refer to the Article, Section or Appendix bearing that number or letter in this Agreement. A reference to "this Agreement," "hereof," "hereunder," "herein," or words of similar meaning, shall mean this Agreement, including the Appendices hereto, together with any amendments thereof. The words "and" and "or" will include the conjunctive and disjunctive, as the context may require or permit. The word "include" (and any variation) is used in an illustrative sense rather than in a limiting sense.

1.33    "Severability"- If any provision of this Agreement is or shall become illegal, invalid or unenforceable, in whole or in part, the remaining provisions shall nevertheless be and remain valid and subsisting and the said remaining provisions shall be construed as if this Agreement had been executed without the illegal, invalid or unenforceable portion.

1.34    "Taxes and Duties" shall mean any and all direct and indirect income, profit, gains, capital gains, corporation, net worth, sales, transaction, payroll, import, export, customs, consul, inspection, value added, consumption, supply, use, turnover, severance, stumpage, cash flow, rental, land rental, surface rental, property, stamp and other taxes, duties, fees, levies, excises, rates, charges, imposts, surcharges, royalties and other GOVERNMENT imposed revenue payments of whatever nature and however called and whether similar or dissimilar to the foregoing.


## ARTICLE II
## EFFECTIVE DATE

This Agreement shall become effective and be binding on the Parties thereto when executed by them, ratified by the National Transitional Legislative Assembly and approved by the Chairman of the National Transitional Government of Liberia.


## ARTICLE III
## TERMS OF THE AGREEMENT

**Section 1 Initial Term**
The initial term of this Agreement shall commence on the Effective Date and, subject to Article III, Section 2 below, end on the twenty-fifth (25th) anniversary of the Effective Date, unless sooner terminated in accordance with the other provisions of this Agreement.

4

**Section 2 Extended Term**

a.   Notwithstanding the provisions of Article III, Section 1 above, the CONCESSIONAIRE shall have the right to request an extension of the term of this Agreement for two (2) additional terms not exceeding twenty-five (25) years each (the "Extended Term") upon providing the CONCESSIONAIRE with Notice, at least one year prior to the termination of the initial term or any extended term, of its intention to seek such extension and, within ninety (90) days after such Notice after the successful completion of the previous work programs, and by providing GOVERNMENT with a Revised Feasibility Report. The Feasibility Report shall indicate that proven reserves exist which shall set forth the type and quantity of ore that is estimated to exist in the Concession Area, or any part thereof, and described in reasonable detail a proposed plan for efficient and economic Production of such ore (in accordance with International Standards and the provisions of this Agreement). It shall also set out a detailed description of the proposed mining and processing methods, the design, cost and construction schedules for the proposed facilities and equipment, the financing arrangements contemplated, and the CONCESSIONAIRE's best estimate in good faith of the date upon which production of such ore will cease (the "Extended Date"), but not later than twenty-five (25) years after the end of the Initial Term or any prior Extended Term.

b.   The GOVERNMENT shall grant its approval for the Extended Term through the Extended Date if the Revised Feasibility Report reasonably complies with International standards, GOVERNMENT's overall mineral development strategy and the provisions of this Agreement. The GOVERNMENT shall, in the event of any delay in or denial of approval of a Revised Feasibility Report, promptly give to CONCESSIONAIRE full details, in writing, of its reasons for withholding or delaying approval. Without prejudice to the generality of Article III, Section 2, if, in the CONCESSIONAIRE's opinion, any such approval has been wrongfully withheld or unreasonably delayed, it may invoke the provisions of Article XXXI on arbitration.

c.   With respect to any such Extended Term, the fiscal terms and conditions of this Agreement shall be amended in such manner as the Parties hereto may agree as fair and reasonable, taking into account fiscal terms generally applicable at the end of any immediately preceding term to large scale mining entities worldwide in respect of operations of the nature envisaged in the Extended Term (due allowance being made for any special circumstances).

## ARTICLE IV
## CONCESSION AREA

**Section 1 Grant of Rights**
By this Agreement and subject to its terms and conditions, GOVERNMENT hereby grants to the CONCESSIONAIRE the exclusive right and license to conduct Exploration for, Development, Production and Marketing of iron ore and associated Minerals and Products and rehabilitation of the associated infrastructure in the former LAMCO Concession area.

**Section 2 Concession Area Defined**
The Concession Area is as shown on the map attached hereto as Appendix "A", the coordinates of which are specified in Appendix "B". It comprises the following:

a.   The Nimba Range including the Main ore body, Mt Gbahm, and Junction Ridge;

b.   The Western Area deposits including Tokadeh, Yuelliton, Gangra and Beeton;

c.   All other areas controlled by LIMINCO, including but not limited to, The Buchanan Facilities (Iron Ore Harbor and associated facilities) and all the housing units at Buchanan and Yekepa; and

d.   Railroad and associated infrastructure.

5

## ARTICLE V
## WORK PROGRAMS

**Section 1 Commencement**
CONCESSIONAIRE shall commence Exploration/Feasibility studies as soon as is reasonably practicable, but not later than forty five (45) days of the Effective Date. A detailed work program is attached hereto as Appendix C.

**Section 2 Minimum Expenditure**
In respect of Article V, Section 1 above, the CONCESSIONAIRE shall incur minimum expenses, as stipulated in Appendix D.

**Section 3 Operation Reports, Records and Inspection**
The CONCESSIONAIRE and the Operator shall maintain at their respective principal offices in Liberia, or at such other offices as CONCESSIONAIRE may approve:

a.      Copies of all maps, geological, mining or other earth science reports and mineral analyses (together with all field data which support such reports or data), production records, marketing and financial reports and other data obtained or compiled by the CONCESSIONAIRE as a result of exploration and/or mining operations and activities. All information, data and material specified in this paragraph shall be in a form suitable for reproduction, use or processing as the case may be. The CONCESSIONAIRE shall have the right to temporarily remove such samples and Liberia for the purpose of study and evaluation;

b.      The Operator through CONCESSIONAIRE shall keep GOVERNMENT fully informed of all operations and activities, wherever conducted, and of its plans in respect thereof. The GOVERNMENT shall have the right to monitor Exploration/Feasibility and Mining Operations and activities from time to time and a reasonable number of GOVERNMENT personnel may, upon prior Notice to the CONCESSIONAIRE, at reasonable time and subject to compliance with the CONCESSIONAIRE's/Operator's security and safety requirements, attend and inspect Exploration/Feasibility and Mining Operations and activities conducted in Liberia; and

c.      Within thirty (30) days after the end of each calendar quarter, the Operator through CONCESSIONAIRE shall provide GOVERNMENT with a report on all Exploration/Feasibility and Mining Operations and activities for that calendar quarter, including financial reports of iron ore recovered and sold. Within ninety (90) days after the end of each financial year, CONCESSIONAIRE shall furnish the GOVERNMENT with a report on all Exploration/Feasibility and Mining Operations and activities for that Financial Year, including financial reports of iron ore recovered and sold.

## ARTICLE VI
## CLASS A MINING LICENSE AND PRODUCTION AREA

**Section 1 Class A Mining License**
Upon receipt of Notice from the CONCESSIONAIRE at the end of the Exploration/Feasibility Period, GOVERNMENT shall grant a Class A Mining License for the proposed Production Area subject to the following terms and conditions:

a.      That the CONCESSIONAIRE shall have successfully completed a proposed Exploration/Feasibility program and submitted to GOVERNMENT a detailed map and descriptive statements on the boundaries and size of the deposits from which production will be carried out pursuant to Article VI, Section 2 below;

b.      The Feasibility Report shall describe, in more detail, a proposed plan for the efficient and economic Production (in accordance with International Standards and the provisions of this Agreement) of the iron ore deposits found, including a more detailed and precise description of the proposed mining and processing methods, the design, costs and construction schedules for the proposed facilities and equipment and the marketing

6

arrangements contemplated. The GOVERNMENT shall not withhold or unreasonably delay its approval of the Feasibility Report and shall grant its approval if the Feasibility Report, or any amendment made to it by CONCESSIONAIRE, reasonably complies with International Standards and the provisions of this Agreement. The GOVERNMENT shall, in the event of any delay in or denial of approval of the Feasibility Report, promptly give to CONCESSIONAIRE full details, in writing, of its reasons for withholding or delaying approval. If, in CONCESSIONAIRE's opinion, any such approval has been wrongfully withheld or unreasonably delayed, it may invoke the provisions of Article XXXI on arbitration; and

c.    That GOVERNMENT shall have been satisfied that the CONCESSIONAIRE possesses the appropriate technical skills and experience and the financial resources to carry out mining operations in keeping with the requirements of a Class A Mining License.

**Section 2 Production Areas**
Each Production Area shall consist of such part of the Concession Area as, in the light of International Standards, and subject to Article IV, Section 2, is reasonable, taking into account the extent and nature of the ore found and the requirements for the efficient and economic Production of such ore and the conduct of other Operations.

Subject to Article VI, Section 2, the CONCESSIONAIRE through the Operator, in order to select a Production Area, shall submit to GOVERNMENT a detailed map and descriptive statement based on actual surveys which shall set forth the boundaries of the Production Area which shall be identified by metes and bounds, and the boundaries and size of the iron ore deposit or deposits which the CONCESSIONAIRE intends to produce. The maps shall be of such scale and contain such detail, including geographical and topographical information, as may reasonably be necessary to identify accurately the Production Area and the boundaries of the iron ore deposits.

**Section 3 Term of the Class A Mining License**
The Class A Mining License for a Production Area selected by the CONCESSIONAIRE shall remain valid and effective for the unexpired portion of the term of this Agreement and any extensions thereof.

# ARTICLE VII
# CONFIDENTIALITY

**Section 1 Confidential Information**
All information exchanged between the Parties hereto in the context of this Agreement shall be considered and treated as confidential information, subject to Article VII, Section 2 below. The Parties hereto hereby agree not to divulge such information to any other Person without the prior written consent of the other party, which consent shall not be unreasonably withheld and/or delayed. Notwithstanding, the foregoing, shall not be applicable to CONCESSIONAIRE's Bankers, Advisors and all those who, in a special way, connected with Operation hereunder.

**Section 2 Public Information**
The obligation of confidentiality set forth in Article VII, Section 1 above shall not apply either to information exchanged between the Parties hereto which is in the public domain or to information exchanged by the Parties which the CONCESSIONAIRE is required to reveal to any other Person by Law.

# ARTICLE VIII
# PRODUCTION WORK PROGRAMS

Subject to Articles V and VI, the CONCESSIONAIRE through the Operator shall commence and continue construction, acquisition and installation of facilities and equipment, and otherwise to produce iron ore and associated minerals and products, substantially in accordance with the Feasibility Report, unless such Production becomes uneconomical, in which event the provisions of Article XXXIII shall apply.

7

## ARTICLE IX
## LAND AND FACILITIES

**Section 1 Public Land**

a.  The CONCESSIONAIRE through the Operator shall have the right to enter upon and utilize all public land within the Concession Area for purposes of and incidental to Operations, without costs except as provided for by ARTICLE XXIV, Sections 1 and 2 below.

b.  To the extent that it does not involve an unreasonable interference with the rights of other persons, GOVERNMENT shall grant the CONCESSIONAIRE and the Operator the right to enter upon, utilize and possess, without cost, any public land not within the Exploration Area or a Production Area and which is reasonably required by the CONCESSIONAIRE for purposes of and incidental to Operations including areas required for plant and equipment, infrastructure and other facilities and equipment. Possession of such land shall be returned to GOVERNMENT following the termination of this Agreement, if not earlier returned, and such land shall be deemed part of the Concession Area during any such period of the occupancy and used by CONCESSIONAIRE.

**Section 2 Private Land**

a.  The CONCESSIONAIRE shall endeavor, by direct agreement with the owner, to enter upon and utilize private land within the Concession Area required for or incidental to Operations.

b.  If the CONCESSIONAIRE and the owner of private land in the Concession Area which the CONCESSIONAIRE reasonably requires for Operations cannot agree, GOVERNMENT shall, at the request of the CONCESSIONAIRE, intervene to assist in the conclusion of such agreement, failing which GOVERNMENT shall, at the request of the CONCESSIONAIRE, acquire such land and all improvements thereon in the public interest. The CONCESSIONAIRE shall reimburse GOVERNMENT for all reasonable costs paid in connection with such exploration, including just compensation paid to the prior owner, provided, however, that the amount paid by GOVERNMENT to the owner shall not exceed the reasonable value of the owner's interest in such land (land and any improvements thereon) determined, without regards to the value of any Mineral which may be contained therein, by means of an appraisal conducted by a qualified Person mutually agreed to by the Parties hereto. Title to the property thus acquired shall vest in GOVERNMENT, and GOVERNMENT shall grant CONCESSIONAIRE the right to enter upon, utilize and possess such land which shall be deemed part of the Concession Area.

c.  If CONCESSIONAIRE reasonably requires private land outside the Concession Area for Operations, the CONCESSIONAIRE will endeavor to enter upon and utilize such land by direct agreement with the owner, and such land shall be deemed part of the Concession Area during any period of the occupancy and use by the CONCESSIONAIRE.

d.  For the purposes of the foregoing:

1.  Private land shall mean any land (including any creeks, streams, rivers or bodies of waters contained thereon, land their residue) owned by a Person other than GOVERNMENT; and

2.  Public land shall mean all land other than private land.

**Section 3 Facilities**
The assets of GOVERNMENT, irrespective of their conditions which shall be contributed to CONCESSIONAIRE' Operations shall comprise but not be limited to the following:

a.  Existing Facilities of the former LAMCO Joint Venture Company:

8

1.    The Mines and Quarries;

2.    The Railroad, including the main railway, all sidings and loops, sheds, communication installations buildings, maintenance yards and facilities, as well as all remaining rolling stocks and other rail infrastructure equipment.

3.    The Port of Buchanan, including the iron ore quay, but excluding the commercial quay; and

4.    All the housing units in Buchanan and Yekepa.

b.    New Facilities within the Concession Area:

1.    The CONCESSIONAIRE shall have the right to acquire, import, construct, install and operate plant and equipment, Infrastructure, import cement and other facilities and equipment reasonably required for Operations;

2.    The CONCESSIONAIRE shall have the right to use public Infrastructure, whether owned, operated or provided by GOVERNMENT or by any other Person under license or authority of GOVERNMENT, to the extent adequate (taking into account the public use thereof) to meet the CONCESSIONAIRE's needs with respect to Operations. GOVERNMENT shall ensure that all charges for, and other terms and conditions of, the use by the CONCESSIONAIRE of public Infrastructure are fair and reasonable, taking into account the cost of providing such Infrastructure, and are not more onerous than those that are generally applicable to others using similar public Infrastructure in a similar manner;

3.    To the extent reasonable in connection with Operations, the CONCESSIONAIRE shall have the right, subject to prior consultation with GOVERNMENT, to integrate any item of its own Infrastructure with similar items of public Infrastructure;

4.    To the extent that CONCESSIONAIRE does not utilize its Infrastructure to full capacity, GOVERNMENT shall have the right to use said Infrastructure on reasonable Notice to the CONCESSIONAIRE, provided that such use does not impair the efficient and economic conduct of Operations. The GOVERNMENT shall pay reasonable compensation to CONCESSIONAIRE (other than in the case of roads and highways unless the use causes material damage thereto) within a reasonable period after invoice from the CONCESSIONAIRE in connection with such use; and

5.    GOVERNMENT reserves the right, on reasonable Notice to and after consultation with the CONCESSIONAIRE, to construct roads, highways, railroads, telegraph and telephone lines and other lines of communication within the Concession Area. GOVERNMENT shall provide timely Notice for the commencement of such operations. In the event of such construction, GOVERNMENT shall, within a reasonable period after invoice from the CONCESSIONAIRE, compensate the CONCESSIONAIRE for all damages thereby caused the CONCESSIONAIRE and its property and thereby indemnifies and saves harmless the CONCESSIONAIRE from all claims by third parties arising therefrom. Under no circumstances will GOVERNMENT engage in such construction if the effect of so doing would be to disrupt or interrupt the conduct of Operations.

c.    Communications Facilities, Systems and Frequencies:

1.    The CONCESSIONAIRE shall have the right, as licensee or assignee, to operate for its own use and that of any Affiliate, such communications systems as it deems necessary, including radio, telecommunication, satellite networks, cellular systems, microwave devices and other communications devices and systems, and to receive from GOVERNMENT such rights, license, registrations, permits and

other authorizations as may be required by Law in connection with the possession, use, importation or purchase of the foregoing; and

2.  GOVERNMENT hereby agrees that it shall make available, for use by the CONCESSIONAIRE, an adequate number of broadcast and communications frequencies for both domestic and international use, and shall grant unto the CONCESSIONAIRE such rights, license, registrations, permits and other authorizations as may be required in order to comply with any Law regarding the possession, use, importation or purchase of related equipment or of any telecommunications devices or other communications equipment or devices. GOVERNMENT and CONCESSIONAIRE shall consult together from time to time as to the specific frequencies to be assigned consistent with international regulations.

## ARTICLE X
## HEALTH CARE, SAFETY AND SECURITY

### Section 1 Health Care
CONCESSIONAIRE shall construct, maintain and operate health facilities in the Concession Area, and shall install, maintain, and use modern health devices and equipment and shall practice modern health procedures and precautions.

In connection with Operations, the CONCESSIONAIRE shall furnish in the Concession Area free medical treatment, care and attention at acceptable standards to all employees and CONCESSIONAIRE officials working in connection with the CONCESSIONAIRE's Operations, and their spouses and dependents, and shall acquire qualified medical staff and maintain dispensaries, clinics or hospitals. Without limiting the generality of the foregoing, whenever the CONCESSIONAIRE employs 100 or more persons at any permanent work site within the Production Area, it shall maintain there a dispensary or hospital headed by a resident medical doctor. The CONCESSIONAIRE shall keep records and notify GOVERNMENT immediately of any death of or serious injury to any person in connection with Operations. For the purposes of this provision a "serious" injury is as is defined in the Labor Practices Law of Liberia.

### Section 2 Safety
In connection with Operations, the CONCESSIONAIRE shall construct, maintain and operate safety devices and equipment and shall practice such safety procedures and precautions (including regular safety training instruction for its employees) as are in accordance with International Standards. The CONCESSIONAIRE shall notify the GOVERNMENT immediately of any death of or serious injury to any employees of the CONCESSIONAIRE that occurred as a result of Operations. For the purposes of this Article X, Section 2, a serious injury shall mean an injury, confirmed by medical reports, which is likely to cause the injured person to lose six (6) or more working days. The CONCESSIONAIRE shall comply with such reasonable written instructions as may, from time to time, be given by the GOVERNMENT under Law with respect to preventing the spread of contagious, life-threatening diseases and other public health hazards.

### Section 3 Security Force
The CONCESSIONAIRE shall have the right in keeping with the provisions of the Laws of Liberia, to directly or under contract with other persons, establish and maintain its own security force for the purpose of maintaining Law, order and security, with power both of detention (any detained person to be handed over to the appropriate GOVERNMENT authorities as soon as practicable), and of search of and exclusion from the Production Area and such other areas as may be properly restricted for economic, operational or security reasons, always being subject to Law. This Section 3 shall not affect or alter the GOVERNMENT's obligations under Article XXIX.

