# EXHIBIT 1
# TO EXHIBIT C

United Nations                                                                    S/2005/360

 **Security Council**

Distr.: General
13 June 2005

Original: English

---

**Letter dated 13 June 2005 from the Chairman of the
Security Council Committee established pursuant to resolution
1521 (2003) concerning Liberia addressed to the President of
the Security Council**

On behalf of the Security Council Committee established pursuant to resolution 1521 (2003) concerning Liberia and in accordance with paragraph 8 (e) of resolution 1579 (2004), I have the honour to submit herewith the report of the Panel of Experts on Liberia (see annex).

I would appreciate it if the present letter, together with its annex, were brought to the attention of the members of the Security Council and issued as a document of the Council.

(*Signed*) Ellen Margrethe **Løj**
Chairman
Security Council Committee established
pursuant to resolution 1521 (2003) concerning Liberia

05-36339 (E)   090605
*0536339*

S/2005/360

**Annex**

### Letter dated 7 June 2005 from the Panel of Experts on Liberia addressed to the Chairman of the Security Council Committee established pursuant to resolution 1521 (2003) concerning Liberia

We have the honour to enclose herewith the report of the Panel, submitted in accordance with paragraph 8 (e) of Security Council resolution 1579 (2004).

Panel of Experts on Liberia

(*Signed*) Arthur **Blundell**

(*Signed*) Damien **Callamand**

(*Signed*) Caspar **Fithen**

(*Signed*) Tommy **Garnett**

(*Signed*) Rajiva Bhushan **Sinha**

S/2005/360

# Report of the Panel of Experts submitted pursuant to paragraph 8 (e) of Security Council resolution 1579 (2004) concerning Liberia

## Contents

| | | Paragraphs | Page |
|---|---|---|---|
| | Abbreviations | | 4 |
| I. | Introduction | 1–14 | 5 |
| II. | Socio-economic and humanitarian impacts of sanctions on Liberia | 15–50 | 8 |
| III. | Arms and travel ban | 51–96 | 17 |
| IV. | Diamonds | 97–119 | 26 |
| V. | Timber | 120–145 | 32 |
| VI. | Financial matters | 146–180 | 39 |
| VII. | Assets freeze | 181–189 | 48 |

Annexes*

| | | Page |
|---|---|---|
| I. | Meetings and consultations | 1 |
| II. | Weapon cache in Vahun | 5 |
| III. | Map of Liberia showing places of entry to Côte d'Ivoire | 6 |
| IV. | West Africa Mining Corporation mineral purchasing contract area | 7 |
| V. | Draft evaluation criteria for the Forest Development Authority concession review committee | 8 |
| VI. | National Port Authority | 10 |
| VII. | Misappropriation of Government revenues | 11 |
| VIII. | Agreements/contracts either signed by ministers or for which bidding process was completed that were cancelled or likely to be cancelled | 12 |
| IX. | Alleged e-mails from Charles Taylor as reprinted in Liberian newspaper | 13 |

---

* The annexes are being circulated in the language of submission only.

## Abbreviations

| | |
|---|---|
| AMA | American Mining Associates |
| FDA | Forest Development Authority |
| FLGO | Front pour la libération du grand ouest |
| FOB | free on board |
| GDP | gross domestic product |
| ICRC | International Committee of the Red Cross |
| IMF | International Monetary Fund |
| LISCR | Liberian International Ship and Corporate Registry |
| LPRC | Liberia Petroleum Refining Company |
| LTC | Liberia Telecommunication Corporation |
| LURD | Liberians United for Reconciliation and Democracy |
| MODEL | Movement for Democracy in Liberia |
| MOTC | Monrovia Oil Transport Corporation |
| NGO | non-governmental organization |
| NPA | National Port Authority |
| RPG | rocket-propelled launcher |
| RUF | Revolutionary United Front |
| UNAMSIL | United Nations Mission in Sierra Leone |
| UNDP | United Nations Development Programme |
| UNICEF | United Nations Children's Fund |
| UNMIL | United Nations Mission in Liberia |
| UNHCR | Office of the United Nations High Commissioner for Refugees |
| USAID | United States Agency for International Development |
| WAMCO | West Africa Mining Corporation |

4

S/2005/360

# I. Introduction

1.    Pursuant to Security Council resolution 1579 (2004), the Secretary-General appointed a Panel of Experts on Liberia to assess: compliance with sanctions imposed on arms, diamonds, timber and the travel of those people deemed a threat to peace in the region; sources of financing, such as from natural resources, for the illicit trade of arms; steps by the National Transitional Government of Liberia to establish an effective certificate of origin regime for trade in diamonds with a view to joining the Kimberley Process; steps to establish control over timber-producing areas and to ensure that Government revenues were used not to fuel conflict but for legitimate purposes for the benefit of Liberians; and observations and recommendations, including how to minimize any humanitarian and socio-economic impact of the above-mentioned sanctions. Furthermore, the Panel was mandated to assess the impact and effectiveness of the measures imposed in paragraph 1 of resolution 1532 (2004). Unless the Security Council decides otherwise, sanctions will remain in force until 21 December 2005, except for the prohibition on the import of Liberian rough diamonds, which will expire on 21 June 2005 (para. 1 (c), resolution 1579 (2004)).

2.    Between February and May, the Panel conducted assessments in Belgium, Denmark, France, Guinea, Ireland, Liberia, Norway, Sierra Leone, the United Kingdom of Great Britain and Northern Ireland and the United States of America (New York and Washington, D.C.). Pursuant to paragraph 12 of resolution 1579 (2004) the present report contains an assessment of all sanctions. It was preceded by an interim report on diamonds issued in March (S/2005/176).

**Basis of the sanctions regime**

3.    In 2001 the Security Council sanctioned Liberia for its role in the Sierra Leone conflict (resolution 1343 (2001)), restricting trade in arms and diamonds and the travel of key individuals undermining peace. Sanctions were retained in 2002 (resolution 1408 (2002)) and 2003 (resolution 1478 (2003)) and they were extended to establish audit regimes on timber and the Liberian shipping registry (resolution 1408 (2002)). In July 2003, the Council increased pressure on the Government of Liberia by extending sanctions to timber (resolution 1478 (2003)). Shortly thereafter, under the Comprehensive Peace Agreement, former president Charles Taylor went into exile in Nigeria, and the Government of Liberia was replaced by the National Transitional Government of Liberia, composed of the three warring factions (the Liberians United for Reconciliation and Democracy, the Movement for Democracy in Liberia and the former Government of Liberia). The Council remained concerned that the Comprehensive Peace Agreement had not been implemented universally, and the linkage between natural resources and the proliferation of arms continued to exacerbate conflict in West Africa. The sanctions were given a revised legal basis in resolution 1521 (2003), and the Council renewed those measures by resolution 1579 (2004), which stipulates, inter alia, that the National Transitional Government of Liberia must demonstrate that exploitation of timber and diamonds will not further conflict before the sanctions will be lifted.

### Acknowledgements

*Assistance from the National Transitional Government of Liberia and the United Nations Mission in Liberia*

4.    The Panel is grateful for the assistance provided by the various ministries and agencies of the National Transitional Government of Liberia and the United Nations Mission in Liberia, especially in the areas of security, administrative and logistical support and transportation, including aircraft.

*Assistance from international and regional organizations*

5.    The Panel received useful cooperation and assistance from several international organizations, including UNMISIL, the European Union, the Economic Community of West African States, the Environmental Foundation for Africa, UNDP-Liberia, the Office for the Coordination of Humanitarian Affairs, the Humanitarian Information Centre in Monrovia, the Office of the United Nations High Commissioner for Refugees, the World Food Programme, the International Committee of the Red Cross, the Department for International Development (United Kingdom), the Ministries for Foreign Affairs (of Denmark, Ireland, Norway and the Netherlands), the Antwerp Diamond High Council, the Kimberley Process, the United States Agency for International Development, the United States Forest Service, the Agency for the Safety of Air Navigation in Africa and Madagascar, the International Civil Aviation Organization, Amnesty International, Green Advocates, the Sustainable Development Institute, Global Witness, Save My Future Foundation, Save the Children Fund (United Kingdom), the Foundation for International Dignity, Liberia Forest Reassessment, Liberia Transitional Initiatives, Creative Associates International, Fauna and Flora International, Conservation International, Development Alternatives Incorporated, Royal Institute of International Affairs and the United Nations Peacebuilding Support Office in Liberia.

*Assistance from private commercial enterprises*

6.    The Panel also received useful cooperation from a number of private enterprises, such as the Rotary Club of Monrovia, the Oriental Timber Company, Lonestar Communications Corporation, CellCom, Mano River Resources and Rudolph Merab (President of the Liberian Timber Association).

### Standards of verification

7.    The Panel used the same high evidentiary standards in its investigations as in previous reports. Wherever possible, the Panel relied on fully authenticated documentary evidence. Where this was not possible, the Panel required at least two credible and verifiably independent sources of information to substantiate a finding. Where necessary, allegations against States, individuals and enterprises were put to those concerned to allow them the right of reply. In its efforts to present only irrefutable facts, the Panel has either omitted or clearly identified as unconfirmed all information for which it has not been able to find proper evidence.

### Composition of the Panel of Experts

8.    The Panel of Experts consisted of a timber expert, Arthur Blundell (Canada); an expert with Interpol investigative and arms experience, Damien Callamand

(France); a diamond expert, Caspar Fithen (United Kingdom); an expert on humanitarian and socio-economic aspects, Tommy Garnett (Sierra Leone); and an expert on financial matters, Rajiva Sinha (India). The Panel was assisted by a consultant with expertise in money-laundering, Tom Brown (United States).

9.      The present report is structured to provide the reader with a broad view of the situation in Liberia through the socio-economic findings followed by a review of the continuing status of weapons and cross-border issues. This is followed by a description of the specific state of the diamond and timber sectors and their direct relationship to the sanctions imposed by the Security Council. The report concludes with an analysis of financial issues relevant to the Panel's mandate and an assessment of the implementation and effectiveness of the assets freeze.

## Situation in Liberia

10.      The United Nations Mission in Liberia brought peace to Liberia in October 2003. However, insurgents are recruiting combatants, including child soldiers, in Liberia, mainly to fight in Côte d'Ivoire and Guinea. There is also concern that Liberians might have been involved in the January 2005 assassination attempt on President Lansana Conté of Guinea. UNMIL is attempting to limit such recruitment and training, but is hampered by the Council's mandate, which does not provide the Mission with full executive authority to detain those undermining peace or to enforce the sanctions.

11.      The situation is exacerbated by a lack of services — there is no electricity, piped water or sanitation, even in the capital, Monrovia — and widespread corruption in the National Transitional Government of Liberia. At the meeting of the International Contact Group on Liberia in Stockholm in March 2005, the European Commission outlined preliminary findings of the organizational systems and financial audits of several revenue-generating State-owned enterprises, namely, the Bureau of Maritime Affairs, including the Liberian International Ship and Corporate Registry, the Liberia Petroleum Refining Company, the Forest Development Authority, the National Port Authority, Robertsfield International Airport and the Central Bank of Liberia. Within the National Transitional Government of Liberia, European Commission auditors found a widespread disregard for generally accepted accounting procedures, which has allowed financial abuse, including unsubstantiated travel (foreign travel accounted for 10 per cent of the expenditures of the National Transitional Government of Liberia during its first half-year); questionable tax exemptions (e.g., between January and September 2004, 33 per cent of the $29 million in reported customs fees was waived by the National Port Authority, and 77 per cent of the $1.3 million in reported customs fees was waived at the Robertsfield International Airport); payments to certain creditors but not others; unjustified "contributions" to officials; unrealistic numbers of staff (of the approximately 3,300 employees of the first five State-owned enterprises listed above, on average 63 per cent were unnecessary, employees were not aware of their job descriptions and there was a severe lack of competence); and payments to contractors for services that were never rendered. Furthermore, the Government has failed to address serious infrastructure problems. Despite written agreement from the Chairman of the National Transitional Government of Liberia to cooperate with the audits, several institutions or individuals refused to provide relevant information in a timely manner. Hostilities and aggression at the National Port Authority and the Bureau of Marine Affairs towards the auditors included verbal threats. In one case, a

team of United Nations peacekeepers had to be assigned to provide protection as a precautionary measure. Likewise, the representative of BIVAC, a French company contracted to verify import/export declarations, received sustained intimidation that led to his flight from Liberia.

12.   Liberians have also had to face rapidly rising prices for basic commodities. In the first quarter of 2005, rice rose from the official price of $23 per 50 kilograms to more than $40. Likewise, gasoline spiked briefly to $10 per gallon, but has settled at $3.

13.   Liberians are concerned about the competence and independence of the judicial system, thus undermining the Government's commitment to the rule of law. UNMIL has highlighted the following examples: the Deputy Director for Operations of the Liberian National Police has been acquitted and reinstated despite compelling evidence of wrongdoing collected by the United Nations civilian police and Dalibor Kopp, a Czech national, was arrested for arms dealing and, despite an Interpol arrest warrant and formal extradition request from the Czech Republic, he was released on bail, posted by a Deputy Minister of Commerce with the involvement of the Assistant Minister of Justice and the Managing Director of LPRC.

14.   In summary, the overall security situation remains tense. UNMIL deployment is complete, but, its limited mandate undermines the Mission's ability to exert authority throughout Liberia. Disarmament and demobilization have concluded, and the warring factions have been officially dissolved, but most ordinary Liberians are jobless and upset that they have not seen substantial improvements in their living conditions. Systematic corruption is eroding confidence in the democratic process and donor support. This may have consequences in the general elections to be held on 16 October 2005.

## II.   Socio-economic and humanitarian impacts of sanctions on Liberia

### A.   Overview of the humanitarian and security situation

15.   So far in 2005, Liberia has seen significant improvements in security, stability and accessibility following the relatively successful implementation of the disarmament, demobilization, reintegration and repatriation programme. However, a climate of political uncertainty and insecurity still lingers in certain parts of the country. The almost complete deployment of UNMIL forces has substantially increased access to vulnerable groups in the more remote areas, hence allowing humanitarian agencies and other providers of relief aid to step up their efforts in meeting the most critical needs for food, medicines, water, sanitation, educational materials, agricultural inputs and construction materials for all categories of beneficiaries.

16.   The rehabilitation of some public infrastructure, including roads, bridges, schools, hospitals and clinics and market centres, in certain key areas and communities, particularly in Bong, Grand Gedeh, Lofa, Maryland and Nimba Counties, has progressed well. On the other hand, there are several more remotely located communities that have yet to benefit from any form of relief assistance. The appalling road conditions have forced many implementing organizations to limit

S/2005/360

their operations to the more easily accessible locations, often along or just off the major roads. With the onset of the rainy season, many roads have become hazardous and sometime impassable, thus completely cutting off several isolated communities from access to much-needed assistance, markets and participation in the ongoing democratic process.

17. Analysis of progress achieved by the results-focused transitional framework as at 31 December 2004 reveals the significant expenses incurred and work undertaken by all parties in the effort to achieve the transition objectives established by the Comprehensive Peace Agreement, within a reasonable time frame. So far, up to 101,500 ex-combatants have been disarmed and demobilized, including 22,313 women and 11,024 children; some 40,000 ex-combatants are involved in reintegration projects, community empowerment initiatives and other parallel skills-training programmes; 10,500 child ex-combatants have been reunited with their families or placed in community-based care.

18. More than 50,000 internally displaced persons and refugees have returned to their places of origin, and food aid is being distributed to 32,500 families. Furthermore, there are well over 2,000 community empowerment projects being implemented or completed with funding mainly from UNHCR, UNDP, USAID, UNMIL, the European Union, the European Community Humanitarian Office, the Department for International Development of the United Kingdom, the UNDP Bureau of Planning and Resources Management and others. The projects are primarily in agriculture, peacebuilding, community services, protection monitoring, strengthening women's groups, youth programmes, skills training, rehabilitation of feeder roads and community shelter reconstruction in the main counties of return, namely, Lofa, Grand Gedeh, Maryland, Bong, Bomi, Grand Cape Mount, Monteserado and Nimba Counties.

