# EXHIBIT D
# HENRIES OPINION

# GEORGE E. HENRIES
Counsellor-at-Law
Liberian Law Consultant

1

704 Plaza Drive
Woodbridge, NJ 07095

Telephone: (732) 602-7887
Telefax: (732) 602-9499
E-Mail: attyghenries@aol.com

June 29, 2005

Sidley Austin Brown & Wood LLP
1501 K Street, N.W.
Washington, D.C. 20005

**Re: Global Steel Holdings, Ltd. –Liberian Contract Law**

Dear Sirs:

You have requested a legal opinion on issues of Liberian contract law with respect to a Mineral Development Agreement among Global Steel Holdings, Ltd., previously known as Global Infrastructure Holdings Ltd. ("GIHL"), Liberia Global Mining Company ("LGMC") and the Government of Liberia ("GOL"). The main issue is whether under Liberian law, after reviewing the documents listed below and the acts of the parties to a negotiated and concluded, though unsigned and unratified, agreement, one could reasonably conclude that the agreement in question is binding and enforceable. I am a Liberian lawyer licensed to practice in Liberia and I am qualified to give this opinion. I am a graduate of the Cornell Law School, Ithaca, New York with a J.D. degree and I am the senior partner of the Henries Law Firm in Monrovia, Liberia. I have served as Solicitor General, Attorney General of Liberia and Associate Justice of the Supreme Court of Liberia. I am a foreign law consultant in the State of New Jersey. On many occasions I have been asked to opine on matters of Liberian law.

In giving this opinion, I have examined copies of the following documents:

(a) A Memorandum of Understanding ("MOU") among GOL, the Liberian Mining Company ("LIMINCO"), GIHL and Provider Limited ("Provider") dated 28th November, 2003;

(b) A letter dated October 4, 2004 from the Inter-Ministerial Mineral Technical Committee addressed to the Minister of Finance and Chairman of the Board of Directors of LIMINCO submitting for the Board's review and consideration the final negotiated Mineral Development Joint Venture Agreement among GOL, GIHL and LGMC granting iron ore mining rights over the former LAMCO concession areas in Nimba and Grand Bassa Counties of Liberia;

(c) The Mineral Development Agreement (the "MDA");

(d) The Articles of Incorporation of Liberia Global Mining Company dated 5th

October 2004;

(e) A letter from the Chairman of the Inter-Ministerial Mineral Technical Committee, dated October 8, 2004, informing Provider that negotiations on the MDA had been successfully concluded and sent to the Board for approval;

(f) A letter from the Inter-Ministerial Mineral Technical Committee dated October 14, 2004 summarizing the steps taken by that Committee leading up to the submission of the final draft of the MDA, and informing the LIMINCO Board of Directors that the Acting Minister of Lands, Mines & Energy had been instructed to stop further negotiations in respect of the LAMCO concession area on the ground that the project should be more widely advertised in the local and foreign media;

(g) Two letters from the Chairman of the National Investment Commission, addressed to GIHL and LGMC: the first, dated October 14, 2004 informing them of GOL's "approval and consent" of the MDA and stating that this approval and authorization constitute permission for GIHL to proceed to perform the works and obligations of the draft agreement pending formal signing of the MDA; and the second, dated December 15, 2004 re-affirming GOL's "approval and consent" of the MDA;

(h) A letter from the Minister of Lands, Mines & Energy, dated December 22, 2004 stating that GIHL had complied with the new Mineral and Mining Law in relation to the LIMINCO Project and requesting that GIHL submit its original proposal together with a progress report for the mere purpose of public awareness law since awarding of the MDA will be based on such compliance; and

(i) GIHL's letter of 30th December 2004, submitting its Progress Report, including details of expenditures incurred by GIHL subsequent to finalization of the MDA and registration of the Concessionaire.

In such examination I have assumed the genuineness of all signatures, and the conformity with the original documents of all documents submitted to us as copies.

In connection with the foregoing, I have also examined such laws, regulations and enactments of the Republic of Liberia as I have deemed relevant and necessary as a basis for the opinion hereinafter expressed. No opinion is expressed as to any country's laws other than the laws of Liberia.