10

## ARTICLE XI
## EDUCATION AND SKILLS TRAINING

**Section 1 Education**

a.    On and from the commencement of Production, the CONCESSIONAIRE shall provide, in the Concession Area, free primary and secondary education (in conformity with provisions of the Education Laws of Liberia and generally applicable standards on education in Liberia) for the dependents of the CONCESSIONAIRE's own employees, and GOVERNMENT officials assigned in the Concession Area in connection with Operations.

b.    If the CONCESSIONAIRE through the Operator conducts substantial Production in an area in which facilities are inadequate to conduct such education, it shall pay the costs of such education in existing facilities or, at its option, provide facilities reasonably adequate for such purpose.

**Section 2 Skills & Training of Liberians**
The CONCESSIONAIRE shall, amongst other measures, provide on a continuing basis for the training of suitable Liberian citizens, in order to qualify them for skilled, technical, administrative and managerial positions, by means of:

a.    Establishing and operating vocational and advanced training centers in Liberia.

b.    Furnishing on-the-job counterpart training, not only in Liberia, but to the extent reasonably feasible in the offices of CONCESSIONAIRE or its agents outside Liberia, in order that such Liberians may receive training in the overseas aspects of CONCESSIONAIRE's shipping, marketing and accounting functions; and

c.    Providing scholarships for qualified Liberian citizens to pursue advanced studies abroad. Detail plans and programs for such training, including timetables and schedules, shall be formulated (and revised when necessary) in consultation with, and shall be subject to the approval of, GOVERNMENT. Such consultation shall commence as soon as practicable in light of the progress of Operations, and in any event after request by GOVERNMENT.

## ARTICLE XII
## EMPLOYMENT AND SECONDMENT

**Section 1 Employment**
CONCESSIONAIRE shall not import unskilled labor into the Republic. CONCESSIONAIRE shall employ (and shall give preference to the employment of) qualified Liberian citizens for skilled, technical, administrative and managerial positions. CONCESSIONAIRE shall, however, have the right at all times to choose its senior management freely. Subject to the foregoing, CONCESSIONAIRE shall be entitled to employ expatriates in accordance with the Labor Practices Law of Liberia for the efficient conduct of Operations in the Republic, and GOVERNMENT shall issue such permits as may be required by Law to allow such expatriates freely to enter into, work and reside in the Republic in connection with Operations, and to depart from the Republic.

**Section 2 Secondment**

a.    In order to effect the policy of technology transfer, at all times during Operations, GOVERNMENT shall, in consultation with CONCESSIONAIRE second an agreed number of professionals including geologists, mining engineers, surveyors, etc., to participate in the technical aspects of the Operations.

b.    CONCESSIONAIRE shall provide subsistence allowances to the secondees at a rate to be mutually agreed by the Parties.

11

c.   The GOVERNMENT shall, in consultation with CONCESSIONAIRE. assign an agreed number of representatives to the external marketing and purchasing units of the CONCESSIONAIRE at the expense of CONCESSIONAIRE.

## ARTICLE XIII
## USE OF LIBERIAN SERVICES AND MATERIALS

The CONCESSIONAIRE shall, when purchasing goods and services required with respect to Operations, give first preference to Liberian goods and services that are comparable in quality, terms, delivery, service, quantity and price to, or better than, goods and services obtainable outside the Republic. Subject to the foregoing, the CONCESSIONAIRE may freely contract with such Persons as it desires. Nothing in this Article XIII shall require the CONCESSIONAIRE to act upon other than commercial considerations.

## ARTICLE XIV
## COMMUNITY RESOURCES

It is the objective of the Parties hereto that Operations hereunder shall be carried out in a manner that is consistent with the continuing economic and social viability, both during the term of this Agreement and thereafter, of centers of population that have formed and which may form as a result of such Operations. Upon request of GOVERNMENT at any time, the CONCESSIONAIRE shall consult with GOVERNMENT to mutually establish plans and programs for the implementation of this objective, and thereafter the CONCESSIONAIRE shall in good faith cooperate with GOVERNMENT in regard to its efforts concerning the realization of such plans and programs. Nothing herein shall require the CONCESSIONAIRE to make any expenditure or incur any costs beyond what it would have made or incurred in the ordinary course of its business.

## ARTICLE XV
## ENVIRONMENTAL PROTECTION AND MANAGEMENT

**Section 1 Environmental Management**
The Parties hereto recognize that Operations may result in pollution, contamination or other environmental damage to land, water and the atmosphere within the Concession Area and elsewhere. Accordingly, CONCESSIONAIRE through the Operator shall conduct its Operations pursuant to the Environmental Protection. And Management Law of the Republic. Notwithstanding the foregoing, CONCESSIONAIRE shall not be liable for pre-existing environmental damage within the Concession Area.

**Section 2 Environmental Audit and Assessment**
GOVERNMENT, at the expense of CONCESSIONAIRE, shall conduct a periodic environmental audit and assessment of any or all areas encompassing the Concession Area to ascertain that the activities of the CONCESSIONAIRE are in conformity with acceptable environmental practices and standards. If any defects are caused to the environment consequent to the CONCESSIONAIRE's Operations, the CONCESSIONAIRE shall be required to mitigate and/or restore the environment as much as possible to its original and natural state. In furtherance to same, the CONCESSIONAIRE shall be warned to take preventive measures to avoid damage to the environment.

## ARTICLE XVI
## CAPITAL AND CORPORATE STRUCTURE

**Section 1 Incorporation**
As soon as is practicable, but before the execution of this Agreement, GOVERNMENT and CONCESSIONAIRE shall effect the incorporation in Liberia of the CONCESSIONAIRE.

The CONCESSIONAIRE shall not be wound up prior to termination of this Agreement.

Unless GOVERNMENT and GIHL otherwise agree, the CONCESSIONAIRE shall be wound up as and when mutually agreed by the Parties hereto.

**Section 2 Name of CONCESSIONAIRE**
The name of the CONCESSIONAIRE shall be LIBERIA GLOBAL MINING COMPANY (LGMC).

**Section 3 Initial Issued Capital**
The capital of the CONCESSIONAIRE shall be denominated in Dollars. The initial issued share capital of the CONCESSIONAIRE shall consist of Class-A Stock and Class-B Stock, respectively. The classification of the shares into Class-A Stock and Class-B Stock shall not accord either class any special rights, preferences or benefits over the other, except as otherwise expressly agreed herein. The capital stock of GOVERNMENT shall consist of thirty (30) Class A Stock with no par value to be issued to GOVERNMENT and of seventy (70) Class B Stock, with no par value to be issued to the GIHL.

**Section 4 Basis for Equity Participation**

a.      GOVERNMENT shall contribute to CONCESSIONAIRE's Operations the mineral and mining rights for the iron ore and the associated Infrastructure and Facilities as defined in Article IX hereof in the Concession Area, as well as any related studies appertaining thereto. In consideration of its contribution in kind GOVERNMENT shall receive CONCESSIONAIRE's Class A shares.

b.      GOVERNMENT shall further contribute to CONCESSIONAIRE's Operations the industrial infrastructure, facilities, rights and assets that it owns in Liberia.

c.      GIHL shall contribute initial capital in the amount of twenty-five million United States (US$25,000,000.00) Dollars to be drawn down against Work Program in accordance with ARTICLE V hereof, and shall arrange financing for the CONCESSIONAIRE's Operations, all loan capital investments required to fund the implementation of the mining operation. GIHL shall receive all of CONCESSIONAIRE's Class-B shares in consideration for its capital contribution.

# ARTICLE XVII
## BOARD, MANAGEMENT AND ADMINISTRATION

**Section 1 Composition of the Board of Directors**
The Board of Directors of CONCESSIONAIRE (hereinafter "the Board") shall consist of Eleven (11) members, as follows: five (5) Persons (and alternates thereof) nominated by the holders of Class A shares and six (6) Persons (and alternates thereof) nominated by holders of Class B shares.

**Section 2 Free Movement in Liberia of GIHL Directors**
The GOVERNMENT shall permit all directors (and alternates) of the GIHL to enter and remain in and depart Liberia for purposes of and incidental to attending meetings of the Board of Directors, without hindrance, molestation and/or intimidation.

The GOVERNMENT shall permit all representatives of or proxy holders for Shareholders of CONCESSIONAIRE to enter and remain in and depart Liberia for purposes of and incidental to attending general meetings, without hindrance, molestation and/or intimidation.

**Section 3 Technical Committee**
GOVERNMENT and GIHL shall constitute a Technical Committee to the Board, which shall hold periodic meetings for the purpose of making recommendations to CONCESSIONAIRE through the Board with respect to matters arising in the course of operational, medical, health, safety, educational, environmental and other matters. The committee shall also make recommendations through the Board to the CONCESSIONAIRE with respect to the construction by the CONCESSIONAIRE within Liberia of new facilities, and/or the expansion of the existing facilities, for the purpose of providing CONCESSIONAIRE with transportation, communication,

13

power, water, sewerage, and similar utilities with a view towards coordinating the needs and plans of the CONCESSIONAIRE with the needs and plans of GOVERNMENT for the construction, maintenance and operation of similar facilities for GOVERNMENTAL and public purposes. The Technical Committee shall submit its recommendations to the Boards.

## ARTICLE XVIII
### PROVISION OF FUNDS TO CONCESSIONAIRE

**Section 1 Procurement of Additional Funds**
For so long as GIHL and GOVERNMENT respectively hold the shares mentioned in Article XVI, Section 3 hereof, and GIHL has the right to appoint a majority of the Board, and to the extent that CONCESSIONAIRE's available funds (including any third party borrowings) are insufficient for its purposes, GIHL shall fund (or procure the funding of) CONCESSIONAIRE in accordance with Article XVI, Section 4c.

**Section 2 Adequate Capital**
In making elections from time to time pursuant to paragraph 1 above, GIHL shall ensure that, at all times, the CONCESSIONAIRE has a prudent capital structure. However, a ratio of loans to the greater of equity capital (stated and surplus) and shareholders funds of 4:1 or less shall not be regarded as imprudent.

## ARTICLE XIX
### UNDERTAKINGS OF THE GOVERNMENT

**Section 1 Access to Information**
GOVERNMENT hereby undertakes and affirms that the CONCESSIONAIRE, at basic cost, shall be entitled to use and to have access to all geological or other information relating to the Concession Area that is owned by the GOVERNMENT or may be in or subject to the GOVERNMENT's control. The GOVERNMENT hereby agrees that it shall provide such information upon the CONCESSIONAIRE's request within a reasonable time. For purposes of this Agreement, basic cost shall mean the cost of reproduction and any additional un-recovered cost actually incurred by GOVERNMENT in obtaining such information but not to exceed rates charged other Persons.

**Section 2 Provision of Documents**
Subject to Article XII, Section 1 and except to the extent any such person may be disqualified by Law, GOVERNMENT shall promptly furnish to each employee of CONCESSIONAIRE, GIHL and of its Associates who is not a citizen of the Republic, and to the spouse and minor dependents of each such employee, all documents and visas necessary to enable such person to enter and to leave, or travel within, the territory of the Republic without hindrance, molestation and intimidation.

**Section 3 Use of Aircraft**
GOVERNMENT hereby undertakes and affirms that CONCESSIONAIRE, GIHL and its Associates shall be entitled to use, in accordance with Law, an aircraft, whether owned or rented, for journeys within the Republic and into and out of its territory. Moreover, CONCESSIONAIRE, GIHL and its Associates shall have aircraft landing and parking rights in all airports, airfields and landing strips within the Republic, except for those used exclusively as military bases, and shall pay the lowest applicable fees and tariffs for such use.

**Section 4 Use of Airports and Seaports**
GOVERNMENT shall permit CONCESSIONAIRE, GIHL and its Associates to obtain access to and use all airport and seaport installations in the Republic, except those reserved for military and national security related activities, at the lowest prices paid by any other Person, for all aircraft and ships whose presence in Liberian territorial airspace or waters is required by CONCESSIONAIRE, GIHL and its Associates in connection with Operations. These aircraft and ships shall have the right to enter and to leave the territorial airspace and waters of the Republic, without restriction, in accordance with Law.

14

**Section 5 Electricity Generation and Transmission**

GOVERNMENT undertakes and affirms that CONCESSIONAIRE, GIHL and its Associates shall be entitled, at their own cost but free of any further Taxes or Duties or other payments to any Person and/or GOVERNMENT for or in connection with the exercise of such entitlement, to generate, transmit and use electricity, and use and provide water, in accordance with Law regulating such use, as may be required for Operations. In the event that CONCESSIONAIRE, GIHL and its Associates purchase electric power or water from GOVERNMENT for any purpose associated with Operations, they shall be charged at the lowest rates applicable in the Republic to industrial users. If CONCESSIONAIRE produces more electricity or water than it can utilize, it shall sell the extra production to third party users at fair market price.

**Section 6 Issuance of Necessary Authorization**

GOVERNMENT undertakes and affirms that it shall issue all licenses, permits, mining titles, easements, and other authorizations, including but not limited to, the rights and titles referred to in Article IV, Section 1 and Article VI, Section 1 above, which are or may be necessary for CONCESSIONAIRE, GIHL and its Associates to conduct Operations.

**Section 7 Protection against Nationalization or Expropriation**

GOVERNMENT undertakes and affirms that it shall not nationalize, condemn or expropriate.

a.    Any infrastructure, Facilities or other property, movable or immovable, of CONCESSIONAIRE, GIHL or its Associates to the extent connected with or affecting Operations;

b.    Iron ore, associated Minerals or derivatives thereof in any form resulting from Operations;

c.    Any equity, shares or ownership interests of whatever nature and kind held in or issued by CONCESSIONAIRE;

d.    Any infrastructure put in place or used by CONCESSIONAIRE in connection with Operations; and

e.    Any capital invested by the CONCESSIONAIRE, GIHL or its Affiliates in the Republic.

**Section 8 Peaceful Enjoyment**

GOVERNMENT hereby warrants and defends CONCESSIONAIRE's title to, possession and peaceful enjoyment of all rights granted to it by this Agreement and all of its property in the Republic against expropriation, confiscation, condemnation, wrongful possession, and to the extent possible, destruction, disruption, or interference by any Person.

**Section 9 Non-Derogation**

GOVERNMENT hereby undertakes and affirms that at no time shall the rights (and the full and peaceful enjoyment thereof) granted by it under this Agreement be derogated from or otherwise prejudiced by any Law or by the action or inaction of GOVERNMENT, or any official of thereof, or any other Person whose actions or inactions are subject to the control of GOVERNMENT.

**Section 10 Equitable Treatment**

In the event that GOVERNMENT grants to any other Person terms or conductions that are more favorable than those provided in this Agreement with respect to Operations, Exploration or Production of the same Mineral(s), or in the event that GOVERNMENT enacts any Law or adopts any practice or policy that permits more favorable treatment of any other Person than that accorded to the CONCESSIONAIRE by this Agreement with respect to Exploration and Production of iron ore being explored for, developed or produced by CONCESSIONAIRE, then GOVERNMENT shall grant the same more favorable treatment to the CONCESSIONAIRE, with effect from the date of its application to such other Person or of its entry into force, as the case may be.

## ARTICLE XX
## UNDERTAKINGS OF GIHL

The undertakings/obligations of GIHL shall include but not be limited to the following

a.    To undertake, through the Operator, a comprehensive Feasibility Study of the mineral deposits in the Concession Area and submit a report to CONCESSIONAIRE;

b.    To produce, through the Operator, a Production Work Program (on the Development/Production of the iron ore deposits in the Concession Area) as will be required under this Mineral Development Agreement (MDA) and use it together with the Feasibility Report as the basis for ongoing Operations (See Appendix 1);

c.    To carry, through the Operator, out an Environmental Impact Assessment hereinafter referred to as "EIA" in relation to Operations as required by the Environmental Protection And Management Law of Liberia, and in keeping with acceptable International Standards on environmental management and control;

d.    To procure Capital Investment and Financing for CONCESSIONAIRE's Operations and manage all such finances on a daily basis;

e.    To bring international expertise, systems and technical know-how to CONCESSIONAIRE's Operations and the associated operations, Facilities and infrastructure;

f.    To solely appoint, constitute, designate and name Operator to manage Operations for and in behalf of CONCESSIONAIRE;

g.    To utilize a well defined management structure, internationally acceptable standards of accounting and governance, and to provide regular comprehensive reporting to the Parties hereto;

h.    To Market all Production, associate products and derivatives;

i.    To bring, through CONCESSIONAIRE, international expertise in Iron Ore mining and processing to Liberia and to provide Employment, Secondment, and Training as may be required as specified in Article XII;

j.    To establish, through CONCESSIONAIRE, Healthcare and Education facilities as may be required as specified in Articles X and XI;

k.    To consider legal and operational obligations for CONCESSIONAIRE's Operations as required by the Liberian Minerals and Mining Law including environmental issues, employment and training of the domestic labor force, the domestic requirement for Iron Ore and the rehabilitation of the mine and site after exhaustion; and

l.    To establish, through CONCESSIONAIRE, an administrative locus in Liberia that will provide reporting and accounting services to Operations and will collaborate with the Parties to ensure smooth running of those Operations.

## ARTICLE XXI
## INDEMNIFICATION

**Section 1 Indemnification for Breach of Agreement**
Any breach by either party to this Agreement of any obligation provided for in this Agreement, shall entitle the party aggrieved by the breach to be indemnified by the defaulting party in an amount equal to the damage suffered by the aggrieved party.

16

**Section 2 CONCESSIONAIRE's Indemnification of GOVERNMENT**

CONCESSIONAIRE shall at all times indemnify and hold harmless GOVERNMENT and its officers and agents from any and all claims and liabilities for death or injury to persons or damage to property from any cause whatsoever arising out of Operations or as a result of the CONCESSIONAIRE's failure to comply with any Law to which it is subject.

**Section 3 GOVERNMENT's Indemnification of CONCESSIONAIRE, GIHL and its Affiliates**

GOVERNMENT shall indemnify and hold harmless CONCESSIONAIRE, GIHL and its Affiliates from any and all claims, liabilities, costs, expenses, loses and damages suffered by it (whether arising by operation of Law or contract voluntarily made, or otherwise reasonably assumed by it) as a result of any failure of GOVERNMENT to honor any provision or undertaking expressed in this Agreement.


# ARTICLE XXII
# INCOME TAXATION

**Section 1 Rate and Basis**

CONCESSIONAIRE shall be liable to taxation under provisions of the ACT ADOPTING A NEW MINERALS AND MINING LAW and the Revenue Code of Liberia (Act of 2000) on its net taxable income, which shall include capital gains, as follows;

The rate of tax applicable to the net taxable income of CONCESSIONAIRE shall not be less than thirty percent (30%), which net taxable income shall mean its gross income from Production and other Operations, as well as its gross income from the sale or distribution of any asset to, for the benefit of, any person, to the extent of the excess of the fair market value of such asset over its adjusted basis, and any other income from business activity or investment, including currency gains when realized, less the deductions set forth in Article XXII, Sections 2 and 4.