19. Despite the above-mentioned achievements, however, new challenges are emerging as thousands of ex-combatants, internally displaced persons and refugees continue to return to their homes. In recent months there have been several reports of isolated incidents of uncivil behaviour by ex-combatants in different parts of the country. For example, the illegal occupation of the Guthrie rubber plantation (in Cape Mount and Bomi Counties) and Sapo National Park (in Sinoe County) by ex-combatants, while provoking many headlines, assessments and public condemnations, continues to undermine the transitional Government's authority and to a certain extent the credibility of UNMIL with respect to control of Liberia's territory.

20. In another instance, UNMIL was reported to have tightened security at Ganta, Nimba County, in March 2005 after a group of youths threw gasoline in the face of a soldier on guard duty and began to beat him, then threw a Molotov cocktail at those who came to his rescue. In the same county, in early May, Bangladeshi peacekeepers fired over the heads of a crowd of ex-fighters who rioted to demand payment of their allowances. This latest incident confirms the volatility of the security situation and highlights the importance of and urgent need for the rehabilitation and reintegration of ex-combatants, now considered central to the future stability of Liberia.

## B.  Socio-economic situation

21.  In May 2005, the International Monetary Fund published a report summarizing the views of its Executive Board of Directors following consultations in Liberia regarding the country's economic development and policies. The directors, while welcoming improvements in the security situation and the initial progress made in implementing important reforms in Liberia, warned that the country faces daunting challenges in its quest to rebuild the economy and reduce poverty and that the achievement of lasting peace and political stability would be an absolute prerequisite. The directors further observed that a large number of ex-combatants still needed to be integrated into economic life and that the lack of cohesion within the power-sharing Government continued to hinder the implementation of sound policies and reforms. The directors stressed that Liberia urgently required external assistance and private investment and that the flow of such assistance would depend on decisive actions to strengthen institutions, reduce corruption and improve governance.

22.  United Nations sources in Liberia have also expressed concern about the shortfall of $39 million to help reintegrate former fighters, warning that this could increase the appeal of mercenary recruiters, who have been active in several border areas, including those in which UNMIL is currently short of funds for rehabilitation work.

23.  According to a report on the Millennium Development Goals in Liberia for 2004, released by UNDP and the Ministry of Planning and Economic Affairs, 76 per cent of the country's estimated 3 million people in 2001 lived on less than $1 a day. During the same period, unemployment stood at an average of 85 per cent, with only 26 per cent of the population having secure access to clean water and a mere 24 per cent having access to secure land tenure. Literacy among 15- to 24-year olds stood at 35 per cent, while the prevalence of HIV among pregnant women in that age group was around 13 per cent.

24.  Current estimates of Liberia's socio-economic indicators place the population at 3.4 million, of which 80 per cent is below the poverty line. Statistical data provided by IMF indicate that the post-conflict recovery in Liberia in 2004/05 has been relatively modest. Real GDP per capita (in 1992 prices) declined from $890 to $116 in 2004. In the mid-1990s, Liberia's economy grew by 122 per cent within two years after the conflict. This strong recovery was attributed largely to the quick improvement in the security situation, which allowed the rapid return of internally displaced persons and refugees, as well as the start-up of forestry and rubber production. By contrast, however, Liberia showed an annual growth rate of only 2 per cent in 2004, despite the relatively large amount of external assistance provided in the form of humanitarian aid. The key factors that have contributed to this modest growth are:

- Stagnating official export activity, due in part to the sanctions on timber exports

- Slow recovery of agricultural activities owing to the delayed return of refugees to rural areas as a result of modest improvement in security conditions

S/2005/360

## C.  Socio-economic and humanitarian impact assessments

25.  During the current mandate, the Panel, with assistance from a team of local consultants, undertook follow-up assessments in timber-producing areas and nearby economic centres. The intention was to determine, as much as possible, the socio-economic impact of the sanctions, the level of economic activity, the state of security and the civil administration, the extent of humanitarian relief available, the status of rehabilitation of community infrastructure, the situation with regard to the ongoing repatriation and resettlement of returnees and internally displaced people and the extent and scope of skills training and income-generating programmes targeting, in particular, ex-combatants and returnee communities with a significant number of former employees of the logging industry. The assessments were undertaken in 13 out of 15 counties, namely, Bong, Nimba, Lofa, Sinoe, Cape Mount, River Gee, Gbarpolu, Grand Bassa, Margibi, Maryland, Rivercess, Bomi and Montserrado. The findings of the assessments are summarized below.

**Economic activities**

26.  The main drivers of any form of organized employment and economic activity in all the counties visited are the United Nations, the European Union, the European Community Humanitarian Office, USAID, non-governmental organizations and international relief agencies, such as the International Committee of the Red Cross, bilateral    aid    organizations,    large-scale    agricultural    enterprises    and governmental/parastatal agencies. With the ban on timber and diamond exports in force, rubber production presently constitutes the largest official sector of the Liberian economy, with the major rubber producers (Firestone, Liberian Agricultural Company, Cavalla Rubber Company and William V. S. Tubman Rubber Estate) providing direct employment for 10,000 to 15,000 Liberians and providing inputs, latex purchasing brokerage and extension services to a further 5,000 to 8,000 smallholders. Official earnings average $1.5 to $2 per day.

27.  "Official" employment currently provided by the timber industry is small and limited to employees of FDA and a number of licensed individuals and companies involved in small-scale processing of timber for the domestic market. These include one sawmill in Grand Bassa County operated by ANA Wood Company, providing sawn timber for the local market. The assessment team found substantive evidence of an increasing number of illegal chainsaw operators in practically all the former concession areas. Several of the major employment and income-providing establishments previously involved in forestry and agricultural production are currently either abandoned or operated illicitly by ex-combatants and the local people. Sinoe Rubber Plantation, Butaw Oil Palm Company and Blokonjlah Gold Fields in Sinoe County and Guthrie Rubber Plantation in Bomi County are a few such examples.

28.  The informal sector remains the single largest preoccupation of most Liberians, with an estimated 700,000 to 900,000 involved in petty trading and making between $1 and $5 per day. Average monthly wages are estimated at between $15 and $40 for Government employees, $65 to $100 for private sector employees, $75 to $150 for NGO local staff and $150 to $350 for United Nations national employees. In addition, there are several temporary employment schemes designed as part of the nine-month reintegration programme for ex-combatants.

These $1-per-day jobs include road works, public facilities construction and plantation rehabilitation.

29.    Subsistence activities, such as upland and swamp cultivation of the staple food crops, fishing, hunting of wild animals in nearby forests for domestic consumption and sale and other income-generating activities, including domestic fuel production and gold and diamond mining, constitute another major preoccupation of 60 to 80 per cent of Liberia's rural poor.

*Security situation*

30.    According to UNMIL military and civilian police personnel and the Liberian National Police, there is an appreciable level of security in all the counties, particularly the counties' headquarters and nearby townships. However, the assessment team observed some level of insecurity in parts of Sinoe where illicit tapping of rubber is taking place, specifically in the Sinoe Rubber Plantation and Butaw Oil Palm Company areas. The UNMIL civilian police and the Liberian National Police informed the team that logistical and manpower shortages coupled with difficult accessibility by road were the major causes of insecurity in the above-mentioned areas. Many persons interviewed reported that harassment and intimidation by ex-combatants had become a common occurrence. Many local residents blamed the absence of the reintegration and repatriation component of the disarmament, demobilization, reintegration and repatriation programme in Sinoe and Rivercess Counties for those abuses. The assessment team witnessed an incident where ex-fighters at the Sinoe Rubber Plantation severely beat a man for allegedly taking away their rubber. Meanwhile, Sapo National Park remains occupied by hundreds of ex-combatants and local people involved mainly in gold mining and hunting of wild animals.

31.    Similarly, the local authorities and human rights groups in Bomi and Cape Mount Counties expressed concern about the level of insecurity at the Guthrie plantation and surrounding villages, where ex-fighters are believed to be armed. There was no evidence of UNMIL or Government control of the plantation and its immediate environs. When the team drove through the plantation, hundreds of people could be seen with tapping materials and bags of rubber. Some individuals interviewed informed the team that intimidation and harassment by ex-combatants were commonplace occurrences.

*Civil administration*

32.    Civil administration is being gradually established in all the counties, although complaints abound about a general lack of support from the central Government. However, some level of support for the rehabilitation and equipping of public office structures is being provided to central and county-level governmental agencies through projects funded largely by the United Nations and USAID. The team was unable to meet with several of the Government officers assigned to some of the counties. It was evident that the prevailing working conditions were not sufficiently attractive for staff to speedily take up their assignments.

33.    The judiciary and police systems were not yet fully established in the counties visited, with the exception of Grand Bassa County. There are no circuit courts in Rivercess, Cape Mount, Bomi, Gbarpolu, River Gee and Sinoe Counties. Circuit judges have been appointed but are unable to function effectively, owing largely to

S/2005/360

logistics and a lack of suitable office space and supplies. The national police establishments in all of the counties visited appeared to be poorly equipped for effective police work. The local authorities in Sinoe, Rivercess, Grand Bassa, Garpolu, Cape Mount and Bomi Counties informed the team that they had not received any financial support from the central Government in the past 12 months and that their modest achievements were largely the result of relief assistance, community contributions and self-help initiatives.

34. Government revenue collection agents in several counties informed the team that all taxes collected were transported to the Ministry of Finance head office in Monrovia. Accurate revenue figures could not be obtained for reasons ranging from lack of authority to disclose them to inaccurate record-keeping by some of the revenue agents.

**Social services**

35. The international community continues to play a pivotal role in the provision of basic services, such as facilities for education, health, water and sanitation. The assessment team found that all the necessary work currently being carried out in the effort to rehabilitate the hundreds of water wells, schools, clinics, community centres and other structures was being carried out by relief agencies, NGOs and community-based organizations, in partnership with local communities. While the Government's support is minimal and limited to payment of salaries for teachers and various health workers, the team found that most teachers did not receive their salaries, averaging $15 per month, on time. Often they had to travel to the capital to collect their salary arrears of several months at a time. The health workers interviewed were slightly better off since most were attached to projects funded by various aid agencies and thus received some salary top-ups, several times above their Government wages.

36. All educational materials provided to the relatively few lucky schools were from various agencies, notably UNICEF and several NGOs. Similarly, in hospitals and clinics, the team found that in addition to day-to-day management and maintenance, practically all the drugs and equipment were provided through grants and relief assistance from various NGOs and relief agencies.

37. It is noteworthy that these follow-up assessments found no evidence of current or previous support in the provision of social services from timber companies or any of the currently operating mining entities. In more than three quarters of the 120 schools visited during the mission, there were no instructional materials such as chalk, chalkboards, books, science laboratories or other teaching aids. The team further found that, owing to the non-payment of salaries to teachers in some remote schools, students had to work on the farms of instructors/teachers on Fridays as compensation for their services. On one of the team's visits to the Tweh Gilklay junior high school in Fish Town on a Friday, there were no students. They were all reported to have gone to work on the farms of various teachers. Many teachers interviewed considered themselves to be volunteers because they hardly ever received any pay from the central Government.

S/2005/360

**Public infrastructure**

*Electricity and water supply*

38.    There is presently no central electricity or piped water supply anywhere in Liberia. In the capital and other major population centres, all electrical power is provided by private generators, which are very expensive to run and contribute significantly to noise, air and water pollution. Clean water is trucked from a central reservoir outside the capital and sold to individual households and businesses at 5 to 10 cents per gallon. For the majority of households, inadequately treated water drawn from wells is the only affordable means of access to "clean" water.

39.    The team learned of a European Commission and World Bank initiative to fund the repair of parts of the existing water treatment installation and the rehabilitation of the trunk mains, as well as to invest in groundwater production infrastructure. The World Bank has also funded a study of the feasibility and socio-economic potential of an urban water supply in Buchanan, Kakata, Zwedru, Greenville, Robertsport and Voinjama and a sanitation, storm-water, drainage and solid waste management system in Liberia.

*Transport and telecommunications*

40.    Public transportation is provided largely by private vehicle operators. In recent months there has been a very limited public bus service operating in Monrovia intended mainly to alleviate the extreme difficulties that commuters face on their way to and from work. The airports and harbours, which collectively represent an important and reliable source of current Government revenue, require substantive rehabilitation. The World Bank has recently funded a number of studies: (a) to technically assess the operations of the port of Monrovia; (b) to determine what emergency works were needed to rapidly improve the efficiency and safety of operations; and (c) to provide a long-term master plan for the port in line with projected future cargo flow.

41.    The World Bank has also funded studies to review the telecommunications sector and recommend sector development strategies, develop the legal and regulatory framework and establish an independent regulator. The State-owned telecommunication system is barely functional, and nearly all telephone services in the country are provided by privately owned cellular phone networks.

*Roads*

42.    Liberia has approximately 11,000 kilometres of roads, of which only 650 kilometres are paved. The overall status of roads in all the counties visited by the team has not changed significantly since the Panel's last assessment, in October 2004. In the former logging concession areas, the lack of maintenance has rendered many of the roads barely passable or, in some cases, impassable. Relief organizations operating in those areas complain incessantly about the extreme difficulty of accessing remote areas and the high cost of maintaining the vehicles that ply those routes, not to mention the frequent accidents.

43.    Despite significant investments by UNMIL, the European Union, USAID and other partners in the rehabilitation and maintenance of the major roads and bridges in the various counties, bad road conditions continue to feature prominently among

S/2005/360

the reasons given for the slow pace of reconstruction efforts in the main returnee areas and thus the delayed return of some refugees and internally displaced persons. Already there are concerns that thousands of returnees may not be able to return to their home counties in time to vote in the October 2005 elections.

## D.   Conclusions

44.   After several consultations with representatives of civil society, aid agencies, international donors, private entrepreneurs and other stakeholders in Liberia (see annex I), the Panel has reached the conclusions set out below.

45.   The mechanisms of the war and post-conflict economy in Liberia have become a vicious cycle at both the macro- and microeconomic levels. For some officials appointed under the framework of the Comprehensive Peace Agreement and for many former fighters, the economic and political incentives to pursue illegal activities and corrupt practices far outweigh any incentives to work for social and economic reforms, lasting peace and true democracy. The control of power and authority by a non-cohesive transitional Government has served to further entrench the processes of exploitation and erosion of the natural resource base. Until the rule of law can be re-established in Liberia, such exploitation of resources and abuse of fundamental human rights will continue to be practised with impunity.

46.   The benefits of lifting economic sanctions on Liberia are obvious in terms of creating employment, kick-starting the rural economy, maintaining roads and contributing to social services and GDP, among other things. However, given the many difficult challenges currently faced by the transitional arrangement, especially with respect to good governance, financial transparency and accountability, the growing perception in the Liberian society and among the international community is that the critical issue now should not be whether sanctions should be lifted, but rather how Liberians, the international community and other stakeholders can manage the situation in such a way that economic sanctions are no longer required.

47.   Investments made by the international community in addressing humanitarian issues in Liberia during the past decade have been substantial, but many of the implementing agencies have often acted in haste owing in part to the urgency of the crisis, individual donor requirements and sometimes the absence of reliable and sound data on all the relevant aspects of the Liberian political, social and economic realities. This information gap quite frequently leads to inadequate or ineffective cooperation and coordination among the various donors and their implementing agencies. It is now widely believed that this lack of effective coordination is partly responsible for the slow progress made in reviving the economy and achieving durable peace and security in Liberia.

48.   The conspicuous absence of the reintegration and repatriation elements of the disarmament, demobilization, reintegration and repatriation process in certain parts of Liberia could lead to a situation whereby a significant proportion of the ex-combatants are not reintegrated, thus potentially becoming a destabilizing factor in the achievement of durable peace and democracy in Liberia and stability in the region. Furthermore, the very bad state of the road networks in Liberia is a major bottleneck that continues to hamper all efforts towards rapid recovery, particularly in the rural areas. The very high cost of maintaining the roads and the vehicles that ply them is a drain on the currently available resources. This situation must be

reassessed in view of serious funding shortfalls for Liberia's reconstruction and rehabilitation process.