Subject to the foregoing, it is my opinion that:

1. Under Liberian law, lack of signature and ratification does not automatically or invariably preclude the conclusion that a contract is valid, binding and enforceable. To the contrary, the doctrines of part performance and estoppel can lead to

the conclusion, under Liberian law, that an unsigned and unratified contract is in fact binding and enforceable on the parties thereto.

2. One important issue relates to the authority of those who enter into, or induce reliance on and performance of a contract on behalf of the Government. The government officials who either negotiated the MDA or signed the various documents pertaining to the granting of mining rights to GIHL in the Nimba Range included the Ministers of Lands & Mines, Finance, Justice, the Board of Directors of LIMINCO, the Chairman of the National Investment Commission, the Inter-Ministerial Technical Committee which was composed of officials of several Government Ministries. All of these officials, by virtue of their positions in the various Ministries and their participation on the committee to investigate and negotiate a concession agreement, had actual authority to act on behalf of the Government. If, for any reason, they lacked such authority they certainly had apparent authority because they held themselves out as having such authority to act for and on behalf of the Government in the negotiations, and GIHL in good faith relied on such appearance, so that GIHL would be prejudiced if the facts were shown to be otherwise. In Merzaric, Scanship v Kamal, 34 Liberian Law Reports ("L.L.R.") 316 (1987), the Supreme Court held that an agency may be created by estoppel insofar as third persons are concerned in that it may arise from acts and appearances which lead third persons to believe that it has been created.

3. Given the fact that under Sections 3.1 – 3.3 of the Mining Law the Minister of Lands, Mines & Energy is responsible for administering the Mining Law, has the authority to conduct investigations to ensure compliance with the law, and that under Sections 3.4 and 3.5 of the Mining Law the Technical Committee is composed of representatives of the Ministries of Lands, Mines & Energy, Justice, Finance, Planning & Economic Affairs, Labor, the National Investment Commission, the Council of Economic Advisors to the President and the Central Bank of Liberia and is empowered to negotiate and conclude mineral development agreements which they did in compliance with the Mining Law, under the doctrine of estoppel the Government is precluded from repudiating its own acts and, in Clarke v Minister of Finance and the Minister of Justice, 32 L.L.R. 464 (1984), the Liberian Supreme Court held that under the doctrine of estoppel, personnel of the same agency are estopped from attacking the authority of their colleagues of similar rank.

4. On the doctrine of estoppel, the Liberian Supreme Court in Cooper v Compagnie Francaise de L"Afrique Occidentale (C.F.A.O.), 20 L.L.R. 554 (1972), held that though an agreement may be otherwise invalid, a party or one in privity with him, will be estopped from denying the validity of that agreement when he is the maker of the instrument involved or has accepted benefits thereunder. Here there is evidence not only that the Government had benefited from the performance of the other party (GIHL), but also that the Government itself performed obligations under the MDA, such as incorporating LGMC to serve

as concessionaire. Thus those who are privy to or participants in the negotiations of the MDA can, under Liberian law, be estopped from attacking its validity because of a lack of signature or otherwise.

5. As to the issue of part performance, several of the listed documents that I reviewed stated that GIHL had complied fully with the law, that the agreement had been approved and even authorized GIHL to proceed with the performance of work envisaged in the unsigned MDA. GIHL apparently did begin performing as evidenced by the activities described in the Progress Report, involving expenditures of hundreds of thousands of dollars. Where a party in reliance on a contract, and particularly in reliance on the representation and inducement of those with actual and apparent authority, performs his part, the counter-party must be equitably estopped from contesting the validity of that contract whether on grounds of lack of signature or otherwise. It would be a fraud upon him to allow the other party to repudiate the contract by invoking any requirement that the contract be signed by the party to be charged (such as the statute of frauds), and the party who has performed should be entitled to an equitable remedy. Montgomery-Trays v Stella Montgomery, et al., 18 L.L.R. 202 (1967).

6. The method of concluding the MDA and granting a concession was followed as provided in the Section 6.2 of the Liberian General Business Law, Liberian Codes Revised, Vol. III, page 734. The only requirements not satisfied are the signing and ratification of the MDA.

7. Given the facts and circumstances and the law, it is my opinion that there are compelling arguments under applicable standards of Liberian law that the MDA, though unsigned and unratified, is valid, binding and enforceable.

Very truly yours,

George E. Henries