**Section 2 Computation of Net Taxable Income**

In computing CONCESSIONAIRE's net taxable income, the following shall be allowed as deductions from its gross income:

a.    In the year incurred, all expenditures on Operations, other than the capital cost of items of plant, equipment, machinery and Infrastructure and other than any payment made to an expatriate employee by CONCESSIONAIRE as reimbursement for Taxes and Duties paid by such employee to CONCESSIONAIRE, or otherwise as specifically provided below;

b.    Commencing in the year construction, acquisition or installation is completed, an allowance for depreciation of the items of plant, equipment, machinery and Infrastructure shall be computed in accordance with the Revenue Code of the Republic (Act of 2000);

c.    In the year sold, the difference between the adjusted basis and the selling price of any assets to the extent the latter is less than the former or, if any asset is declared to be scrap or obsolete or if construction, acquisition or installation of any asset is abandoned prior to completion, the adjusted basis of the asset in the year the asset is declared scrap or obsolete by CONCESSIONAIRE or in which construction, acquisition or installation of the asset is abandoned;

d.    In the year incurred, all interest and other financing charges on any Approved Indebtedness of CONCESSIONAIRE incurred in connection with Operations;

e.    In the year paid or incurred, any and all payments of Taxes, except for Income Tax and other fees as provided within the Revenue Code of Liberia (Act of 2000);

f.    In each year, all bad debts in excess of any reserve against bad debts, existing in such year and allowed as a deduction against gross income;

g.    In each year, currency exchange losses and accounting translation losses when realized;

17

h.  All costs incurred prior to the Effective Date of this Agreement and with respect to the Concession Area and paid for by CONCESSIONAIRE, subject to the review of such costs for accuracy by the Minister of Finance and the Minister of Lands, Mines and Energy, which shall be capitalized and amortized over five (5) Concession Years from the Effective Date; and

i.  All charitable contributions made in the Republic for educational, religious or medical purposes or for other social services approved by GOVERNMENT to the extent that, with respect to any tax year, such charitable contributions do not exceed fifteen percent (15%) of CONCESSIONAIRE's taxable income as defined under the Revenue Code of Liberia (Act of 2000).

**Section 3 Carry Forward Permitted**
To the extent that, for any reason, there is a net operating loss, it may be carried forward pursuant to the Revenue Code of Liberia (Act of 2000) for such other period(s) as may be provided by the said law or any amendment thereof.

**Section 4 Computation of Taxable Income in Dollars**
Except as otherwise provided in this Agreement, the net taxable income of CONCESSIONAIRE shall be determined in Dollars in accordance with generally accepted accounting principles. Notwithstanding the foregoing, CONCESSIONAIRE shall commence to pay or cause to be paid Income Tax ten (10) years after the Effective Date of this Agreement.

## ARTICLE XXIII
## ROYALTIES

**Section 1 Royalty Rate**
CONCESSIONAIRE shall pay to GOVERNMENT in Dollars a royalty of three (3%) percent from the sale of iron ore.

**Section 2 Royalty Basis**
Royalty shall be determined on a gross revenue basis taking into account the actual weight and analysis of the ore sold.

**Section 3 Payment**
Royalty shall be paid ninety (90) days after the day on which the iron ore sold is shipped to the purchaser.

## ARTICLE XXIV
## SURFACE RENTAL

**Section 1 Concession Area**
CONCESSIONAIRE shall pay to GOVERNMENT, during each calendar year, a surface rental equal to a lump sum of One Hundred and Seventy-five Thousand (US$175,000.00) United States Dollars for land subject to Exploration/Feasibility Studies and Production. The payment of the surface rental shall commence five (5) years after the Effective Date of this Agreement.

**Section 2 Payment**
All such surface rentals shall be payable annually to GOVERNMENT in advance on or before January 15 of the year period for which payment is being made.

## ARTICLE XXV
## OTHER PAYMENTS TO GOVERNMENT

**Section 1 Import Duties and Other Payments**
Pursuant to provisions of the Investment Incentive Code of Liberia, CONCESSIONAIRE shall pay no Taxes and Duties with respect to the import, use or purchase of goods, equipment, vehicles, machinery, heavy oil, diesel, lubricants and supplies (including medical, training and

18

educational supplies and housing and office materials, furniture and supplies), and any other items required for and used in Exploration, Development and Production. CONCESSIONAIRE shall, with regard to items not used in Exploration, Development and Production or otherwise exempt pursuant to this Article XXV, Section 1 hereof, pay import duties and sales taxes under Law but, without prejudice to Article XXV, Section 2, at rates no higher than those payable by any other producer of iron ore in the Republic.

**Section 2 Payments in Lieu of Duties and Fees**
In lieu of the customs duties and fees and other taxes waived herein, CONCESSIONAIRE shall pay to GOVERNMENT an annual lump sum amount of Two Hundred Thousand (US$200,000.00) United States Dollars to be paid in two installments of One Hundred Thousand (US$100,000.00) United States Dollars each on January 15, and July 15, respectively each year.

In consideration of this payment, CONCESSIONAIRE shall not be subject to the payment of taxes, duties and fees with respect to import, use or purchase of goods, equipment, vehicles, machinery, heavy oil, diesel, lubricants and supplies (including medical training and educational supplies and housing and office materials, furniture and supplies), and any other items required for and used in Exploration, Development, and Production. CONCESSIONAIRE shall, with regard to items not used in Exploration, Development and Production. CONCESSIONAIRE shall, with regard to items not used in Exploration, Development and Production or otherwise exempt pursuant to the Agreement, pay import duties and excise taxes under Law but, without prejudice to ARTICLE XXV, Section 1, at rates no higher than those payable by any other producer of iron ore in the Republic. Such payment shall commence five (5) years after the Effective Date of this Agreement.

**Section 3 Other Payments**
In respect of Operations and activities CONCESSIONAIRE shall pay to GOVERNMENT:

a.      50% concessionary rate of Import Levy, pursuant to the Revenue Code of Liberia (Act of 2000) on gasoline;

b.      CONCESSIONAIRE shall pay a quarterly presumptive Turn-Over Tax at a concessionary rate of one quarter of one percent of its Gross Income which Tax shall be credited against its corporate income tax in keeping with the Revenue Code of Liberia (Act of 2000); and

c.      CONCESSIONAIRE shall be exempt from the payment of BIVAC or its successor's fee of 1.5% on imports and exports.

**Section 4 Mineral Development Fund**
On the Effective Date of this Agreement pursuant to Article II, CONCESSIONAIRE shall make a one-time payment to GOVERNMENT for the Mineral Development Fund, US$50,000 Fifty Thousand (US$50,000.00) United States Dollars.

**Section 5 Other Exemptions from Taxes and Duties**
The Taxes and Duties and other amounts specifically provided in this Agreement to be paid to GOVERNMENT are in lieu of all other Taxes and Duties and other amounts (except for ordinary taxes, fees and revenue charges of general application that are minor in nature and amount that are not imposed upon or derived from Operations, such as, for example, business and auto registration and driver's license fees) which, directly or indirectly, at any time, under any sovereign or other Law or otherwise, would be levied upon or payable to the GOVERNMENT by CONCESSIONAIRE or its Associates with respect to any activity or transaction engaged in by any of them, or any items or materials possessed, owned, transported, imported, exported, processed, mined or otherwise dealt with or in by any of them. The above shall apply, without limitation as to the generality of the foregoing, to any Taxes and Duties that might be paid to CONCESSIONAIRE by any of the foregoing Persons resulting from the subscription of equity or loan capital to or by any of them; the payment or receipt of interest and dividends by any of them; the import, export, acquisition, supply, sale, disposition or other dealing with property and any payment, receipt, income, profit or gain made, received, earned or realized by any of them as a result thereof. The above shall further apply, but not be limited, to any payments made to non-

19

residents, including payments for goods and services, and payments of interest, dividends and other fixed and determinable income.

**Section 6 Non-Application of Article XXV, Section 5**
The provisions of Article XXV, Section 5 shall not apply, however, to the Associates of CONCESSIONAIRE with respect to the following: their Taxes and Duties measured by reference to their net income, profit and gain under Law unless any such Person was resident in the Republic for less than one hundred eight-three (183) days in the tax year;

Subject to the foregoing, their Taxes and Duties measured by reference to their net income, profit and gain under Law, and earned by them in the Republic except that no Taxes and Duties shall be payable with respect to any payments made to any of them by CONCESSIONAIRE as reimbursement for Taxes and Duties; or

The import into (and subsequent re-export from) the Republic of personal and household goods and effects except as to one motor vehicle per family and as to their first move to the Republic to establish residency.

## ARTICLE XXVI
## FINANCIAL REPORTING AND CURRENCY

**Section 1 Accounting**
All of CONCESSIONAIRE's accounting under this Agreement shall be in Dollars and all amounts paid or received, and obligations incurred or transactions carried out, in currency that is legal tender in the Republic or in any Foreign Currency other than Dollars shall be converted to Dollars in accordance with and pursuant to generally accepted accounting principles in the United States (except to the extent inconsistent with the terms of this Agreement) based upon the Prevailing Market Rate of Exchange of Dollars and any such currency at the date of the applicable transactions.

**Section 2 Exchange Control**
CONCESSIONAIRE shall at all times have the right, without restriction, directly or indirectly, by GOVERNMENT, to obtain, hold, deal with and disburse funds in such manner, currencies and places as it chooses. Without prejudice to the generality of the foregoing, CONCESSIONAIRE shall have the unrestricted and unencumbered right to sell and receive payment for iron ore in any currency, including the currency in which the iron ore is sold, and all proceeds therefrom may be deposited in bank accounts outside of the Republic and held there or remitted therefrom to anywhere in the world, in any currency. Notwithstanding the foregoing, CONCESSIONAIRE shall maintain at least one account with a bank or financial institution in the Republic. CONCESSIONAIRE shall also have the right to acquire from, and sell to, any Person currency that is legal tender in the Republic at the Prevailing Market Rate of Exchange. Additionally, any and all transactions between GOVERNMENT and the CONCESSIONAIRE dealing with or referring to currency that is legal tender in the Republic will be converted to Dollars at the Prevailing Market Rate of Exchange on the Date of such transaction. Currency gains or losses for purposes of Article XXII shall be determined by reference to the prevailing Market Rate of Exchange.

**Section 3 Currency of Payment**
Payment of CONCESSIONAIRE's direct obligation to GOVERNMENT for Taxes and Duties payable under Articles XXII, XXIII, XXIV and XXV of this Agreement shall be in Dollars, unless the Parties hereto otherwise agree. Any obligation originally stated in currency that is legal tender in the Republic, or in any currency other than Dollars, will be converted to Dollars at the Prevailing Market Rate of Exchange on the date such obligation is paid, or shall fall due, whichever is earlier. However, CONCESSIONAIRE shall make payments of sums it collects on behalf of GOVERNMENT, including, but not limited to, taxes withheld from the salaries or wages of the employees of CONCESSIONAIRE, and any other sums payable to other Persons from which a portion is required by law to be withheld or retained by CONCESSIONAIRE on behalf of GOVERNMENT, in the currency in which such salaries or wages or such other sums are paid. CONCESSIONAIRE shall have the right to make all other payments whether to GOVERNMENT or to other Persons in currency that is legal tender in the Republic.

**Section 4 Right to Remit and Receive Payments**
GOVERNMENT, CONCESSIONAIRE, GIHL Operator and its Affiliates shall have the right to receive and remit in Dollars all payments of dividends, interest, principal and other payments arising from, as a result of, or related to Operations, and to do so free of Taxes and Duties on such remittances or receipts, and without penalties, any required total or partial surrender, exchange or confiscation so such Dollars, or other direct or indirect restrictions on such remittances or receipts.

**Section 5 Audit**

a.      CONCESSIONAIRE, Operator and its Affiliates shall cause their respective books of account to be audited within three (3) months, or such longer period of time as GOVERNMENT may approve, after the close of each Financial Year by an independent auditor selected by CONCESSIONAIRE, and a copy of the annual financial statement duly certified by said auditor shall be furnished to GOVERNMENT within twenty working (20) days after its receipt by the CONCESSIONAIRE. GOVERNMENT shall have the right freely to discuss with the said auditor the results of the audit and certification, and the CONCESSIONAIRE shall take all reasonable measures to ensure that said auditor shall cooperate fully in such discussions. The foregoing shall not in any way imply acceptance of any such audit or certification by GOVERNMENT or preclude GOVERNMENT from auditing such books of account as provided under Law, provided that GOVERNMENT shall provide the CONCESSIONAIRE with a copy of any such audit within forty five (45) days of receipt. However, once either GOVERNMENT or CONCESSIONAIRE has audited any book of accounts, the financial statement thus audited shall be considered acceptable and the audit results binding and conclusive as to its findings, unless a party hereto shall have indicated to the contrary within three (3) years after its receipt of a copy of the audited financial statement.

b.      If CONCESSIONAIRE has, pursuant to this Agreement, underpaid its liability for Taxes and Duties, GOVERNMENT shall assess interest and penalties in accordance with the Revenue Code of Liberia (Act of 2000). If the CONCESSIONAIRE has overpaid its liability for Taxes and Duties then, at its option, it may elect either to be reimbursed by GOVERNMENT or to apply such overpayment against future Taxes and Duties.

c.      In case a review of records or books outside of the Republic is required, CONCESSIONAIRE will cooperate to provide GOVERNMENT with copies of the information, books and records needed to complete the audit. If GOVERNMENT nonetheless deems it necessary for any part of such audit to be performed outside of the Republic, the cost of associated travel will be borne by the CONCESSIONAIRE.

## ARTICLE XXVII
## INCIDENTAL RIGHTS

**Section 1 Use of Resources**
Except as otherwise provided in this Agreement, CONCESSIONAIRE shall have the right to remove, extract and use water, gravel, sand, clay, stone and timber (except for protected species, insofar as they do not interfere with or hinder Operations) provided, however, that CONCESSIONAIRE shall not deprive any Person of a constant and reasonable supply of usable water form a previously utilized traditional source without replacing it, nor shall CONCESSIONAIRE, without GOVERNMENT's consent, interfere with any water rights enjoyed by any user under any agreement with GOVERNMENT made prior to the date of execution of this Agreement. In this connection, GOVERNMENT shall advise the existence of any such agreement with respect to the use of water.

**Section 2 Imports**
CONCESSIONAIRE, GIHL and its Affiliates shall be entitled to import and use in respect of Operations, and subsequently export, any and all machinery, equipment, consumable items, fuels, explosives and any other thing whatsoever reasonably required with respect to Operations and in accordance with the terms of this Agreement, provided, however, that CONCESSIONAIRE shall not re-export fuels and explosives surplus to requirements if such

21

surplus can be sold at competitive international prices within the Republic. CONCESSIONAIRE shall at all time comply with Law regarding the safe use, safe disposal and security of explosives.

**Section 3 Taxes on Resale**
CONCESSIONAIRE, GIHL and its Affiliates may sell, in the Republic, all imported items that are no longer needed for Operations. However, if such imports were exempted from Taxes and Duties, CONCESSIONAIRE shall fulfill all formalities required in connection with the payment by a purchaser of all Taxes and Duties imposed on such sales by Law.

## ARTICLE XXVIII
### ASSIGNMENT AND ENCUMBRANCE

**Section 1 Right of Assignment**
CONCESSIONAIRE shall have the right to assign or otherwise dispose of all or part of its interest under this Agreement with the prior written consent of GOVERNMENT, which consent shall not be unreasonably held and/or delayed.

**Section 2 Right to Encumber**
CONCESSIONAIRE shall have the right to mortgage, charge or otherwise encumber all or part of its interest under this Agreement for the purpose of raising, from one or more Affiliates or third parties, financing for its obligations under this Agreement, but any power of sale arising under any such mortgage, charge or other encumbrance shall only be exercised with the prior written consent of GOVERNMENT, which consent shall not be unreasonably withheld and/or delayed.

**Section 3 Notice of Assignment or Encumbrance**
CONCESSIONAIRE shall promptly give Notice to GOVERNMENT of any assignment, mortgage, charge or other disposition or encumbrance pursuant to this Article XXVIII.

## ARTICLE XXIX
### TERMINATION

**Section 1 Termination by CONCESSIONAIRE**
Notwithstanding any other provisions of this Agreement, CONCESSIONAIRE shall have the right to terminate this Agreement at any time, either in its entirety or as to any part of the Concession Area, thirty (30) days after giving Notice to GOVERNMENT if such notice to GOVERNMENT is given within five (5) years of the Effective Date, or one hundred eighty (180) days after giving Notice to GOVERNMENT if such is given more than five (5) years after the Effective Date. The CONCESSIONAIRE may also terminate this Agreement pursuant to Article XXXIII.

**Section 2 Termination by GOVERNMENT**
Subject to the provisions of Article XXIX, GOVERNMENT shall have the right to terminate this Agreement if any of the following events (hereinafter called "Events of Default") shall occur and be continuing:

a.    Where CONCESSIONAIRE shall fail to comply with its material obligations under this Agreement and such failure shall have a materially adverse effect on GOVERNMENT,

b.    Where CONCESSIONAIRE shall (i) voluntarily make an assignment of all or substantially all of its assets for the benefit of creditors other than an assignment made to secure indebtedness incurred in the ordinary course of business, (ii) file a petition or application to any tribunal for the appointment of a trustee or receiver for all or any substantial part of CONCESSIONAIRE's assets, (iii) commence any proceedings for its bankruptcy, reorganization, arrangement or insolvency under the laws of any jurisdiction, whether now or hereafter in effect, or if any such petition or application is filed, or any such proceedings are commenced against it, indicate its approval thereof, consent thereto or acquiescence therein, or (iv) if any order is entered appointing any such trustee or receiver, or adjudicating CONCESSIONAIRE bankrupt or insolvent, or approving the

22

petition in any such proceedings, permit such order to remain in effect for more than ninety (90) days;

c.    Where CONCESSIONAIRE shall fail to carry out Exploration/Feasibility Studies and other work programs as stipulated in Article V, for a period of Three (3) consecutive months or cease Production with respect to all Production Areas for a period of twenty four (24) consecutive months unless such failure or cessation is consented to by GOVERNMENT or is caused by Force Majeure;

d.    Where CONCESSIONAIRE shall fail to make payments of Taxes and Fees to GOVERNMENT or comply with the Minimum Expenditure requirement in Article V, Section 2; and

e.    GOVERNMENT shall terminate this Agreement at any time, either in its entirety or as to any part of the Concession Area, thirty (30) days after giving Notice to CONCESSIONAIRE if such notice to CONCESSIONAIRE is given within five (5) years of the Effective Date; or one hundred eighty (180) days after giving Notice to CONCESSIONAIRE if such is given more than five (5) years after the Effective Date. GOVERNMENT may also terminate this Agreement pursuant to Article XXXIII.

## Section 3 Opportunity to Cure

In the case of an alleged Event of Default described in Article XXIX, Section 2 above, GOVERNMENT, before taking any further action, shall provide Notice to CONCESSIONAIRE of the alleged occurrence of such Event of Default and of GOVERNMENT's views in that regard and shall offer the CONCESSIONAIRE a fair opportunity to consult with GOVERNMENT to resolve the matter. If after a reasonable period of time of consultation, GOVERNMENT is of the reasonable opinion that the matter cannot be resolved by further consultation, GOVERNMENT may then send to CONCESSIONAIRE Notice of GOVERNMENT's intention to terminate this Agreement. If the Event of Default is not cured within sixty (60) days after the said Notice, or within such longer period as may be necessary to allow a reasonable period of time to effect such cure, then this Agreement shall be terminated.