49. The increasing pace of subsistence farming and reconstruction activities caused by the ongoing mass returns of refugees and internally displaced persons has the potential for large-scale and rapid degradation of forests, wildlife habitats and fertile farmland.

## E.  Recommendations

50. The Panel recommends the following:

- Donors and other contributors to Liberia's recovery process must use the opportunity that the current situation provides to do business differently by reconciling their individual priorities and taking a proactive stance in ensuring increased coordination of efforts by their implementing agencies, transparency and accountability in governance institutions and strategic empowerment of the local people. Such an approach will optimize the immediate positive benefits and longer-term effects of donor investments in Liberia's peace process and regional stability.

- The National Transitional Government of Liberia, in partnership with UNMIL and the donor community, must immediately develop a comprehensive action plan for the removal, resettlement and reintegration of all illegal occupants of various commercial plantations and the Sapo National Park to amply demonstrate governmental control and authority over Liberia's territory.

- The National Transitional Government of Liberia and all donors must give urgent attention to the current spate of unregulated and illegal harvesting of timber and rubber, the mining of diamonds and gold and the attendant environmental consequences of those activities. Subsequently, the planning of all infrastructural rehabilitation, community reconstruction and reintegration projects must integrate measures to mitigate the adverse environmental impact resulting from those activities.

- The Environmental Protection Agency, the Forest Development Authority, the Ministry of Agriculture and other related governmental agencies, United Nations agencies and NGOs, in partnership with local community leaders, must effectively utilize the existing opportunities to create short- to medium-term employment and training programmes for thousands of ex-combatants, former logging company employees and other people in the local community. One option is to develop an extensive reforestation and land rehabilitation programme in areas previously deforested by logging, mineral mining and other destructive industrial activities. Such an approach would help to alleviate the economic hardships caused by the timber ban and provide current and future training opportunities in forestry and land rehabilitation for many youths, while at the same time demonstrating the economic, social and cultural benefits of responsible stewardship of the rich but dwindling and highly sought-after forest and mineral resource base.

## III. Arms and travel ban

### A. Movement of arms and munitions

#### Disarmament and demobilization

51.    The disarmament process in Liberia recovered 28,314 weapons and 6.5 million pieces of ordnance from 101,500 demobilized soldiers, a ratio of 3.6 combatants per weapon surrendered. In addition, 33,604 pieces of ordnance for heavy weapons were recovered. By comparison, and even though the sources are fragmentary, the Sierra Leone disarmament process yielded 75,000 combatants and 25,000 weapons. The United Nations/Economic Community of West African States 1997 Liberia disarmament programme yielded almost 19,000 weapons, although the number of combatants disarmed remains unknown.

52.    Of the 28,314 weapons surrendered, 21,189 (74 per cent of the total) were rifles (Kalashnikov type) and 133 (0.4 per cent) were mortar launchers. Shotguns, which are mainly used for hunting and self-defence, generally do not belong to any faction, but 5,310 (18.7 per cent) were surrendered. They are cheap and ammunition is easily found (ammunition for shotguns was on sale in the Voinjama markets in 2005).

53.    The real number of weapons in Liberia in comparison with the number registered is open to discussion, as is, in particular, the efficacy of disarmament in those areas most difficult to access (namely the border areas of phase 3, which were processed towards the end of the programme).

#### Are there still arms and munitions in Liberia?

54.    It is unlikely that it will ever be known exactly how many weapons were in Liberia at the commencement of disarmament, demobilization, reintegration and repatriation programme. However, where the size of an important batch of arms is known and is uniquely identifiable (i.e., through sequential serial numbers), it is possible to check how many have been retrieved. Few weapons fit all these criteria, including the M70 AB2 assault rifles, the LMG 84 light machine guns and the RB M57 missile launchers that were imported in 2002. However, the Panel independently verified that six arms shipments had been delivered to Liberia between June and August 2002 (S/2003/498, para. 69 et seq.) and, using UNMIL statistics, it is possible to compare the arms delivered with those surrendered or recovered in Liberia to date.

S/2005/360

Table 1
**Percentage of weapons delivered in 2002 that were collected**

| Weapon | Weapons delivered to the Government from June to August 2002 | Total weapons collected in the disarmament, demobilization, reintegration and repatriation process | Percentage of weapons collected as at 5 May 2005 |
|---|---|---|---|
| Automatic rifles, 7.62x39 mm | 5 000 | 3 894 | 77.88 |
| Missile launchers, RB M57 | 352 | 212 | 60.51 |
| Black Arrow long-range rifles, M93 12.7 mm | 10 | 4 | 40.00 |
| Machine guns, M84 7.62 mm | 80 | 34 | 42.50 |

55.    The assault rifles and the M84 light machine guns that were not surrendered are important because they are new, serviceable and therefore represent a threat that should not be underestimated.

56.    Another way to estimate recovery is to compare the total number of weapons imported with the range of sequential serial numbers registered in the disarmament and demobilization process. This is possible in the case of the new AK-47s, of unknown origin, that were seized at the Robertsfield International Airport in Monrovia on 7 August 2003 and a comprehensive set of RPG-7s recovered during the disarmament, demobilization, reintegration and repatriation programme. If the serial numbers of weapons delivered in a particular batch fell within a range, then the numbers in that range could be assumed to correspond to the number of weapons delivered, which could in turn be compared to the number reported during the disarmament, demobilization, reintegration and repatriation programme (see table 1). (This conclusion may be biased to underestimate return rates because some weapons in the serial number range might not have been delivered.)

Table 2
**Estimate of weapons missing based on analysis of serial numbers**

| | Weapon | |
|---|---|---|
| | New AK-47 | RPG-7 |
| Collected in disarmament programme | 287 | 420 |
| Range of serial numbers | 1 117 | 792 |
| Estimated missing | 830 (74 per cent) | 372 (47 per cent) |

**Ammunition**

57.    It is difficult to know how much ammunition remains in circulation in Liberia because figures are available only for how much was destroyed (6,486,136 pieces of small arms ammunition and 33,604 pieces of unexploded ordnance), and no complete figures are available for how much was delivered. Furthermore, the Panel has no figures for what was used in the course of the fighting. As a matter of fact,

18

the amount of rounds (7.62x39 mm for the M70 AB2) delivered in the above-mentioned six flights, to only one faction (the Government of Liberia), during just three months in 2002 represents 4,450,320 rounds of small arms ammunition, or 68 per cent of the total amount of ammunition recovered from all factions during the entire disarmament, demobilization, reintegration and repatriation process. The 10,996 hand grenades and rockets for the RB M57 from the same flights represent a little more than 32 per cent of the total recovered during that process.

### Possibility of weapons still hidden in Liberia

58.    The Panel has received reports from UNMIL military observers and civil society indicating that weapons were probably still available to some former combatants, in particular small weapons such as assault rifles (AK-47-type) and also rocket launchers. Those weapons are probably located in the bush, rubber plantations, border regions and also in Monrovia, especially those neighbourhoods where former combatants currently reside. These are areas in which UNMIL and the Liberian National Police are experiencing difficulty establishing authority.

### Weapons and ammunition found

59.    Weapons and ammunition are being discovered and presented to UNMIL, especially in border regions like Lofa. But these are principally individual small weapons or munitions buried not far from homes, or even, in the case of a machine gun in Toe Town, thrown into a swamp and found by land-clearers. This equipment is in poor condition because of the extreme conditions under which it was stored.

60.    In the past few weeks, in Foya (Lofa County), where UNMIL forces have just been deployed, UNMIL collected ammunition (700 rounds of small arms ammunition) recovered by civilians who were preparing land for building.

61.    Searches have uncovered weapons caches belonging to Liberians United for Reconciliation and Democracy in Lofa and Gbarpolu Counties. No weapons caches have been discovered in those areas controlled by the Movement for Democracy in Liberia (Grand Gedeh and Maryland Counties — both bordering Côte d'Ivoire), despite the fact that there was a low rate of disarmament in those areas. For example, about 120 weapons were surrendered during the final disarmament and demobilization stage in Harper, which was controlled by MODEL. This suggests that much of the MODEL weaponry ended up in Côte d'Ivoire.

62.    Moreover, the authorities in both Liberia and Sierra Leone, as well as reports from civilian police units that conducted investigations on weapons caches, confirmed that village chiefs and civilians feared reprisals from former combatants if they answered questions about weapons, weapons caches or recruitment.

### Case study: Vahun, Lofa County — recurring weapons caches

63.    In previous Panel reports (see, e.g., S/2001/1015, para. 117), Vahun was mentioned as a trans-shipment point for weapons that once belonged to the Revolutionary United Front entering Liberia from Kailahun, Sierra Leone. At the end of September 2004, seven rocket launchers, 543 40-mm rockets, several AK-47 rifles and some 81-mm mortars were discovered in Vahun as a result of information provided by a LURD informant. In February 2005, another weapons cache was discovered that contained one 12.7 calibre anti-aircraft machine gun, two rocket-

S/2005/360

propelled grenade launchers, six AK-47 assault rifles and one 7.62-mm rifle (see annex II). This cache was discovered by accident by a Vahun resident who found it buried behind his house while he was working on the adjacent land. A local civilian source indicated that weapons caches were still to be discovered, and that was also the opinion of the UNMIL security officer in Voinjama. No further caches have been discovered in Liberia since February. In May 2005 there were no National Transitional Government of Liberia or UNMIL security forces at Vahun or at the Sierra Leone border, which lies nine miles away by car and three miles away by foot.

### Where are the missing weapons?

64.    Not all UNMIL investigations have led to discoveries of weapons and munitions. There are cases in which all or part of the weapons caches reported to UNMIL had probably been moved before UNMIL forces arrived. UNMIL police units even received information to the effect that weapons had been moved a few days before they arrived because the former combatants had been warned through information leaks, as in the cases mentioned below.

### Camp Alpha, anti-aircraft gun

65.    In May 2004, 1 BZT anti-aircraft gun was reported to UNMIL, along with 200 61-mm, 150 81-mm and several 107-mm mortar grenades in Camp Alpha, near the Sierra Leone border. When the UNMIL team arrived on site, the BZT anti-aircraft gun was not found.

### Investigation of possible weapons cache in Bakeidou (Lofa County)

66.    One of the largest weapons caches reported in Liberia in June 2004 was never found: 10 175-mm anti-aircraft weapons and 375 cases of ammunition containing 24 rockets apiece, 1 multi-tube rocket launcher, 40 122-mm tubes and 250 cases of ammunition containing 12 rockets apiece, 12 82-mm rocket launchers with 300 cases of ammunition containing 24 rockets apiece and 15 81-mm rocket launchers with 300 cases of ammunition containing 24 rockets apiece — a complete heavy weaponry arsenal. The report on the incident indicated that, according to the informant, 350 civilians were paid $1,000 to carry the material on foot to the weapons cache, a three-day journey on foot. The cache, allegedly located in the town of Bakeidou, in Lofa County, a few kilometres from the border with Guinea, has never been found.

67.    According to UNMIL security representatives in the field, there is no doubt that part of the LURD heavy weaponry crossed into Guinea, probably to Macenta. It was not possible for the Panel to confirm this in Guinea.

## B.    Personnel movements

### Former combatants

68.    Since the riots of October/November 2004, no major incidents have occurred in Liberia. Thus, one of the primary objectives of UNMIL is now to implement the reintegration and repatriation phase. Former combatants are dissatisfied, however. Although disarmament forecasts ranged from 38,000 to 53,000 ex-combatants,

S/2005/360

established on the basis of prior experience with disarmament in Sierra Leone,[1] the turnout for disarmament and demobilization was nearly double the estimate, with more than 100,000 identified. That high turnout affected the reintegration phase, which led to budgetary difficulties and thus to delays in payments and in establishing reintegration programmes. The presence of approximately 44,000 former combatants in Monrovia, in an environment that affords little hope of finding a job, is a source of concern for stability and security in the capital in the short to medium term.

**Recruitment**

69.    Of equal concern for stability in the subregion are the persistent reports about the recruitment of former combatants on behalf of both the Ivorian Government and, to a lesser extent, the New Forces of Côte d'Ivoire. Likewise, there are concerns regarding Guinea, and recruitment there with a view to destabilizing the current regime. Although the information is based on testimony and thus is solely circumstantial, the amount and consistency of testimony leaves little doubt that recruitment is going on.

*Recruitment for Guinea*

70.    Recruitment of former combatants took place in Lofa County, mainly in Voinjama and Foya. Recruitment for Guinea is currently ongoing in Monrovia.

71.    It is alleged that recruitment was made on behalf of the son of a former president of Guinea, Sékou Touré, in an effort to destabilize the present Government of Guinea. Recruiters from the Gambia, based in Mali, and recruiters in Touba, Côte d'Ivoire, were allegedly seen in Voinjama in February 2005. Payment by the former was reportedly $300 per ex-combatant, whereas the latter were offering $1,000. In April 2005, UNMIL forces in Voinjama reported that they had received information that LURD ex-combatants had been approached by Guinean military officials in the prefecture of N'Zerekore, about 45 kilometres from Ganta, Nimba County, and offered money to join a mission to attack Guinea.

72.    Recruitment on behalf of the former LURD branch, led by Ayesha Conneh and assisted by the former LURD commander in Foya, aimed at supporting the Guinean Government, was reported in May 2005 by UNMIL but so far remains unconfirmed. Former combatants wearing T-shirts marked "Mission in Guinea" were allegedly seen in Foya.

73.    There is always a possibility of insurrection in Liberia itself. A photocopy of an article entitled "Secret training in Guinea to disrupt October elections" from an unidentified magazine was found on an ex-combatant in Voinjama. UNMIL has received unconfirmed information on training camps in the Guinea forest region for this purpose.

74.    Information obtained in Guinea from authorities in the Guinea forest region confirmed that weapons had regularly been passed from Guinea to Liberia to be "sold" as part of the disarmament, demobilization, reintegration and repatriation process in Voinjama, in particular with Liberians making several round trips to fetch

---

[1] It should be noted that previous studies conducted in 2001/02 on the real number of combatants have always produced far lower figures, with an overall number of combatants barely above 15,000, counting all groups.

those weapons. This indicates that some of the weapons carried by Liberians were indeed located in Guinean territory.

*Recruitment for Côte d'Ivoire*

75. In March 2005, an NGO in Zwedru (Grand Gedeh County) reported to UNMIL, through UNICEF, that five demobilized children had been recruited by General Oulai, also known as "Rebel Father" (Ivorian), and General Gueye (Liberian). UNICEF also indicated in April that child recruitment was being carried out by former MODEL fighters for at least the past two months in Harper, Maryland County. Payments ranged from $150 to $300. Those reports were corroborated by Human Rights Watch in a meeting held on 30 March 2005, which provided the names of 16 former MODEL commanders in charge of recruitment, including "Sergeant Oulie" in Toe Town (Grand Gedeh County). UNMIL reported that on 22 March, MODEL General Amos Vleyee, also known as "Bush Dog" had recruited 10 children in Grand Gedeh County.

76. In mid-May one report from Côte d'Ivoire of recruitment for the Front pour la libération du grand ouest came to the attention of the Panel and two names matched the Human Rights Watch information: in Blolequin, Côte d'Ivoire, "Child Could Die" also known as Bob Marley, and the aforementioned "Bush Dog", Chief of Staff for FLGO, based in Toulépleu, Côte d'Ivoire, and spotted in Zwedru, Liberia.

77. Finally, an alleged Ivorian recruiter, Adam Keita, was arrested by the United Nations civilian police and the Liberian National Police in Zwedru on 31 March, thus preventing recruitment for a time. Mr. Keita was later released for lack of evidence, as two of the three witnesses retracted their statements. The Force Commander of UNMIL expressed doubts that UNMIL had the mandate to arrest such persons. Mr. Keita had been issued a Liberian passport (OF/005982) on 25 November 2004 and had visited the Ministry for Foreign Affairs of Liberia between the end of September and the end of October 2004.

78. The Panel also received information that the Ivorian officer in charge of recruiting for the Government of Côte d'Ivoire in the peace camp of Guiglo was "Chief Mao".

79. Finally, a former MODEL commander who had travelled to Côte d'Ivoire reported on 16 February that ex-combatants at Toulépleu were armed and in military uniform and that he had seen 5 of his ex-comrades and his ex-battalion commander with about 1,000 soldiers.