## Section 4 Disputes Regarding Events of Default

Notwithstanding the provisions of Article XXIX, Sections 2 and 3, if CONCESSIONAIRE disputes whether there has been an Event of Default described in Article XXIX, Section 2 and, within sixty (60) days after receipt by the CONCESSIONAIRE of GOVERNMENT's Notice of its intention to terminate, refer such dispute to arbitration in accordance with Article XXXI, then termination of this Agreement shall not take effect until the finality of, and in accordance with, an arbitration award upholding GOVERNMENT's right to terminate.

## Section 5 Winding-up Commission

a.    That at the time of Notice of any termination of this Agreement, and pursuant to its terms and conditions, the Parties hereto shall set up a winding-up commission (hereinafter referred to as "the Commission") which shall consist of the Technical Committee and two (2) additional members, one each to be appointed by GOVERNMENT and CONCESSIONAIRE. The chairman of the Commission shall be appointed by GOVERNMENT from among the members of the Commission. Each member of the Commission, including its chairman, shall have only one (1) vote.

b.    That the chairman of the Commission shall issue a Notice and agenda for the first meeting of the Commission, which shall be held no later than three (3) weeks after the establishment of the Commission. Thereafter, the Commission shall hold periodic meetings at least once a calendar month.

c.    That CONCESSIONAIRE shall present to the Commission a detailed report on the status of Operations of CONCESSIONAIRE under this Agreement so that the Commission will be able to make recommendations to GOVERNMENT on steps which GOVERNMENT might take under the circumstances with a view to preserving the viability of the enterprise, employment in the area and the centers of population.

23

d.   That at the request of GOVERNMENT, the Commission shall establish plans for the full or partial cessation of operations including the disposition of assets and their demolition or removal according to Article XXX.

e.   That at the request of either party to this Agreement, any meeting of the Commission shall be held outside the Republic, and the requesting party shall be responsible for the travel cost of the participants.

f.   That CONCESSIONAIRE may elect not to participate on the Commission, in which event its obligations under this Article XXIX shall be limited to providing the information required in Article XXIX, Section 5c above.

## ARTICLE XXX
## DISPOSITION OF ASSETS

**Section 1 Immovable Assets**
Upon a regular termination of this Agreement occasioned by the expiration of its term(s), except for termination resulting from a breach of this Agreement by GOVERNMENT, or termination pursuant to Article XXIX, Section 1, all lien free permanent immovable assets of CONCESSIONAIRE in the Concession Area that are not otherwise the property of GOVERNMENT shall become the property of GOVERNMENT without charge. In the event of a breach by either Party hereto, the value of the non-movable assets shall be taken into account in any award of damages under Article XXXI, Section 6.

**Section 2 Movable Assets**
At any time after termination of this Agreement and with respect to each movable asset of CONCESSIONAIRE in the Republic, which CONCESSIONAIRE desires to sell (other than to an Affiliate at market price), GOVERNMENT shall have the first option to purchase such asset at the fair market price thereof, such price to be paid in Dollars. If GOVERNMENT does not exercise such option within one hundred twenty (120) days after being informed by the CONCESSIONAIRE that it desires to sell such asset, then the CONCESSIONAIRE may sell such asst to any Person, including GOVERNMENT, for such price as it may be able to obtain therefore, or remove such asset from the Republic without Taxes and Duties or other liability to GOVERNMENT. If, however, GOVERNMENT purchases any such asset, it shall pay the purchase price within sixty (60) days after such price has been agreed upon or determined, unless the Parties hereto otherwise agree.

**Section 3 Removal of movable Assets**
GOVERNMENT, by Notice to CONCESSIONAIRE within a reasonable period but not to exceed one (1) year after a regular termination of this Agreement occasioned by the expiry of its term(s), and except for termination resulting from a breach by GOVERNMENT, may require reasonable disposal or removal, in accordance with Law, of any or all assets, including unusable assets, remaining within the Concession Area after total disposition of assets in accordance with this Article XXX, and if CONCESSIONAIRE does not reasonably dispose of or remove such asset or assets within a reasonable period after said Notice, GOVERNMENT may effect such reasonable disposal or removal at the expense of CONCESSIONAIRE, but CONCESSIONAIRE shall be entitled to any income realized from the salvage value of such assets.

## ARTICLE XXXI
## ARBITRATION

**Section 1 Submission to Arbitration**
Any dispute between GOVERNMENT and CONCESSIONAIRE arising out of, in relation to or in connection with this Agreement or its formation, or the validity, interpretation, performance, termination, enforceability or breach of this Agreement (including any dispute concerning whether GOVERNMENT or CONCESSIONAIRE has violated or is in breach of this Agreement), for which resolution by submission to an expert is not specifically provided elsewhere in this Agreement shall be exclusively and finally settled by binding arbitration pursuant to the Convention in accordance with the rules of the Centre in effect on the Effective

24

Date except to the extent in conflict with this Article XXXI which shall prevail in that event. The Parties hereto agree that this Agreement and CONCESSIONAIRE's Operations pursuant thereto constitute an "investment" by reason of the expenditure of a considerable amount of money in the Republic and that for purposes of Article 25(1) of the Convention, any dispute subject to this Article XXXI is a legal dispute arising directly out of an investment. Either of the Parties to such dispute may institute arbitration proceedings by giving Notice to the other Party and Notice to the Secretary-General of the Centre, including in each a statement of the issues in dispute.

### Section 2 Nationality for purposes of Arbitration

CONCESSIONAIRE is incorporated in Liberia and notwithstanding the incorporation in the Republic of any of CONCESSIONAIRE's successors or assignees, or of any of its other Affiliates, all such entities shall be treated for purposes of arbitration under this Article XXXI as nationals of the United Kingdom of Great Britain for purposes of the Convention and of this Agreement, except that CONCESSIONAIRE and any other such entity may, alternatively, elect to be treated instead as a national of any other state of which, under the Convention, international law or the law of such State or country, it is a national.

### Section 3 Arbitrators

Any arbitration tribunal constituted pursuant to this Agreement shall consist of one (1) arbitrator to be appointed by GOVERNMENT, one (1) arbitrator to be appointed by CONCESSIONAIRE and one (1) arbitrator, who shall be the president of the tribunal and shall be a citizen neither of the Republic nor of a national of the United States of America (or of any other state of which a party is a national under Article XXXI, Section 2) to be appointed by the Secretary-General of the Centre. Any such arbitrator shall have neither an interest in the matters in dispute, nor in the Parties thereof.

### Section 4 Referee

At the request of a Party hereto, any matter otherwise subject to arbitration under this Agreement shall instead be referred for resolution to a single referee to be appointed by the Secretary-General of the Centre, or of any successor entity as provided for by Article XXXI, Section 9 below, except for any dispute arising out of or related to Articles III, VI and XXIX of this Agreement, which must be referred to arbitrators appointed pursuant to Article XXX, Section 3 above unless the Parties mutually agree that any such dispute is not material, in which event it may be referred to the referee for decision at the option of either Party. The decision of the referee shall be rendered pursuant to Article XXXI, Section 6 of this Agreement (except as regards the requirement for a decision by majority vote) and shall be final and binding unless appealed by any party to arbitrators appointed as provided in this Article XXXI, Section 3, who shall examine the referee's decision only as to manifest error(s) of law, findings of fact that are not supported by any credible evidence, and abuse of authority, misconduct or other unauthorized act by the referee.

### Section 5 Venue

Arbitration proceedings conducted pursuant to this Agreement shall be held in Washington, D.C., United States of America, or such other place as the Parties hereto may agree and shall be conducted in the English language. The costs of the proceedings shall be assessed and borne in such manner as the arbitration tribunal shall decide. Any procedural issues that cannot be determined under the arbitral rules of the Centre shall be determined pursuant to applicable law as set forth in Article XXXIV below.

### Section 6 Award

The arbitrators shall, by majority vote, render a written award that shall state the reasons for their award within three (3) months after any hearing conducted has been concluded. Any monetary award shall be assessed and payable in Dollars (determined at the prevailing Market Rate of exchange as the award of the award involved an obligation expressed in any currency other than Dollars through a bank designated by the recipient, and in the case of an award to the CONCESSIONAIRE, shall be exempt from any Taxes and Duties imposed upon CONCESSIONAIRE by GOVERNMENT. Each Party shall bear its own costs and attorney fees. Neither Party to the arbitration proceedings shall have any liability for either consequential damages (except for purposes of set off) or exemplary or punitive damages, but interest at a rate not to exceed the London Interbank Offering Rate (LIBOR) existing at the time of such award, plus one (1) percentage point, multiplied by the amount of the award, shall be assessed from the

25

date of any monetary award until its satisfaction. If LIBOR should cease to be reported, then the rate to be applied shall be another substitute rate agreed to by a majority of the tribunal. If the tribunal's award is adverse to the CONCESSIONAIRE, then the arbitration tribunal may, in its discretion, specify a reasonable period of grace to cure any defect or default on the part of the CONCESSIONAIRE, provided that such period of grace shall not exceed one hundred eighty (180) days for the making of any payment by such award.

**Section 7 Waiver of Sovereign Immunity**
The GOVERNMENT hereby irrevocably, unreservedly and unconditionally waives all claims of sovereign immunity from the Arbitrators' jurisdiction, and from the enforcement of any arbitral award rendered by a tribunal constituted pursuant to this Agreement, including immunity from service of process and immunity from the jurisdiction of any court situated in any state, country or nation.

**Section 8 Reservation of Rights**
The right to refer a claim or dispute to arbitration hereunder shall not be affected by the fact that a claimant or respondent has received full or partial compensation from another Person for a loss or injury that is the object of the claim or dispute, and any such other Person may participate in such proceedings by right of subrogation.

**Section 9 Successors**
The consent to the jurisdiction of the Centre as set forth in this Article XXXI shall equally bind any successor of or successors-in-interest to either Party to this Agreement. Should the Centre be replaced by, or its functions be substantially conferred upon or be transferred to, any new international body of a similar type and competence, the Parties hereto shall have the right to submit any dispute to such body for settlement by arbitration in accordance with the foregoing provisions of this Article XXXI.

## ARTICLE XXXII
## COMMUNICATION BETWEEN PARTIES HERETO

**Section 1 Written Communication**
All orders, approvals, declarations and Notices of any kind between the Parties hereto which are required, expressly authorized or provided for under this Agreement (hereinafter each referred to as a "Communication") shall be in writing and delivered by hand, by telefax, by postage registered mail, by any other means of communication agreed upon by the Parties hereto, or pursuant to Article XXXII, Section 4. The Communication shall also be signed by a duly authorized representative of the Party dispatching the Communication.

**Section 2 Delivery**
A delivery of a Communication to a Party hereto shall be deemed to have occurred in any of the following circumstances:

a.    When an official of GOVERNMENT, in the case of GOVERNMENT, or a director of CONCESSIONAIRE, in the case of CONCESSIONAIRE, has signed a return receipt of registered mail;

b.    When an official confirmation of the receipt has been electronically issued to the sender by a receiving telefax device at a telefax number authorized hereby indicating receipt of a communication sent via telefax;

c.    When verification of the receipt of the Communication has been obtained in any manner specifically agreed to in writing by the Parties hereto; or

d.    When a Party hereto has directly or indirectly acknowledged the receipt of the Communication in writing.

## Section 3 Address

a.     All Communication from GOVERNMENT to the CONCESSIONAIRE shall be addressed to:

> The Managing Director
> Liberia Global Mining Company
> First Merchant Bank Building
> Broad Street
> Monrovia
> Liberia.

b.     All Communication from CONCESSIONAIRE to GOVERNMENT shall be addressed to:

> The Minister of Lands, Mines and Energy
> Ministry of Lands, Mines and Energy
> Monrovia
> Liberia

with copies sent to:

> The Minister of Finance
> Ministry of Finance
> Broad Street
> Monrovia
> Liberia;

and

> The Chairman
> National Investment Commission
> Tubman Boulevard
> Monrovia
> Liberia.

## Section 4 Change of Address

Either Party hereto may, upon prior Notice to the other Party, at any time change the designation of the Person(s) named to receive Communication from the other Party, the address or telefax number of the office in the Republic, or elsewhere authorized to receive such Communication or the address or addresses or telefax number or numbers of the offices to which copies of Communication from one Party to the other are to be delivered.

# ARTICLE XXXIII
# FORCE MAJEURE

## Section 1 Application

In the event of either Party to this Agreement being rendered unable, in whole or in part, by force majeure to carry out any obligation under this Agreement, other than an obligation to make payments of money that accrued prior to the commencement of force majeure, such Person shall give Notice and the particulars of such force majeure in writing to the other Party as soon as is practicable after the occurrence of the cause relied upon, the obligation of the Party giving such Notice, insofar as it is affected by such force majeure, shall be suspended during the continuance of any such inability. However, any such inability shall, as far as is practicable, be remedied with all reasonable dispatch. All time periods specified in this Agreement for the performance of obligations or the enjoyment of rights that are affected by force majeure, except in connection with an obligation to make payments of money that accrued prior to the commencement of force majeure, but including the term of the Agreement, shall be extended by the period of time the inability caused by such force majeure exists. Sixty (60) days after giving Notice to GOVERNMENT, CONCESSIONAIRE shall have the right to terminate this Agreement without further obligations or cost (except for any obligations and cost that accrued prior to the

27

commencement of force majeure) if a condition of force majeure has existed for a period of one (1) year or more which renders Production impracticable or unprofitable, or prevents Production, the export or sale of minerals, or CONCESSIONAIRE's exercise of a substantial part of its rights under this Agreement.

**Section 2 Definition**
The term "force majeure" as used in this Agreement shall mean acts of God (natural disasters which include but are not limited to epidemics, floods, hurricanes, landslides, earthquakes, wild fires as a result of spontaneous combustion, windstorms and lightning) and man made events such as, accidents, wars, acts of war, invasions, acts of public enemies, hostilities (whether war is declared or not), restrictions on trade or other activities imposed by any sovereign, embargoes, blockades, revolutions, riots, civil commotions, sabotage, strikes, shortage of petroleum products, lubricants, cement and/or other industrial, labor or employer-employee disputes (if not cured for a period of more than two (2) months) fires, explosions, expropriation of facilities or goods, and any similar causes, provided any such cause was not within the reasonable control of the Party claiming suspension and could not have been avoided or overcome by such Party through the exercise of due diligence.

**Section 3 No Required Settlement**
Nothing in Article XXXIII, Sections 1 or 2 above shall, in and of itself, be construed to require CONCESSIONAIRE to settle any strikes, lockouts or other labor or industrial disputes except as may be required by law.

## ARTICLE XXXIV
## GOVERNING LAW

This Agreement and the rights, obligations and duties of the Parties hereunder shall be construed and interpreted in accordance with Laws of the Republic and by such rules and principles of generally accepted international law as may be applicable, particularly with regard to an investment by nations of one country in another country. Notwithstanding the foregoing, in the event of a conflict between this Agreement or the rights, obligations and duties of a party under this Agreement, and any other Law, including administrative rules and procedures and matters relating to procedure, and applicable international law, then this Agreement shall govern the rights, obligations and duties of the Parties hereto.

## ARTICLE XXXV
## ENTIRE AGREEMENT-MODIFICATIONS

**Section 1 Entire Agreement**
This Agreement, including the Appendices attached hereto, represents the entire agreement between the Parties hereto and supersedes all previous oral and written negotiations and agreements.

**Section 2 Amendments**
Any modifications or amendments of any of the terms and conditions of this Agreement shall be by the mutually written agreement of the Parties hereto.

## ARTICLE XXXVI
## PERIODIC REVIEW

**Section 1 Modification and Review**
The Parties hereto agree that the Agreement shall be subject to periodic review once every five years after the commencement of Production for the purpose of good faith discussions to effect such modifications to the Agreement as may be necessary or desirable in the light of any substantial changes in circumstances which may have occurred during the previous five years.

**Section 2 Good Faith**

It is hereby understood that this clause subjects the Parties to this Agreement to a simple obligation to consider in good faith any proposed modification(s) of the Agreement, subject to Article XXXV, Section 2. This Agreement shall remain unaltered and in force during any such period of consideration.

## ARTICLE XXXVII
## NON-WAIVER OF RIGHTS

The non-exercise or partial exercise by one or the other of the Parties hereto of any of its rights under the terms and conditions of this Agreement shall not in any case constitute a waiver of that right.

## ARTICLE XXXVIII
## SUCCESSION

The terms and conditions of this Agreement shall inure to the benefit of and be binding in addition to the Parties themselves upon their successors, beneficiaries and assignees, including, without limitation, all future manifestations or forms of public power exercising sovereign authority over all or part of the present territory of the Republic.

## ARTICLE XXXIX
## SURVIVAL PROVISION

Notwithstanding termination of this Agreement by either Party thereto or for any reason, including a termination due to a finding that this Agreement or a portion thereof is void, invalid, or unenforceable, Articles XXX, XXXI, XXXII, XXXIII, XXXIV and XXXIX shall survive such termination and shall remain effective as to any matters which are the subject of this Agreement or which arise out of, in relation to or in connection with this Agreement. Moreover, any such termination shall be without prejudice to the rights, duties and obligations that have accrued prior to termination and, notwithstanding such termination, such provisions of this Agreement as are reasonably necessary for the full enjoyment and enforcement of such rights, duties and obligations shall survive such termination for the period necessary.

29

# APPENDIX C

## ARTICLE V WORK PROGRAM

**Feasibility.**
Year 1     Initiating Scoping activities for Feasibility Report
            Site preparation at Yekepa and Buchanan and rehabilitation works.
            Carry out Feasibility Report.

**Planning**
Year 2     Detailed engineering including the surveying, designing, drawing and
            obtaining estimates for the mines and beneficiation plant, railroad, port
            and communities.
            Mine and road developments.
            Installation of communication systems.
            Financial structuring and planning
            Mobilisation.
            Site preparation.
            Port works.

**Development**
Year 3     Initiate development of mine for operations.
            Crushing unit and downhill system for beneficiation plant.
            Railroad loops, sleepers and track.
            Ore quay and ore handling system.
            Expand communications systems
            Community rehabilitations.
            Port navigation system.

**Construction**
Year 4     Continue development and construction of mine for operations.
            Construction of grinding systems, beneficiation circuit and
            conveyors/structures for beneficiation plant.
            Port ore handling and loading systems.

**Trial Runs & Production**
Year 5     Performance testing and trials of beneficiation plant, railways and port
            systems.
            Initiate full mining production and associated operations.