80. Places of entry to Côte d'Ivoire for the recruits along the "grand ouest" are numerous but lie mainly between Tappita and Zwedru (see annex III).

*Recruitment for the New Forces*

81. There is less information on recruitment by the New Forces than by the Ivorian government militias, such as the Lima Militia.

82. The place of recruitment is Upper Nimba, between Yekepa and Sanniquellie. Information was transmitted by the Liberian Government on alleged recruitment for the Mouvement populaire ivoirien du grand ouest by a certain T. Mark and an Ivorian national in November 2004. Information gathered at this time indicated that a former bodyguard of Benjamin Yeaten had been in charge. Other information

S/2005/360

gathered in May 2005 indicates that a training camp is located in Gbah, near Sanniquellie (Upper Nimba).

83.    Recruitment methods are often similar. Recruiters from outside try to contact the officers of the factions concerned who, in turn, are given the task of recruiting on the spot and are allocated a sum of money and rice or coffee. They get a percentage for every recruit. The amount mentioned for recruits in Côte d'Ivoire is 125,000 CFA francs, or about $300. Some Liberians therefore have to be persuaded to enter into the process. The prospect of looting and the argument made by the recruiters that they had been betrayed by the United Nations and that the reintegration part of the programme would never come to pass are also among the motivations and incentives for ex-combatants to restart a soldier's life. Ironically, they prove to recruiters that they are real fighters by showing their demobilization card obtained during the disarmament and demobilization process in Liberia.

*Recruitment for Sierra Leone*

84.    The situation seems to be stable in Sierra Leone, however, one report (subject to police investigation) from a witness transmitted to UNAMSIL stated that in February 2005 about 60 ex-combatants from Sierra Leone had been recruited in western Liberia for service in the Côte d'Ivoire armed forces.

**Various areas of concern for the future of Liberia**

*Complete lack of data for ex-combatants before the disarmament, demobilization, reintegration and repatriation process*

85.    As the belligerents provided neither a list of combatants nor a list of weapons, despite repeated requests from UNMIL before and during the disarmament process, and as the National Transitional Government of Liberia always avoided the issue citing a variety of technical pretexts, it is difficult to estimate the real number of ex-combatants in Liberia. Paradoxically, once disarmament was completed the National Transitional Government of Liberia issued a list of 13,600 Armed Forces of Liberia soldiers who, according to the Ministry of Defence, except for 100 or so, had not participated in the disarmament, demobilization, reintegration and repatriation process. The National Transitional Government of Liberia plans to demobilize 9,860 and retire the remainder.

*New Liberian armed forces*

86.    The new Liberian army should be realized through an aid programme consisting of $200 million from the United States Government with the help of DynCorp. According to information given to the Panel by the Ministry of Defence, this aid is contingent on the Liberian Minister of Defence paying out some $16.2 million in demobilization payments and pensions to the former armed forces personnel; this has not yet been done. The Minister of Defence indicated to the Panel that he was trying to find donors to complete the process and so far had received donations from China and Ghana. He also mentioned that he had approached authorities of the Libyan Arab Jamahiriya and South Africa but that nothing had yet come of it. Firestone would also make an advance tax payment to contribute to the process.

87.    However, in the best case, the new army will not be ready before December 2005. Then the question of an arms waiver from the Security Council for its military equipment will be necessary.

88.    According to several accounts and documents, LURD and MODEL were organized militarily into battalions, brigades and special units, which meant that there must have been listings, even though the volatility of the troops allowed for great differences in the numbers from one week to another.

89.    The Panel transmitted a letter to the Ministry of Defence asking for information on the weapons status of all factions before the disarmament, demobilization, reintegration and repatriation. The Minister insisted that he needed time to gather that type of information and did not reply before the Panel left Monrovia.

*Unregistered persons and demobilized civilians*

90.    Since the disarmament programme ended, some people, including members of LURD, have been complaining that they had handed in their weapons but had not benefited from the disarmament, demobilization, reintegration and repatriation programme. According to their testimony, their chiefs had confiscated their weapons and distributed them to others in exchange for a percentage of the disarmament bonus. According to the information the Panel gathered from UNMIL and civil society, the warlords drew up a checklist of who should be a part of the disarmament, demobilization, reintegration and repatriation process and who should not. A percentage of the compensation was then handed over to them. Numerous civilians were "enrolled" in the disarmament, demobilization, reintegration and repatriation process, many of whom did not know how to use the weapon they were handing in or could not tell what type of ammunition was needed for the assault rifle with which they had supposedly been fighting for several years. The warlords have tightened their grip on the civilian population and have organized a business. The Panel also noted that people entering the disarmament, demobilization, reintegration and repatriation process could establish their identity merely with an oral statement, as was the case in phase 1 of the disarmament programme in December 2003 in Shiefflin camp. Thus identity checks are unreliable because there is no means of verification available and identity fraud is possible.

## C.    Travel ban

### Case of Charles Taylor

91.    The question remains as to what role the former president, Charles Taylor, played in the ongoing recruitments. The Special Court for Sierra Leone confided to the Panel that it had serious suspicions and was almost certain that former president Taylor had gone to Burkina Faso from Nigeria in violation of the travel ban and the Accra Agreement. The elements — which were numerous and consistent — adduced by the Special Court were based on testimony that the Panel has been unable to verify as yet. The Special Court also stressed that Charles Taylor was in permanent contact by phone with his accomplices in Liberia. The Panel, for its part, has also received testimony to that effect, though it does not have a direct witness.

S/2005/360

92.   The Panel feels that the presence of former president Charles Taylor in exile in Nigeria, even though the Special Court for Sierra Leone has issued a warrant for his arrest on charges of war crimes, is in itself a destabilizing factor. The situation of de facto impunity arising from this situation of exile can only undermine respect for international law and thereby lessen its deterrent effect.

93.   The Panel is conscious of the danger that this situation poses and asked to visit Nigeria to verify certain matters, including financial matters, within the framework of its mandate, but it has not received a reply from Nigeria. The Nigerian diplomatic authorities informed the Panel that President Taylor was a burden, including a financial burden, for Nigeria, since the Government of Nigeria was required to pay for his accommodation and upkeep from its own funds.

**Other travel ban violations**

94.   The Panel met with the Immigration Commissioner of Liberia, who indicated that in the past six months, two violations of the travel ban had been brought to his attention. In the first case, Belle Dunbar was stopped at Robertsfield International Airport and in the second, Tupee Taylor was travelling with an authorization granted by the Security Council for humanitarian reasons (sickness). The Commissioner indicated that, even though he had 2,000 men at his disposal, owing to the lack of means of communication and of a computerized system, his service did not have complete control of the borders.

## D.   Conclusions and recommendation

95.   The Panel noted that through the collaboration of many people in Liberia, the United Nations forces, including the civilian police, had discovered a substantial number of weapons and ammunition. If police officers specializing in criminal investigations and/or military intelligence officers were to pursue a systematic policy of seeking information and contacts— with an "informant" budget — the results might be even better.

96.   The Panel recommends:

- That the competent UNMIL and civilian police authorities and, in particular, the units in charge of criminal investigations, be given a special mandate, together with the material and legal means, to undertake independent inquiries in Liberia in order to recover weapons and monitor the possible recruitment of former combatants. The inquiries would have to be conducted while preserving the utmost confidentiality with the power to recruit undercover agents and informants.

- That legal protection from prosecution be given to undercover agents and informants recruited for that purpose.

- That a witness protection programme be established to eliminate pressure on witnesses.

- That the inquiries should cover not only weapons, but also violations of any sanctions, such as those on diamonds and timber, the travel ban and seizures of assets.

- That ongoing cooperation be established between the various United Nations missions in the subregion as regards, inter alia, reports on recruitment and arms trafficking, and that nominal information be provided.

- That information concerning disarmament, including serial numbers and types of weapons identified during the process, be made available to the United Nations missions in Côte d'Ivoire and in Liberia.

## IV.  Diamonds

### A.  Current situation

97.  The Ministry of Lands, Mines and Energy continues with its training of outstation personnel for the Bureau of Mines. Officials were able to brief the Panel on the success of recent workshops for the training of regional coordinators, mining agents and mineral inspectors in compliance with the requirements of the 8 September 2004 act amending the new minerals and mining law, part 1, title 23, by adding thereto a new chapter 40 providing for controls on export, import and transit of rough diamonds. This process has now been largely completed, and the Panel commends the Ministry for achieving this goal in difficult circumstances. However, while deployment of some of the trained personnel to the field has begun, little provision has been made for their salaries, transport or equipment.

98.  The Ministry has completed the second phase of its extension by adding a second floor to its building, which will house the assaying and computer equipment necessary for the Kimberley Process certification scheme. However, all work ceased in late March and the building still requires extensive fitting out and finishing. Reports indicate that the private sector financing that was funding construction has now ceased.

99.  While the suspension on 14 January 2005 of the issuance of all licences and permits for diamond mining continues (see S/2005/176), mining activity has not been curbed in the interior. It was hoped that the embargo would help to combat the illegal export of diamonds from legally operating licensed mines. However, within the mining sector, word appears to have spread that the Government lacks the capacity, and UNMIL lacks the mandate, to enforce such a policy. In consequence, people are moving back into mining areas in numbers, miners are digging at will with no fear of interference from the authorities, and the level of mining activity has increased significantly over the past few months. As a result, the level of production and illegal exports in contravention of the United Nations embargo is rising steadily in direct proportion to mining activity.

100.  Since the issuance of its interim report, prepared in accordance with paragraph 8 (f) of Security Council resolution 1579 (2004) (ibid.), the Panel has been able to confirm that a mining cooperatives support/mineral purchase agreement between the Republic of Liberia and West Africa Mining Corporation Limited was signed in four copies on 19 January 2005, despite repeated denials to the contrary by the Minister of Lands, Mines and Energy. The Panel is in possession of a copy of the document, which was signed by the Minister of Lands, Mines and Energy, Jonathan A. Mason, the Chairman of the National Investment Commission, Roosevelt K. Quiah, and the Deputy Minister of Finance, Tugbeh Doe, in place of Minister of Finance Lucinee F.

Kamara, Sr. The agreement was attested to by the Minister of Justice and Attorney-General, Kabineh Ja'neh, and approved by the Deputy Chairman of the National Transitional Government of Liberia, Wesley Johnson, in place of the Chairman, Charles Gyude Bryant. General Manager Michael Saint Yrian signed for WAMCO.

101. While the Panel has tried to maintain a cordial relationship with the Ministry of Lands, Mines and Energy, the working relationship between the Ministry and the international donor community in Monrovia has deteriorated in the light of this development. The Panel believes that the shroud of secrecy that the Ministry used to disguise the agreement with WAMCO implies that it was fully aware that some aspects of the deal were likely to raise serious concerns among international donors, particularly those with an interest in helping the Government meet the requirements of the Security Council for the lifting of the embargo on the export of Liberian rough diamonds.

### West Africa Mining Corporation agreement

102. The agreement between the National Transitional Government of Liberia and WAMCO is a comprehensive 35-page contract, the main details of which were outlined in the Panel's interim report. There was no open, competitive tender process, and the contract was not referred to the Monopolies and Contracts Commission. Of principal concern to the Panel and international donors are the sweeping rights that the contract awards to WAMCO for the exclusive purchase of all minerals in Liberia to the west of the St. Paul River (except those covered under a mineral development agreement or an exploration agreement — see annex IV) by a "reputable and established buying agency" that would be appointed by the company. Such an arrangement would have negative consequences for market competition, deny diggers a fair price for their goods and, ultimately, encourage the smuggling of diamonds to more favourable markets in neighbouring countries, thus undermining the credibility of Kimberley Process certification schemes in those countries.

103. Furthermore, any material or technical support for mining cooperatives remains the exclusive preserve of the company, even though the National Transitional Government of Liberia has been in discussion with various international donors about possible support in this area for some time (see S/2005/176). The contract also allows for WAMCO to establish a private guard service that the Panel believes would be used to enforce its many contractual privileges in the contract area (it is unlikely that the national police will have the capacity to fulfil such a role for years to come). Moreover, annexes within the contract foresee that by year four of the company's presence in Liberia, the terms of the contract would be amended to expand the contract area to cover the entire country. WAMCO is given this option in the agreement along with a further option to extend the contract to up to 10 years.

### West Africa Mining Corporation backing

104. WAMCO is currently 90 per cent backed by the London International Bank Ltd, a private investment house managed by David Aim, a French citizen. WAMCO is represented in Liberia by a United Kingdom citizen, Paul Majmader, an employee of the Bank, and Michael Saint Yrian, a French citizen who also holds a Liberian diplomatic passport. The Panel met Mr. Saint Yrian and Mr. Majmader in Monrovia

S/2005/360

to discuss the terms of the contract and the circumstances surrounding its agreement. The Panel was informed that Liberian embassies worldwide had invited bids for the "management" of Liberia's diamond and gold sectors. Mr. Saint Yrian was approached in 2004 by Martin George, Ambassador of Liberia to Nigeria, and encouraged to submit a proposal. There appears to have been no interest from other companies, and this proposal was subsequently developed into the agreement that was signed last January. WAMCO was created as an investment vehicle solely for this purpose and currently has no interests or liabilities elsewhere. Nevertheless, it remains unclear why companies and individuals with no experience in the extractive minerals sector would consider the gold and diamond sectors in Liberia to be realistic or attractive propositions.

**Implications**

105. In the context of the obfuscation and opacity surrounding the WAMCO agreement, progress by the National Transitional Government of Liberia towards meeting the requirements of the Security Council has effectively stalled. In particular, funding that was to be provided by the United States and multilateral and bilateral donors for the implementation of the internal control structures and the provision of equipment and technical assistance now appears to be on hold. Without this vital assistance, Liberia will be unable to make a successful application for participation in the Kimberley Process certification scheme. The Panel expects this impasse to continue until international donors have had an opportunity to discuss the agreement with the National Transitional Government of Liberia and WAMCO, raise their specific concerns with regard to relevant details in the contract and then resolve those outstanding issues.

106. The WAMCO agreement, as well as deals concerning iron ore and scrap metal, which are outlined elsewhere in the present report, have had a significant negative impact on the credibility of the Ministry of Lands, Mines and Energy. Repairing the damage to the reputation of the Ministry is likely to take some time and will not happen before the elections in October. Compounding the problem is the general lack of technical and professional expertise in Liberia to replace those who may be removed from office after the elections in the context of a new political climate. In the light of these recent developments, the Panel believes that an external independent supervisory management structure for Liberia's mineral resources is the most likely solution to current problems concerning technical expertise and administrative probity.

**B. Current patterns of mining activity**

107. With the assistance of UNMIL, the Panel was able to conduct an extensive aerial survey of established mining areas in Nimba County and the Upper Lofa River region in late April 2005. The ineffective application of the current mining moratorium is failing to curb illegal activity, which is increasing steadily. Although production is still small compared to that of Guinea or Sierra Leone, the Panel believes illegal output has risen to about $500,000 per month. Most of this production is occurring in parts of Nimba, Lofa and Gbarpolu Counties, where there is still no permanent deployment of security personnel, either national or UNMIL. With an influx of itinerant labour into these remote and largely lawless regions, the potential for conflict over concessions is growing. The Panel has received reports

from UNMIL that clashes between rival groups of diggers armed with machetes have occurred close to the border with Sierra Leone. The Panel is concerned that as the stakes rise in mining areas, individuals may resort to the use of small arms to resolve disputes.

### Nimba County

108. The Panel has monitored a significant mining site in close proximity to Gbapa, Nimba County, since August 2004 (see S/2004/752). The concession is held by local businessman Floyd Thomas, through his company, Jungle Waters. The Panel stated in its interim report that this mine, under the terms of the 14 January moratorium, had closed. This situation has now changed dramatically and the mine has reopened on a much larger scale than before. During overflights, the Panel was able to identify two D6 Caterpillar earth movers, a sizeable mechanical digger, at least 60 miners at work, pumps and a washing plant. In the past, the Panel considered the site to be a sizeable class B operation. It now views the operation as class A, given the mechanical equipment and industrial sophistication that are being employed. The Panel was unable to locate Mr. Thomas for comment.