# APPENDIX D

## ARTICLE V WORK PROGRAM

### MINIMUM EXPENDITURE

| | |
|---|---|
| **YEAR ONE** | USD 5.00 M   (Five Million United States Dollars) |
| **YEAR TWO** | USD 7.00 M   (Seven Million United States Dollars) |
| **YEAR THREE** | USD 13.00 M (Thirteen Million United States Dollars) |

# EXHIBIT 2

# ARTICLES OF INCORPORATION
OF
LIBERIA    GLOBAL   MINING   COMPANY

# REPUBLIC OF LIBERIA
# MINISTRY OF FOREIGN AFFAIRS

## DUPLICATE COPY

The original copy of this document was filed in
Accordance with Section 1.4 of the Business
Corporation Action

_October  7,  2004_

_Abhny_

DEP UTY    MINISTER

*Republic of Liberia*
*Montserrado County*

*Office of the Notary Public*
*Monrovia, Liberia*

# NOTARY CERTIFICATE

*Personally Appeared Before Me in My Office within the City of Monrovia, Montserrado County, Republic of Liberia this _____ 5th day of October _____, A. D. 20⁰⁴ duly qualified Notary Public for and in the County of Montserrado and in the Republic Aforesaid the Parties to the attached documents :-*

ARTICLES OF INCORPORATION
TUTELA GLOBAL MINING COMPANY

*and did in my presence and in the presence of each other execute and signed their genuine signatures on the said Instruments(s) to be the person(s) they represent and that the same was made in my presence and declared by each of them to be their voluntary acts and in their own hand writings.*

*Therefore, I Mary Mamie Howe, Notary Public aforesaid, have attached my Official Signature Notary Seal to avail when and where Necessary.*

*I have affixed my genuine Signature attesting to this transaction by the power vested in me this _____ 5th day of October _____, A. D. 20⁰⁴*

**MARY MAMIE HOWE**

NOTARY PUBLIC, MONTSERRADO COUNTY, R.L.
$2.50 REVENUE STAMPS AFFIXED ON THE ORIGINAL.
PROCESSED BY: LEGAL ASSOCIATES

# ARTICLES OF INCORPORATION
## OF
## LIBERIA GLOBAL MINING COMPANY

We, the undersigned, for the purpose of forming a corporation, do hereby make, subscribe, acknowledge and file into the Office of The Minister of Foreign Affairs of the Republic of Liberia, this application for a Certificate of Incorporation, pursuant to the Business Corporation Act, the same being Part I of the Associations Law, Title 5 of the *Liberian Code of Laws Revised* of 3 January 1977, as follows:

## ARTICLE I

The name of the Corporation (hereinafter referred to as "the Corporation") shall be:

## LIBERIA GLOBAL MINING COMPANY

## ARTICLE II

The general nature of the business to be transacted by the Corporation shall be:

1.  To carry on the business of mining, milling, concentrating, converting, smelting, treating, refining, preparing for market, manufacturing, buying, selling, exchanging and otherwise producing and dealing in iron ore, iron, steel, gold, silver, copper, coal, and in all kinds of ores, metals, and minerals, and in the products and by-products of every kind and description and by whatsoever process, the same can be or may hereafter be produced;

2.  To manufacture, buy, sell, or otherwise deal or traffic in iron ore, iron, steel, copper, coal, and other metals, minerals, or materials, and all or any products or articles consisting or partly consisting of iron ore, iron, steel, copper, coal or other metals, minerals, or materials; and to acquire, own, lease, occupy, use, develop, or deal in any lands containing iron ore, iron, cooper, coal, stone, or other ores or minerals, and in other lands, and to mine and otherwise extract or to remove ores, coal, stone, or other minerals, materials, or substances from any lands;

3.  To purchase, lease, option, locate or otherwise acquire, own, exchange, sell, otherwise dispose of, pledge, mortgage, deed in trust, hypothecate, and deal in mines, mining claims, mineral lands, coal lands, oil lands, timber lands, water and water rights, and other property, both real and personal.

4.  To carry on as principals, agents, commission merchants, or consignees the business of mining, milling, concentrating, converting, smelting, treating, refining, buying, selling, exchanging, manufacturing, and dealing in the above specified products or any of them and of materials used in the manufacture of each, and any and all of such articles and to carry on as such principals, agents, commission merchants, or consignees any other business which in the judgment of the board of directors of the Corporation may be conveniently conducted in conjunction with any of the matters aforesaid.

5. To engage in the business of logging, including but not limited to timber, milling and allied interests, together with the building or railroads, logging roads, and other things necessary in the full and complete operation thereof; to engage in general lumber, timber, kiln drying, milling, construction materials, and merchandise business; to manufacture, purchase, or otherwise acquire, sell, or otherwise dispose of logs, lumber, wood products in a processed or unprocessed state, and by-products of wood or of the said merchandise, either at wholesale or retail; to engage in the business of hauling and transporting logs, timber, lumber, lumber products, and other freight, goods, wares, and merchandise, by means of trucks, and other forms of transporation, over public or private highways, or roads; and to do such other things as are incidental or necessary, to the carrying on of such business.

6. To engage in the business of operating quarries and the sale of aggregates therefrom;

7. To own or otherwise acquire by deed, purchase, devise or bequest or otherwise, the necessary property, real or personal, including buildings, machinery and shares of stock, bonds and securities of other corporations, as well equipment necessary or incidental to the business of the Corporation;

8. To sue and be sued in all courts of competent jurisdiction within and without the Republic of Liberia and to participate in actions and proceedings, whether judicial, administrative, arbitrative or otherwise, in like manner as natural persons;

9. To have a Corporate Seal, and to alter such seal at pleasure, and to use it by causing it or a facsimile thereof to be affixed or impressed or reproduced in any other manner;

10. To purchase, receive, take by grant, gift, devise, bequest or otherwise, lease or otherwise acquire, own, hold, improve, employ, use and otherwise deal in and with, real or personal property or any interest therein wherever situated;

11. To sell, convey, lease, exchange, transfer or otherwise dispose of, or mortgage or pledge or create a security interest therein, wherever situated;

12. To purchase, take, receive, subscribe for, or otherwise acquire, own, hold, vote, employ, sell, lend, lease, exchange, transfer or otherwise dispose of, mortgage, pledge bonds and other obligations, shares or other securities or interests issued by others, whether engaged in similar or different business, governmental or other activities;

13. To make contracts, give guarantees and incur liabilities, borrow money at such rates of interest as the Corporation may determine, issue its notes, bonds, and other obligations and secure any of its obligations by mortgage or pledge of all or any of its property or interest therein, wherever situated;

14. To act as trustee under any trust incidental to the principal objects of the Corporation, and to receive, hold, administer, and expend funds and property subject trust;

15. To do all other acts necessary or expedient for the administration of the affairs and attainment of the purposes of the Corporation;

J. Emmanuel Wreh, Esquire
**LEGAL ASSOCIATES, LLPC**
Monrovia, Liberia

16. To do business, carry on its operations, and have offices and exercise the powers granted by these Articles of Incorporation and the Business Corporation Act in any jurisdiction within or without the Republic of Liberia;

17. To elect or appoint officers, employees and other agents of the Corporation, define their duties, fix their compensations, and the compensation of directors, and to indemnify corporate personnel;

18. To adopt, amend or repeal by-laws relating to the business of the Corporation, the conduct of its affairs, its rights or powers of its shareholders, directors or officers;

19. To make donations for the public welfare or for charitable, educational, scientific, civic or similar purposes;

20. To pay pensions and establish pension plans, pension trusts for any and all of its directors, officers and employees;

21. To engage in any lawful activity for which corporations may now or hereafter be organized under the Business Corporation Act;

22. To have and exercise all powers necessary or convenient to effect any or all of the purposes for which the Corporation is formed;

23. The Corporation shall have every power which a corporation now or hereafter organized under the Business Corporation Act, as amended, from time to time, may have.

## ARTICLE III

The Corporation shall have perpetual existence.

## ARTICLE IV

The Principal Office of the Corporation for the transaction of the business of the Corporation shall be at the City of Monrovia, County of Montserrado, Republic of Liberia, West Africa, and the name and address of the Corporation's Registered Agent are Rakesh Dikshit, the Corporation's Manager for Business Development or his successor, at the same address.

## ARTICLE V

The total number of shares of stock which the Corporation is authorized to issue is one hundred divided into thirty class A shares and seventy class B shares which shares shall be of no par value and the number of such share which each subscriber to these Articles of Incorporate contracts to purchase are, as follows:

| NAMES | NUMBER OF SHARES |
|---|---|
| The Republic of Liberia | 30 Class A Shares |
| Global Infrastructure Holdings Limited | 70 Class B Shares |

## ARTICLE VI

The number of directors the Corporation shall have shall be eleven. The names of the directors who shall serve as directors of the Corporation until the first annual meeting and until their successors are elected and qualified are, as follows:

### NAMES

Honourable Lucinee F. Kamara
Minister of Finance, R. L., or his
successor

Honourable Kabineh Ja'neh
Minister of Justice & Attorney
General, R. L., or his successor

Honourable Jonathan A. Mason,
Minister of Lands, Mines & Energy,
R. L., or his successor

Honourable J. Laveli Supuwood
Minister of Labour, R. L. or his
successor

Honourable Christian Herbert
Minister of Planning & Economic
Affairs, R. L., or his successor

Mr. Pramod Kumar Mittal

Ashok Agarwal

Mr. Guntupalli Jagannadham

Mr. Rakesh Dikshit, Manager, Business
Development, Global Infrastructure
Holdings Limited

Mr. Jacob Varnam, Director, Provider Ltd.

Dr. Fodee Kromah

### ADDRESSES

Ministry of Finance, Monrovia, Liberia

Ministry of Justice

Ministry of Lands, Mines & Energy
Monrovia, Liberia

Ministry of Labour, Monrovia, Liberia

Ministry of Planning & Economic Affairs
Monrovia, Liberia

Lob 16 Suite 517, Jebel Ali Free Zone
P. O. Box 61088, Dubai, UAE

Lob 16 Suite 517, Jebel Ali Free Zone
P. O. Box 61088, Dubai, UAE

Lob 16 Suite 517, Jebel Ali Free Zone
P. O. Box 61088, Dubai, UAE

Lob 16 Suite 517, Jebel Ali Free Zone
P. O. Box 61088, Dubai, UAE

Stalston, 11 Elvaston Place
South Kensington, London SW7 5G, UK

Monrovia, Liberia

## ARTICLE VI

The name and post office address of the Incorporator of the Corporation are, as follows:

J. Emmanuel Wureh, Esquire
LEGAL ASSOCIATES, LLPC
Monrovia, Liberia

| *NAME* | POST OFFICE ADDRESS |
|---|---|
| Honourable Kabineh Ja'neh Minister of Justice & Attorney General, R. L. | Ministry of Justice Monrovia, Liberia |

## ARTICLE VII

(a) In the absence of fraud, no contract or other transaction of the Corporation shall be affected or invalidated by the fact that any of the Directors of the Corporation is in any way interested in or connected with any other party to such contract or transaction, or is himself a party to such contract or transaction, provided that the interest in any such contract or transaction of any Director shall at the time be fully disclosed or otherwise known to the Board of Directors; and each and every person who may become a director of the Corporation is hereby relieved from liability that might otherwise exist from contracting with the Corporation for the benefit of himself/herself or any person in whom he/she may be in any way interested or connected. Any Director of the Corporation may vote and act upon any matter, contract or transaction between the Corporation and any other person without regard to the fact that he/she is also stockholder, director or officer, or has any interest in, such person. Any contract or other transaction of the Corporation or the Board of Directors or any committee thereof which shall be ratified by a majority of a quorum of the members entitled to vote at any annual meeting or special meeting called for the purpose shall be as valid and binding as though ratified by every Director or Shareholder of the Corporation except as otherwise provided by law; provided, however, that any failure of the Shareholders or Directors to approve or ratify such contract or other transaction, when and if submitted, shall not be deemed in any way to render the same invalid or to deprive the Directors and Officers of their right to proceed with such contract or transaction;

(b) Except as may be provided in the By-Laws, the Board of Directors, from time to time, shall determine to what extent and at what times and places and under what conditions and regulations the account and books of the Corporation, or any of them shall be opened to the inspection of Shareholders; and,

(d) Any director or officer elected or appointed by the Shareholders or by the Board of Directors may be removed at any time in such manner as may be provided for by the Corporation's By-Laws or the Business Corporation Act.

## ARTICLE VIII

The Corporation shall indemnify any and all of its Directors or Officers or former directors or officers or any person who may have served at it request as a director or officer of another corporation in which it owns shares of capital stock or of which it is creditor, against expenses actually and necessarily incurred by them in connection with the defense of an action, suit or proceeding in which they, or any of them, are made parties, or party, by reason of being or having been directors or officers or director or an officer of the Corporation, except in relation to matters as to which any such director or officer or person shall be adjudged in such action, suit, or proceeding to-be liable for negligence or misconduct in the performance of duty. Such indemnification shall not be deemed exclusive of any other rights to which those indemnified may be entitled, under any by-laws, agreement, vote of stockholders, or otherwise.

## ARTICLE IX

Corporate existence shall commence upon the filing of these Articles of Incorporation with the Minister of Foreign Affairs as of the filing date stated on these Articles.

**WITNESS WHEREOF,** I have made, subscribed and acknowledged this instrument this 5th day of October, A. D. 2004 at Monrovia, Liberia.

IN THE PRESENCE OF:

Honourable Kabineh Ja'neh
INCORPORATOR

$12.000 Revenue Stamp affixed
to the Original hereof.

J Emmanuel Wureh, Esquire
LEGAL ASSOCIATES, LLPC
Monrovia, Liberia

# EXHIBIT 3

Page 1 of 2

# FINANCIAL SUPERVISION COMMISSION

## ISLE OF MAN

## GLOBAL STEEL HOLDINGS LIMITED

### HOLDINGS LIMITED
**Formerly Called**
**Global Infrastructure Holdings Limited &**
**Avondale Limited**
**66279C**



The Financial Supervision Commission certifies that the above mentioned company was incorporated on the 25th January 1994 and that it has continued in existence since that date to the present time.

The present officials of the company are as follows:

### Directors

| | | |
|---|---|---|
| Mohan Lal Mittal | JL. Bukit Golfutama, Block PE-06 Pondok Indan, Jakarta Selatan-2310, Indonesia | Industrialist |
| Seema Kumari Lohia | JL. Bukit Golfutama, Block PE-06 Pondok Indan, Jakarta Selatan-2310, Indonesia | Industrialist |
| Ashok Kumar Agarwal | Abdul Aziz Al Baker's Building, Flat 203 317-II Street, PO Box 61088, Dubai United Arab Emirates | Business Manager |
| Pramod Mittal | Mittal House, 24 Alipore Road, Calcutta 700 027 India | Industrialist |
| Sangita Mittal | Renaissance Court 3/5, Wood Mews, London, United Kingdom | Business |
| Guntupalli Jagannadham | Zeleznicka 1, 75300 , Lukavac Bosnia and Herzegovina | Service |

### Secretary

| | |
|---|---|
| Richard Bryan Hird | 7 Romney Wynd, Clifton Park, Ramsey, Isle of Man |
| Umesh Somani | PO Box 61088, Abdul Qader, A.W.A.R. Al Sharafi L Hamid, A.K.N. Al Arif Building, Flat No. 211, Dubai, UAE |

NOTE: The information contained in this certificate reflects that contained in the Statutory Records maintained by the Isle of Man Financial Supervision Commission as at the date of this certificate. The information, which does not include financial information, is subject to change.



Isle of Man
Government

Page 2 of 2



## GLOBAL STEEL HOLDINGS LIMITED

### HOLDINGS LIMITED
**Formerly Called**
**Global Infrastructure Holdings Limited &**
**Avondale Limited**
**66279C**

The present Registered Office is situate at 1st Floor, Murdoch House, North Shore Road Ramsey, Isle of Man 1M8 3DY.

There are no documents on the company file relating to the winding-up or striking-off.

This 21st day of June 2005

Clive Oldale
Assistant Manager
Companies Registry

NOTE:The information contained in this certificate reflects that contained in the Statutory Records maintained by the Isle of Man Financial Supervision Commission as at the date of this certificate. The information, which does not include financial information, is subject to change.



# EXHIBIT 4

No: 066279C



# FINANCIAL SUPERVISION COMMISSION
## ISLE OF MAN

## Certificate of Change of Name

THE FINANCIAL SUPERVISION COMMISSION hereby certify that pursuant to the Companies Acts 1931 to 2004

### Global Infrastructure Holdings Limited

has, by SPECIAL RESOLUTION, and with the approval of the FINANCIAL SUPERVISION COMMISSION, changed its name and is now called

### GLOBAL STEEL HOLDINGS LIMITED

This 4th day of March 2005



Assistant Manager
Companies Registry



Certified True Copy

Isle of Man
Government

# EXHIBIT 5

# LIBERIA GLOBAL MINING COMPANY

First Merchant Bank Building, Broad Street,
Monrovia, Liberia
Tel Nos: + 2316 536187, + 2316 536190

"RESOLVED that the undersigned, constituting a majority of the duly appointed Board of Directors of Liberia Global Mining Company ("the company"), hereby determine and direct the company (a) to pursue arbitration in accordance with the Rules of the International Centre for Settlement of Investment Disputes, and (b) if and as appropriate, to pursue legal proceedings before the Courts in the USA or any other appropriate jurisdiction, in relation to the Mineral Development Agreement entered into between the company and the Government of the Republic of Liberia with regard to the former LAMCO Concession Area.   FURTHER RESOLVED that Sidley Brown and Wood, LLP is directed to take all necessary and incidental steps to carry out these actions."

Dated this 16th day of June 2005.

CERTIFIED TRUE COPY

Name  RAKESH DIKSHIT
Director

Name  JACOB VARKAM
Director

Name  Dr. FODEE KROMAH
Director

Name  Ashok Agarwal
Director

Name  GUNTUPALLI JAGANNADHAM
Director

Name  PRAMOD KUMAR MITTAL
Director

# EXHIBIT 6

# GLOBAL STEEL HOLDINGS LTD

(Formerly known as Global Infrastructure Holdings Ltd)
LOB 16, Suite No: 501, Jebel Ali Free Zone, DUBAI, UAE.
Tel No. +9714(0)8818384, Fax: +9714(0)8818385

EXTRACTS FROM THE MINUTES OF MEETING OF THE BOARD OF DIRECTORS OF GLOBAL STEEL HOLDINGS LTD. HELD ON 15th June, 2005.

"RESOLVED that the company hereby determines (a) to pursue arbitration in accordance with the Rules of the International Centre for Settlement of Investment Disputes, and (b) if and as appropriate, to pursue legal proceedings before the Courts in the USA or any other appropriate jurisdiction, in relation to the Mineral Development Agreement entered into with the Government of the Republic of Liberia with regard to the former LAMCO Concession Area"

"FURTHER RESOLVED that the Company appoints and authorizes Sidley Austin Brown and Wood, LLP to take all necessary and incidental steps to carry out these actions."

Certified True Copy

For Global Steel Holdings Limited

Director

Regd Office: 1st Floor, Murdoch House, North Shore Road, Ramsey, Isle of Man IM8 3DY

# EXHIBIT 7

# MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding is entered into by and between

The Government of Liberia hereinafter referred to us "GOL" of the address, Capitol Hill, PO Box 9024, Monrovia. Republic of Liberia hereby represented by the Honorable Jonathan A.Mason. Minister of Lands Mines and Energy;

Liberian Mining Corporation, hereinafter referred to as "LIMINCO" of the address, 4th Street, Tubman Boulevard, Sinkor, Monrovia, Republic of Liberia Box 10-3727 hereby represented by Mr Ciapha Gbollie, President of LIMINCO;

Global Infrastructure Holdings Limited, hereinafter referred to as "GIHL" a holding company of ISPAT GROUP with registered office at 1st Floor Murdoch House, North Shore Road, Ramsay, Isle of Man, IM8 3DY hereby represented by Mr Rakesh Dikshit, General Manager – Business Development, ISPAT Group;

**AND**

Provider Limited hereafter referred to as "Provider", a company registered in the United Kingdom having its main office at address at 59, St.Mary Abbots Terrace, Holland Park, London W14 8NX., United Kingdom, hereby represented by Jacob Varnam, Director.