### Upper Lofa

109. During its aerial survey work, the Panel flew along the entire course of the Lofa River from Voinjama in the north-western part of the country to its Atlantic confluence. Since the Panel conducted its last overflight in mid-February, there has been a noticeable increase in the level of mining, as well as the degree of sophistication employed in methods of extraction. This increased technical sophistication indicates increased investment on the part of mining supporters and demonstrates a concomitant growth in economic confidence (even though under the terms of the current mining licence moratorium most of this activity is illegal).

110. In particular, the presence of heavy earth-moving equipment was noted in a number of different locations along the Upper Lofa. Some of the mining operations identified by the Panel were fairly ambitious and included:

- A complex and expensive operation to dam an entire deposition on a bend of the Upper Lofa River

- A professionally constructed solution pump airlift operation that incorporates a lengthy pontoon raft and divers

- A wide range of open-cast alluvial sites of all sizes, from class C "bucket and spade" enterprises to extensive, high-investment class B operations with the potential for development to class A

111. The Panel noticed a general movement of people into mining areas in search of work. This is clearly evidenced by the repair and development of villages and towns in close proximity to mining areas. Furthermore, the Panel continues to receive reports that mines are being opened in remote areas under the forest canopy where they are hidden from the air. The Ministry of Lands, Mines and Energy clearly lacks the capacity to address illegal mining in such inaccessible locations and there is still no permanent UNMIL deployment north of the Bomi Hills between the Lofa and Moro Rivers.

**American Mining Associates**

112. The Panel flew over the operational site of American Mining Associates, located in the remote Kumgbor forest region of Lofa County (latitude 07°38.170' north, longitude 10°34.294' west), close to the Moro River and Liberia's border with Sierra Leone. The Panel last visited the area in February 2005. There is still no permanent UNMIL deployment in the region.

113. The site is extensive and comprises three subsites: an area for accommodation; an area for vehicle and equipment storage; and the mining site itself. Since the Panel's last visit, there does not appear to have been any major developments to either the accommodation areas or to the vehicle and equipment storage area. The number of vehicles in evidence appeared consistent with those noted during the last inspection, although there was an increase in the number of personnel in and around the site. Individuals spotted on the ground numbered around 30, far fewer than the original 75 that AMA managers in February told the Panel had once been employed by the company prior to the mining moratorium.

114. Nevertheless, although there was little in the way of activity on the day of the Panel's overflight, the actual area of mining had been developed considerably and there were many more pits and trenches in evidence. These had been mechanically dug and demonstrated professional engineering expertise. AMA has argued in the past that this activity constituted exploration for which it had a valid licence, and not mining. However, the Panel continues to believe that activity on this scale, and with the necessary investment, goes far beyond the realm of straightforward exploratory sampling. Although AMA was requested by the Ministry of Lands, Mines and Energy on 17 February 2005 to cease its activities, it has either settled any outstanding issues with the Ministry or has ignored its instructions and recommenced digging.

**Mining equipment imports**

115. The Panel has obtained documents and photographs showing that mining equipment has been imported into Liberia disguised as farm equipment. During the first week of January this year, a Liberian company, Malavasi Farms, imported a significant amount of mining plant which it claimed was agricultural machinery. Moreover, Malavasi Farms' declaration to customs officials valued the equipment at $33,500. However, BIVAC valued the plant at closer to $500,000. Much of this equipment has subsequently disappeared and is now believed to be utilized in mining areas in the Liberian interior. The Panel has received reports that additional mining equipment has also been imported into the country in this way.

**Diamond trading**

116. The Panel continues to receive credible reports that while some licensed diamond dealerships in Monrovia have suspended operations in line with the current moratorium on diamond mining, the numbers of foreign buyers running ad hoc buying offices from hotels and guest houses is on the increase in line with illegal production. This production is being smuggled to neighbouring States, where it may be passed off as the domestic production of those States and obtain Kimberley Process certification. While there is no doubt that Liberian goods are being trafficked through Guinea and Sierra Leone, the Panel has received credible reports that Banjul and Bamako are now becoming key trans-shipment points for uncertified

S/2005/360

diamonds of questionable provenance. Recent reports suggest that goods passing through Bamako are being shipped directly to the growing diamond market of Dubai on the Air Senegal service that now operates weekly between the two capitals. Moreover, Dubai is only a short flight from the major manufacturing centre and polished diamond market of Mumbai, India.

## C.  Conclusions and recommendations

117. The opaque nature of the agreement between the National Transitional Government of Liberia and WAMCO has stalled efforts to meeting the requirements of the Security Council for the lifting of the embargo on the export of rough diamonds. Much of the funding for the implementation of the mechanisms necessary for an application by Liberia to participate in the Kimberley Process certification scheme is likely to be suspended by international donors until outstanding questions regarding the deal have been answered. This process could take time and, in consequence, it is unlikely that Liberia will be in a position to participate in the Kimberley Process for some time. The Panel recommends that international donors with an interest in diamond sector reform work quickly with the National Transitional Government of Liberia and WAMCO to resolve this issue as soon as possible.

118. Levels of illegal mining and the illegal export of Liberian diamonds in contravention of the United Nations embargo are set to increase steadily in future, particularly as the Government lacks the capacity to deal with the problem and UNMIL has no mandate to offer assistance in this area. The embargo on the export of diamonds from Liberia is rapidly becoming ineffective, as miners dig with a flagrant disregard for national or United Nations authority. As people move into mining areas in numbers to dig for diamonds, the potential for conflict over claims, property and production is likely to grow. The Panel believes that unchecked mining activity is likely to pose an increasing threat to security and stability in mining areas in the short to medium term. The Panel therefore recommends that UNMIL be given a robust mandate to assist the National Transitional Government of Liberia and any future Government with its control of illegal mining in order to maintain security in mining areas.

119. The damage to the reputation of the Ministry of Lands, Mines and Energy, in the light of the WAMCO agreement as well as other dealings in iron ore and scrap metal, is likely to take a considerable period of time to repair. This situation is compounded by a lack of professional expertise in Liberia to replace those who may be removed from office in a new political climate. As a result, the Panel believes that an external independent supervisory management structure for Liberia's mineral resources will be the best solution to current problems concerning managerial professionalism and administrative transparency.

S/2005/360

## V. Timber

### A. Exports

120. There is no evidence of timber exports. No industrial logging was detected during overflights of Liberia and on-the-ground assessments in Maryland, Grand Cape Mount, Grand Gedeh, River Gee, Grand Bassah, Lofa and Nimba Counties. Likewise, visits to the four ports, the ferry crossing from Pedebo, Maryland County, to Côte d'Ivoire, and the bridge from Toe Town, Grand Gedeh County, to Côte d'Ivoire indicated compliance with sanctions.

### B. Domestic production

121. In contrast to industrial logging, pit-sawing (processing logs using chainsaws) is increasing as the domestic market grows. Regulation No. 26 of the Forest Development Authority has banned pit-sawing since 15 September 2000; nonetheless, permits were issued in 2003/04. The Managing Director of FDA claimed that his signature had been forged on the permits. He reiterated the ban effective 1 November 2004, in part because commanders of the warring factions were running the operations. However, pit-sawing continues to be common in the counties surrounding Monrovia and, to a lesser extent, in some of the larger county towns.

122. The total revenue from pit-sawing is unclear. Despite the illegality, the last FDA report, for October 2003 to September 2004, indicated $14,700 in fees from pit-sawing.

123. In April 2005, the Panel was assisted by a local NGO to monitor timber entering Monrovia. The United Nations peacekeepers at one checkpoint objected to the presence of the monitors as a security threat, but they were allowed to remain at the two other major checkpoints.

124. Although it was illegal, each day at least two trucks brought sawn timber into the capital (worth about $3,000 per truck). Approximately 60 per cent of the trucks entered Monrovia at night, between midnight and 5 a.m. Furthermore, in four cases (10 per cent of the traffic) at Samuel K. Doe Stadium, the truck would stop a few hundred meters short of the checkpoint, then the FDA inspectors would walk back and consult with the driver, return and consult with the peacekeepers. After a brief discussion the truck continued through the checkpoint uninspected. The Panel raised this issue with the interim Special Representative of the Secretary-General, who has informed the Deputy Force Commander.

#### Role of ex-combatants in pit-sawing

125. UNMIL civil affairs officers investigated pit-sawing in more than 100 locations in Grand Bassa and River Cess Counties. Of the 200 people interviewed, all had FDA permits, some "gratis", however only 10 per cent were authentic; the remainder were photocopies. The holders claimed to have paid $400 per permit to FDA. According to the locals, the regional FDA officers were still giving out permits in April 2005, and they patrolled once or twice a month.

S/2005/360

126. All of the pit-sawyers interviewed were Armed Forces of Liberia and MODEL ex-combatants, including some from the Oriental Timber Corporation's former militia. They felt no stigma attached to their status as ex-combatants. Some locals expressed intimidation by the ex-combatants.

127. Much of the trade in River Cess County was "controlled" by a former member of the National Patriotic Forces of Liberia and the Armed Forces of Liberia, "Commander Kofi", in Yapa Town. In January 2005, the locals complained that they were not receiving a large enough share of the proceeds of the estimated 20 trucks per day being harvested in the area. Commander Kofi threatened to burn down Yapa Town if they questioned his authority. Despite his threats, he was arrested by the local authorities but was soon released.

128. The ban on pit-sawing is ineffective and the trade is strictly illegal. Yet there is a growing market for wood in Liberia. The FDA technicians have developed an initiative to involve independent monitoring to manage the trade.

**Security**

129. Security remains a concern throughout rural Liberia. UNMIL peacekeepers do not generally travel at night and do not patrol off the major roads. The civilian police trained 164 enforcement officers for FDA and some have been deployed, but they do not have the capacity to enforce forestry regulations, despite their willingness to enter into duty (see S/2004/955, annex VII).

130. Two examples highlight the lack of control:

- Guthrie is a 22,000-hectare rubber plantation in the west of Liberia that has been occupied for more than two years by LURD ex-combatants. UNMIL has engaged the rebels, but has not yet achieved resolution. To end their occupation of the plantation, the ex-combatants demand resettlement, compensation and retraining. A conservative estimate of the value of Guthrie to the rebels: if half of the plantation produces 1 ton of rubber per hectare per year and if rebels receive $400 per ton, then revenue may be more than $4 million per year.

- Sapo, Liberia's only national park, has been invaded by more than 4,000 illegal gold miners and bushmeat hunters. Despite pronouncements by Chairman Bryant and the Special Representative of the Secretary-General demanding that the squatters vacate the park, people have not left. UNMIL and FDA are planning to evict them.

**Financial reporting**

131. The Panel has received no audited financial statements from FDA. In the previous mandate, the Panel received unaudited financial information covering up to October 2004. The Panel received unaudited information on payments made by the National Transitional Government of Liberia up to April 2005 (see table 3).

S/2005/360

Table 3
**Partial summary of National Transitional Government of Liberia subsidies,
revenue and salary payments for FDA from October 2003 to April 2005.**
(United States dollars)

| | Allotted by Government[a] | Received from Ministry of Finance | Difference | Revenue generated | Salary expenses |
|---|---|---|---|---|---|
| **2003** | | | | | |
| October | ... | — | | — | 38 567 |
| November | ... | 50 000 | | — | 38 567 |
| December | ... | 50 000 | | — | 38 567 |
| **2004** | | | | | |
| January | ... | 50 000 | | 513 | 38 567 |
| February | ... | — | | 5 811 | 38 567 |
| March | ... | 80 000 | | 3 701 | 38 567 |
| April | ... | 50 000 | | 4 271 | 38 567 |
| May | ... | 350 000 | | 1 208 | 38 567 |
| June | ... | 50 000 | | 1 649 | 38 567 |
| July | ... | 50 000 | | 3 569 | 38 567 |
| August | ... | 50 000 | | 2 021 | 38 567 |
| September | ... | — | | 3 523 | 38 567 |
| October | 113 008 | 91 880 | 21 128 | ... | 38 567 |
| November | 50 000 | 50 000 | — | ... | 38 567 |
| December | 50 000 | 50 000 | — | ... | 38 567 |
| **2005** | | | | | |
| January | ... | — | | ... | 38 567 |
| February | 80 334 | 70 834 | 9 500 | ... | — |
| March | ... | — | | ... | — |
| April | 90 334 | 50 000 | 40 334 | ... | — |
| **Total** | | **1 092 714** | **70 962** | **26 266** | **539 938** |

*Note*: A dash (—) indicates a nil amount; an ellipsis (...) indicates that data are not available.
   [a] National Transitional Government of Liberia, Bureau of Budget.

132. FDA has not officially responded to a preliminary audit submitted in July 2004 conducted by the Liberia accountant firm Voscon. The Managing Director of FDA forwarded detailed comments to the executive mansion regarding the European Commission financial review, which was given to the National Transitional Government of Liberia in February 2005, however, the Government has not responded formally.

133. The Board of Directors of FDA has not approved a budget, nor has it appointed an independent financial manager. A proper financial audit is needed to ensure transparency.

**Expenses**

134. FDA has not released a statement of expenditures since October 2004, at which time $833,000 was reported having been spent and $221,000 was reported in accounts payable. Since then, FDA has paid an additional eight months' worth of salaries and operating expenses (estimated at $300,000) and has paid $131,000 for three jeeps for the deputy managers. FDA also purchased a jeep for $58,260 for the Managing Director, with $38,260 still outstanding. In its report dated 6 December 2004 (S/2004/955), the Panel reported that FDA had purchased a vehicle for the Chairman of the Board of FDA; this was incorrect.

135. In May 2005, the FDA staff went on a go-slow strike, demanding that the National Transitional Government of Liberia honour its commitment to fund FDA salaries. The strike ended when the Ministry of Finance paid enough for two months — bringing salary payments up to February. The strike meant that senior staff were unable to attend training workshops or benefit from other technical assistance (including in the areas of land-use planning, environmental impact assessment and reform of the concession agreement contracts) arranged by the Liberian Forest Initiative (composed of, inter alia, the United States, the World Bank, the European Commission and NGOs).

**Operations**

136. Despite the bans on logging and pit-sawing, FDA has registered four sawmills, two of which have permits to harvest timber (see table 4). The owner of ANA Wood expressed concern that UNMIL was purchasing wood from dealers who did not have a legal supply.

Table 4
**Registered sawmills**

| Name | Company | Contract awarded | Fees paid[a] | Location | Area |
|------|---------|------------------|-----------|----------|------|
| R. Goffier | General Timber Corp. | June 2004 | 1 700 | Grand Bassa County | 1 470 acres |
| A. Martins | ANA Wood Liberia Corporation | October 2004 | 5 000 | Buchanan, Grand Bassa County | |
| R. Youssef | Texas International Inc. | November 2004 | 2 500 | GrandCape Mount County | 60 000 acres |
| C. Allen | Charbural | ... | 2 500 | Greenville, Sinoe County | |

*Note*: An ellipsis (...) indicates that data are not available.
   [a] United States dollars.

137. The regional offices of FDA are open, but staff complain about the lack of transportation, which hinders their ability to manage the forests. Likewise, the Managing Director argues that the National Transitional Government of Liberia's inability to provide sufficient funds severely compromises the ability to reform.

**Concession review**

138. FDA is in the final stages of reviewing the behaviour of concessionaires to determine which should lose their concessions because of failure to comply with the rule of law. FDA formed a committee with Government, NGOs (local and international), UNMIL, the civilian police and donors. The committee then established criteria for maintaining or revoking concessions (see annex V).

139. A technical secretariat — a group of international and national lawyers, financial experts and foresters, plus the Deputy Managing Director of FDA for commercial activity — compiled a dossier on each concessionaire including the legal basis of operations (business licences, articles of incorporation, concession contracts, etc.); conflicts with other concessions (i.e., overlapping with other concessions); tax arrears; social responsibilities (clinics, schools, training); labour, human rights; and United Nations sanctions violations. The technical secretariat has completed its report, which is being reviewed by the entire committee.

140. The concession review committee's results and recommendations will then be forwarded to Chairman Bryant, and the Government will act accordingly.