The above entities referred to jointly as the "Parties" (singularly "Party")

**Whereas:**

1. GOL is the organ of the Sovereign State of Liberia charged to represent the State and is empowered to enter into agreements with international companies and entities to bring investment, operations, expertise and technical know-how to Liberia.

2. The Minister of Finance and Minister of Lands Mines and Energy are empowered by GOL to enter into agreements with international companies and entities to bring investment, operations, expertise and technical know-how to the mining and associated sectors in Liberia;

3. LIMINCO is a Parastatal being a business owned and controlled by GOL;

4. LIMINCO was established and is responsible for GOL's interests in Iron Ore mining in the Nimba/Liberia Range;

5. LIMINCO is empowered by the GOL to enter into agreements with international companies and entities to bring investment, operations, expertise and technical know-how to the developments of Nimba/Liberia Ores;

6. LIMINCO is the owner and operator of, the Port Of Buchanan hereinafter referred to as the "Port", the Railway from the Port of Buchanan to the Mine site at Mount Nimba near the international border between Liberia and Guinea hereinafter referred to as the "Railway", "Power Plants", "Roads" and other associated utilities and infrastructure;

7. LIMINCO controls the Mineral Development Agreements "MDA" in relation to Iron Ore deposits and mines in Nimba Range in Liberia;

8. LIMINCO owns and controls the Iron Ore stockpiles hereinafter referred to as the "Ore Stockpiles" located near the Port anticipated to consist of approximately some 750,000 Metric Tonnes of Nimba Washed Fines ;

And whereas

1. GIHL is a major international group having specialty in operation and management of Iron and Steel business and integrated plants worldwide;

2. Mr Rakesh Dikshit as General Manager – Business Development, ISPAT Group, is empowered by GIHL to seek business opportunities and is authorised to enter into agreements on their behalf in relation to activities of ISPAT Group;

3. Provider is an international company involved in investment worldwide, and bringing expertise and technical know-how to countries in Africa.

4. Mr Jacob Varnum as director of Provider is empowered by the board of the Company to seek and facilitate business and enter into agreements on behalf of the company.

Now therefore in respect of the mutual covenant and promises the Parties have agreed the following:

Clause 1
Objectives and Purpose of this MOU

1.1.1   The main Objectives and Purpose of this MOU are to establish the principles and define the scope that will regulate collaboration between the Parties in relation to the establishment of a Joint Venture between the Parties, hereinafter referred to as "JV", to:

1.1.2   Explore, Extract, Process and Market Iron Ore and products under MDA(s) in the Nimba Range, Liberia;

1.1.3   Rehabilitate and operate the Port, the Railway and the Power Plants;

1.1.4   Charge and collect revenues from the operation of the Port and Railway, power plants etc.;

1.1.5   Finance the Mining, Railway and Port rehabilitation and operations utilising international finance and the revenue streams arising from those operations;

1.1.6   To train and employ Liberians at all levels;

This MOU will serve as the basis for Detailed Agreements referred to in Clause 7 to be drawn up within 160 days between the parties in respect of those objectives.

Clause 2
Obligations of GOL

2.1 To assist and exclusively work with the other Parties to achieve the Objectives of this Agreement as set out in clause 1 above;

2.2 To provide necessary assistance which includes information, data, introductions, ongoing support, a secure positive environment to achieve the objectives as referred to in clause 1 above;

2.3 Guarantee the Parties and their consultants the necessary assistance in obtaining, authorizations, licences, visas, and general freedom of movement to facilitate the execution of its obligations;

2.4 To assist, support and encourage JV nationally and internationally in its quest to generate alternative business and revenue opportunities;

Prelim/Agmt LIMINCO/ GIHL / 28.11.03 / NV6

**Clause 3**
**Obligations of LIMINCO**

3.1 To assist and exclusively work with the other Parties to achieve the Objectives of this Agreement as set out in clause 1 above;

3.2 To transfer ownership and operational control of, and vest all rights in, the Port, Railway, Power Plants and other associated infrastructure to JV;

3.4 To assist, support and encourage JV nationally and internationally in its quest to generate alternative business and revenue opportunities;

3.5 To provide necessary assistance which includes information, data, introductions, ongoing support, and a secure positive environment to achieve the objectives as referred to in clause 1 above;

3.6 To assist, arrange for, accompany and provide support to the other Parties in relation to visit(s) to the Port, Ore Stockpiles, Railway, Power Plants, potential Mine sites and other facilities as referred to in clause 4.5 below:

**Clause 4**
**Obligations of GIHL**

4.1 To bring investment, together with international expertise, experience, systems and technical know-how to the Liberian Iron Ore sector and the associated operations and infrastructure including the Mine, Railway, Port, Power Plants etc;

4.2 To carry out due diligence into current and historical iron mining business, industry and associated practices within Liberia;

4.3 To review governmental geological and prospecting data, and other data and information to which the government has access in relation to Iron Ore mining and deposits identified in Liberia;

4.4 To visit and survey the Port, Railway, Power Plants and potential Mine sites and carry out inspections as required to collect data and information to assist the production of the feasibility report as referred to in clause 4.5 below;

4.5 To produce a pre-feasibility study in relation to data reviewed and field visits in respect of the Nimba, Liberia deposits and associated infrastructure;

4.6 Finance the Mine(s), Railway and Port rehabilitation and operations utilising international finance and the revenue streams arising from those operations as indicated in the pre-feasibility study;

4.7 To participate in the management, operation and control all aspects of the operations of JV, utilising international standards of governance and providing regular comprehensive reporting to the Parties;

4.8 To bring international expertise in Iron Ore Mining and processing to Liberia and provide training and employment to local personnel;

4.9 To utilize international and local consultants, agents and associates as it sees fit to carry out its obligations;

4.10 Subject to feasibility to bring investment, develop processing operations and contribute to downstream processing of Iron Ore in Liberia;

4.11 To consider legal and operational obligations for the JV as the concession holder, including, environmental issues, employment and training of the domestic labour force, the domestic requirement for Iron Ore, and the rehabilitation of the mine site after exhaustion;

4.12 To establish an administrative locus in Liberia that will provide reporting and accounting services to the Operations, and will collaborate with the Parties to ensure smooth running of those operations;

## Clause 5
**Obligations of Provider**

5.1  To bring investors to Liberia, in order to secure inward investment for the development of the mining and mineral sector;

5.2  To participate in the management, operation and control all aspects of the daily operations of JV, utilising international standards of governance and providing regular comprehensive reporting to the Parties;

5.3  To bring international expertise in Iron Ore Mining and processing to Liberia and provide training and employment to local personnel;

5.4  To utilize international and local consultants, agents and associates as it sees fit to carry out its obligations;

5.5  Subject to feasibility to bring investment, develop processing operations and contribute to downstream processing of Iron Ore in Liberia;

## Clause 6
**Structure of the Joint Venture**

6.1  The structure of the joint venture shall be formally determined at the formulation of the Detailed Agreement.

## Clause 7
**Execution**

7.1  Execution of each Party's obligations under this agreement is expected to take up to 160 days from the signing of this MOU with the Detailed Agreements being agreed and signed by the parties during this time. However should there be the need for an extension due to unforeseen circumstances GIHL may ask for an extension to this MOU which will not be unreasonably denied.

7.2  The parties agree to cooperate and act in good faith, and at all times maintain a relationship that allows for the correct execution of the provisions of this Agreement.

7.3  The Detailed Agreement referred to in Clause (1) and Clause (7.1) shall involve negotiation between the Inter-Ministerial Mineral Committee of the GOL on one hand, and GIHL and Provider on the other hand, in accordance with the New Minerals and Mining Law of Liberia, approved on April 03, 2000.

## Clause 8
**Exclusivity**

8.1  This MOU will provide for a period of 160 days from the signing date of this MOU during which time the Parties will work exclusively with each other in relation to the carrying out their obligations and establishment of the JV in Liberia.

4

**Clause 9**

**Delegation and Assignment**

9.1 The Parties may delegate their duties under this MOU in whole or part. The provisions of this MOU shall be binding upon and accrue to the parties hereto and their respective representatives, successors, heirs and permitted assigns, such assignment to be with the other parties written consent.

**IN WITNESS WHEREOF**, the Parties have executed this MOU, through their respective duly authorized representatives, on the day, month and year indicated below:

Signed in _____ originals on the ___ day of _____ A. D, 2003

**IN THE PRESENCE OF**

**FOR THE GOVERNMENT OF THE REPUBLIC OF LIBERIA**

Hon. Jonathan A. Mason
Minister of Lands Mines and Energy

Mr Ciapha Gbollie,
President, LIMINCO

(Sanjay Ku Srivastava)

Rakesh Dikshit
General Manager, ISPAT GROUP.
On behalf Global Infrastructure Holdings Ltd.

Jacob Varnam
Director, PROVIDER Ltd.

5

# EXHIBIT 8



# REPUBLIC OF LIBERIA
## MINISTRY OF LANDS, MINES AND ENERGY
P.O. BOX 10-9024
1000 MONROVIA 10
LIBERIA, WEST AFRICA
TEL: (231) 227490, FAX: (231) 226281

OFFICE OF THE MINISTER

NTGL/JAM/529/MLME/'04

August 30, 2004

Mr Jacob Varnam
Provider Limited
Stalston
11 Elvaston Place
South Kensington
London SW7 5QG
UK

Dear Mr Varnam:

### Ref.: LIMINCO Project

We present our compliments and wish to update you on the progress on the proposal of the GIHL received on 4th August 2004 in respect of the LIMINCO Project.

A total of five proposals from Rio Tinto/WATCO, LNM Holdings, GIHL, BHP Billiton and the Shandong International Trading Group were submitted by the Board of Directors of LIMINCO for evaluation to its Inter-Ministerial Technical Committee.

After ten days of deliberations, the Technical Committee selected the GIHL and submitted its findings and recommendations to the LIMINCO Board for approval.

At the meeting of the Board on Friday 27th August 2004 the Technical Committee's recommendations were adopted and a motion agreed to commence contract negotiations with Global Infrastructure Holdings Limited (GIHL) in relation to its successful proposal, most especially the preparedness to commence work immediately.

In respect of the above, I am now in a position to confirm the Board's commitment to work with GIHL in respect of the LIMINCO project and certify that it has authorised the Technical Committee to commence negotiations for a Mineral Development Agreement with GIHL in relation to implementation of the project.

Kind regards.

Very truly yours,

Jonathan A. Mason
**Minister**

# EXHIBIT 9

# GEORGE E. HENRIES
### Counsellor-at-Law
### Liberian Law Consultant

1

704 Plaza Drive
Woodbridge, NJ 07095

Telephone: (732) 602-7887
Telefax: (732) 602-9499
E-Mail: attyghenries@aol.com

June 29, 2005

Sidley Austin Brown & Wood LLP
1501 K Street, N.W.
Washington, D.C. 20005

### Re: Global Steel Holdings, Ltd. –Liberian Contract Law

Dear Sirs:

You have requested a legal opinion on issues of Liberian contract law with respect to a Mineral Development Agreement among Global Steel Holdings, Ltd., previously known as Global Infrastructure Holdings Ltd. ("GIHL"), Liberia Global Mining Company ("LGMC") and the Government of Liberia ("GOL"). The main issue is whether under Liberian law, after reviewing the documents listed below and the acts of the parties to a negotiated and concluded, though unsigned and unratified, agreement, one could reasonably conclude that the agreement in question is binding and enforceable. I am a Liberian lawyer licensed to practice in Liberia and I am qualified to give this opinion. I am a graduate of the Cornell Law School, Ithaca, New York with a J.D. degree and I am the senior partner of the Henries Law Firm in Monrovia, Liberia. I have served as Solicitor General, Attorney General of Liberia and Associate Justice of the Supreme Court of Liberia. I am a foreign law consultant in the State of New Jersey. On many occasions I have been asked to opine on matters of Liberian law.

In giving this opinion, I have examined copies of the following documents:

(a) A Memorandum of Understanding ("MOU") among GOL, the Liberian Mining Company ("LIMINCO"), GIHL and Provider Limited ("Provider") dated 28th November, 2003;

(b) A letter dated October 4, 2004 from the Inter-Ministerial Mineral Technical Committee addressed to the Minister of Finance and Chairman of the Board of Directors of LIMINCO submitting for the Board's review and consideration the final negotiated Mineral Development Joint Venture Agreement among GOL, GIHL and LGMC granting iron ore mining rights over the former LAMCO concession areas in Nimba and Grand Bassa Counties of Liberia;

(c) The Mineral Development Agreement (the "MDA");

(d) The Articles of Incorporation of Liberia Global Mining Company dated 5th

October 2004;

(e)   A letter from the Chairman of the Inter-Ministerial Mineral Technical Committee, dated October 8, 2004, informing Provider that negotiations on the MDA had been successfully concluded and sent to the Board for approval;

(f)   A letter from the Inter-Ministerial Mineral Technical Committee dated October 14, 2004 summarizing the steps taken by that Committee leading up to the submission of the final draft of the MDA, and informing the LIMINCO Board of Directors that the Acting Minister of Lands, Mines & Energy had been instructed to stop further negotiations in respect of the LAMCO concession area on the ground that the project should be more widely advertised in the local and foreign media;

(g)   Two letters from the Chairman of the National Investment Commission, addressed to GIHL and LGMC: the first, dated October 14, 2004 informing them of GOL's "approval and consent" of the MDA and stating that this approval and authorization constitute permission for GIHL to proceed to perform the works and obligations of the draft agreement pending formal signing of the MDA; and the second, dated December 15, 2004 re-affirming GOL's "approval and consent" of the MDA;

(h)   A letter from the Minister of Lands, Mines & Energy, dated December 22, 2004 stating that GIHL had complied with the new Mineral and Mining Law in relation to the LIMINCO Project and requesting that GIHL submit its original proposal together with a progress report for the mere purpose of public awareness law since awarding of the MDA will be based on such compliance; and

(i)   GIHL's letter of 30th December 2004, submitting its Progress Report, including details of expenditures incurred by GIHL subsequent to finalization of the MDA and registration of the Concessionaire.

In such examination I have assumed the genuineness of all signatures, and the conformity with the original documents of all documents submitted to us as copies.

In connection with the foregoing, I have also examined such laws, regulations and enactments of the Republic of Liberia as I have deemed relevant and necessary as a basis for the opinion hereinafter expressed. No opinion is expressed as to any country's laws other than the laws of Liberia.

Subject to the foregoing, it is my opinion that:

1.   Under Liberian law, lack of signature and ratification does not automatically or invariably preclude the conclusion that a contract is valid, binding and enforceable. To the contrary, the doctrines of part performance and estoppel can lead to

the conclusion, under Liberian law, that an unsigned and unratified contract is in fact binding and enforceable on the parties thereto.

2. One important issue relates to the authority of those who enter into, or induce reliance on and performance of a contract on behalf of the Government. The government officials who either negotiated the MDA or signed the various documents pertaining to the granting of mining rights to GIHL in the Nimba Range included the Ministers of Lands & Mines, Finance, Justice, the Board of Directors of LIMINCO, the Chairman of the National Investment Commission, the Inter-Ministerial Technical Committee which was composed of officials of several Government Ministries. All of these officials, by virtue of their positions in the various Ministries and their participation on the committee to investigate and negotiate a concession agreement, had actual authority to act on behalf of the Government. If, for any reason, they lacked such authority they certainly had apparent authority because they held themselves out as having such authority to act for and on behalf of the Government in the negotiations, and GIHL in good faith relied on such appearance, so that GIHL would be prejudiced if the facts were shown to be otherwise. In Merzaric, Scanship v Kamal, 34 Liberian Law Reports ("L.L.R.") 316 (1987), the Supreme Court held that an agency may be created by estoppel insofar as third persons are concerned in that it may arise from acts and appearances which lead third persons to believe that it has been created.

3. Given the fact that under Sections 3.1 – 3.3 of the Mining Law the Minister of Lands, Mines & Energy is responsible for administering the Mining Law, has the authority to conduct investigations to ensure compliance with the law, and that under Sections 3.4 and 3.5 of the Mining Law the Technical Committee is composed of representatives of the Ministries of Lands, Mines & Energy, Justice, Finance, Planning & Economic Affairs, Labor, the National Investment Commission, the Council of Economic Advisors to the President and the Central Bank of Liberia and is empowered to negotiate and conclude mineral development agreements which they did in compliance with the Mining Law, under the doctrine of estoppel the Government is precluded from repudiating its own acts and, in Clarke v Minister of Finance and the Minister of Justice, 32 L.L.R. 464 (1984), the Liberian Supreme Court held that under the doctrine of estoppel, personnel of the same agency are estopped from attacking the authority of their colleagues of similar rank.

4. On the doctrine of estoppel, the Liberian Supreme Court in Cooper v Compagnie Francaise de L''Afrique Occidentale (C.F.A.O.), 20 L.L.R. 554 (1972), held that though an agreement may be otherwise invalid, a party or one in privity with him, will be estopped from denying the validity of that agreement when he is the maker of the instrument involved or has accepted benefits thereunder. Here there is evidence not only that the Government had benefited from the performance of the other party (GIHL), but also that the Government itself performed obligations under the MDA, such as incorporating LGMC to serve

4

as concessionaire. Thus those who are privy to or participants in the negotiations of the MDA can, under Liberian law, be estopped from attacking its validity because of a lack of signature or otherwise.

5. As to the issue of part performance, several of the listed documents that I reviewed stated that GIHL had complied fully with the law, that the agreement had been approved and even authorized GIHL to proceed with the performance of work envisaged in the unsigned MDA. GIHL apparently did begin performing as evidenced by the activities described in the Progress Report, involving expenditures of hundreds of thousands of dollars. Where a party in reliance on a contract, and particularly in reliance on the representation and inducement of those with actual and apparent authority, performs his part, the counter-party must be equitably estopped from contesting the validity of that contract whether on grounds of lack of signature or otherwise. It would be a fraud upon him to allow the other party to repudiate the contract by invoking any requirement that the contract be signed by the party to be charged (such as the statute of frauds), and the party who has performed should be entitled to an equitable remedy. Montgomery-Trays v Stella Montgomery, et al., 18 L.L.R. 202 (1967).

6. The method of concluding the MDA and granting a concession was followed as provided in the Section 6.2 of the Liberian General Business Law, Liberian Codes Revised, Vol. III, page 734. The only requirements not satisfied are the signing and ratification of the MDA.

7. Given the facts and circumstances and the law, it is my opinion that there are compelling arguments under applicable standards of Liberian law that the MDA, though unsigned and unratified, is valid, binding and enforceable.