**Management company**

141. Given the incapacity of FDA, the Managing Director concluded that the most pragmatic way to ensure proper management of the sector was to contract the management of commercial forestry to a private organization. He has been in consultation with the Panel and the Liberian Forest Initiative on the appropriate form that a management organization should take.

142. The Panel advocates a system in which:

- Concessionaires are responsible for complying with regulations and calculating taxes due.

- FDA remains in place, auditing concessionaires' forestry practices and tax assessments.

- A management organization would assume authority and: (a) audit the concessionaires; (b) audit FDA; (c) collect revenues and pay taxes to the Central Bank; and (d) complete reporting (in part to facilitate oversight by civil society). It may be most efficient to divide those responsibilities among a number of organizations.

- Civil society oversees all forestry activities and the operations of any management organization.

- The international community, in particular the Liberian Forest Initiative, provides technical assistance and training and builds FDA capacity.

**Progress**

143. In December 2003, the National Transitional Government of Liberia produced a road map of the reform necessary to lift sanctions. The progress achieved is reported in table 5.

Table 5
**Reform programmes for lifting timber sanctions (Committee to Review Sanctions on Log and Timber Trade)**

| Reform programme | Description | Completed[a] |
|---|---|---|
| Building the capacity of FDA | Appoint FDA Board of Directors | Yes |
| | Structure management, adequately compensate staff and provide logistics | Staff not paid since November 2004 |
| | Train field technicians and middle-level staff at a later date | No |
| | Prepare the terms of reference and commission an independent oversight committee with a mandate to raise community awareness, supervise and review NGOs and encourage sustainable forest management | No |
| | Request technical assistance for forest and financial management | Yes, the Liberian Forest Initiative has two full-time technical assistants in Monrovia |
| Improving sector's transparency and accountability | Commission an audit of the FDA | No financial audit has been done. Voscon pre-audit and European Commission financial review revealed poor management |
| | Establish a system for depositing all forestry revenues in accounts directed by the Ministry of Finance at the Central Bank of Liberia | Yes, all money to be paid to the Central Bank of Liberia |
| | Establish a system for funding FDA accounts with the Central Bank of Liberia based on budget allocation of quarterly transfer of funds from Government of Liberia accounts based on standing instruction | Yes, but funds are not flowing from Ministry of Finance to FDA at full value appropriated through the Bureau of Budget |
| | Design a system for separate receiving and disbursing of reforestation and conservation fees | No |
| | Establish a system of reporting and making information accessible to the public | No |
| | Set up an independent oversight committee | No |
| Concession review | Recall and review all existing concession agreements | To be completed by June 2005 |
| | Impose penalties on companies violating sanctions | — |

S/2005/360

| Reform programme | Description | Completed[a] |
|---|---|---|
| | Prepare addendum to concession agreements reflecting conservation and environmental policies | In preparation with technical assistance from Liberian Forest Initiative |
| Conduct forest inventory | Ground-truthing field surveys and maps from the Geographic Information System | No |
| | Determine potential value of forest resources (timber and non-timber forest products) | No |
| | Provide information for monitoring, taxation, and enforcement | No |
| Park protection and development | Reconstruct Sapo Park infrastructure | No; Sapo Park has been invaded by thousands of illegal miners associated with MODEL; UNMIL is planning to remove the squatters |
| | Provide equipment and materials for park management | No |
| | Train and deploy park personnel | No, United Nations civilian police trained 164 enforcement officers, but they have not been deployed fully |
| Mobilize technical and financial assistance | Participate in donors' meeting and other promotional activities | Yes |
| | Discuss bilateral arrangements | Yes |

[a] As at May 2005.

## C.  Conclusions and recommendations

144. Sanctions are effective, but the domestic industry continues to operate illegally. Few of the necessary reforms have been implemented. Therefore, the recommendations of previous Panel reports (S/2003/779, S/2003/937, S/2004/396 and Corr.1 and 2, S/2004/752, S/2004/955) remain valid.

145. One possible solution to hasten the lifting of sanctions is to install a management organization to control the forestry sector. However, the Security Council should ensure that appropriate systems are in place and that the management organization is fully capable of such operations.

# VI.   Financial matters

146. In accordance with the mandate accorded to it in paragraphs 8 (a) and (b) of resolution 1579 (2004) and in the context of paragraph 1 of resolution 1532 (2004), the Panel examined sources of funding that were used in the past for illicit trade in arms in order to determine whether the proper internal control mechanisms had been put in place to prevent similar misappropriations of funds in future. The governmental infrastructure, record-keeping and archives were in such a poor state that the Panel also gathered financial information from private enterprises and quasi-governmental organizations as well as from the Government agencies themselves. The Panel closely reviewed the functioning of business associates and other contacts of former president Taylor to see whether they continued to have access to funds, particularly in view of the consistent but unconfirmed reports of interference by Mr. Taylor to destabilize peace and security in Liberia and the region. The Panel also focused on the functioning of erstwhile colleagues of Mr. Taylor and leaders of other factions (LURD and MODEL) in influential positions to see whether their departments and agencies continued to be active and viable sources of funding for conflicts and/or illicit trade of arms. The findings of the Panel are summarized briefly below.

## A.   Prime sources of revenue

147. The National Transitional Government of Liberia generated revenue of $101.58 million during the period from October 2003 to March 2005: $48.44 million during the first nine months and $53.15 million during the second nine months (July 2004 to March 2005), which corresponds to the first three quarters of the 2004/05 annual budget. While United Nations sanctions on timber and diamonds are in effect, the National Transitional Government of Liberia expects to collect nearly 90 per cent of its revenues through customs duties, maritime collections income tax and corporate tax.

### Customs duties

148. Customs duties from the National Port Authority and Roberts Field International Airport constitute the most important sources of revenue for the National Transitional Government of Liberia. No customs duties are being collected from the other three ports of Buchanan, Greensville and Harper, although more than 600,000 tons of iron ore were exported from Buchanan port recently and there is a small amount of traffic at the other ports. The export of all rubber and iron ore continues to be exempt. In late April 2005 UNMIL took over the custody of all entry and exit points of the Monrovia port and, although the number of exemptions and waivers continue to be significant, security has improved dramatically and revenues should rise further owing to a reduction in the unauthorized movement of goods out of the free port. The observations of the Panel on the accounts of the National Port Authority for 2004, as well as the comments of the European Commission-sponsored audit firm Ernst & Young, are depicted in annex VI.

### *No pre-shipment inspection of petroleum and rice imports*

149. The National Transitional Government of Liberia renewed its contract with an independent international firm, BIVAC, in September 2004 for three years to

conduct pre-shipment inspections of exports and imports to verify quantity, quality and pricing. Although the contract provides for pre-shipment inspections of petroleum and rice imports, inspections have not yet commenced. A large number of complaints were received by the Government regarding the importation of inferior quality rice from January to March 2005, and many people refused to purchase the substandard rice, which resulted in a huge rise in the price of the staple butter rice.

*Missing import and export declaration forms and death threat to BIVAC Managing Director*

150. BIVAC inspections have been severely restricted because a variety of exemptions and waivers have been given to two thirds of the traffic at the free port of Monrovia. In January 2005, after reporting to the Chairman of the National Transitional Government of Liberia huge leakages in revenues as a result of missing import and export declaration forms, the Managing Director of BIVAC received a death threat and had to leave Liberia within 24 hours. Each form is printed for BIVAC and has a unique sequential number. Every month on a specific requisition by the Ministry of Commerce and Industry, BIVAC provides these documents free of cost. The Ministry, in turn, issues them to traders at a cost of $25 for an import declaration form and $150 for an export declaration form. The traders are supposed to return the form to BIVAC at the time of clearance of goods but before taking the goods out of the port. On examination, BIVAC found that during 2004 several thousand import declaration forms and nearly 1,000 export declaration forms had not been returned to it. This means that not only has the Government lost substantial fees from the sale of those documents, but the National Transitional Government of Liberia and BIVAC have lost substantial taxes and revenues owing to the direct clearance of goods listed on the forms through illegitimate means.

151. In his audit report, which was conducted pursuant to the direction of the Chairman, the Auditor-General confirmed that goods valued at $5,170,995 FOB declared on 84 import and export declaration forms were granted duty-free to several business entities and individuals by the Minister of Commerce and Industry in gross violation of existing orders, resulting in a loss of revenue of $79,053 to the Government. Furthermore, the goods listed on the forms did not qualify for exemption as duty-free goods.

**Trading of Government revenues**

152. The Auditor-General further stated that, between August and December 2004, the Ministry of Commerce and Industry traded Government revenues totalling $79,053 for rice worth $38,803. This was done by providing a business entity exemption from the pre-shipment inspection fee that should have been paid to the Government. Although the Auditor-General's report was submitted in mid-February, the Chairman has not approved or taken any action on it.

**Misappropriation of Government revenues**

153. Previous panels provided instances in which the Government of ex-president Taylor diverted revenues for various licit and illicit transactions. The same practice continues unabated despite National Transitional Government of Liberia executive order No. 2 of October 2003 requiring that all revenues be credited to a consolidated fund in the Central Bank of Liberia, as depicted in annex VII.

S/2005/360

**Missing revenues**

*Low import duty receipts from petroleum importers*

154. Liberia Petroleum Refining Company records of imports of petroleum products indicate that $27.9 million was payable as import duty and sales tax, whereas the Ministry of Finance reports that only $5.2 million has been paid (see table 6).

Table 6
**Import duty and sales tax paid between 1 January 2004 and 30 April 2005**
(United States dollars)

| Petroleum product | Imports (gallons) | Import duty payable | Sales tax payable[a] | Import duty and sales tax payable | Import duty and sales tax paid by all importers[b] |
|---|---|---|---|---|---|
| Gasoline | 20 913 732 | 5 228 433 | 6 274 119 | 11 502 552 | |
| Diesel | 32 820 237 | 6 564 047 | 9 846 071 | 16 410 118 | |
| **Total** | **53 733 969** | **11 792 480** | **16 120 190** | **27 912 670** | **5 229 758** |

[a] Sales tax was payable at the rate of 35 cents per gallon except during March to May 2004 and April 2005.
[b] Data not available by type of product.

155. It may be worthwhile to mention here that petroleum products imported for the United Nations, other international bodies, embassies, NGOs and the like are duty-free and constitute around one quarter of total imports.

*$388,108 untraceable*

156. When the Panel requested tax information from the major importers, only Monrovia Oil Transport Corporation and Aminata responded. MOTC claimed to have paid $3,092,561, or $212,188 more than Government reports, while Aminata claimed to have paid $390,920 through April 2005, $175,920 in excess of Government accounts. Aminata also submitted duty-free claims of $290,000 for gasoline and diesel supplied to various Government ministries and agencies.

S/2005/360

Table 7
**Import duty and sales tax paid by importers between 1 January 2004 and 30 April 2005**
(United States dollars)

| Company | Gasoline/diesel imported (gallons) | Import duty and sales tax payable[a] | Import duty and sales tax paid as shown to Government account | Missing taxes |
|---|---|---|---|---|
| West Oil | 35 083 516 | 12 088 836 | 1 419 871 | 10 668 965 |
| MOTC | 13 523 549 | 5 659 274 | 2 880 373 | 2 778 901 |
| Aminata | 2 529 855 | 1 082 925 | 215 000 | 867 925 |
| Origin | 2 098 807 | 1 002 246 | 483 023 | 519 223 |
| **Total** | **53 235 727** | **19 833 281** | **4 998 267** | **14 835 014** |

[a] Excluding duty-free supplies. Based on information received from the United Nations and other sources, it is conservatively estimated that nearly one third of the West Oil, one fifth of the MOTC and Aminata and one tenth of the Origin oil imports are meant for duty-free supplies.

*Petroleum products of $4.2 million supplied to executive mansion and others against taxes*

157. West Oil claimed that it had supplied $4.2 million worth of petroleum products to the executive mansion (Office of the Chairman of the National Transitional Government of Liberia), the Ministry of Finance, the General Service Agency and so on from October 2003 to March 2005 in lieu of paying taxes. Those deliveries were made at the request of the Minister of Finance or his deputy, for which no payment is generally made by the Government.

158. The Minister of Finance assured the Panel in early May that the previous system of the tax adjustment had been discontinued and all transactions were being done on a payment basis. However, the Government continues to ask petroleum importers to supply the executive mansion and other Government agencies and adjusts the taxes accordingly.

*$3.33 million adjusted from West Oil loan*

159. West Oil claimed that $3.33 million in taxes had been adjusted by the Government on the basis of an agreement from December 2003 that 50 per cent of the taxes on the import of petroleum products would be adjusted against outstanding debt/prepayment of taxes of $10 million made to the Taylor Government in 1998. The Ministry of Finance claims that records pertaining to the Taylor period have been destroyed, and details regarding repayment of the loans have been obtained from the debtor himself. In fact, such records as exist at the Ministry of Finance suggest that the loan of $10 million granted in September 1998 appears to have already been paid back along with 10 per cent interest per annum, but West Oil further claims to have paid additional advance taxes of $1,623,025 on 31 December 2001 and $1,066,750 in 2002. There is, however, no contract or agreement for those two payments. The National Transitional Government of Liberia did not obtain the approval of the Assembly for repaying the loan and interest to West Oil, nor did it make any disclosure in the budget regarding the contract or transaction.

S/2005/360

160. As a result of these types of trading of Government revenues and adjustment of debts/loans against taxes paid outside the budgetary process, neither are the revenues correctly depicted in the Government books nor are the expenditures properly shown in the books of accounts.

161. The Monrovia Oil Transport Corporation is also owed by the Taylor Government ($2.7 million), but it has not received any payment from the National Transitional Government of Liberia. Likewise, none of the external agencies (the World Bank, IMF, the African Development Bank, the European Union, etc.) to which the National Transitional Government of Liberia owes $3 billion, have received any repayment except the token amount of $50,000 per month to IMF on its outstanding debt in excess of $718 million. IMF requested that the Government desist from repaying any debt until the entire quantum of debt is determined and rescheduled and the repayments are prioritized. (See table 7.)

*Rice imports*

162. Reports of rice imports differ by more than 100 per cent between the Ministry of Commerce and Industry and the Ministry of Finance (see table 8).

Table 8
**Import of rice during 2004**
(Tons)

| Importer | According to Ministry of Commerce and Industry | According to Ministry of Finance | Difference |
|---|---|---|---|
| Bridgeway Corporation | 46 922 | 23 459 | 23 463 |
| K&K Corporation | 49 150 | 20 946 | 28 204 |
| Fouta Corporation | 5 000 | 2 200 | 2 800 |
| Fouani Brothers Corp. | 7 000 | 5 602 | 1 398 |
| **Total** | **108 072** | **52 207** | **55 865** |

163. The Ministry of Commerce and Industry states that an importer has to pay taxes of $35.81 per ton based on applicable rates of custom duty and goods and services tax at the FOB cost of $249 per ton. Using the Ministry's data on rice imports, there is a shortfall in tax payments by the rice importers of at least $3.7 million. Furthermore, those taxes would have already been collected from the public.

Table 9
**Taxes paid by rice importers during 2004**
(United States dollars)

| Importer | Customs duty/goods and services tax payable | Customs duty/goods and services tax paid | Difference |
|---|---|---|---|
| Bridgeway Corporation | 1 680 277 | — | 1 680 277 |
| K&K Corporation | 1 760 062 | 88 000 | 1 672 062 |
| Fouta Corporation | 179 050 | 62 257 | 116 793 |
| Fouani Brothers Corp. | 250 670 | — | 250 670 |
| **Total** | **3 870 058** | **150 257** | **3 719 801** |

*Note:* dash (—) indicates nil amount.

*Maritime affairs*

164. The Liberian International Ship and Corporate Registry is a major source of revenue for the National Transitional Government of Liberia. LISCR has not had an independent audit since 2000, the year it was created. The Bureau of Maritime Affairs staff, co-located with LISCR in their home offices in Virginia, United States, do not provide oversight because of lack of ability, lack of knowledge and lack of support from the Bureau.