Very truly yours,

George E. Henries

# EXHIBIT 10



# REPUBLIC OF LIBERIA
## National Investment Commission



*Office of The Chairman*

1. Global Infrastructure Holdings Limited,                    October 14, 2004
   1st Floor, Murdoch House,
   North Shore Road, Ramsay,
   Isle of Man
   Attn: Mr. Ashok Agarwal, Director

2. Global Minerals Liberia Limited,
   First Merchant Bank Limited,
   Broad Street ,
   Monrovia, Liberia
   Attn: Rakesh Dikshit, Director

3. Liberian Global Mining Company
   First Merchant Bank Limited,
   Broad Street,
   Monrovia,   Liberia

Sir,

### Subject : Consent and Approval to Mineral Development Agreement between the Government of Liberia and GIHL/LGMC

This refers to the aforementioned agreement to be formally executed between the parties mentioned.

On behalf of the Government of the Republic of Liberia and its agencies and instrumentalities, this communication constitutes approval and consent to the execution of the Mineral Development Agreement as negotiated with the Technical Committee of Liberia in substantially the attached format..

This approval and authorization also constitutes permission to GIHL or its nominee as Operator to proceed with the performance of the works and obligations  envisaged in the draft agreement pending formal signing of the Mineral Development Agreement.

Kind Regards,

Sincerely,
For National Investment Commission

Roosevelt K. Quiah (Amb.)
**CHAIRMAN**

---

Mail Bag 9043, 12th Street, Monrovia, Liberia
Tel.: (231) 226 685, Fax: (231) 226 685
E-mail: webmaster@liberia.net

# EXHIBIT 11



# REPUBLIC OF LIBERIA

## National Investment Commission



*Office of The Chairman*

1. Global Infrastructure Holdings Limited,                    December 15, 2004
   1st Floor, Murdoch House,
   North Shore Road, Ramsay,
   Isle of Man
   Attn: Mr. Ashok Agarwal, Director

2. Provider Limited
   Stalston, 11 Elvaston Place
   South Kensington,
   London Sw7 5QG
   United Kingdom
   Attn: Jacob C. Varnam, Director

3. Liberian Global Mining Company
   First Merchant Bank Limited,
   Broad Street,
   Monrovia,   Liberia

Sir,

**Subject: The re-affirmation, Consent and Approval to the execution of Mineral Development Agreement between the Government of Liberia and GIHL/LGMC**

This refers to the aforementioned agreement to be formally executed between the parties mentioned to be signed prior to January 14, 2005.

On behalf of the Government of the Republic of Liberia and its agencies and instrumentalities, this communication constitutes the re-affirmation, approval and consent to the execution of the Mineral Development Agreement as negotiated with the Technical Committee of Liberia in substantially the attached format.

This approval and authorization also constitutes permission to GIHL or its nominee as Operator to proceed with the performance of the works and obligations envisaged in the draft agreement pending formal signing of the Mineral Development Agreement.

Kind Regards,                          SWORN and SUBSCRIBED TO BEFORE ME
                                       this 16th day of _____ , A D 2004.

Sincerely,
For National Investment Commission

Roosevelt K. Quiah (Amb.)            MARY MAMIE HOWE
**CHAIRMAN**                          NOTARY PUBLIC. MONTSERRADO CJ
                                      REPUBLIC OF LIBERIA

Mail Bag 9043, 12th Street, Monrovia, Liberia
Tel.: (231) 226 685, Fax: (231) 226 685
E-mail: webmaster@liberia.net

# EXHIBIT 12



# REPUBLIC OF LIBERIA
## MINISTRY OF LANDS, MINES AND ENERGY
P.O. BOX 10-9024
1000 MONROVIA 10. LIBERIA, WEST AFRICA
TEL: (231) 226-858, FAX: (231) 226-281



OFFICE OF THE MINISTER

NTGL/JAM/701/MLM&E/'04

December 22, 2004

Jacob Varnam
Director
Provider Limited
Stalston, 11 Elvaston Place
London SW7-5QG
England

Dear Jacob:

## LIMINCO Project - Mineral Development Agreement between Government of Liberia and GIHL/LGMC

We present our x-mas and New Year greetings and wish to make the following clarification in respect of your letter of December 10, 2004.

GIHL has complied with the Mineral and Mining Law in relation to the LIMINCO Project in respect of its signing of the Memorandum of Understanding with the Government on 28th November 2003 through the successful conclusion of negotiations of the Mineral Development Agreement (MDA) in October 2004 with the Inter-Ministerial Technical Committee as mandated under that law.

In August 2004 the LIMINCO Board adopted the recommendations and findings of the Inter-Ministerial Technical Committee's review of those companies having interest in the former LAMCO concession. The process was observed by the Contracts and Monoplies Commission and selected GIHL as the company with which to conclude the MDA.

In accordance and in compliance with the Comprehensive Peace Accord (CPA), as mandated under Article XVII of the CPA, the Mineral Development Agreement was drafted with the Contracts and Monopolies Commission observing deliberations, activities and negotiations of the Inter-Ministerial Technical Committee in its drafting of the MDA with GIHL.

Jacob Varnam
Director
Provider Limited

Page 2

The recent Request for Proposals (RFP) as published by the Ministry of Lands, Mines and Energy in the Liberian press is mainly for public awareness as mining contracts are not awarded by tender. GIHL is required to submit its original proposal together with a progress report for compliance purposes only and will be awarded the Mineral Development Agreement (MDA) based upon its compliance with the new Minerals and Mining Law approved April 2000 being the legal process.

Board of Directors, LIMINCO

Kind regards.

Very truly yours,

Jonathan A. Mason
**MINISTER**

# EXHIBIT 13

*Exhibit "PAA/6"*

 **Global Infrastructure Holdings Ltd.**

LOB XVI, 411, Jebel Ali Free Zone, Dubai, UAE
Tel: +971-4-8818384, Fax: +971-4-8818385, www.gihl.org

**GIHL**

Ref : GIHL/LIMINCO/04-05                                    Dated : 30th December 2004

To,
Hon'ble Jonathan Mason
Minister of Land, Mines & Energy
Capitol Hill, Monrovia
Republic Of Liberia.

Hon'ble Minister,

**Subject:  LIMINCO Project – Mineral Development Agreement
between the Government of Liberia and GIHL.**

We have the honor to present our compliments and express our Seasons Greetings and Best Wishes for the New Year.

As a response to your letter NTGL/JAM/701/MLM&E/'04 dated 22nd December 04, GIHL, endorses the view that it has complied with the Mineral and Mining Law in force in relation to the LIMINCO Project (erstwhile LAMCO Concession) and that the successful conclusion of the negotiations in September - October 2004 with the Inter-Ministerial Technical Committee confer upon the Mineral Development Agreement a binding and enforceable status. However, GIHL has been made to understand that certain segments within the Government of Liberia have expressed a wish to see more benefits flowing to the Government coffers and to the Liberian population at large.

In deference to this wish, but without detracting from the binding nature of the Mineral Development Agreement concluded in October 2004, and purely as a matter of grace and as evidence of its concern for the development of the economy of Liberia, GIHL submits this revision of the figures/targets/investments contemplated in the Mineral Development Agreement.

- **Investment of USD 1.1 Billion.**

    PHASE I      YEAR  1 to 3        USD 465 Million

    PHASE II     YEAR  4 to 10       USD 492 Million

    PHASE III    YEAR  11 to 15      USD 120 Million

    **TOTAL (Approx.)**              **USD 1.1 Billion**

This includes the setting up of a Beneficiation Plant, a Pelletisation Plant and a Steel Plant of a capacity of 750,000 MT to 1.0 million MT.

Contd. . .p/2

Regd. Office : 1st Floor, Murdoch House, North Shore Road, Ramsay, Isle of Man- IMB 3DY



# Global Infrastructure Holdings Ltd.
LOB XVI, 411, Jabel Ali Free Zone, Dubai, UAE
Tel: +971-4-8818384, Fax: +971-4-8818385, www.gihl.org

– 2 –

- **Increased Employment Generation**

  The manpower deployment is expected to be as under

| Section | Phase I | Phase II | Phase III | Total |
|---|---|---|---|---|
| Mine & Plant | 1000 | 400 | 400 | 1800 |
| Rail Road | 0200 | 100 | 100 | 0400 |
| Port | 1000 | 100 | 100 | 0300 |
| Pellet Plant | 0000 | 000 | 100 | 0100 |
| Steel Plant | 0000 | 000 | 400 | 0400 |
| Total | 1300 | 600 | 1100 | 3000 |

The long lasting benefits of this employment generation to the local economy are self evident. This direct employment will further lead to indirect employment of approx. 50,000 persons and which in turn can cater to the requirements of up to 300,000 dependents.

- **Immediate Fiscal Benefits to the Government.**

  ➢ Investment of USD 465 Million in the first three years (Phase I).

  ➢ Royalty of 5 % on ore shipped (FOB value).

  ➢ Payment of USD 200,000.00 per annum in lieu of exemption from import duties and taxes to commence after 5 years of starting.

  ➢ One time contribution of USD 100,000.00 towards the Mineral Development Fund.

  ➢ Ground Rent of USD 175,000.00 per annum after 3 years.

- **Increase in the GDP**

  The project is expected to enhance the National GDP by about 10% and the Sectoral GDP by approx. 15%.

- In addition to the aforementioned, the project is likely to add tremendously to the ancillary industries and infrastructure facilities in the area, which in turn are bound to have a positive impact the local economy.

Contd..p/3

Regd. Office : 1st Floor, Murdoch House, North Shore Road, Ramsay, Isle of Man- IMB 3DY



# Global Infrastructure Holdings Ltd:
LOB XVI, 411, Jabel Ali Free Zone, Dubai, UAE
Tel: +971-4-8818384, Fax: +971-4-8818385, www.gihl.org

**GIHL**

- 3 -

- **Regional Mineral Development**

  The project is to benefit the development of the mineral sector in Liberia and the adjoining
  ECOWAS nations. The iron ore shall become a stable source to be used by the steel plants of
  ECOWAS members including those of GIHL in Nigeria (Ajakouta Steel and Delta Steel), other
  developing countries viz. Libya and in India.

A more detailed narration of the benefits that would flow from the project has already been
finalized during the negotiations with the Technical Committee and form part of the Mineral
Development Agreement concluded in Oct'04.

As required in the letter dated 22ND December 2004, a progress report is also attached. It will be
recalled that GIHL had started deploying its personnel and other resources on this project as long
back as August'03, entered into an MOU with the Govt. Of Liberia in Nov'03 and had completed
the requirement of Scoping Study Report in July 04 and the consequently proposal submitted with
the Govt. of Liberia in August'04. More than 25 representatives from GIHL and industry experts
have visited Liberia and other countries during the course of the various activities. GIHL has
already incurred an expenditure of USD 700,000.00 approximately on the various activities.

GIHL wishes to reiterate that this letter should not be construed to constitute a departure from the
binding nature of the Mineral Development Agreement concluded in October 2004.

Thanking you in anticipation.

Yours Sincerely

Rakesh Dikshit
Authorized Signatory

Encl: as above and list of enclosures attached

Regd. Office : 1st Floor, Murdoch House, North Shore Road, Ramsay, Isle of Man- IMB 3DY



## PROGRESS REPORT ON LIMINCO PROJECT AND MDA WITH GIHL

**Dated: 31ˢᵗ Dec 2004**

A brief progress report on the area wise activities performed in the recent past is detailed herein for kind perusal

### A.    MINING  AND GEOLOGICAL ACTIVITY

- Calculations have been made for number of HEMM equipments required for short term mining as well as long term mining .
- Mine planning for quick impact program has been initiated with maps and areas identified for this activity.
- Mining equipment technical specification are being prepared.
- The technical specification are almost ready for the following types of equipments identified:
  1. Hydraulic Excavators.
  2. Dumpers
  3. Dozers
  4. Loaders
  5. Motor graders
  6. Road rollers
  7. Cranes
  8. Tyre handlers
  9. Explosive vans
  10. Mobile maintenance van etc.
- Enquiries sent to various suppliers in Ghana , South Africa and Canada etc.
- Documents for sourcing of various equipments are under preparation.
- Secondary exploratory drilling at Tokadeh and other western deposit is planned at grid pattern of 100X 100 in a line to the  Previous exploration done by LAMCO to have a confirmation .
- Demarking of bore holes in the field is to be carried out shortly in consultation wit the authorities for confirmatory drilling.
- Exploratory agency are being identified in Ghana and South Africa.
- A survey of Western deposits is being planned in the ensuing month of Jan'05 in consultation with authorities .
- Pit layouts are planned theeafter to cary out trial production.
- Nekree  and Green hill ballast quarries have been assessed for future exploitation to rehabilitate the rail track.
- Refurbishment of existing crusher has been planned and technical specification of equipment required for crusher is being prepared.

11

GHL

## B.    PROCESS FLOW DESIGN

- To asses and review the facilities available in the existing washing plant is being carried out.

- Based on the report obtained from Sweden contacts were made with manufacturers of different mineral processing equipments.

- Technical specification of various process equipment has been prepared.

- Based on above specifications quotation and test work has been sought from a leading manufacturers of magnetic separators and ferrous wheel manufacturer.

- Contact is being established with various manufacturer in USA , South Africa and Australia for obtaining quotations for equipment as well as for test work.

- Test work on Hindered Settling is also on the anvil and necessary contacts are being established.

- We are also in contact with parties in South Africa to do necessary test work at appropriate time to freeze the flow sheet.

- Details of power generation at Buchanan and Yekapa is being worked out.

- Past data on bond work index being obtained to establish requirement of grinding energy.


## C.    RAILROAD REFURBISHMENT

Present status of the rail road refurbishment activities:

- Agencies for doing initial survey of the track are being identified and discussions are to be carried out.
- Bush cutting activities for facilitation of the thorough investigation and full length survey of the track is being detailed out.
- Vendor development for rail ties both with in Liberia and near by countries is in progress.

22

GHL

- Consultations with technical experts in rail road installation and refurbishment are being contacted form India and from Europe.
- Efforts are being made to explore the local expertise who had involved in the rail road operation and maintenance.
- Consultations are on with Association of American Rail Road (AAR), Swedish State Railway –SJ, German Federal Railways DB for further technical assistance for speedy refurbishment of the rail road.

## E.    PORT AND MATERIAL HANDLING SYSTEM

**Buchanan Port**

- Preliminary Assessment of the various structures and equipments at Buchanan Port has been carried out jointly with International consultant.
- Revival options for structures and equipments are being worked out.
- Technical specifications for various facilities are being worked out.
- Enquiries for refurbishing have been floated and the feedback is being compiled.
- Process of preparing bankable document is under progress.

## 2. Material Handling Systems:

- Material handling systems at the Buchanan Port has been studied with the help of international consultants.
- The feasibility of retrieving various facilities is being worked out.
- Various options for refurbishing of material handling equipments are being considered.
- Enquiries for this work are being floated. Compiling of feed backs from various sources is under progress.
- Process of preparation of bankable document will begin soon.

## 3. Civil Work associated with the above facilities:

- The present status of the civil structures has been evaluated by reputed international consultants.
-



- Various refurbishing options for the civil structures are being worked out with help of the consultants.
- Different agencies are being contacted to work out and prepare a bankable document.

## E.    PEREPHERAL DEVELOPEMTAL ACTIVITIES

- Assistance in bush cleaning in Buchanan and Yekepa is being done.

- Service road along the railway track has been assessed with the help of the local community as well as by engineers.

- Assistance provided to Picafa Mission area in laying out a wooden bride on culvert to provide access to the community.

- Refurbishing of the structures at Buchanan and Yekepa being planned and discussed wit the agencies in Monrovia.

- Bush cutting of the railway track for assessment by the RITES Ltd team members is planned.

- Presentations being made to groups / communities who have evinced interests in the activities planned to appraise them on the progress.

- Investment planning and work pertaining to appointment of consultants to carry out the feasibility study is in progress with South African and Canadian Agencies. In addition some preliminary exercises have been carried out for the manpower projections.

LIST OF GHL EXPERTS :

| GHL Department | Area of Expertise | Visits Period |
|---|---|---|
| Addindi Thirumalai Kannan | Deputy General Manager Process | December to date / September / April / May |
| Amn Raverndra | Asst. Manager Maintenance | October to date |
| Aditi Kumar Patto | Assistant Manager Geology | October to date |
| Bhaskaran Jyothikumar | Manager Mining Maintenance | Arrival tbe |
| Binod Kumar | Assistant Manager Geology | Arrival tbe |
| Chandra Shekbar Singh | Manager Mining | July / August / Arrival tbe |
| Devender Prcood Kumar | Consultant – Melting & Casting | Arrival tbe / September / January |
| G.S Kopalan Shri Shripad | | |
| Gangadhar Rout | Deputy Gen Mkn Logistics | |
| Goel Mahesh Kumar | President Logistic | |
| Iyer Ganpathy Natrajan | Consultant – BF | |
| Kamala Kanta Naade | Manager Chemical | |
| Kaur Sharad Gundbasappe | Manager Technical services | Arrival tbe / January |
| Manish Bansal | Mgr (Fin) | |
| Myrala Jayblan Shankar | Sr. Manager Electrical | September / April / May / January |
| Nagashwar Seelam | Mgr Maintena Sr Sigma | September |
| Nirendom Kumar Mishra | Dy G Mgr (Geo) | |
| Narendra Singh | | Arrival tbe / Arrival tbe / January |
| Narve Nagorakabhat Jagadaakha | Sr. Mgr Automation | |
| Poonalapraad Rand Nair | Director Business | |
| Prahlon Kumar Vishwakarma | Man Geology | November to date / July / August / January |
| Rakesh Adluira | Asst. Mgr Mine Maintenance | Arrival tbe |
| Rakesh Dilazhi | G Mgr | |
| Ramanand Singh | Director Mining & Raw Material | |
| Ramesh Bhagorano Bhonsle | Vice President Finance | |
| Ramu Mahadevan | Sr. Manager Mine maintence | |
| Sai Prasad Krishnamoorthy | Mgr, Fire and Casting | November / September / January |
| Sanjay Kumar Sabastava | Assistant Man Geology | |
| Simandar Sai Kacosh Vululukukare | Manager Mechnical Port Handling | |
| Shanpar Singh | G. Mgr Logistics | December to date |
| Smobby Kumar Ghosh | Advisor (Rlng Project) | September |
| Srtkhram Verma Ramesh | Sr. manager Beneficiation Mech. | Arrival tbe / January |
| Subramanma Krishnamurthy | V President (Mining) | |
| Sud Surrivar Mohan | Consultant – Roll Mills | tas to date |
| Sunil Kapoor | Mgr. Civil | Arrival tbe |
| Sushant Shrutosn | Sr sigma | December to date |
| Vpin Verte Mital | Mgr. Business Strey | September |
| Vora Ckandra Sekhas Rao | Manger Mechanical Rail Service | December to date |
| Yogendar Kumar | Manager Process | Arrival tbe |

GRL Consultants

| Consultants | Area of Expertise | Contracted | |
|---|---|---|---|
| | | **2004** | **2005** |
| **MB Howe India Ltd.** | International Port Rehabilitation | | |
| Vilas Ramchandra Patankar | | December to date | January |
| Tapaskumar Kundu | | | January |
| Vasu Dev Krishna Bhatia | | | |
| **MB Rites Ltd.** | International Railway | | |
| V.C. Sharma | | | January |
| **RSG Global** | International Mining | | |
| Steve Rupprecht | Mine Engineer | April to July | |
| Andre van der Merwe | Senior Geologist | April to July | |
| John van Zetten | Mine Engineer | April to July | |

# EXHIBIT 14

Published by Liberia Analyst Corporation

Page 1 of 2

" Liberia's
Most
Analytical
Newspaper "

# THE ANALYST

" For Those
Who Strive
For Better
Liberia "

**Analyst Home**

**Editorial Policy**

**Why The Analyst**

**Our Staff**

**Our Contact**

**Email Center**

**Feedback**

**Search**

**Inside Today's Edition**

**Editorial**

**Memo to the President**

**Guest Commentary**

**Guest Articles**

**Guest Features**

**Environmental Issues**

**Sports**

**Thursday, 07 April 2005**

## Crisis Unfolding In LIMINCO Concession

### Blaney Protects American Interest, Who Protects Liberia's?

"Do anything, break the law, throw away sovereignty, just Mittal Steel the LIMINCO concession," might just be some of the words floating around in the hotly contested bid process between two companies of Indian origin fighting fiercely to take over the LIMINCO concession.