165. It was not possible to reconcile the revenues reported by LISCR to those recorded by the Ministry of Finance or the Bureau of Maritime Affairs. The total revenues reported from corporate registry and tonnage taxes were:

| | |
|---|---|
| LISCR | $11,129,962 |
| Ministry of Finance | $10,974,775 |
| Bureau of Maritime Affairs | $10,546,885 |

166. It is apparent that not all of the income from LISCR is being recorded by the Government, but without a detailed audit of accounts it is impossible to explain where the unreported funds went.

**Corporate and income tax**

167. In its budget for 2004/05, the National Transitional Government of Liberia expected to collect 22 per cent ($17.28 million) of total Government revenue from corporate and personal income taxes. In the first nine months (July 2004 to March 2005), it had already collected $16.38 million from voluntary taxpayers. The Ministry of Finance created a Large Taxpayers Unit in March 2004, but corporations are not required to submit audited financial statements to the Unit or the Ministry of Finance, and thus the Government does not have any idea of the number of the corporations and the amount of taxes payable. The Large Taxpayers Unit simply consolidates the taxes paid by the "volunteer" self-identified firms. In one meeting, the Coordinator of the Unit told the Panel of enormous pressure put on it by superiors whenever it tried to touch a "big fish".

168. The Ministry of Finance reports that only eight firms paid more than $5,000 in corporate tax between March 2004 and February 2005, and only four firms paid the current taxes due. None of the major petroleum and rice importers paid corporate

S/2005/360

tax for the current year. The best hotel in the city, which charges $120 per night and has an occupancy level of 75 per cent, does not appear on the list.

169. The Ministry of Finance also reports that only 90 individuals in Liberia pay income tax exceeding $1,000 annually. All 90 are employees of large corporations, none are self-employed businessmen and none are ministers, a few of whom are members of the boards of directors of Government parastatals and draw $5,000 every quarter. About 500 United Nations international staff members reside in Monrovia, paying rent ranging from $3,600 to $15,000 per annum to owners/landlords, but none of the owners/landlords appear on the large taxpayer list.

**Revenue receipts from telecommunications**

170. One of the chief beneficiaries of peace is the telecommunication sector. In Liberia there are no landline telephones. The Taylor regime neglected the public sector and encouraged the private GSM cellular provider Lonestar Communication Corporation, in which some of the top functionaries of his Government had substantial equity investment.

171. Lonestar's turnover doubled during 2004, leading to a jump in profits by 400 per cent. It paid over $6 million in taxes to the National Transitional Government of Liberia between October 2003 and April 2005, with another $3 million to be paid during May 2005 in instalments. However, the Government has not been enforcing the clauses of the license agreement, leading to lower taxes paid to the Government.

**Sale of iron ore**

172. The National Transitional Government of Liberia sold the iron ore in Buchanan to a Chinese firm at below market price without following a transparent competitive bidding process. In fact, the Chinese firm in turn sold part of the iron ore to a Czech firm at nearly double the price it paid to the Government from the Buchanan port itself. Under the agreement signed in January 2004, the sale was on an "as is where is" basis at $10 per ton. Nonetheless, the Government received only $6,164,750 on the sale of 679,086 tons, or $626,120 less than contracted. The Government attributes the reduction to the fact that the iron ore was in the wet state. However there should have been no deductions regardless of whether the ore was wet because the sale was on an "as is where is" basis.

## B.   Expenditure

173. The National Transitional Government of Liberia budget is $80 million for the period from 1 July 2004 to 30 June 2005. However, the expenditures are not consistent with the established budget (see table 10).

S/2005/360

Table 10
**Actual expenditure as compared to budget provision**
(Millions of United States dollars)

| Category | Budget 2004/05[a] | Percentage | Actual expenditure[b] | Percentage |
|---|---|---|---|---|
| Personnel | 23.719 | 30 | 22.273 | 41 |
| Goods and services | 19.339 | 24 | 15.295 | 28 |
| Transfers and subsidies | 15.015 | 19 | 4.452 | 8 |
| Capital expenditure | 11.077 | 14 | 8.371 | 14 |
| Domestic debt | 9.850 | 12 | 4.138 | 8 |
| External debt | 1.000 | 1 | 0.500 | 1 |
| **Total** | **80.000** | **100** | **55.029** | **100** |

[a] July 2004 to June 2005.
[b] July 2004 to March 2005.

**Large reappropriations**

174. Large reappropriations were made in March 2005 shifting major budget amounts to presidential affairs, finance and the General Service Agency. The reappropriations have come at the expense of important social and economic services sectors such as education, health, public works, rural development, agriculture, gender development, and so on, even though those sectors need maximum attention as a result of long years of conflict (see table 11).

Table 11
**Reappropriations**
(Millions of United States dollars)

| Ministry/Agency | Original appropriation | Revised appropriation | Total commitment till March 2005 | Percentage increase (decrease) |
|---|---|---|---|---|
| Presidential affairs | 2.9 | 5.8 | 5.4 | 100 |
| Finance | 1.3 | 4.9 | 4.5 | 277 |
| General Services | 0.7 | 5.5 | 5.2 | 686 |
| Legislature | 3.6 | 4.1 | 3.8 | 14 |
| Budget Bureau | 0.8 | 1.8 | 0.8 | 125 |
| Education | 8.2 | 6.3 | 4.6 | (23) |
| Health | 7.0 | 5.9 | 3.2 | (16) |
| Public Works | 2.3 | 1.1 | 0.4 | (50) |
| Rural development | 0.7 | 0.3 | 0.1 | (57) |
| Agriculture | 1.1 | 0.7 | 0.4 | (36) |
| Judiciary | 4.0 | 3.0 | 1.4 | (25) |
| Gender Development | 1.2 | 0.5 | 0.2 | (58) |
| Salary arrears | 9.0 | 1.9 | | (79) |

175. It is not clear whether the reappropriations were made by the Budget Bureau itself or with the approval of the National Transitional Legislative Assembly. In addition, the figures exclude amounts received outside the budget process such as the fuel delivered to the mansion and paid through reduction of taxes.

**Open defiance of Supreme Court order**

176. In open defiance of a Supreme Court stay order, the Chairman approved, on 18 April, a proposal to award a concession to Mittal Steel for the exploitation of iron ore in the former Liberia American Mining Company concession area in Nimba County. The Supreme Court had issued two stay orders in response to petitions filed by one of the rival bidders on 15 April 2005 and had fixed 28 April for a further hearing, which is continuing. This is reminiscent of the defiance of the Supreme Court stay order in September 2004 on iron ore that was shipped from Buchanan port over a period of six months. A few instances of failures of the non-transparent contracting system and collective responsibility system are shown in annex VIII.

## C.  Function of the Auditor-General

177. The Auditor-General submitted a report in August 2004 on the travel expenses of National Transitional Government of Liberia officials for October 2003 to March 2004. The report was not released for seven months, and then only after the Panel asked the Chairman's office for a copy in March 2005. The report highlights serious financial irregularities, including payments of tens of thousands of dollars for non-existent travel, double payment of airline tickets, withdrawal of funds that were then not-disbursed to the travellers and so on. Several senior ministers and officials had drawn $130,938 for foreign travel but did not furnish details of the expenditure. Six travel agencies did not confirm the receipt of $81,247 paid to them. The Auditor-General found that a delegation of more than 40 individuals attended a donor conference in New York in February 2004 and were paid on a per diem basis for a period ranging from 8 to 56 days. Although the budgeted estimate was for 8 days, 41 people exceeded 12 days, and 12 exceeded 30 days.

178. Although the audit report was submitted to the Chairman by the Auditor-General in August 2004, no action has been taken by the National Transitional Government of Liberia to recover the money from the concerned ministers and officials.

## D.  Conclusions and recommendations

179. The financial administration of the National Transitional Government of Liberia is weak, with non-existent internal control systems and ineffective external oversight systems. There is a lack of transparency and accountability in the system. Large chunks of revenue from the import of petroleum products and rice are still leaking from the Government coffers. Parastatals were one of the main sources of extrabudgetary expenditures by top functionaries of the Government. The modus operandi followed by the top functionaries of the Government in siphoning off Government revenues for various licit or illicit purposes appears to be the same as that used by the Taylor regime. Most of the missing revenues relate to businessmen who had close business relationships with the previous regime. There has been

consistent but unconfirmed reports around Liberia that those businessmen continued to provide monetary support to Mr. Taylor on a regular basis.

180. The Panel recommends that:

- No Government revenues be traded or adjusted against dues or debt outside the budgetary process. All revenues should be deposited in a consolidated fund of the Republic of Liberia and the payment of any expenses from it should be done through budgetary appropriation after due approval of the Legislative Assembly.

- All reappropriations in excess of 10 per cent of the original appropriation should be done with the prior approval of the Legislative Assembly.

- Low receipts of import duties and sales tax from petroleum and rice importers should be investigated by an international independent auditing firm and culprits should be held accountable.

- There should be close oversight over receipts from maritime operations. LISCR should be audited by a reputed international auditing firm without any further delay.

- The Ministry of Finance should be strengthened with international assistance in the form of qualified manpower in the areas of revenue generation, accounting, internal audit and expenditure control.

- The National Transitional Government of Liberia should take immediate action on the reports of the Auditor-General in respect of import and export declaration forms and foreign travel expenditures and recover the overpayments/excess payments made to ministers/officials.

- The office of the Auditor-General should be strengthened and adequate infrastructural facilities and qualified manpower should be provided in consultation with the International Organization of Supreme Audit Institutions so that it can carry out the onerous responsibilities cast upon it. The Auditor-General should also conduct an audit of the annual accounts of major revenue-generating parastatals every year.

## VII.  Assets freeze

181. The Panel contacted Liberia, the United States, the United Kingdom, France, Switzerland, South Africa, Nigeria, Ghana, Sierra Leone, Guinea, Côte d'Ivoire, Greece, the Russian Federation, Germany, Israel and Lebanon to gather information regarding action taken by the Member States pursuant to the relevant resolutions.

### Impact in Liberia

182. There is no impact of the assets freeze in Liberia. No action has been taken by the National Transitional Government of Liberia in the past six months. In 2004, when the Government tried to freeze the investment of Benoni Urey and Emanuel Shaw in a prominent GSM cellular mobile company, it did so without taking the appropriate legal course of action or passing proper legislation. As a result, the two went to the Supreme Court, which issued a stay order immediately. The case is still pending.

183. The Panel met the Deputy Governor of the Central Bank of Liberia, who stated that it could not do anything until the Minister of Justice issued a legal order to freeze assets. Because this has not been done, no banks have been contacted to identify accounts that should be frozen.

184. The Minister of Justice, who is also the ex officio Attorney-General of the Republic of Liberia, stated that after the stay order was issued by the Supreme Court in October, he had written to the Chief Justice, in November 2004, to expedite the case. The Chief Justice had assured him that the case would be taken up on a priority basis during the session of the Court commencing in March 2005. However, as at May 2005 the case had not yet been heard by the Court.

185. Mr. Urey and Mr. Shaw represent PLC Investment Ltd on the Board of Directors of Lonestar Communications Corporation and are two of the five directors of the company. PLC gets 4 per cent of the revenue of Lonestar Communications Corporation every month. In the past three years (2002-2004), PLC has received $1,968,994, of which $1,131,440 was paid during 2004. In 2004, PLC received $600,000 in dividends. All directors are paid a monthly fee of $4,000 while the Chairman, Mr. Urey, gets $6,000 per month. However, neither Mr. Urey nor Mr. Shaw appear in the list of large taxpayers paying income tax exceeding $1,000 per annum. Had the investment of those two persons been frozen, they would have been deprived of at least $2 million.

186. Recently many newspapers in Monrovia have printed a set of e-mails (see annex IX) purported to have been sent by Charles Taylor to a few of his close confidants during February and March 2005. One of the e-mails requested his wife to collect $300,000 from Lonestar, which is equivalent to 50 per cent of the dividend of PLC. It is widely believed that PLC is a front company of Charles Taylor. Edwin Snowe is presently working as Managing Director of the Liberia Petroleum Refining Company. He draws $12,000 every month, including benefits from the National Transitional Government of Liberia, but his name does not appear on the large taxpayers list and none of his assets have been frozen. He cooperated with the Panel and provided all records the Panel requested. LPRC was one of the very few organizations that submitted full and complete information to the Panel. Mr. Snowe claimed that he had tried to block the transfer of funds to Charles Taylor after he took over as the Managing Director of LPRC.

**Impact outside Liberia**

187. Other countries have identified the bank accounts to be frozen and in some cases this has been accomplished (see table 12).

S/2005/360

Table 12
**Assets frozen**

| Country that has frozen assets | Person whose assets have been frozen | Type of asset | Value |
|---|---|---|---|
| United States | Benoni Urey | Real estate | $695 000 |
| | Victor Bout | Investments in many companies | Approximately $2 million |
| United Kingdom | Agnes Reeves-Taylor | Bank accounts | £22 400 |
| Germany | Leonid Minin | Bank accounts | €2 089 |
| Lebanon | Mohamed Salame | Bank accounts | ... |
| | Ali Ramada Kleilat Al-Dilby | Bank accounts | ... |
| | Charles Bright | Bank accounts | ... |
| | Edwin Snowe | Bank accounts | ... |
| France | Mohamed Salame | Bank accounts | ... |
| | Moussa Cisse | Bank accounts | ... |

*Note*: An ellipsis (...) indicates that data are not available.

188. It appears that the assets freeze has not been very effective. First, the faction-ridden National Transitional Government of Liberia has not taken the requisite interest in implementing the order. Second, there was a time lag between the travel ban resolution and the issuing of the assets freeze resolution. Furthermore, there was delay of another three months between the issuance of the assets freeze resolution and the issuance of the assets freeze list. As a result, all concerned individuals had enough time to transfer the funds from their bank accounts. Third, the assets freeze order required only the assets of concerned individuals to be frozen. It was easy for those persons to transfer the assets to their relatives. For example, in the United Kingdom, Agnes Reeves-Taylor, the former wife of Charles Taylor, removed assets and placed them in the names of close relatives just prior to the adoption of Security Council resolution 1532 (2004). In both November 2003 and February 2004, she transferred over $100,000 to an account at Wachovia bank in the United States. Subsequent to being included on the travel ban list but prior to being added to the assets freeze list, she transferred £102,646 to her niece, Christal Dionne Elizabeth Reeves, in March 2004. In June 2004 she made a gift of a property worth £90,000 in London to the same niece. Although those assets have been identified, they are out of the reach of the enforcement agencies. Furthermore, the permanent representative of the National Transitional Government of Liberia to the International Maritime Organization in London, under the instructions of the Commissioner, Bureau of Maritime Affairs, gave £15,000 in cash to Agnes Reeves-Taylor in May/June 2004 out of the proceeds received as a dividend from the investment in INMARSAT Ventures PLC.

S/2005/360

189. It may, however, be pointed out that the Government of Lebanon has frozen the accounts of two family members of Kleilat Ali who are not included on the assets freeze list, including his wife, Rana Badie Sharaf, and one family member of Mohamed Salame, under the domestic laws. Furthermore, the Gambia reported that, although the former Liberian president and his known associates did not have any assets or financial resources in that country, Fatoumatta Yattara, who claims to be Taylor's wife, had acquired a plot of land (plot No. YHE/072) from a private company, TAF Holding Company Ltd, at Yarambamba Housing Estate, Yundum, Western Division, in the Gambia at a cost of $34,000 in September 2003. Reliable Liberian sources confirmed that she was one of the wives of Charles Taylor.