This paper has in its possession the original scores of the bid process. These scores were handed in by members of the committee last week.

A controversy arose between two factions of the Liberian Business Association, one faction led by a consultant and the other by a vice president, something which delayed the process until Friday of last Week.

The scores presented to Committee Chairman Mulbah Willie read: Labor marked Mittal Steel 41



J. Blaney - US Ambassador

and GIHL 85; Planning Ministry, Mittal-84, GIHL-89, Justice abstained, Lands and Mines, Mittal-41, GIHL-91, Finance, Mittal-50, GIHL-94, and NIC, Mittal-62, GIHL-78.

Others are: Liberian Business Association, Mittal-76, GIHL-86, Liberian Chamber of Commerce, Mittal-80, GIHL-78, Sam Ricks, Mittal-85, GIHL-94, Amelia Ward, Mittal-63, GIHL-78, Central Bank, Mittal-78, GIHL-80, and LIMINCO, Mittal-62, GIHL-82.

Mittal Steel accumulated the total score of 722, while GIHL accumulated the total score of 935, which placed the bid in favor of the latter.

It appears that there has been a dramatic change, which no one seems to be speaking about, but it is alleged that bribery is looming, while the scores are in the possession of the Mr. Willie.

There are fears though by many experts that the long delay in producing the results can only be construed as attempts by outsiders to influence the committee's work.

Insiders say the March 30th letter by Amb. John Blaney has not helped to move the process along, and some committee members are privately saying that efforts are being made to alter the scores to

Ads by Goooooogle

**Liberia**
Visiting Liberia? Compa
hotel prices, reviews,
maps
travel.Yahoo.com

**Liberian Dreams**
Back-to-Africa Narrative
from the 1850s
www.psupress.org

**Liberia Adoption**
Find an agency, child
photolisting, country inf
message boards
liberia.adoption.com

**Liberian Guys & Girls**
Conferencing & Minglir
On the Web Looking fo
Dates, Romance & Fur
www.onthe-internet.com

**Liberia Connection**
Great deals on Liberia
Connection Shop on eE
and Save!
www.eBay.com

please. This has yet to be independently confirmed.

One source said "it would interesting to note what the U.S. Ambassador's reaction would be if Mittal Steel is awarded this concession under the controversial circumstances. Even if this were to be considered the 'pepper bush' of the Americans, this is being badly mishandled."

Observers believe Blaney's letter should have awaited the outcome of the bidding, "but in his haste to influence the outcome of the process, he may have injured Mittal Steel irreparably, since any award to them now would be suspect and forever tainted. Even his letter suggested that the whole process should be scuttled."

Information from Washington indicates that the Americans do not look upon Liberia's iron ore as strategic, as exemplified in the utterances of Americans during the long civil war that "there was no strategic interest in Liberia."

"Any machinations by diplomats on the ground to advance the commercial interests of one firm over the other can only be considered personal," an insider said.

Some observers say there is some level of hypocrisy in the manner how the bidding process is being handled, noting that "transparency and accountability standards should be constant and not changed according to power politics or national interests...the overt diplomatic maneuvering on behalf of Mittal is clumsy."

Information is that Laskhmi Mittal allegedly bribed Britain's Labor Party in the tune of 125,000 pounds in an attempt to take over Sidex, the Romanian Steel Parastatal. This is yet to be independently confirmed, and Mittal is unavailable to verify the information.

Our sources said: The European Commission has remained silent. Global infrastructure Holdings Limited (GIHL), a British Isle of Man Company is preparing to file a complaint with them. Mittal Steel is not a British company, rather a company with head offices in the Dutch Antilles which competes against British companies, and is responsible for job losses in both the UK and US."

An expert alleged that the company is noted for transfer pricing, using cheap labor and raw materials to enter advanced markets, something which is said to be contrary to the Cotonou Accords.

Meanwhile, Chairman Gyude Bryant and Lands, Mines and Energy Minister Jonathan Mason are expected to travel to Lofa County and would back in the city soon.

Homepage   Contact:  webmaster@analystnewspaper.com

Copyright ©2005 The Analyst Newspaper - Published by Liberia Analyst Corporation. All rights reserved

# EXHIBIT 15



EXHIBIT "R/3"

# REPUBLIC OF LIBERIA
## MINISTRY OF LANDS, MINES AND ENERGY
P.O. BOX 10-9024
1000 MONROVIA 10
LIBERIA. WEST AFRICA

NTGL/MKW/3.15/MLM&E/'05

April 6, 2005

His Excellency C. Gyude Bryant
Chairman
National Transitional Government of Liberia
Executive Mansion
Monrovia, Liberia

Excellency:

We extend our compliments and have the honor to inform you that, as per your mandate given the expanded Inter-Ministerial Mineral Technical Committee, that as at March ending 2005, said Committee should submit the selection of one company for the LIMINCO Project to your office for appropriate Government action, we are pleased to forward herewith the name of Mittal Steel Company as the company selected based on the evaluation criteria as established by the members of the Technical Committee.

The selection of Mittal Steel Company was based on a series of comparative advantages it has over other companies, prominent of which are : 1) Mittal's worldwide steel networks and mining experiences, making it the number one supplier of steel products to the US, and second largest supplier to the EU; 2) its financial proficiency, which can allow it to finance Project without external borrowing thereby triggering an early commencement of Project with minimum delay; and 3) an attractive proposition for local community development.

These advantages have been further re-enforced by the announcement of Rio Tinto, the world's largest iron ore mining company, that it will collaborate with Mittal Steel Company to develop the Nimba iron ore deposits.

Excellency, the Committee awaits your further instruction to commence negotiation with Mittal Steel.

Please find attached copies of evaluation sheets of agencies that comprise the Inter-Ministerial Mineral Technical Committee.

May God bless you as you steer the ship of State.

# EXHIBIT 16

*Exhibit "PAH/8"*

REPUBLIC OF LIBERIA    )    IN THE OFFICE OF THE JUSTICE OF THE PEACE FOR
MONTSERRADO COUNTY)    MONTSERRADO COUNTY, MONROVIA, LIBERIA.

## AFFIDAVIT

PERSONALLY APPEARED BEFORE ME, the undersigned, a qualified Justice of the Peace for and in Montserrado County at the City of Monrovia, County and Republic aforesaid, GEORGE S. MULBAH, SR., of the City, County and Republic aforesaid, and deposed under OATH, as follows:

1. That, he, the said GEORGE S. MULBAH, SR., is a *bona fide* citizen of the Republic of Liberia in good legal and moral standing;

2. That, he, the said GEORGE S. MULBAH, SR., is presently employed by the Government of the Republic of Liberia as the Assistant Minister of Labour for Trade Union Affairs, at the Ministry of Labour;

3. That further, the said GEORGE S. MULBAH, SR., is also a member of the Minerals Technical Committee of the Republic of Liberia (hereinafter referred to as "the Technical Committee) established by section 3.4 of the Minerals And Mining Law of Liberia; and as such he, the said GEORGE S. MULBAH, SR., has participated in all deliberations on the former LAMCO Concession Area from 2004 up to and including March 2005;

4. That during one of the deliberations in 2004, Global Infrastructure Holdings Limited was selected from among five (5) companies as an eligible applicant with whom a final draft Mineral Development Agreement was negotiated and concluded in favor of Liberia Global Mining Company of which Global Infrastructure Holdings Limited is a seventy (70%) percent Class B Shareholder;

5. That further to paragraph 4 above, and that is after the final draft Mineral Development Agreement between the Government of the Republic of Liberia and Liberia Global Mining Company was recommended for execution by the relevant Government authorities, we were advised that His Excellency Chairman Charles Gyude Bryant had cancelled the said final draft Mineral Development Agreement and that he, the said Chairman Bryant had authorized that the former LAMCO Concession Area be advertised for tender bids.

6. That in response to the request for tender Mittal Steel Company and RIO TINTO submitted bids. That Global Infrastructure Holdings Limited was only requested to submit its original proposal with a progress report on its activities up to that and up and including the that date. That a day prior to inviting the bidders to appear before the Technical Committee for the evaluation of their respective bids, RIO TINTO withdrew and gave their support to Mittal Steel.

7. That the Technical Committee after perusing the bid documents submitted and interviewing the companies, Global Infrastructure Holdings Limited was again selected and that after the selection of Global Infrastructure Holdings Limited based on the grading system submitted on the 29th day of Mach 2005, the Ministry of Labour' representative was asked by the Committee Chairman, Mr. Mulbah Willie, to change the result in favor of Mittal Steel because Chairman Bryant and the US Embassy want Mittal Steel to be the successful bidder for the award of a Mineral Development Agreement.

SR., hereby says that all of the allegations of facts as contained in this Affidavit are true and correct.

SWORN and SUBSCRIBED to before me, this 27th day of May, A. D. 2005.

_____
JUSTICE OF THE PEACE, MONT. CO, R.L.

GEORGE S. MULBAH, SR., - DEPONENT

$3.00 Revenue Stamp Affixed to the Original Hereof.

SWORN and SUBSCRIBED to before me, this 27th day of May, A. D. 2005.

_____
MARY NELSIE HOWE
NOTARY PUBLIC, MONTSERRADO CO.
REPUBLIC OF LIBERIA

# EXHIBIT 17

REPUBLIC OF LIBERIA    )  IN THE OFFICE OF THE JUSTICE
MONTSERRADO COUNTY)  OF THE PEACE FOR MONTSER-
RADO COUNTY, MONROVIA,
LIBERIA.

## AFFIDAVIT

PERSONALLY APPEARED BEFORE ME, the undersigned, a duly qualified Justice of the Peace for and in Montserrado County at the City of Monrovia, County of Montserraedo, Republic of Liberia, P. SUMO DARWULO of the City of Monrovia, County and Republic aforesaid, and deposed under OATH, as follows:

That, he, the said P. Sumo Darwulo, is Inspector General of Labour, Ministry of Labour, in the Republic of Liberia.

That, he, the said P. Sumo Darwulo, is the primary representative of the Ministry of Labour on the Inter-Ministerial Minerals Technical Committee responsible, under law, to negotiate and conclude agreements with eligible applicants for Class A Mining Licences.

That in August 2004, the Inter-Ministerial Minerals Technical Committee (IMTC), under the Chairmanship of the Ministry of Lands, Mines and Energy received proposals from 5 (five) companies that expressed interest in the rehabilitation and operation of the LIMINCO facilities and mines of the former LAMCO Concession. The Companies were BHP Rio Tinto/WATCO, Shandong International Trading Group, LNM Holdings, and GIHL. GIHL had in November 2003 signed a Memorandum of Understanding with the Government of Liberia to carry out a feasibility study and presented its findings to the IMTC. After several weeks of deliberations in its review of the proposal, the IMTC selected GIHL using evaluation criteria, and recommended its findings to the LIMINCO Board of Directors.

That Counselor Osman Kanneh of the Contracts and Monopolies Commission (CMC) was at all times present and oversaw the deliberations of the IMTC in line with the provisions of the Comprehensive Peace Agreement (CPA).

That at the LIMINCO Board meeting of 27th August 2004 the LIMINCO Board adopted the IMTC's recommendation and agreed to commence contract negotiations with GIHL in relation to its successful proposal in respect of the former LAMCO Concession. In September 2004 the IMTC accordingly commenced negotiations with GIHL to conclude a Mineral Development Agreement (MDA) including the Class A Mining Licence. Those negotiations were successfully concluded with GIHL and the completed final draft of the MDA was submitted to the LIMINCO Board for approval and signature on 4th October 2004 accompanied by a letter signed by all IMTC members.

That Chairman Bryant subsequently on 11th October 2004 ordered the IMTC, through its Chairman, to stop all negotiations in respect of the former LAMCO Concession on the ground, stating that he was under international pressure and wanted transparency. Thus Chairman Bryant, required the Concession to be more widely advertised to allow other companies to bid.

That on October 14th 2004 the IMTC again wrote to the LIMINCO Board with all members signing the letter outlining the process of the evaluation and stating its position in respect of GIHL's selection.

That in December 2004 following continued dialogue between the LIMINCO Board and Chairman Bryant, the Minister of Lands, Mines and Energy placed an advertisement in the Liberian press requesting sealed proposals for the development of the Liberian Iron Ore Industry.

That in January 2005, proposals from two companies; Mittal Steel (formerly LNM Holdings), Rio Tinto, and a progress report from GIHL, were opened in relation to the former LAMCO Concession.

That the IMTC initiated a review process of the three documents and during that process in March 2005 Rio Tinto wrote advising that they were withdrawing their bid and would be joining with Mittal Steel in its bid.

That again the IMTC used evaluation criteria and after some weeks of deliberations, for the second time, selected GIHL over Mittal Steel. The Labour Ministry awarded 83% points to GIHL and 41% points to Mittal Steel, the overall IMTC totals for the companies being a score of just over 80% points for GIHL, and a little over 60% points for Mittal Steel.

That prior to the publication of the results the IMTC was advised that the Minister of Lands, Mines and Energy was told by Chairman Bryant that the selection of GIHL did not go down well with the American Government and thus the Americans would slow down their support of the peace process in Liberia. The Minister, through the Chairman of the IMTC, advised that the Americans would wave 80% of its Liberian debt if Mittal Steel was given the project. The Chairman of the IMTC advised that the American Government had historically exerted influence over Liberia and he feared for his life if he did not comply with their wishes. Based upon these points the IMTC was advised to change the result in favour of Mittal Steel, this was done even though members objected.

That, he, the said P. Sumo Darwulo, as an IMTC member, strongly feels that the process that led to the selection of Mittal Steel is unlawful. The process was filled with a lot of political manipulation over the economic empowerment of the nation.

That GIHL has shown good faith in its financing the employment of several hundred Liberians, including a good number of former combatants, in improving the communities in and around the concession area and works along the railway and has been prepared to start work on the Concession since the initial award of the agreement in October 2004.

SWORN and SUBSCRIBED to before me this
15th day of June A. D. 2005.

_____
JUSTICE OF THE PEACE, MONT. CO., R. L.

_____
P. SUMO DARWULO
INSPECTOR GENERAL OF LABOUR, R. L.
MINISTRY OF LABOUR – AFFIANT.

$3.00 Revenue Stamp Affixed To The
Original Hereof.

# EXHIBIT 18

REPUBLIC OF LIBERIA    ) IN THE OFFICE OF THE JUSTICE
MONTSERRADO COUNTY) OF THE PEACE FOR MONTSER-
                              RADO COUNTY, MONROVIA,
                              LIBERIA.

## AFFIDAVIT

       PERSONALLY APPEARED BEFORE ME, the undersigned, a duly qualified Justice of the Peace for and in Montserrado County at my office in the City of Monrovia, County of Montserraedo, Republic of Liberia. James S. Kpateh of the City of Monrovia, County and Republic aforesaid, who deposed, under OATH, as follows:

That, he, the said James S. Kpateh, is a member represents the Ministry of Finance of the Republic of Liberia, a statutory member of the Minerals Technical Committee of the Republic of Liberia (MTC);

That to best of his certain knowledge and belief the Government of Liberia (GOL) signed a Memorandum of Understanding (MOU) with Global Infrastructure Holdings Limited (GIHL) in November, 2003 in relation to the development and mining of iron ore at the former LAMCO Concession;

That in August 2004, he, the said James S. Kpateh took part in the Minerals Technical Committee's review of proposals for the former LAMCO Concession from five (5) companies, BHP. Watco/Rio Tinto, Shandong International Trading Group, LNM Holdings and GIHL;

That after several weeks of deliberations the MTC selected GIHL using evaluation criteria and made its recommendation to the LIMINCO Board of Directors (the LIMINCO Board);

That on August 27th the LIMINCO Board adopted the MTC's recommendations and authorized the MTC to enter into negotiations with GIHL for the conclusion of Mineral Development Agreement for the former LAMCO Concession;

That, he, the said James S. Kpateh, as a member of the MTC was involved in the negotiations and drafting of the MDA in September 2004. Those negotiations were successfully concluded with GIHL and on 4th October 2004 the competed draft MDA was submitted to the LIMINCO Board for approval and signature;

That on 11th October 2004. Chairman Bryant ordered the MTC to stop all negotiations with companies in relation to the former LAMCO Concession;

That in January 2005, proposals from Mittal Steel (formerly LNM Holdings) and Rio Tinto in relation to the development of the former LAMCO Concession and a progress report from GIHL outlining its works to date were opened by the Minister of Lands, Mines and Emergy;

That, he, the said James S. Kpateh, took part in the review of the proposals and progress report by the MTC which used evaluation criteria to make its selection.  During the process Rio Tinto withdrew its proposal;

That in March 2005, after evaluation of the documents submitted by Mittal Steel and GIHL, the MTC unanimously selected GIHL as the winner of the bid process for the former LAMCO Concession. The Ministry of Finance awarded 94% points to GIHL and 50% points to Mittal Steel;

That subsequent to GIHL's successful selection the Chairman of the MTC advised that due to international pressure the MDA had to be awarded to Mittal Steel. That the Chairman of the MTC thereafter revised the result of the selection in favour of Mittal Steel;

That the foregoing statements of fact are true and correct to the best of his knowledge and belief and as to those matters of information, he, the said James S. Kpateh, received he verily believes them to be true and correct.

SWORN and SUBSCRIBED to before me this 21st day of June, A. D. 2005.

_____
JUSTICE OF THE PEACE, MONT. CO., R. L.

_____
JAMES S. KPATEH
MINISTRY OF FINANCE REPRESENTATIVE ON
THE MINERALS TECHNICAL COMMITTEE, R. L.
DEPONENT

$3.00 Revenue Stamp Affixed To The
Original Hereof.

SWORN AND SUBSCRIBED TO BEFORE ME
the 21st day of June, A. D. 2005.

_____
MARY MAMIE HOWE.
NOTARY PUBLIC. MONTSERRADO CO.
REPUBLIC OF LIBERIA

# EXHIBIT 19

## CERTIFICATION

I, Rakesh Dikshit, hereby certify that the documents attached as Exhibits to this Request for Arbitration are true copies of the originals.

Rakesh Dikshit
Registered Agent, Liberia Global Mining Company
Manager, Global Steel Holdings Limited

Dated: June 30, 2005