S/2005/360

## Annex I

### Meetings and consultations

**Belgium**

European Commission — West Africa Division

European Union Permanent Representatives: France; Sweden; United Kingdom

**Denmark**

Ministry for Foreign Affairs/DANIDA

United Nations Development Programme — Denmark

**France**

*Government*

Ministry for Foreign Affairs

**Guinea**

*Government*

État Major Defense

**Republic of Ireland**

*Government*

Ministry for Foreign Affairs

**Norway**

*Government*

Ministry for Foreign Affairs

Norwegian Agency for Development

FAFO-Institute for Applied International Studies

*Bilateral and multilateral agencies*

United Nations Development Programme

World Food Programme

Office of the United Nations High Commissioner for Refugees

International Committee of the Red Cross

*Diplomatic*

Ukraine

1

S/2005/360

**Liberia**

*Government*

Vice-Chairman

Ministry of Agriculture

Ministry of Finance

Ministry of Commerce and Industry

Ministry of Foreign Affairs

Ministry of Defence

Ministry of Lands, Mines and Energy

Ministry of Post and Telecommunications

National Port Authority

Central Bank of Liberia

Bureau of Maritime Affairs

National Investment Commission

Forestry Development Authority

Liberia Petroleum Refinery Corporation

Budget Bureau

Auditor-General

Chairperson Governance Reforms Commission

Chairperson Contract and Monopolies Commission

Liberia Telecommunication Corporation

*Diplomatic*

Guinea (Consular)

France (Humanitarian Attaché, Consular Attaché)

United States

United Kingdom

*Bilateral and multilateral agencies*

United Nations Development Programme

United Nations Environment Programme

United Nations Mission in Liberia

European Commission

International Crisis Group (ICG)

Danish Refugee Council

S/2005/360

Peace Winds Japan

Liberia Forest Initiative

Conservation International

Fauna and Flora International

Sustainable Development Institute

Green Advocates

*Private sector*

ANA Woods

BIVAC International

Liberian Timber Association

West Oil Investments Inc.

Monrovia Oil Transport Corporation

Aminata & Sons

Lonestar Communications Corporation

CellCom

Mano River Resources

**Sierra Leone**

*Government*

Protocol

National Security Commission

Sierra Leone Police

Sierra Leone Army

Sierra Leone Customs

*Multilateral and bilateral agencies*

Special Court of Sierra Leone

UNAMSIL

**United Kingdom**

*Government*

International Organizations Department

Foreign and Commonwealth Office

S/2005/360

*Bilateral and multilateral agencies*
Royal Institute of International Affairs
Global Witness
Bank of England

**Belgium**
Antwerp Diamond High Council
World Diamond Council

**United Nations**
Department of Political Affairs

*Permanent missions*
France
Nigeria

**United States of America**
*Government*
US Forest Service
US State Department
US Treasury

*Bilateral and multilateral agencies*
Interpol
Conservation International
Human Rights Watch
International Crisis Group

4

S/2005/360

## Annex II

### Weapon cache in Vahun



S/2005/360

Annex III

Map of Liberia showing places of entry to Côte d'Ivoire



AXES DE PENETRATION

S/2005/360

**Annex IV**

### West Africa Mining Corporation mineral purchasing contract area



## Annex V

### Draft evaluation criteria for the Forest Development Authority concession review committee

In conducting the review under the methodology, the Technical Secretariat recognizes the need for basic threshold criteria that allow it to evaluate if a concession holder meets the criteria or not.

The following is a list of threshold criteria for cancellation, minimum requirements for clearance and a list of issues that should be evaluated on a cumulative basis. The Technical Secretariat will continue to work to complete as much of the individual company data sheets as possible given the data submitted by each concession holder, supplemented by data from the FDA, civil society and the public at large. This data will be used to form basic recommendations on the future of each concession according to the minimum standards set.

    a.     Basic minimum requirements before the concession will be evaluated:

        1.     The concession holder submitted all relevant documentation to the Committee under oath (affidavit) and

        2.     In its submission, the concession holder documented that it is a bona fide business entity, including production of a legal Article of Incorporation and a Business Certificate for the last year in which it operated and

        3.     The concession holder shows the Committee a contract that is in full force and effect and that it is consistent with all legal requirements at the time of its effective date; and

        4.     There are no prior contract rights to the concession area in question held by any other company or individual.

The Technical Secretariat has also defined specific issues that should lead directly to concession cancellation and debarment from operating in the foreseeable future in the Liberian forest sector. Liberia is making the transition from over a decade of civil war to culture of re-instating the rule of law. There must be a bottom line that cannot be crossed in order to achieve rule of law.

    b.     Behavior or conditions that debar a concession from further evaluation:

        1.     Supported militia, involved in arms for timber, aiding or abetting civil instability, cultural transgressions or community disruption, or other UN sanctions related issues. The Technical Secretariat will require citation in an UN report or list or, in the alternative, three separate sources of information to corroborate any concession holder's involvement in such activities or

        2.     Encroachment into protected, private or other concession areas or having worked beyond the concession holder's allocated concession area; or

        3.     Holding a concession or taking over a concession through force or other non-legal procedure. The concession holder will have to show proof that the previous concession holder legally relinquished its concession according to the rule of law or went through due process with the FDA and opportunities for arbitration.

If a concession holder meets the two sets of criteria above it will be evaluated on the following points.

The completed individual company data sheet must reflect that the concession holder demonstrated compliance with the means of verification in the following categories. If the concession holder fails to comply with a

S/2005/360

substantial percentage of the categories they have been recommended for cancellation without further review. The issues are as follows:

1.      Compliance with financial requirement: proof of holding a performance bond, compliance with the minimum expenditures for their contract, paid taxes, social security and financial obligations

2.      Compliance with the rule of law; followed legal procurement procedures for concession contracting, and follow all technical requirements under the forest contract (annual coupe maps, respected management plan, etc) and completed and filed technical and operational reports.

3.      Compliance with community development obligations; build schools, health clinics and offered shares to communities.

4.      Respected labor laws.

S/2005/360

## Annex VI

### National Port Authority

Examination of the annual accounts of NPA, as presented to the Panel, for the year 2004 revealed the following interesting points:-

The authority does not have any accounts for the last five years. Hence, the financial performance can not be compared with the past years.

The NPA did not have the details of foreign loans totaling $21.789 million. Nor have they made any efforts to collect them.

The depreciation expenses have gone up to $2.02 million against the budgeted amount of $0.9 million. The circumstances under which the depreciation expenses increased by 100 percent could not be satisfactorily explained to the Panel.

Other financial cost of $0.8 million, which increased sharply over the budgeted amount, was also not clarified with full details.

Even though the figures cannot be relied on for total accuracy, the expenses of the NPA for labor and employees are one of the highest cost recorded and includes $3,162,548, which is 42% of the total expenses of $7,567,772. All employees get allowances paid in US dollars. The allowances are generally several times higher than their salaries and wages paid in Liberian dollars.

Even though the allowances are taxable as wages under the 2000 Revenue Code, when the auditors come from the Revenue Department they treat this issue in a "relaxed" way. The NPA said they also choose to treat it "relaxed" and therefore don't pay any taxes on this amount.

Top officials draw allowances in US dollars ranging from $10500 to 12500, while their salaries are $55-60. Salaries are paid in local currency while allowances are paid in US dollars. The Managing Director of the NPA draws a monthly salary of 3500 Liberian dollars ($60) while he draws allowances of $12600 every month (Car rental $2600+ Housing allowances $2500+ Emergency allowance $2500 + Monthly benefit $5000). Additionally, he receives $100 for every board meeting he attends and $5000 every quarter as a member of the board.

A financial audit conducted by the European Commission sponsored audit firm Ernst & Young in September-October 2004 revealed the following:

The financial statements are not reliable as the general ledger function does not exist and the double entry system was non-functional in the NPA.

Most of the balances in the financial statements were not supported by underlying records and had no appropriate basis. Examples include Fixed Assets, Long term borrowings, Accounts payable, Accounts receivables, Cash and Bank Balances.

Accuracy and completeness of revenues reported at the NPA were not confirmed.

A lot of private individuals and business entities were granted waivers though most of them did not qualify for the exemptions, reductions and waivers.

As a practice, all assets acquired for the residences of the executives were directly expensed. These assets are not recorded in a register to facilitate their control. E.g. one of the top functionary purchased household goods worth $52195 (27 KVA Generator, 29" Platron TV, LG Ice box, Paint items, etc.) during January and February 2004 and left the NPA in October 2004.

S/2005/360

## Annex VII

### Misappropriation of Government revenues

The Panel came across several cases where top functionaries of the NTGL instructed their subordinates to mis-utilise/divert/misapprpriate the Government funds without obtaining the approval of the budgetary process.

In January 2004, the Minister of Commerce and Industry requested BIVAC to purchase four vehicles (two buses and two Jeeps worth $162,000) using the Government share of the Pre-inspection fees for January-May 2004.

In January 2004, the then Speaker of the National Transitional Legislative Assembly (NTLA) requested one of the parastatals to make payment of $9265 for the purchase of household furniture from a company named J-MART. The Speaker has since been suspended from the post and it is not known whether he has returned the furniture back to the assembly, to his successor, or not at all. He is presently on the travel ban list in Resolution 1521.

In March 2004, the Vice Chairman of NTGL made a request to the one of the parastatals to purchase a vehicle for $9500 from Traffic Enterprise although there was a provision of $23,400 in the budget of the Vice Chairman for the purchase of cars. This kept his budget from being reduced for the purchase of the vehicle. In May 2004, he requested the same parastatal to give him $10,000 for meeting his expenses for travel to the USA. In July 2004, by telephone, he requested the same parastatal to give $20000 to a person to accompany him to Seoul.

In August–September 2004 the Chairman of the NTGL directly requested one of the parastatals to give $205,983.65 to a person to organize the 157th anniversary celebration. In April 2004, the Chairman, directed, by telephone, one of the parastatals to $100,000 to the University of Liberia. In May and November 2004, the Chairman again requested, by telephone, the Managing Director of the same parastatal to give $20,000 for national security purposes, even though nearly one-fifth of the total NTGL budget was meant for Security Services Sector. In November 2004, he requested the same parastatal to give $100,000 to the Permanent Mission in New York to meet his expenses. These telephonic directions were not confirmed in writing.

11

## Annex VIII

### Agreements/contracts either signed by ministers or for which bidding process was completed that were cancelled or likely to be cancelled

**ADTI Contract**

On behalf of the NTGL, the Minister of Post and Telecommunications signed a Spectrum Management & Telecommunication Regulatory Agreement with ADTI Liberia Inc. on 26 February 2005, empowering the firm with a wide range of regulatory functions, including spectrum allocation and monitoring, price and mobile telephone regulation, licensing of all radio and television Broadcasting stations, etc without following any transparent competitive bidding process. The agreement was also signed by the Acting Minister of Finance, Solicitor General and Acting Minister of Justice and was approved by the Vice Chairman as Acting Chairman of the NTGL, since the Chairman was away on a county visit.

Interestingly, the agreement was cancelled in late April on the ground that Chairman had not seen the contract and Minister of Justice also felt that he had not examined the contract.

**WAMCO Contract**

In the interim report submitted in March 2005, the panel reported on the WAMCO contract, signed by the Minister of Lands and Mines Jonathan Mason, giving a monopoly over the purchase of diamonds to WAMCO without following any transparent competitive tendering process. Though the agreement had been signed on 19th January 2005 by the Minister of Lands and Mines along with the Acting Minister of Finance, Chairman of National Investment Commission, Minister of Justice and approved by the Vice Chairman as Acting Chairman of the NTGL, the Minister of Lands and Mines in his meeting with the Panel on 15th March, vehemently and repeatedly denied the existence of the Contract even though in a meeting a week earlier (9 March 2005), the Chairman of NIC had confirmed having signed the contract in January 2005.

Interestingly, Minister of Finance told the Panel, in one of the meetings in early May, that the panel should inform the international community that he had not signed the contract but his deputy had signed it on his behalf. Therefore, he had no responsibility.

**LTC case**

In yet another case, though the bids were called for submission from the suitable international firms for revitalization and modernization of the Liberian Telecommunications Corporation, the recommendation of the bidding committee constituted by the Chairman of the NTGL himself for award of the contract to a particular bidder, Universal telephone Exchange, was not accepted by the Chairman after keeping the proposal hanging for several months. Interestingly, the LTC bidding committee had publicly declared UTE the winner in early February 2005, which was hotly contested by the other bidder, Infotel.

A close scrutiny of the bid document revealed that the entire problem lay in the document "Application for submission of the bids" which was not prepared professionally, leading to ambiguous interpretations, which elevated a bidder, who did not have a good credit rating.

All these incidents have undermined the credibility of the transitional Government of Liberia. None of the Ministers carry any credibility with the general population. It is widely believed that since none of the senior functionaries of the NTGL can contest the forthcoming elections, they are trying to indulge in activities, which are more beneficial to themselves than to general public.

S/2005/360

## Annex IX

### Alleged e-mails from Charles Taylor as reprinted in Liberian newspaper



I have intelligence that those guys are claiming that they have, in their possession credible sources linking me to a plan to eliminate Blah, Browne, Nagbe, and Snowe and all....

Jewel, I intended calling you on this issue, but lately realized that your phone conversation was linked to Snowe, moreover, calls are easily traced; however I will continuously channel information to you via e-mail. Please make sure my dear, that you alone should have access to your mail box.

Finally, I will be mailing you an important message, which will be an attachment. Make sure to access your mail constantly. For Snowe, I owe you a brief explanation, I have perceived copy of the hand written complaint forwarded to the police station by Snowe through Faxes. Faxes is actually doing well, he is on top of information. Please advise your son not to move about at night alone. Here you received the stuff from Lone Star? Please let me know....

Thanks

Dr. Charles G. Taylor

Do you Yahoo!?
Yahoo! Mail - Helps

13

S/2005/360

Yahoo! Mail - [illegible]

YAHOO! MAIL

[illegible]

This message is not flagged. [ Flag Message - Mark as Unread ]

Date: [illegible] Feb 2005 [illegible]

From: "Dr. Charles Taylor" [illegible]

Subject: I [illegible] in LIBERIA.

To: [illegible]

cc: [illegible]

Jewel,

I received the result from the meeting you people held regarding the [illegible] [illegible] Goodridge did also inform me [illegible] that you guys are working on the report, which was requested by NSA and that you people are also seeking my input in this direction. [illegible] the European Parliamentarians [illegible] to be taken to Sierra Leone has brought a complete setback to the process. My Lawyers and I have spent the rest of the days strategizing ways to handle the matter.

However, I will send you my input this weekend through e-mail, [illegible] you are going to forward your report to the NSA, regarding [illegible] on Monday. I received call that [illegible] from [illegible] to the Capitol and was seen at the [illegible] Clinic in [illegible] friday afternoon. I learned that he is also sick, maybe from the threatening [illegible] he has received, which took him to Nimba to consult with his people.

Jewel, my regards to Goodridge for mailing me yesterday information. I'm going to fully support his newspaper as requested. Please negotiate USD 20,000 check for him from the funds deposited at the Global Bank, Do this as soon as possible and expect my input tomorrow. Again, make sure to secure your box and let no one dig out our information for it's our life. Always warn that [illegible] girl to be [illegible] minded and discreet enough to [illegible] because it's not prudent to have you in a public cafe, knowing that you might draw attention.

Please let me know the present security situation in Liberia. Keep away from calling me.

Cordially,

Dr. Charles G. Taylor.

Do you Yahoo!?
Yahoo! Mail - Helps protect you from nasty viruses.

Delete | Reply | Forward | Spam | Move...

Previous | Next | Back to Messages

Save Message Text

Yahoo! Mail - jewelatmonrovia@yahoo.com

message is not flagged. [ Flag Message - Mark as Unread ]

Date: Tue, 22 Feb 2005 08:54:56 -0800 (PST)

From: "Dr. Charles Taylor" <crolyatselrahc@yahoo.com> Add to Address Book

Subject: Daily contact.

To: jewelatmonrovia@yahoo.com

Jewel,

I just received a ~~telephone call from Goodridge this~~ morning concerning his paper story last week friday, "The Liberian Dispora", that Death Squard Allegation Nonsense.

Please send me the Newspapers, and collect the money from Lone Star, the amount of USD$300.000(Three Hundred Thousand United States Dollars), and 50% of the funding should be deposited at the newly Global Bank Liberia Limited, the balance 50% should be use at White Flower. I have finally talk to Chez Republic to take over your house so that you will tranfer to White Flower..

Jewel, any clandestine plot will not be allow now, eyes on us, concerning the elimination of certain stalwarts. Meet Goodridge urgently for discussion. What was Snowe doing at Urey office today, call Foxes to tell me.. Take care.

Cordially,

Dr. Charles G. Taylor.